

# RESPONSE TEAM REPORT

## In the Matter of the Misconduct of Commissioner Brad Molnar

## May 1, 2026

Montana Department of Public Service Regulation

# 1. Introduction

This Department of Public Service Regulation (DPSR or Department) Response Team Report addresses misconduct of Public Service Commissioner Brad Molnar from February 2025 through April 2026. It does not purport to capture all allegations or instances of his misconduct, nor all the details associated with the misconduct addressed by this report. Misconduct as used in this report refers to consequential violations of 2.1 through 2.13 of the DPSR Code of Conduct Policy.

Detailed accounts of several allegations and the related investigation are captured in two reports conducted by an Independent Investigator. The first phase of the investigation was conducted June-August 2025 based upon three reports of misconduct submitted to the Response Team by three individuals between May and July 2025. A second phase of the investigation was conducted October-December 2025 based on three additional reports by three different individuals in September 2025.

A seventh report, alleging retaliation, was received from one of the original complainants in late October 2025. Due to its timing, this latter complaint was not included in the Independent Investigation, but key findings associated with it were produced by separate governmental entities and served to inform the Response Team's findings. Additionally, this report notes attempts of Commission officers to directly address several other instances of misconduct with Commissioner Molnar for months.

Together with this Introduction, the Response Team Report is comprised of seven sections:

**Section 1 (page 1):** Introduction

**Section 2 (page 2):** Measures implemented to protect process integrity (independent investigator, confidentiality controls, witness non-communication, and anti-retaliation measures).

**Section 3 (page 4):** Due process provided to Commissioner Molnar (notice, training and warnings, opportunities to participate, public meetings, and judicial review).

**Section 4 (page 6):** Background underlying the need for and authorization of the Code of Conduct including legislative audit recommendations, and comprehensive agency reforms.

**Section 5 (page 8):** Timeline of key events beginning with new commissioner orientation (November 2024) through multiple complaints, independent investigation, and attempted corrective measures spanning Commissioner Molnar's term on the Commission (2025-26).

**Section 6 (page 15):** Findings (independent and internal) confirm that Commissioner Molnar committed serious, repeated violations of agency policies and state law. Additionally, his obstruction and retaliation resulted in organizational harm and increased costs. His lack of accountability continues to expose the agency and the State to high risk of further misconduct.

**Section 7 (page 25):** The report concludes with recommended corrective and disciplinary measures to prevent risk of further misconduct and demonstrate accountability. These measures include remote work requirements, acknowledgment and apology, compliance commitments, remedial training and testing, restitution of direct costs, potential suspension, and probationary monitoring.

# 2. Measures to Protect Integrity of the Process

## 2.1 Process Integrity Overview

The Response Team implemented multiple safeguards to ensure the investigation was **fair, unbiased, confidential, and legally compliant**. These included:

- Independent, external investigation;
- Witness non-communication rules;
- Strict confidentiality protecting individual privacy rights;
- Confidential handling of all records;
- Anti-retaliation protections; and
- Escalation to the Governor to stop active interference and retaliation.

## 2.2 Independent External Investigation

To avoid internal bias and **ensure fairness to both President Molnar and the complainants**, the Response Team hired an outside investigator.

**Purpose:**

- Prevent conflicts of interest within Public Service Commission (PSC) leadership;
- Ensure neutrality when allegations involve the agency's highest-ranking official; and
- Protect the credibility of the findings.

## 2.3 Witness Non-Communication Requirement

Witnesses were instructed **not to discuss the allegations** with one another during the investigation.

**Purpose:**

- Prevent witness contamination;
- Avoid coordinated stories or unintentional influence; and
- Preserve the accuracy of testimony.

## 2.4 Confidentiality Requirements for Response Team Members

Members of the Response Team - including management and legal counsel - were **prohibited from discussing case details** outside authorized channels.

**Purpose:**

- Protect complainants from retaliation;
- Protect Commissioner Molnar from premature public accusations;
- Maintain the integrity of the investigative process; and
- Comply with Montana Administrative Rules on personnel matters.

## 2.5 Confidential Handling of Complaints and Records

All workplace-conduct complaints and disciplinary records were kept **separate from personnel files** and treated as confidential.

**Purpose:**

- Prevent public disclosure of unverified allegations;
- Protect all parties from reputational harm; and
- Encourage staff to report concerns without fear.

## 2.6 Anti-Retaliation Safeguards

The accused and complainants were repeatedly informed that **retaliation is illegal**, and the Response Team took steps to prevent it.

**Purpose:**

- Ensure complainants could participate safely;
- Prevent intimidation or coercion; and
- Maintain compliance with state law.

## 2.7 Administrative Leave was Sought

Because the allegations involved the then-**President of the Commission**, internal authority was limited. The Response Team escalated the matter to the Governor **only after**:

- President Molnar rejected Response Team warnings about his misconduct and retaliatory actions;
- President Molnar interfered in the investigative process;
- Retaliation against employees was substantiated by an Independent Investigation; and
- The Response Team anticipated ongoing risk.

**Purpose:**

- Ensure due process;
- Protect staff from ongoing retaliation; and
- Follow requirements for handling misconduct.

# 3. Due Process

The DPSR's Internal Policy Manual (IPM) outlines a formal process the Department must follow when receiving, investigating, and responding to reports of harassment, discrimination, retaliation, or violations of the Code of Conduct. The following summarizes the due process, and other process, afforded to Commissioner Molnar under these requirements.

## 3.1 Required Procedures Under DPSR Policy

- The IPM requires DPSR to **receive, investigate, and respond** to reports of harassment, discrimination, retaliation, or Code of Conduct violations.
  *(Code of Conduct Policy, Sec. 2.15.1.)*
- Investigations must follow **ARM 2.21.4020 and 2.21.4021**.
  *(Code of Conduct Policy Sec. 2.16.1.2.)*

## 3.2 Training, Counseling, and Warnings

- Commissioner-Elect Molnar received an orientation to and **hard copy of the IPM** and was instructed to review the Code of Conduct prior to his inauguration.
- He received **training on internal policies, agency head and commissioner obligations, and Equal Employment Opportunity Commission (EEOC) laws**.
- Agency managers **counseled him directly** on multiple occasions to stop making unwelcome sex-based remarks in the workplace.
- After misconduct was reported, Commissioner Molnar received **three subsequent written warnings** regarding retaliation.

## 3.3 Notice of Complaints and Investigation

- Commissioner Molnar was **informed in writing** that reports about his conduct had been submitted to the Response Team and were under independent review.
- Before Commissioner Molnar hired an attorney to represent him, the former chair of the Response Team spent significant time answering the Commissioner's questions regarding the Code of Conduct and the Response Team process.
- Commissioner Molnar received **periodic written updates** on the status of the investigation.
- Once the investigation was complete, he received written notification about the outcome of the investigation.

- On April 28, 2026, he received advanced notice of tentative Commission action scheduled for May 6, 2026.
- On May 1, 2026, all Commissioners, including Commissioner Molnar, received copies of this Response Team Report and the confidential, redacted Investigation Reports.

## 3.4 Measures to Protect Process Integrity and Confidentiality

Refer to Section 2.

## 3.5 Opportunity to Participate and Respond

Commissioner Molnar was **repeatedly invited** to interview with independent investigators in both phases of the investigation to learn about and respond to the allegations, but he **declined to participate**.

- On June 20, 2025, in conversation with the Response Team chair, Commissioner Molnar was told that he could participate with the independent review in writing, in person, or over the phone, as he preferred. He was also told that he could have his attorney present with him during conversations with the independent reviewer.

- Commissioner Molnar was initially invited to interview with CMS on Tuesday, July 29, 2025. Through his attorney, he was told that he "will have a chance to respond to specific allegations during his interview and, if he later feels that he has additional information to share or wants to elaborate on any answers he provided, CMS can meet with him again or he can provide written information for the investigator's consideration."

- On July 29, 2025, Commissioner Molnar's counsel was asked to confirm if he has decided to decline an interview with CMS. He was told that if he declines to participate, "the investigation will proceed to its completion without the benefit of his participation or responses to questions. If there is a possibility that Commissioner Molnar will participate in an interview, we can discuss the other items you mentioned in your email from yesterday morning." He was also told that his request to record the interview was not rejected and could be discussed further.

- On August 1, 2025, Commissioner Molnar's attorney communicated that the Commissioner will not participate in the investigation based on his disagreement with the authority for the investigation being the Commission's adopted Internal Policy Manual, Code of Conduct Policy.

- In a letter to Commissioner Molnar's attorney on October 23, 2025, Molnar was told: "You will have the opportunity for an interview with the investigator, at which time you will receive additional information about the specific allegations and be provided the opportunity to respond to them."

- On November, 5, 2025, Commissioner Molnar, through his attorney, was invited to meet with CMS on either November 12 or 17, 2025.

- On November 10, 2025, Commissioner Molnar, again, declined to participate in an interview under the current process.

## 3.6 Public Process and Commission Participation

- Commissioner Molnar was permitted to:
  - **Call a public meeting** to consider Response Team action in his case;
  - **Participate as a seated Commissioner**; and
  - **Debate and vote** on whether to rescind the Response Team's request for his temporary suspension
- He has been allowed to **continue serving on the Commission** throughout the review.
- He and other commissioners were given **early notice** eight days in advance of the meeting in which the Response Team Report and Recommendations would be considered by the Commission.
- He has retained his **full voting authority** while the Commission considers the investigation results and Response Team recommendations.

## 3.7 Judicial Review

- Brad Molnar, in his individual capacity through counsel, **challenged the Response Team process in court**.
- After hearing and assessing the parties' arguments, the Court ultimately **ruled against him and** allowed the process to continue.

## 3.8 Role of the Response Team in Remedial Actions

The Response Team, and agency managers in general, have and will continue to provide guidance, oversight, and direction as needed to support Commissioner Molnar in successfully avoiding additional misconduct and completing approved remedial and/or disciplinary recommendations.

# 4. Background Underlying Code of Conduct

## 4.1 Financial Compliance Audit of DPSR/PSC (2021):

- Audit identifies **organizational challenges**, including Commissioners overriding internal controls.

- **Legislative Audit Division Recommendation #1:**
  - Leadership must comply with all internal policies.

- o Leadership must develop and implement a comprehensive plan to improve department culture.

## 4.2 Strategic Planning Reforms (2021–2022)

- January 2021: PSC launches an intensive strategic planning effort to improve operations, performance, culture, and public reputation.

- August 30, 2022: After 18 months, 14 public meetings, and extensive stakeholder input, the Commission adopts the Strategic Plan unanimously (5–0).

- The Strategic Plan establishes five major goals:

  1. Improve Organizational Structure;

  2. Improve Centralized Services Fiscal Performance;

  3. Improve Internal Policies and Controls;

  4. Increase Regulatory Effectiveness; and

  5. Provide Beneficial Public Policy Solutions.

## 4.3 2022: Executive Director Position Created

- Commission creates and fills an **Executive Director** role as part of reform efforts identified through Strategic Planning.

- Responsibilities include:

  - o Workload balance and productivity;

  - o Budget management;

  - o Audit compliance;

  - o External affairs;

  - o Internal policy compliance; and

  - o Oversight of Commissioner resource use

## 4.4 2023–2024: Overhaul of Internal Policies

Full review and modernization of internal policies as key part of agency reform efforts.

- Creation of a comprehensive **Internal Policy Manual** (IPM) aligned with statutes, state policies, and the Strategic Plan.

- Policy development team includes legal counsel, administrators, internal auditor, and commissioners.

- **May 2023–September 2024:** Policies adopted in tranches after public posting, informational meetings, and formal Commission votes.

- The Commission held approximately **13 public meetings** and took **20 approval actions** to finalize the IPM.

- The IPM **Administration Policy** establishes the Department's updated organizational structure and chain of command.

## 4.5 January 2024: Performance Audit

- Legislative Audit Division publishes *Reinforcing Organizational Improvements in Public Service Regulation*.

- Audit acknowledges progress and **recommends**:

  o Further defining the **Commissioner Code of Conduct**

  o Providing **ongoing training**

## 4.6 August 2024: Code of Conduct Adopted

- Commission formally adopts the **Code of Conduct Policy** and incorporates it into the IPM.

- The Code of Conduct explicitly applies to all department personnel (Commissioners and staff), without exception.

- The Code of Conduct establishes:

  o Behavioral standards;

  o Processes for addressing misconduct; and

  o Expectations for professionalism and civility.

# 5. Timeline of Key Events

5.1 November 14, 2024: Commissioner Orientation & IPM Training

- Commissioner-Elects receive orientation training on the Strategic Plan and Internal Policy Manual (IPM). Six key policies emphasized:

  o Administration;

  o Commission Proceedings;

  o Code of Conduct;

- o   Communications;

- o   Personnel Schedule; and

- o   Procurement.

- Attendees included Commissioner-Elects Molnar and Welborn, outgoing Commission President James Brown, and Vice President Jennifer Fielder (training lead).

- New commissioners received hard copies of the IPM and were asked to review key policies and sign the IPM Acknowledgment Form by **January 2025**.

## 5.2 January 2025: Commissioner Brad Molnar Is Inaugurated and Selected as Commission President

- The Commission votes unanimously to select newly elected Commissioner Brad Molnar as the PSC President.

## 5.3 February–April 2025: Early Attempts to Address President Molnar's Behavior

- Agency managers begin informally counseling Molnar regarding reports and observations of inappropriate, unwelcome sex-based comments and disrespectful treatment of staff.

- Former DPSR Chief Legal Counsel and Vice President Fielder jointly review EEOC laws with Molnar to try to stop continuation of sex-based comments.

- Molnar refuses to sign the IPM Acknowledgment Form, asserting policies do not apply to Commissioners.

- Molnar is again asked to review and acknowledge the IPM. When reminded of this requirement, he threatens to put it on the next Commission meeting agenda and "blow things up in a grand fashion." (*email Molnar to Fielder and Lake, April 9, 2025*)

- Trainings are developed to benefit Commissioners and staff on conduct-related topics

## 5.4 March–July 2025: Agency-Wide Trainings Provided

- 4-Mar-25       Internal Policy Manual

- 25-Mar-25      Prejudice and Bias

- 8-Apr-25       Agency Head and Commission Roles

- 25-Jul-25      State of Montana Ethics

- 25-Jul-25      State of Montana EEO

## 5.5 May–July 2025: First Round of Misconduct Reports

- Formal complaints about President Molnar's conduct trigger Response Team review.

- Response Team follows IPM Code of Conduct Section 2.15 procedures.

- Internal Staff and State HR are unavailable to investigate; Communications & Management Services (CMS) is selected as the independent investigator.

- Upon notification, Molnar retains legal counsel and declines to cooperate with the investigation.

## 5.6 June 2025: Independent Investigator Requires Legal Oversight

- Mont. Admin. R. 2.21.4020(4)(b) requires than the investigator shall "coordinate with the agency's legal counsel before conducting interviews and throughout the investigation."

- CMS will not proceed without specialized legal counsel due to requirements for the investigatory process and Molnar's refusal to cooperate.

- Due to recusal of two Department attorneys, as well as the State Department of Administration's unavailability, the Response Team determines that outside legal counsel is necessary to provide legal advice on the investigatory process. The Response Team conducted a limited solicitation and obtained verbal quotes from at least three attorneys. The Response Team selected attorney Amy Christensen, based on her availability, reduced government rate, and expertise in state government Human Resources law.

## 5.7 Summer 2025: Interference In the Investigation and Response Team Process

Documented interference with the Response Team process from Commissioner Molnar included:

- **Threatened retaliation:** Commissioner Molnar stated he would "take down" whoever had brought the complaints.

- **Retaliatory statements:** Disparaging and defamatory public and private remarks about complainants, Response Team members, and independent counsel.

- **Attempts to obstruct the investigation:**

  - Threatening to withhold payment to investigator and legal counsel

  - Attempting to negate contracts and block staff from advising the Commission

  - Denying payment for investigative services

  - Pressuring department personnel for confidential information

- o Retaliating against Response Team members

- o Two Response Team members recused themselves. The remaining Response Team members select Vice President Fielder to fill the vacant Chairmanship.

## 5.8 August 15, 2025: Administrative Leave (via Temporary Suspension) Sought

During the Response Team meeting on August 15, 2025, then-President Molnar's interference in the Response Team process, combined with confirmation from the independent investigator of retaliation toward staff, resulted in a Response Team decision to ask the Governor to temporarily suspend Commissioner Molnar for administrative leave purposes during the pendency of the investigation.

- Initial Investigation Report Reviewed; Pattern of Obstruction and Retaliation Confirmed

- Response Team recognizes management is obligated to act quickly due to ongoing harm; determines administrative leave is necessary.

- Governor holds sole authority to suspend a commissioner; Communication to the Commission limited due to confidentiality requirements and pendency of complete report.

- Response Team begins drafting request to governor asking that Molnar be placed on temporary administrative leave. The letter is finalized and sent, with supplemental exhibits, to the Governor on August 20, 2025.

## 5.9 August–October 2025: Additional Misconduct & Retaliation

- Managers receive further reports of alarming behavior and workplace safety concerns.

- Three additional formal complaints alleging retaliation received.

- Department personnel alter schedules and work locations to avoid perceived danger.

- On-site security measures increased.

- CMS engaged to investigate additional misconduct reports.

## 5.10 September 2–3, 2025: Public Commission Meetings

### 5.10.1 Privacy Waivers

- During two public Commission meetings Commissioner Molnar announced that he waives his privacy rights, and in statements to the media, Commissioner Molnar voluntarily identified himself as the subject of an ongoing investigation.

- Commissioner Bukacek partially waived her privacy interest during the Commission's September 3, 2025, public work session. She disclosed that she made a complaint about statements Commissioner Molnar made about her "in a scheduling meeting that were mischaracterization, misrepresentation, and blatantly untrue."

- Commissioner Bukacek also partially waives her privacy interest regarding her complaint that Commission Molnar's COPP complaint against her, as well as and his unsupported witness statements provided in support of a Medical Board complaint against her, were retaliatory actions.

## 5.10.2 Commission Hears Public Comment, Debates, and Declines to Rescind Suspension Request

On September 3, 2025, then-President Molnar convened a public work session seeking to rescind the request for his suspension:

- Extensive public comment is heard, including from staff who ask Molnar to accept accountability for his behavior and cooperate with the investigation.

- Commissioners debate due process, retaliation, confidentiality, and policy.

- Nature of complaints generally discussed:

  - Violations of the PSC Code of Conduct

  - Behavior creating a hostile or unsafe work environment

  - Administrative Rules of Montana - Sexual harassment

  - Administrative Rules of Montana - Retaliation

- President Molnar denies misconduct and interference and moves to recall the Response Team's request for his administrative leave.

- President Molnar's Motion fails. The Commission sustains Response Team's August 20, 2025 letter to the Governor seeking temporary suspension of Commissioner Molnar during pendency of the case.

## 5.11 September–October 2025: Legal Action

- Brad Molnar, in his individual capacity, files legal action against the Response Team Chair and Governor on September 4, 2025, to stop consideration of his suspension.

- Molnar argues the Response Team's request for his temporary suspension is invalid, and claims it is a ploy to remove him from an important PSC regulatory matter.

- The Court issues a temporary restraining order.

- The Department hires outside counsel to defend Response Team process, pursuant to its statutory duty (Mont. Code Ann. § 2-9-305) to defend and indemnify public officers who are civilly sued for their actions taken within the course and scope of their employment.

- Court denies Molnar's motion for preliminary injunction on October 10,2025, stating:

  - All factors favor the Response Team Chair;
  - The Commission has authority to establish Internal Policies;
  - The Response Team complaint to the Governor is valid;
  - Molnar's claims about a nexus to PSC regulatory matters are purely speculative;
  - State law authorizes the Governor to receive and act on complaints; and
  - The Governor has a duty to investigate whether good cause exists for suspension.

## 5.12 October–December 2025: Molnar Removed as President; Conduct Issues and Investigation Continue

- On October 21, 2025, Commissioner Bukacek moves to remove Molnar as Commission President. Commissioner Bukacek's motion passes.

- On October 28, 2025 Commissioner Welborn is elected as the new Commission President and begins attempting to internally address  new matters of misconduct with Commissioner Molnar through conversations, emails, and formal memorandums.

- CMS investigates new reports relating to retaliation.

- On October 29, 2025, Commissioner Molnar files ethics complaint against Commissioner Bukacek with the Commissioner of Political Practices (COPP).

- Through counsel, Commissioner Molnar was given multiple opportunities to respond to the Governor regarding the Department's request for his temporary suspension.

## 5.13 December 2025: Governor Declines to Suspend Molnar;  COPP Rejects Molnar's Ethics Complaint

- On December 3, 2025, the COPP rejects Commissioner Molnar's ethics complaint against Commissioner Bukacek, noting Molnar's claims as speculative and unsupported by evidence.

- On December 26, 2025, Governor Gianforte declines to suspend Commissioner Molnar, as a form of administrative leave during the Response Team's work on the case, stating:

  - Molnar's removal from the presidency is sufficient to limit further interference in the investigation;

o   Statute permits Molnar to sit in judgement of his own case if the Commission considers disciplinary action;

o   The decision does not excuse the alleged conduct of Commissioner Molnar; and

o   The Commission can complete its investigation of his conduct and render a decision on its own using the tools available to it in its policy manual.

## 5.14 April 2025 – April 2026: Ongoing Misconduct Addressed on a Continual Basis

Over the past year, agency managers have directly notified Commissioner Molnar of significant breaches in required policies, to which he often  responded with refusal to comply or take corrective action. The documented breaches presented to Commissioner Molnar include, but are not limited to:

- Security Policy violations - including failures to follow established security protocols and requirements;

- Communications Policy violations - involving improper or unauthorized external communications;

- Administration Policy violations - including disregard for the established chain of command and administrative procedures;

- Confidential Information requirements - including unauthorized disclosure of confidential and attorney-client privileged information;

- Proceedings Policy violations - including failure to follow rules of order and procedural requirements during Commission proceedings; and

- Code of Conduct violations - documented instances of conduct inconsistent with required ethical and professional standards.

## 5.15 March–May 2026: Bukacek Cleared of Alleged Licensing Violations; Response Team Prepares Report and Recommendations

- On March 20, 2026, the Screening Panel of the MED - Board of Medical Examiners dismisses a complaint against Commissioner Bukacek. This complaint correlated with the COPP ethics complaint Commissioner Molnar filed, and as noted above was also rejected.

- Report and Recommendations are prepared and provided to the full Commission.

# 6. Response Team Findings

## 6.1 Finding #1: Independent Investigation Confirm Serious Misconduct

The independent investigation of reported misconduct by PSC Commissioner Brad Molnar substantiated multiple forms of policy violations, including:

- Unprofessional conduct toward staff;

- Repeated, unwelcome sex-based comments;

- Retaliation against complainants and other employees who were involved in the investigatory process;

- Misrepresenting colleagues and facts;

- Violation of MCA § 49-2-301—Retaliation Prohibited; and

- Violation of anti-retaliation standards set forth by the EEOC.

The Response Team concurs with the independent investigator's findings of misconduct and further finds complainants' accounts to be generally consistent with observed behavioral patterns of Commissioner Molnar. In addition, the Response Team has reason to believe that discrimination against a protected class, namely women, may have occurred.

## 6.2 Finding #2: Molnar Chose Non-Cooperation, Escalation, Obstruction, Diversion, and Retaliation Instead of Good Faith Efforts Toward Resolution

Commissioner Molnar declined to cooperate with the investigation and defied multiple explicit warnings about retaliatory actions. Rather than engage in good-faith efforts to address and resolve the initial allegations, Commissioner Molnar escalated the situation by immediately denying, denouncing, or dismissing the validity of the allegations; making disparaging and threatening statements to and about department personnel; disseminating misleading and false information to the public (including to the media, Governor, and Court) about the purpose of the investigation; and repeatedly attempting to obstruct the investigation and interfere in the Response Team process.

Commissioner Molnar chose to engage in a multitude of retaliatory, obstructive, and diversionary tactics, thereby turning a relatively simple, confidential HR matter into a public controversy of substantial cost, complexity, and severity.

## 6.3 Finding #3: The Prior Response Team's Letter to the Governor Requesting and Establishing Grounds for Administrative Leave Is Affirmed

The Response Team's membership has changed over the course of this matter due to personnel transitions. The current Response Team concurs that the prior Response Team's August 20, 2025 letter to the Governor - requesting that Commissioner Molnar be placed on Administrative Leave during the pendency of this matter - was clearly warranted. The grounds for the request as provided in the Response Team letter are affirmed. Had Commissioner Molnar been temporarily suspended at that time, his ability to continue harmful conduct would have been materially curtailed, the Response Team process likely would have concluded months earlier and at substantially lower cost, and adverse impacts to the workforce could have been avoided or mitigated.

## 6.4 Finding #4: The Independent Investigation Does Not Include All Misconduct

The independent investigation was constrained by time and cost and, therefore, does not capture all reported or observed instances of misconduct.

The first phase of the investigation examined three reports of alleged misconduct fielded by the Response Team from May to July 2025; a second investigation phase addressed three additional reports fielded in September and October 2025. A seventh report was made on October 30, 2025 with ensuing follow-ups in November 2025 and again as recently as March 2026. These accounts fell outside the date range of the investigation's contractual scope and therefore were not included in it. See Finding 5, which addresses the seventh report.

Additionally, agency management has documented and/or observed several other instances of conduct that materially violates applicable policies beyond the matters encompassed in the independent investigation. When such matters have been brought to Commissioner Molnar's attention with request for correction, he has often responded with belligerence and defiance.

The Response Team is also aware that some individuals indicated reluctance to report misconduct due to fear of retaliation from Commissioner Molnar, belief that the Response Team was overloaded, or because reporting it might not solve the problem or may even make matters worse. Therefore, the Response Team finds that not all instances of material misconduct have been reported, investigated, or addressed.

## 6.5 Finding #5: Additional Retaliation Confirmed; Bukacek Exonerated

As noted above, the Response Team received a seventh report of alleged misconduct on October 30, 2025, which came after the independent investigation's contractual scope had closed. This report alleged that Commissioner Molnar retaliated against Commissioner Bukacek after she participated in complaints about his conduct and voted to remove him as PSC President.

### 6.5.1 Summary of Key Allegations and Findings

The alleged retaliation in the seventh misconduct report consisted of two complaints filed against Bukacek:

- Licensing Complaint to the Montana Board of Medical Examiners (MED), and

- Ethics Complaint to the Commissioner of Political Practices (COPP).

Both complaints asserted that Bukacek used PSC facilities and equipment for her private medical practice and mishandled confidential or HIPAA-protected information. These allegations were broadcast by the COPP and Medical Board complainants in statewide media and/or social media.

Both governing bodies dismissed the complaints against Commissioner Bukacek, finding no evidence to support the allegations. The COPP described Commissioner Molnar's complaint against Commissioner Bukacek as speculative and unsupported. The timing of the filings and Molnar's own statements indicate that the complaints were likely retaliation.

**The Response Team finds that the allegations against Commissioner Bukacek lacked factual basis and fit a broader pattern of retaliatory behavior. Further detail follows.**

### 6.5.2 The MED Licensing Complaint:

The Licensing Complaint to the Board of Medical Examiners (Complaint No. 2025-MED-11783/Bukacek, Ann) was filed by Catherine 'Cat' Holley on October 24, 2025 (three days after Bukacek voted to unseat Molnar as Commission President and five days before Molnar filed a similar complaint with COPP). Holley alleged, "Dr. Annie Bukacek has been bringing her medical records from her practice from Kalispel MT to Helena PSC where she is a Commissioner using state taxpayer funded equipment to make these copies." Holley's complaint reports that the conduct began on February 2, 2025. The complaint listed only Commissioners Molnar and Pinocci as persons who may have evidence of the alleged conduct.

#### 6.5.2.1 Licensing Complaint Dismissed:

On March 24, 2026, the Montana Department of Labor and Industries sent a letter to Bukacek reading, "The Screening Panel of the MED - Board of Medical Examiners met on March 20,

2026. After considering the complaint, Bukacek's response to the complaint, and the staff's investigation, the Screening Panel voted to dismiss the complaint. The complaint is now closed."

### 6.5.3 The COPP Ethics Complaint:

In the COPP Ethics Complaint, dated October 29, 2025, Commissioner Molnar alleged that Commissioner Bukacek had been using Public Service Commission facilities, time, and equipment to conduct her private medical practice business rather than Commission work. Molnar states she had been bringing large quantities of private business documents into the office, using PSC copy rooms extensively for non-PSC purposes, and discarding confidential medical business materials (which he began collecting from an office recycling bin in April 2025). On one page, Molnar says, "During the legislative session she often was present for days at a time." On the next page he further claims Bukacek "is often in the office for only one or two hours per week (with no evidence of learning or preparation for subsequent meetings)." He alludes to potential HIPAA violations and directly alleges violation of Montana's ethics laws regarding use of public resources. These claims were unfounded.

#### 6.5.3.1 Ethics Complaint Rejected:

On December 3, 2025, the COPP rejected Molnar's ethics complaint against Bukacek, and issued a formal response letter to Molnar describing his principal claims against Bukacek as "pure speculation," noting that Molnar "inaccurately marked advertisements and scrap paper as "business correspondence," and "even if such a description were accurate, it would only indicate they had been disposed of."  The COPP concluded, "None of the facts provided [by Molnar] support a finding that Commissioner Bukacek "used public time, facilities, equipment, state letterhead, supplies, personnel, or funds for [her] business purposes in violation of MCA 2021-121."  No evidence has been provided that indicates Commissioner Bukacek copied medical records or other correspondence."

### 6.5.4 Direct quotes from the media coverage include:

- *Montana PSC Controversies Continue as Molnar Files Ethics Complaint on Bukacek*, Jonathon Ambarian, KTVH (Oct. 31, 2025), https://www.ktvh.com/news/montana-politics/montana-psc-controversies-continue-as-molnar-files-ethics-complaint-on-bukacek.

  o From Molnar's ethics complaint and interview about Bukacek: "In it, he claimed Bukacek, a doctor from Kalispell, frequently brought documents related to her practice to the PSC offices and worked on them in the PSC's copy room. He said he found discarded documents related to her work in the trash there."

  o On his attempt to route concerns through Fielder: "In his complaint, Molnar said he first found Bukacek's discarded papers in April, and that he asked PSC vice president

Commissioner Jennifer Fielder to talk to her about the issue 'since Commissioner Bukacek refuses to talk to me.'"

- On why he filed the complaint and whether it was retaliatory; *Public Service Commissioner Representing Flathead County Draws Commissioner of Political Practices Complaint*, Mariah Thomast, Flathead Beacon (Nov. 28, 2025), https://flatheadbeacon.com/2025/11/28/public-service-commissioner-representing-flathead-county-draws-commissioner-of-political-practices-complaint/:

  - "Molnar filed the complaint against Bukacek the next day, Oct. 29. He denied filing the complaint against Bukacek in retaliation for his ouster — though he admitted Bukacek has been a 'colossal pain' to him since mid-March."

  - "'I'm not a retaliatory guy. It just was a violation of federal and state law for the breach of confidentiality,' Molnar said, referring to the personal business-related documents he accused Bukacek of bringing to the PSC offices."

- *Montana PSC: Regulator Dismisses Molnar's Ethics Complaint Against Bukacek*, Jonathon Ambarian, KPAX-TV (Dec. 3, 2025), https://www.ktvh.com/news/montana-politics/montana-psc-regulator-dismisses-molnars-ethics-complaint-against-bukacek.

  - "MTN asked Molnar if there could have been another way to address this issue without making an ethics complaint. He said he had previously asked Fielder to talk to Bukacek about it, but felt there was no other alternative now because Bukacek wouldn't speak with him directly. "I've never tried to resolve things in the press or resolve things outside the commission," he said."

  - On the Commissioner of Political Practices' dismissal of his complaint (from KTVH summary of the COPP decision): "Montana's top political cop has rejected an ethics complaint filed by one member of the state Public Service Commission against another member."

## 6.5.5 Correlation Between MED & COPP Complaints:

In the Medical Board complaint, Holley, identified herself as an independent investigative journalist who received the reported violations regarding Bukacek from an unnamed source. Notably, Holley has made comment at Public Service Commission meetings and on social media indicating support of Commissioner Molnar and opposition to Commissioner Bukacek. In her Medical Licensing complaint, Holley makes the same allegations against Commissioner Bukacek that Molnar alleged his COPP complaint. Again, the Medical Board complaint lists only Commissioners Molnar and Pinocci as persons who may have evidence of the alleged conduct.

Holley's October 24, 2025 complaint to the Board of Medical Examiners was filed five days before Commissioner Molnar filed his COPP Ethics Complaint, in which he referred to discarded papers he collected from the DPSR office recycling bin as evidence that Bukacek had violated ethics laws and possibly HIPPA. The subject matter of Molnar's COPP complaint was publicized when the Daily Montanan ran a story on it the next day.

### 6.5.6 Conclusion Regarding Retaliation Against Bukacek:

Commissioner Molnar's allegations in his COPP complaint against Commissioner Bukacek lacked factual basis and were not supported. The Commissioner of Political Practices (COPP) declined to accept the complaint for further action, finding it "insufficiently supported" and noting that several allegations rested on speculation rather than evidence. Public reporting likewise reflects that the complaint arose in the context of ongoing internal conflict, including Commissioner Bukacek's role in the vote to remove Commissioner Molnar as PSC President and that the filing was perceived by some as retaliation. A strong correlation between the subject matter, evidence relied upon, and timing of Molnar's Ethics Complaint to COPP and Holley's Licensing Complaint to the Board of Medical Examiners suggests collusion occurred between Molnar and Holley.

Taken together, the COPP's response, the lack of corroborating evidence in the complaint, public statements by the parties, and the timing of the filing support the Response Team's finding that the complaints against Commissioner Bukacek do not provide a credible basis for concerns about her use of state resources. The Response Team concludes that these complaints form part of a pattern of retaliatory behavior by Commissioner Molnar against Department personnel who participated in the Response Team process or who took action to allow the Response Team process to continue.

## 6.6 Finding #6: Misconduct Has Been Pervasive Since February 2025

Formal and informal efforts to address Commissioner Molnar's workplace misconduct began in February 2025 -- the month after he joined the Commission -- and have continued to present time.

Over the last 11 months, the Response Team has received seven reports alleging a wide range of misconduct on the part of Commissioner Molnar, including repeated and unwelcome sex-based remarks; demeaning, disparaging, or hostile language toward staff; untruthful or misleading statements about coworkers and events; and behavior perceived as retaliatory toward individuals who raised concerns or participated in the Response Team process.

Beyond the allegations substantiated by the independent investigation, agency managers have observed many other improprieties and policy violations. Managers have attempted to address

some of these issues directly through a variety of means including frank conversations, written reminders, training, and multiple formal memoranda.

Collectively, the reports, investigation, and other observations reflect a sustained pattern of unprofessional, disruptive, policy-violating conduct -- not isolated or inadvertent behavior. Commissioner Molnar has shown little interest in acknowledging or correcting his misbehavior.

## 6.7 Finding #7: Molnar's Conduct Resulted in Organizational Harm and Costs

Commissioner Molnar's misconduct has caused significant and ongoing harm to state employees and has adversely impacted the department's ability to serve the public. His conduct has generated extraordinary workplace tension, disruption, and instability; consumed public funds; repeatedly diverted staff and commissioners from core duties; and damaged the reputation of the Commission, the agency, and several individuals.

An independent review of the initial allegations was projected to cost no more than $5,000 and conclude within two months. Instead, Commissioner Molnar's uncooperative and retaliatory actions generated additional complaints, extended this matter to approximately 11 months, and increased direct costs to more than $65,000.

In response to workplace litigation issues arising from his conduct, the agency retained three categories of outside services:

- CMS to conduct a follow-up workplace investigation.

  - CMS's workplan limited its scope to matters connected to the investigation and included witness interviews, review of documents and recordings, policy and legal analysis, and preparation of a comprehensive report for agency counsel resulting in fees of $22,749.

- Christensen & Prezeau PLLP to provide "Public Service Commission – Investigation Advice" in support of the Response Team and CMS.

  - Christensen Prezeau invoices reflect $17,577.91 in charges for work that included meetings with the Response Team, conferences with CMS, review of CMS materials and court orders, discovery-related work, and communications with counsel for Commissioner Molnar and the Governor.

- Boone Karlberg P.C. to defend Commissioner Fielder, who was sued by Molnar in her official capacity, for actions taken within the course and scope of her duties as a member of the DPSR Response Team, in *Brad Molnar v. Greg Gianforte and Jennifer Fielder*.

o    The Boone Karlberg engagement agreement confirms the litigation-related representation, resulting in payments of $24,703.75,

Agency payment records indicate that total payments under the relevant contracts were $65,030.66 in direct costs.

Commissioner Molnar's conduct has disrupted routine operations and caused changes to personnel schedules and work locations; necessitated increased security and management oversight; and contributed to the demoralization and loss of highly skilled public servants, thereby impairing the Department's ability to serve the public.

## 6.8 Finding #8:  Financial Impact of Policy Noncompliance

The entire cost of this case, including $65,000 in direct costs for required outside legal counsel and independent investigators (detailed in section 6.7), could have been completely avoided if Commissioner Molnar had followed fundamental policy requirements in the first place, and heeded management's subsequent repeated warnings to control his behavior in the second place.

## 6.9 Finding #9: This Case Is a Human Resource Issue and Is Not In Any Way Related To Past or Potential Outcomes in Regulatory Decision(s) Of The Public Service Commission

The allegations, investigation, findings, or recommendations associated with Commissioner Molnar's workplace misconduct are in no way motivated by a desire to affect the outcome of the Commission's regulatory decisions or of any person to move into the role of Commission President. Despite Commissioner Molnar having repeatedly made these assertions in the past, the facts demonstrate that there is no correlation between the Response Team process and anything but the agency's requirements to address workplace misconduct. Specifically, Commissioner Molnar previously asserted that the Response Team's August 20, 2025 request for his temporary suspension was precipitated by an attempt to remove him from Commission consideration of a proposed merger between NorthWestern Energy Group and Black Hills Corporation. When Montana's First Judicial District Court reviewed this assertion, the Court characterized Molnar's claims as "purely speculative" and found them unsupported by evidence. In fact, the process for addressing Commissioner Molnar's misconduct began months before any department personnel could have known about the proposed merger, and the Response Team's decision to request his suspension was made several days before the merger was announced. The Response Team process that followed to address Commissioner Molnar's misconduct was consistent with internal policies, the laws governing harassment and retaliation, and sound practices for public agencies.

## 6.10 Finding #10: Commissioner Molnar Poses a High Risk of Further Misconduct

Based on Commissioner Molnar's established pattern of inappropriate behavior, adversarial actions and statements, and refusal to acknowledge wrongdoing, the risk of continued misconduct and retaliation -- without appropriate corrective intervention -- is high.

## 6.11 Finding #11: Legal Authority and Obligation to Act

### 6.11.1 Authority of the PSC to Adopt and Apply Workplace Conduct Policies

MCA § 2-15-2601 established the Department of Public Service Regulation as a State of Montana executive branch department, and the Public Service Commission as the head of the department. MCA § 2-15-112 requires the Commission to:

(a) supervise, direct, account for, organize, plan, administer, and execute the functions vested in the department by this chapter or other law; and

(b) establish the policy to be followed by the department and employees.

### 6.11.2 Accountability of Commissioners

Multiple Legislative Audit Reports have emphasized the need for PSC commissioners to comply with department policies and for the Commission to adopt strong, enforceable standards of conduct applicable to commissioners. In response, the PSC undertook significant reform efforts beginning in 2021, resulting in the adoption of a Strategic Plan in 2022, and completion of a comprehensive Internal Policy Manual in 2024. The IPM includes a Code of Conduct Policy that expressly applies to all PSC personnel, including Commissioners. The IPM also includes an Acknowledgment Form requiring all department personnel to confirm that they have been informed of the IPM, that a copy has been made available to them, that they understand their responsibility to read and familiarize themselves with its contents, and that they will be expected to comply with all policies and procedures applicable to their position.

- The IPM was adopted by the Commission and fully in effect before Commissioner Molnar assumed office, and he received a copy during the New Commissioner Orientation months prior to his start date.

- **Internal processes apply to Commissioners:**

  o The Internal Policy Manual applies to all department personnel, including commissioners.
  o The enforcement mechanisms are lawful, necessary, and consistent with the PSC's statutory authority.

- These processes were adopted publicly, after extensive deliberation, and reflect recommendations from the Legislative Auditor.

### 6.11.3 Legal Obligations to Prevent and Correct Misconduct

Commissioner misconduct can adversely impact the department's workforce, workplace environment, operational effectiveness, and overall liability exposure. As an employer, the department is subject to the Montana Human Rights Act, the Governmental Code of Fair Practices, and Title VII of the Civil Rights Act of 1964. Under these laws, the department may be held vicariously liable for discriminatory or harassing conduct by supervisors or high-level officials.

The U.S. Supreme Court has recognized an affirmative defense for employers who take reasonable steps to prevent and promptly correct workplace harassment. *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). This defense requires:

- Effective anti-harassment policies, and

- A complaint and investigation process capable of identifying and addressing misconduct.

EEOC's 2024 Enforcement Guidance and Montana precedent - including *Stringer-Altmaier v. Haffner*, 2006 MT 129, and *Benjamin v. Anderson*, 2005 MT 123 - emphasize that an employer's failure to investigate or discipline a harasser can itself constitute unlawful discrimination. The PSC's Code of Conduct and incorporated administrative rules align with these legal standards and are necessary to protect the agency from liability.

### 6.11.4 Wrongful Discharge Act Considerations

Under the Montana Wrongful Discharge from Employment Act, an employee may bring a claim if they resign due to intolerable working conditions. The employer's response to reported misconduct is central to its defense. Ignoring complaints involving senior officials exposes the department to significant risk.

## 6.12 Finding #12: Good Cause Exists to Suspend Commissioner Molnar

Based on the law, the facts and information discussed in this report, and available supplemental information, good cause exists for the Governor to suspend Commissioner Molnar. "Good cause" is defined in Mont. Code Ann. § 39-2-903(5) as:

"(5) 'Good cause' means any reasonable job-related grounds for an employee's dismissal based on:

(a) the employee's failure to satisfactorily perform job duties;

(b) the employee's disruption of the employer's operation;

(c) the employee's material or repeated violation of an express provision of the employer's written policies; or

(d) other legitimate business reasons determined by the employer while exercising the employer's reasonable business judgment."

# 7. Recommendations

Misconduct cannot be allowed to continue without meaningful intervention. When corrective action is not taken—or when it fails to produce sustained improvement—the Department faces heightened operational and legal risks. The following recommendations are offered with the goal of preventing further misconduct by ensuring that Commissioner Molnar is held accountable for his actions. They also aim to provide him with a clear, achievable path toward remediation, strengthening his effectiveness as a member of the Commission and supporting the restoration of orderly operations and a healthy workplace culture within the agency.

## 7.1 Recommendations To Commissioner Molnar:

### 7.1.1 Recommendation to Molnar #1: Acknowledge & Apologize for Misconduct

Commissioner Molnar should acknowledge his misconduct and issue a sincere public apology for the time, cost, disruptions, and other harm his actions have caused the agency, his co-workers, and the public. The apology statement should be submitted in writing to the Commission within three business days of Commission adoption of this Report and, if deemed appropriate by the President, scheduled for reading into the record at a future public meeting of the Commission. A sincere apology and acknowledgement of misconduct would demonstrate accountability and remorse for his misbehavior, which is an essential step toward preventing repeat offenses.

### 7.1.2 Recommendation to Molnar #2: Compliance Commitment

Commissioner Molnar should affirm in writing, and demonstrate in practice, a good faith commitment to follow the Department's Internal Policy Manual (IPM) with a particular focus on striving to abide by the Code of Conduct policy. Such good faith effort includes:

a. Signing the IPM acknowledgement form, without caveats, within three business days of Commission adoption of this Report;

b. Carefully following policy requirements and heeding management instructions regarding interpretation of and adherence to agency policies; and

c. Demonstrating continued and sustained improvement in aligning his conduct with these expectations.

The above would signify a sincere commitment to personal conduct that complies with applicable laws, rules, and policies in support of respectful, productive, and orderly workplace interactions.

### 7.1.3 Recommendation to Molnar #3: Remedial Training

Commissioner Molnar should complete trainings, including potential testing, as prescribed by the Response Team, to demonstrate knowledge and understanding of the following subject areas:

a. Sexual Harassment, Confidentiality Requirements, and Retaliation Prohibitions. (MCA 49-2-301—Retaliation Prohibited; EEOC Anti-Retaliation Standards; ARM - 2.21.4013 – Harassment; ARM - 2.21.4014 – Retaliation).

b. DPSR Internal Policy Manual (IPM): Emphasis on the Code of Conduct, Administration (chain of command), and Communications Policies.

c. Professional Conduct and Civility Standards.

d. Robert's Rules of Order, 12th Edition, newly revised: Emphasis on order and decorum.

## 7.2 Recommendations To The Public Service Commission:

### 7.2.1 Recommendation to PSC #1: Remote Work Requirement

The Commission should impose an immediate remote-work requirement upon Commissioner Molnar to mitigate the risk of further retaliation and other Code of Conduct violations in the workplace. This recommendation would limit his access to co-workers and the workplace environment while allowing the Commissioner to perform his official duties through remote access which can be monitored and recorded. The remote-work requirement should be managed by the Response Team, or their designee(s), and continue until the Response Team finds that the risk of further retaliation or misconduct has been adequately mitigated.

### 7.2.2 Recommendation to PSC #2: Consider Public Censure

The Commission should publicly censure Commissioner Molnar if he fails to timely demonstrate a good faith effort to execute the Recommendations made to him in 7.1.1, 7.1.2, or 7.1.3.

### 7.2.3 Recommendation to PSC #3: Request Temporary Suspension

The Commission should request that the Governor suspend Commissioner Molnar for good cause, for a period of time consistent with one of the following options:

a. At a minimum, until the Response Team finds that the risk of further misconduct or retaliation has been mitigated through Commissioner Molnar's good faith completion of Recommendations 7.1.1, 7.1.2, and 7.1.3. This suspension should provide a limited exception to the extent deemed necessary by the Response Team to facilitate Commissioner Molnar's successful completion of the training Recommended in 7.1.3; or

b. At a maximum, for a term commensurate with the period of harm and disruption Commissioner Molnar has caused in the workplace which, at this time, is estimated to be 1 year.

### 7.2.4 Recommendation to PSC #4: Probation/Monitoring

The Commission should place Commissioner Molnar on probation for the remainder of his term in public office and provide expedited processes and tools to address any further misconduct, including:

a. Authorize members of agency management to remove Commissioner Molnar from the workplace immediately upon observing any additional retaliation or misconduct. This will trigger a remote-work requirement which shall continue until the Response Team finds that the risk of further misconduct or retaliation has been mitigated.

b. Authorize the Response Team to expedite all manner of remedy deemed necessary and lawful to address any additional retaliation or misconduct committed by Commissioner Molnar regardless of whether the misconduct is formally reported to the Response Team or not.