Matthew G. Monforton, Montana Bar # 5245
Monforton Law Offices, PLLC
32 Kelly Court
Bozeman, Montana 59718
Telephone: (406) 570-2949
Email: matthewmonforton@yahoo.com

Attorney for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA
## HELENA DIVISION

| | |
|---|---|
| BRAD MOLNAR, | Case No. CV 26-41-H-DWM |
| Plaintiff, | **BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| vs. | |
| JEFF WELBORN, in his official capacity as a member of the Montana Public Service Commission; JENNIFER FIELDER; in her official capacity as a member of the Montana Public Service Commission; ANNIE BUKACEK, in her official capacity as a member of the Montana Public Service Commission; | |
| Defendants. | |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. iii

INTRODUCTION .............................................................................................. 1

STATEMENT OF FACTS .................................................................................. 3

ARGUMENT ...................................................................................................... 16

I. MOLNAR IS LIKELY TO SUCCEED ON THE MERITS .......................... 17

II. MOLNAR WILL SUFFER IRREPARABLE HARM IN THE
ABSENCE OF INJUNCTIVE RELIEF .......................................................... 28

III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST TIPS
SHARPLY IN MOLNAR'S FAVOR .............................................................. 29

CONCLUSION ................................................................................................... 30

# TABLE OF AUTHORITIES

## CASES:

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ................................................................... 16-17

*Bond v. Floyd*,
385 U.S. 116 (1966) ...............................................................................20, 28

*Boquist v. Courtney*,
32 F.4th 764 (9th Cir. 2022) .................................................................*passim*

*Elrod v. Burns*,
427 U.S. 347 (1976) .......................................................................................28

*Flathead-Lolo-Bitterroot Citizen v. Montana*,
98 F.4th 1180 (9th Cir. 2024) ......................................................................17

*Garcia v. County of Alameda*,
150 F.4th 1224 (9th Cir. 2025)......................................................................29

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) .......................................................................16

*Nieves v. Bartlett*,
587 U.S. 391 (2019) .......................................................................................17

*Shell Offshore, Inc. v. Greenpeace, Inc.*,
709 F.3d 1281 (9th Cir. 2013) .......................................................................16

*Tschida v. Motl*,
924 F.3d 1297 (9th Cir. 2019) .......................................................................22

*Warsoldier v. Woodford*,
418 F.3d 989 (9th Cir. 2005) .........................................................................28

*Wood v. Georgia*,
370 U.S. 375 (1962) .......................................................................................19

## INTRODUCTION

This case is about whether an elected public official can be silenced, expelled from his own workplace, and ultimately replaced — because he refused to conform to the government's preferred messaging.

Commissioner Brad Molnar has served Montana ratepayers for more than two decades. He asks hard questions. He talks to reporters. He files complaints when he witnesses misconduct. He calls out utilities when they raise rates without authorization. In short, he acts like a regulator. That, it turns out, is precisely what Defendants on the Montana Public Service Commission (PSC) cannot tolerate.

For the better part of a year, Defendants waged a methodical campaign to suppress Commissioner Molnar's speech — issuing censorship memos, initiating a sham misconduct investigation, stripping him of the PSC presidency, and ultimately voting to bar him from the only building where he can do his job. When this Court issued a Temporary Restraining Order permitting him to attend the NorthWestern Energy/Black Hills merger hearings, Doc. 9, Defendants responded by having armed guards escort him everywhere, even to the restroom. When the initial merger hearings concluded, they reinstated the ban.

Now Defendants are attempting an end-run around this Court entirely.

On May 21, 2026 — days after this Court's TRO expired — Defendants transmitted a second request to Governor Greg Gianforte to suspend Commissioner

Molnar from the PSC for one full year under Mont. Code Ann. § 69-1-113. What Defendants conspicuously omit from that request is what the statute permits next: upon suspending a commissioner, the Governor may appoint a "temporary" replacement to fill the seat.

The significance of that omission cannot be overstated. Governor Gianforte and Senator Steve Daines publicly endorsed the NorthWestern Energy/Black Hills Energy merger within hours of its announcement in August 2025 — the same merger now pending before the PSC, the largest utility transaction in Montana history. If the Governor suspends Commissioner Molnar and installs a replacement of his choosing, Defendants, the utilities, and Montana's political establishment will have accomplished through executive action what they could not accomplish through internal process: the removal, for at least a year, of the one commissioner who has consistently refused to rubber-stamp NorthWestern Energy's agenda. Defendants' requested suspension would create precisely that opportunity.

The PSC has five commissioners. Montana's ratepayers — 250,000 of them in Commissioner Molnar's district alone, and hundreds of thousands more whose energy costs will be shaped by the outcome of the pending merger proceedings and future rate hike hearings — deserve to have at least one member of that body who possesses genuine regulatory experience, who scrutinizes rate hike requests instead of waving them through, and who asks the questions that large utilities would

2

prefer go unasked. They deserve, in other words, a commissioner who acts like a regulator.

Defendants have an elaborate vocabulary for that kind of commissioner. They call it "misconduct." They call it "retaliation." They call it a violation of the PSC's "Communications Policy." The First Amendment calls it protected speech.

Commissioner Molnar respectfully asks this Court to call it what it is — and to enter a preliminary injunction restoring him to full participation in the proceedings of the agency to which the people of Montana elected him.

<strong>STATEMENT OF FACTS</strong>

## I. Commissioner Molnar's Background

Commissioner Molnar has served as an elected member of the Montana Public Service Commission (PSC) since 2004, winning re-election in 2008, serving until term-limited in 2012, and returning to the PSC after winning election again in November 2024. Doc. 12 (Molnar Decl.), ¶¶4-6. He brings more than 21 years of energy and utility-regulatory experience to the position, including service on the Governor's Blue Ribbon Energy Committee and as energy advisor to the Speaker of the Montana House. *Id.* ¶¶2-3. His colleagues unanimously chose him to serve as PSC President when he took office in January 2025. *Id.* ¶8.

Commissioner Molnar has long regarded open communication with journalists and the public as a core duty of his office. *Id.* ¶7. He openly refused to

3

comply with the PSC's 2023 "Communications Policy," which requires elected Commissioners to obtain approval from a "Communications Review Panel" before speaking to the press and to route all press inquiries through the PSC President and External Affairs Coordinator, Doc. 12-1, on the ground that those provisions are unconstitutional. Doc. 12, ¶13.

His refusal was not abstract. In late May 2025, NorthWestern Energy (NWE) unilaterally raised rates without PSC approval. Commissioner Molnar told the press on May 23, 2025, that the rate hike would have "huge negative effects" and that "[m]any people are not going to afford their utility bills." Doc. 12-2. The remarks drew an angry response from then-PSC Executive Director Alana Lake; Defendant Fielder piled on, lamenting the need for "better internal teamwork, coordination, and communication on our media interactions." Doc. 12-3. But Commissioner Molnar's candor also drew public appreciation: a week later, prominent Montana columnist George Ochenski wrote that "Montanans owe a debt of gratitude to Commissioner Molnar for finally standing up to NorthWestern instead of rubber-stamping their endless rate increases." Doc. 12-4.

## II.    The PSC's Campaign to Suppress Commissioner Molnar's Protected Speech

On July 22, 2025, the three Defendants voted to authorize private, unrecorded meetings between PSC staff and utility representatives—a practice

4

Commissioner Molnar had prohibited and publicly condemned. *Id.* ¶¶17-18. PSC staff informed Commissioner Molnar that unidentified employees had filed "misconduct" complaints against him, without disclosing the complainants' identities or the substance of the allegations. *Id.* ¶19. A "Response Team" was formed and an outside investigative firm, Communications and Management Services ("CMS"), was retained. *Id.* ¶20.

Commissioner Molnar asked to know who had accused him and of what, and requested that his attorney be permitted to participate in any interview. *Id.* ¶21. The Response Team refused both requests, and Commissioner Molnar declined to proceed on those terms. *Id.* On July 29, 2025, he held a press conference on the steps of the PSC building in Helena, publicly criticizing the investigation, identifying PSC Executive Director Lake and Defendant Bukacek by name as exemplars of the PSC's accommodation of NWE, and charging that he was being targeted by those who sought to suppress scrutiny of the PSC's relationship with large utilities. *Id.* ¶¶22-24. The press conference received extensive statewide coverage. *Id.* ¶24; *see also* Doc. 12-5.

Three days later, Commissioner Fielder, one of the Defendants in this matter, warned Commissioner Molnar that "retaliation is prohibited by the department's internal policy, as well as state and federal law," and that "[s]ome of

your *press activities* over the last few days relating to the investigation appear to be retaliatory in nature." Doc. 12-6 (emphasis added).

### III.    Defendants' Fury at Commissioner Molnar's Publication of Their "Confidential" Suspension Demand

On August 19, 2025, NWE announced a proposed $3.6 billion merger with Black Hills Energy. *Id.* ¶27. Within moments of the announcement, PSC Executive Director Alana Lake emailed all Commissioners instructing them to "direct any questions you receive to myself and the media team," with a "generic response" attached. Doc. 12-7. That same day, both Governor Greg Gianforte and Senator Steve Daines endorsed the proposed merger. Doc. 1, ¶40.

The following day – less than 24 hours after the announcement of the proposed merger – Defendant Fielder secretly transmitted a letter to the Governor demanding Commissioner Molnar's "immediate" suspension. Doc. 12-8. The letter was marked "CONFIDENTIAL" but lacks any legal citation explaining why the document – a request sent to the Governor by one elected PSC commissioner demanding the immediate suspension of another PSC commissioner - was not a public record. *Id.* Fielder did not inform Commissioner Molnar of the complaint. *Id.* ¶29. Virtually every act cited in the complaint—holding a press conference, demanding through counsel that the investigation be terminated, declining to participate in the investigative interview, filing a work session request to negate

6

investigative contracts—was constitutionally protected speech or petition activity. Doc. 12-8 at 2-3. After the Governor requested a response, Commissioner Molnar explained in detail that nearly all of the alleged acts of misconduct constituted protected speech. Doc. 12-9.

Commissioner Molnar made public both Defendant Fielder's "Confidential" suspension request as well as his response. *Id.* ¶33. Defendants responded with open hostility. On August 27, 2025, Defendant Bukacek sent an email to all PSC personnel denouncing the publication of Defendant Fielder's complaint and declaring: "Public opinion is being skewed/mislead [*sic*] to believe that it is in the public interest that *everything* in government be made transparent." Doc. 12-10 (emphasis in original).

## IV.   Additional Statements to the Press Characterized as "Retaliation"

On August 29, 2025, Molnar appeared on *Voices of Montana*, a radio talk show broadcast throughout Montana. Doc. 12, ¶36. During that interview, he accused PSC Executive Director Lake of "saving up" complaints against him. *Id.*

On September 18, 2025, Jim Larson, publisher of *ButteNews.Net*, asked Commissioner Molnar to identify which NWE representative met most frequently with Lake. *Id.* ¶37. He responded by identifying Charley Lane, a NWE employee, by name. *Id.* ¶37. Ms. Lake later sent Commissioner Molnar an email characterizing his statement to *ButteNews.Net* as "an example of the retaliation I

7

have asked to be stopped." Doc. 12-11. A month later, the three Defendants voted to remove Commissioner Molnar as PSC President, with Defendant Welborn assuming the role. *Id.* ¶39.

## V.  Molnar's Protected Petitions Filed with Other State Agencies

Commissioner Molnar filed a complaint against Defendant Bukacek with the Montana Commissioner of Political Practices in late October 2025. Doc. 12-12. He did so after discovering in the PSC copy room, on multiple occasions, confidential patient records, service solicitations, and cover sheets for medical documents originating from Defendant Bukacek's medical facility in Kalispell. *Id.* ¶40. He concluded that Bukacek, a licensed physician, was using PSC equipment to copy and collate medical documents late at night – and he noted that her time in the PSC office was often limited to one or two hours per week outside of legislative sessions. *Id.*

Prior to filing the complaint, Commissioner Molnar notified Defendant Fielder that he had discovered the patient records in the PSC copy room and asked her to request that Defendant Bukacek cease the activity. *Id.* ¶41. Commissioner Bukacek nonetheless continued leaving patient records there. *Id.*

**VI.    Defendants' Renewed Efforts to Censor Molnar in Response to His Criticisms of Bukacek Reported in the Press**

On October 31, 2025, Commissioner Molnar gave multiple press statements about the Political Practices complaint he had filed against Defendant Bukacek, several of which were published. Doc. 12-13; *see also* <https://www.ktvh.com/news/montana-politics/montana-psc-controversies-continue-as-molnar-files-ethics-complaint-on-bukacek> One week later, newly installed PSC President Welborn issued a memo expressly prohibiting unapproved press communications by elected Commissioners: "Per the IPM Communications Policy, Commissioners must coordinate with the Commission President and the External Affairs Coordinator/Executive Director before engaging in media interaction regarding DPSR business." Doc. 12-14. Commissioner Molnar responded four days later with a press release denouncing the memo as a "transparent attempt to cover-up PSC corruption," criticizing Commissioners who treated their elected positions as part-time roles and recited utility-provided talking points, and reiterating his concerns about Defendant Bukacek's use of PSC equipment for her private medical practice. Doc. 12-15.

**VII. The Governor's Rejection of Defendant Fielder's Complaint**

On December 3, 2025, the Governor wrote to Defendant Fielder asking whether any new allegations of misconduct had been lodged since Commissioner

9

Molnar's removal from the PSC presidency in October 2025. Doc. 12-16.

Defendant Fielder responded on December 9, 2025. Doc. 12-17. She identified no

new allegations of misconduct – none – and represented that the response team

would conclude its work "as early as January 2026." *Id*.

On December 26, 2025, the Governor rejected Defendant Fielder's

complaint, finding that Molnar's removal as President sufficed:

> …[S]ince Commissioner Molnar's removal as president, the
> [Response] Team has been able to move forward with the
> investigation and expects to receive a report of the findings of the
> investigation this month, with any recommended action presented to
> the full Commission as soon as January 2026.

Doc. 12-18.

## VIII. Defendants' Anger at Commissioner Molnar's Public Criticism of Their False Recording of a Commissioner Pinocci's Vote

On January 13, 2026, Commissioner Molnar spoke with a reporter about

Defendants' claim that Commissioner Pinocci voted for a NWE rate increase when

he denied doing so. Doc. 12-19. Commissioner Molnar characterized the incident

as a "stolen" vote. *Id.*

The following day, PSC Executive Director Jamey Petersen emailed all PSC

personnel to strictly route all media inquiries through the External

Communications Coordinator, and she attached a copy of the Communications

Policy to that email. Doc. 12-20. Hours later, Defendant Bukacek emailed all

10

personnel thanking Ms. Petersen "for this reminder to all" and noting that "[t]he reckless irresponsibility of a few has not been for the good of the order." Doc. 12-21.

## IX.   Defendants Escalate Their Retaliatory Campaign in Response to Molnar's Merger and Energy Criticisms

During the spring of 2026, Commissioner Molnar made several statements to the press concerning NWE. On March 20, 2026, he publicly criticized Defendants on Billings television station KTVQ for refusing to allow adequate time to review merger-related documents.  Doc. 12, ¶52. On April 13, 2026, Molnar again appeared on KTVQ, warning that proliferating data centers would pit large commercial customers against residential ratepayers in competition for low-cost Colstrip electricity. *Id.* ¶53.

Defendants issued a Report by its "Response Team" dated May 1, 2026 (the "Report"). Doc. 12-22. They scheduled a hearing for May 6, 2026 regarding Commissioner Molnar's "misconduct" at which the Report would be the primary evidence, even though it consisted almost entirely of of vague and conclusory assertions.

One category of allegations which the Report repeatedly denounces with at least some clarity is protected speech by Molnar:

11

- Describing as "interference with the Response Team process" Commissioner Molnar's "[d]isparaging and defamatory public and private remarks about complainants, Response Team members, and independent counsel." Doc. 12-22 at 11.[1]

- Reciting a claim by Defendant Bukacek that statements made by Molnar during a scheduling meeting were "mischaracterization, misrepresentation, and blatantly untrue." *Id.* at 13.

- "Communications Policy violations - involving improper or unauthorized external communications" *Id.* at 15.

- "Administration Policy violations - including disregard for the established chain of command and administrative procedures" *Id.* at 15.

- "Confidential Information requirements - including unauthorized disclosure of confidential and attorney-client privileged information," *Id.* at 15.

- "Proceedings Policy violations - including failure to follow rules of order and procedural requirements during Commission proceedings," *Id.* at 15.

- "Misrepresenting colleagues and facts" *Id.* at 16.

- "Commissioner Molnar escalated the situation by immediately denying, denouncing, or dismissing the validity of the allegations; making disparaging and threatening statements to and about department personnel; disseminating misleading and false information to the public (including to the media, Governor, and Court) about the purpose of the investigation" *Id.* at 16.

Additionally, the Report devotes nearly four (4) pages to the Political Practices complaint filed by Commission Molnar as well as his statements to the press about it. Doc. 12-22 at 18-21. That portion of the Report also includes

---

[1] All exhibit page numbers cited in this brief are those assigned by the Court's ECF system.

12

discussion concerning a complaint to the state medical board filed on October 24, 2025, by Catherine Holley, a private citizen, against Defendant Bukacek. *Id.* at 18. The Report does not include evidence of Molnar's involvement in the complaint and he expressly denies any such involvement. Doc. 12, ¶42. The Report notes that Holley had previously made comments during PSC meetings and on social media in support of Commissioner Molnar and in opposition to Defendant Bukacek. Doc. 12-22 at 20.

**X.     The May 6, 2026 Hearing: Adoption of the Report and Physical Exclusion of Commissioner Molnar**

The May 6 public hearing consisted of three segments: an introductory session held in public, a closed session, and another public session later that morning.[2] Doc. 12, ¶55. During the introductory portion of the hearing, PSC counsel admitted that, along with interviewing witnesses and reviewing documents, CMS investigators reviewed "a transcript from Commissioner Molnar's press conference, press articles with Commissioner Molnar's comments, and they watched video of public meetings." Doc. 12-23 at 6. When Commissioner Molnar questioned Executive Director Petersen—the only witness who spoke to the Report's contents—she acknowledged that she had been employed at the PSC

---

[2] Transcripts of the early morning public and late morning public sessions can be found at Doc. 12-23 and Doc. 12-24, respectively. Commissioner Molnar does not have a transcript of the closed session.

13

only since early December 2025 and that her knowledge of the underlying events derived entirely from having read the Report itself. *Id.* at 14-15. Defendant Welborn then terminated Commissioner Molnar's questioning on the ground that his questions constituted "nothing more than trying to attack staff." *Id.* at 17.

During the closed session PSC staff provided to each Commissioner a copy of (1) a document entitled "CMS Investigation Report" dated August 2025 and (2) a document entitled "CMS Retaliation Investigation Report" dated October – November 2025. Doc. 12, ¶56. At the conclusion of the closed session, staff removed all copies of the CMS reports from the Commissioners. *Id.*[3]

During the late morning session, Defendant Fielder moved to adopt the Report in full. Doc. 12-24 at 13-14. Her supporting statement recited the Report's conclusory labels - "unprofessional conduct," "repeated unwelcome sex-based comments," "retaliation," "misrepresenting colleagues and facts" - without identifying a single specific statement, a single specific act of retaliation, or a single specific instance of misrepresentation – with one exception. She described with specificity Commissioner Molnar's Political Practices complaint against

---

[3] Defendants contend that these documents, which have already been redacted, should nevertheless be filed under seal. Commissioner Molnar disagrees and believes the public is entitled to evaluate them. Defendants have represented that they will file a motion for a protective order applicable to the documents. In order to preserve whatever confidentiality Defendants believe attach to the documents, Commissioner Molnar will file the documents temporarily under seal in this Court in accordance with L.R. 5.2(b)(1).

Defendant Bukacek and the medical licensing complaint filed by a private citizen –

characterizing them as "retaliation" and asserting that Molnar "should be

ashamed." *Id.* at 16-17. Commissioner Bukacek's statement similarly focused

almost entirely on those complaints. *Id.* at 28-30. President Welborn offered only

that he "err[ed] on the side of trusting enough of what's in this report." *Id.* at 32.

All three Defendants voted to adopt the Report. *Id.* at 33. Immediately after

the vote, Defendant Welborn directed a security officer to escort Commissioner

Molnar out of the PSC building. Doc. 12, ¶58. He was notified that he would no

longer be permitted to enter the building—including the hearing room—under any

circumstances. *Id.* This Court issued a Temporary Restraining Order on May 11,

2026, permitting Molnar to attend the NorthWestern Energy/Black Hills merger

hearings in person. Doc. 9.

Rather than comply in good faith, however, Defendants imposed conditions

on the TRO-ordered access during the merger hearing: access limited to the

hearing room and a single designated restroom; a ten-minute pre-hearing entry

window; a five-minute post-recess exit requirement; no in-person contact with

staff; and a requirement that all remarks to "staff, parties, or witnesses" be

"directed through the Chair." Doc. 12, ¶61; Doc. 12-25. The conditions were

implemented in an unusually degrading fashion: throughout the proceedings,

armed security personnel escorted Commissioner Molnar, including during

15

restroom breaks, where an armed guard stood outside. *Id.* ¶62. He was required to leave the building during recesses and eat lunch outside—on one occasion in his car because of wind. *Id*. No other Commissioner, party, witness, or member of the public was subjected to these conditions. *Id*.

After the merger hearing, Defendants reinstated their punishment of remote work for Commissioner Molnar and continue to ban him from the PSC building. *Id.* ¶68. On May 21, 2026, Defendants sent a *second* request to Governor Gianforte to suspend Commissioner Molnar from the PSC for one year. Doc. 12-26. The Governor has requested a response from Commissioner Molnar by June 5, 2026. Doc. 12-27.

## ARGUMENT

Plaintiffs seeking a preliminary injunction must show that: (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1289 (9th Cir. 2013). The first of these factors—likelihood of success on the merits—is the "most important." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc). However, "the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still

16

supporting some preliminary relief." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1133 (9th Cir. 2011).

The Ninth Circuit has adopted the "serious questions" test—a "sliding scale" variant of the *Winter* test—under which a party is entitled to a preliminary injunction if it demonstrates (1) serious questions going to the merits, (2) a likelihood of irreparable injury, (3) a balance of hardships that tips sharply towards the plaintiff," and (4) the injunction is in the public interest. *Flathead-Lolo-Bitterroot Citizen v. Montana,* 98 F.4th 1180, 1190 (9th Cir. 2024). The serious questions standard is "a lesser showing than likelihood of success on the merits." *Id.* Commissioner Molnar can easily satisfy these four requirements.

## I.   MOLNAR IS LIKELY TO SUCCEED ON THE MERITS

The First Amendment prohibits government officials from retaliating against an individual for engaging in protected speech. *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019). Elected officials may bring First Amendment retaliation claims, *Boquist v. Courtney*, 32 F.4th 764, 774 (9th Cir. 2022), which require proof that

(1) The plaintiff engaged in constitutionally protected activity;

(2) The defendant's actions would "chill a person of ordinary firmness" from continuing to engage in that activity; and

(3) The protected activity was a substantial motivating factor in the defendant's conduct.

17

*Id.* at 775.

*Boquist* controls this case. There, a minority-party state senator walked out of the senate chamber to break a quorum, prompting leadership to threaten his arrest. He responded by telling the senate president that "Hell's coming to visit you personally" if police were sent, and told a reporter: "Send bachelors and come heavily armed. I'm not going to be a political prisoner in the state of Oregon." *Id.* at 772. The senate majority responded by imposing a rule requiring twelve hours' advance notice before he could enter the capitol. The district court dismissed the senator's retaliation claim, but the Ninth Circuit reversed.

On the first prong, the court held that "[a]n elected official's speech is a vital component of his duties" and that Boquist's remarks, though combative, "fit[] easily within the wide latitude given to elected officials to express their views, even when such political expressions are vituperative, abusive, and inexact." *Id.* at 780-81. On the second prong, the twelve-hour rule was "a form of punishment" that deprived Boquist of "timely access to the physical seat of government" and "prevent[ed] Boquist from doing his job." *Id.* at 783. On the third prong, his speech "played a part, substantial or otherwise, in the retaliation." *Id.* at 784.

Commissioner Molnar's case is stronger than *Boquist* on every prong. His claim is not merely colorable – it is overwhelming.

18

**A. Commissioner Molnar Engaged in Protected Activity**

Nearly all of the speech by Commissioner Molnar that Defendants complain about is protected by the First Amendment:

1. Molnar's Statements to the Press:

Commissioner Molnar's statements to the press criticizing Defendants and PSC personnel are unambiguously protected by the First Amendment. *Wood v. Georgia*, 370 U.S. 375, 388 (1962) (describing sheriff's letter to newspaper criticizing judge as "precisely one of the types of activity envisioned by the Founders in presenting the First Amendment for ratification."). That principle applies with even greater force here, where a duly elected public utility regulator spoke out about matters directly within his regulatory jurisdiction.

The protected press statements at issue span nearly a year and reflect a consistent pattern of constitutionally protected speech on matters of urgent public concern:

- Molnar's May 23, 2025 statements to press denouncing NWE's unilateral rate hike, Doc. 12-2;

- Molnar's press conference on the steps of the PSC building July 29, 2025 denouncing PSC commissioners and staff for bias towards NWE, Doc. 12-5;

- Disclosure by Molnar to the press of Defendant Fielder's "Confidential" complaint to the Governor in August 2025 demanding Molnar's immediate suspension, Doc. 12, ¶33;

19

- Molnar's appearance on August 29, 2025, on *Voices of Montana* in which he accused then-PSC Executive Director Lake of "saving up" complaints against him, Doc. 12, ¶36;

- Molnar's response on September 18, 2025, to *ButteNews.Net* answering reporter's question as to which NWE representatives met most frequently with PSC Executive Director Lake, Doc. 12, ¶36;

- Molnar's statements to the press concerning Bukacek's use of PSC resources to facilitate her private medical practice, Doc. 12, ¶43;

- Molnar's press release on November 11, 2025, denouncing Defendant Welborn's censorship memo as a "transparent attempt to cover-up PSC corruption," Doc. 12-15;

- Molnar's statements to the press denouncing the "stolen" vote from Commissioner Pinocci by Defendants concerning an NWE-requested rate hike; Doc. 12-19;

- Molnar's statements concerning NWE to the press in the weeks preceding the May 6 disciplinary hearing, Doc. 12, ¶¶52-53.

Each statement concerns a matter of substantial public concern. Each is unambiguously protected. *Bond v. Floyd*, 385 U.S. 116, 135–36 (1966) ("The manifest function of the First Amendment in a representative government requires that legislators be given the widest latitude to express their views on issues of policy.").

2. Molnar's Statements During PSC Hearings

Speech by elected members of a government body made during official proceedings sits at the very heart of First Amendment protection. The Ninth Circuit held in *Boquist* that an elected official's in-session statements are protected even

20

when they are "vituperative, abusive, and inexact." *Id.,* 32 F.4th at 780–81. The

statement at issue in *Boquist* was a declaration made on the senate floor that "if

you send the state police to get me, Hell's coming to visit you personally" —

language the Ninth Circuit found "fit[ ] easily within the wide latitude given to

elected officials to express their views." *Id.* If that statement is protected, the in-

session statements attributed to Commissioner Molnar are protected by an even

wider margin.

Each of the complained-of in-session comments by Molnar falls well short

of the threshold *Boquist* established:

- Molnar's use of a "mocking tone" in an exchange with Defendant Bukacek during a hearing on April 30, 2025, that "convey[ed] superiority or disdain through his tone";

- Molnar's comment during a June 2025 rate hearing in which he stated that "the most beautiful women in China" come from a particular region of the country;

- A claim that Molnar "misrepresented" Defendant Bukacek during a hearing on March 11, 2025.[4]

The Report separately cites Molnar's "failure to follow rules of order and

procedural requirements during Commission proceedings." Doc. 12-22 at 15. A

failure to adhere at all times to Robert's Rules, however, does not forfeit an elected

official's First Amendment rights. If Commissioner Molnar misapplies a

---

[4] The CMS Reports, which will be filed under seal with this Court, determined each of these in-session statements by Commissioner Molnar to be sanctionable.

procedural rule, the presiding chair can simply rule him out of order. Locking him out of the building is not a constitutionally permitted response.

### 3. Molnar's Political Practices Complaint

Filing a complaint with a government oversight body, such as Molnar's filing of his Political Practices complaint against Defendant Bukacek, Doc. 12-12, is the paradigmatic exercise of the First Amendment right to petition. *Tschida v. Motl*, 924 F.3d 1297, 1303 (9th Cir. 2019).

### 4. Molnar's Criticisms of Commissioners and Staff

The Ninth Circuit has held that "[a]n elected official's speech is a vital component of his duties" and that such officials have "wide latitude . . .to express their views, even when such political expressions are vituperative, abusive, and inexact." *Boquist,* 32 F.4th at 780-81. The sealed CMS Reports alleged that while he acted as PSC President until October 2025, Commissioner Molnar criticized the shortcomings of other Commissioners and staff, sometimes pointedly. He also expressed to Commissioners and staff his disdain of the investigation into his speech, sometimes harshly. Because Molnar is an elected official, however, this speech is protected.

In short, Defendants condemn Commissioner Molnar for speaking to the press, filing complaints with oversight agencies, responding to reporters' questions, and disclosing a public record. Every one of those acts, however, is constitutionally protected. The first prong is satisfied.

**B.      Defendants' Actions Constitute a Materially Adverse Action That Would Chill a Person of Ordinary Firmness.**

What Defendants have done to Commissioner Molnar is categorically worse than the punishment inflicted in *Boquist*. The state senator in *Boquist* could still enter the building — he simply had to give twelve hours' notice. Commissioner Molnar cannot enter the PSC building at all, under any circumstances, for any purpose.

A commissioner participating by video is not "present" in any meaningful sense. Doc. 12, ¶64. He cannot consult in real time with PSC staff when live testimony conflicts with prior submissions, observe the informal dynamics that shape any complex proceeding, or confer quietly with counsel at the table as testimony unfolds. *Id.*, ¶¶65-67. Those limitations are not inconveniences. They are the functional equivalent of exclusion which would unquestionably "chill a person of ordinary firmness" from continuing to engage in the protected activity that prompted it. *Boquist*, 32 F.4th at 783. The second prong is satisfied.

23

C.      **Commissioner Molnar's Protected Activity Was a Substantial Motivating Factor in Defendants' Conduct**

The Ninth Circuit requires a plaintiff alleging First Amendment retaliation to show only that the protected activity "played a part, substantial or otherwise, in defendant's wrongdoing." *Boquist*, 32 F.4th at 777. A plaintiff need not prove that protected speech was the sole motive—or even the primary one. In many cases, "establishing the causal connection between a defendant's animus and a plaintiff's injury is straightforward," and courts may take "the evidence of the motive and the defendant's wrongdoing as sufficient for a circumstantial demonstration that the one caused the other." *Id.* Courts also "give weight to circumstantial evidence such as a proximity in time between the protected speech and the adverse action, the defendant's expression of opposition to the protected speech, and evidence that the defendant proffered false or pretextual explanations for the adverse action." *Id.*

Here, the causal connection is not subtle. It is explicit. Defendants' own reports repeatedly identify Commissioner Molnar's protected speech and petitioning activity as the very conduct warranting punishment.

The Report – the document Defendants formally adopted before expelling Molnar from the PSC building – is, at bottom, a compilation of speech offenses. The Report condemns Molnar for:

- making "disparaging and defamatory public and private remarks" about complainants and PSC personnel;
- engaging in "improper or unauthorized external communications";

24

- "misrepresenting colleagues and facts";
- disseminating "misleading and false information to the public";
- criticizing the investigation itself;
- speaking to the media;
- filing oversight complaints;
- disclosing allegedly "confidential" information; and
- publicly accusing PSC officials of favoritism toward NWE.

Doc. 12-22 at 11, 13, 15-16, 18-21. That is not incidental overlap with protected expression. It is protected expression.

The same pattern appears throughout the underlying CMS investigative reports. Those reports repeatedly characterize Molnar's press statements, public criticisms, hearing remarks, and communications with journalists as "retaliation," "misconduct," "policy violations," or "interference." The reports even conclude that discipline was warranted because of statements Molnar made during Commission hearings—including allegations that he used a "mocking tone" while questioning Defendant Bukacek during a public proceeding.

The chronology confirms the retaliatory motive. Each escalation followed directly on the heels of protected speech.

When Molnar publicly criticized PSC leadership and the investigation at his July 29, 2025 press conference, Defendant Fielder responded three days later by warning him that his "press activities" appeared "retaliatory." Doc. 12-6.

When Molnar disclosed Defendant Fielder's purportedly "confidential" suspension request to the Governor—a document authored by an elected

25

Commissioner demanding the suspension of another elected Commissioner—Defendants reacted with fury. Defendant Bukacek circulated an email to PSC personnel lamenting that the public had been "mislead [*sic*] to believe that it is in the public interest that *everything* in government be made transparent." Doc. 12-10 (emphasis in original).

When Molnar spoke publicly about Bukacek's use of PSC resources in connection with her private medical practice and filed a Political Practices complaint, Defendants escalated again. The Report devotes nearly four pages to those acts alone. Doc. 12-22 at 18-21. During the May 6 hearing, Defendants repeatedly fixated on the Political Practices complaint as supposed evidence of "retaliation." Doc. 12-24 at 16-17, 28-30.

The retaliation became so extreme that Defendants punished Molnar not merely for his own speech, but for speech by third parties. The Report discusses at length a Medical Board complaint filed by private citizen Catherine Holley, despite conceding there was no evidence that Molnar was involved in filing it. Doc. 12-22 at 18-20. Molnar expressly denied involvement then and denies it now. Doc. 12-24 at 29-30; Doc. 12 ¶42. Yet Defendants still treated the complaint as part of the justification for sanctioning him.

The timing further exposes the pretext. The final employee complaint against Molnar was lodged in September 2025. Defendants removed him as PSC

26

President in October 2025. Doc. 12 ¶39. After that removal, no new employee misconduct complaints were identified to the Governor. Doc. 12-17; Doc. 12-18. Yet Defendants waited nearly *seven months*—until immediately before hearings on the largest utility merger in Montana history—to suddenly declare that Molnar was too dangerous and disruptive to be physically present in the PSC building.

That claim is impossible to reconcile with Defendants' own conduct. The reports contain no evidence of violence, no evidence of threats of violence, and no evidence that Molnar posed any physical risk whatsoever. Yet Defendants subjected him to humiliating escort conditions, including armed guards accompanying him during restroom breaks despite the absence of any finding that Molnar posed a physical threat. Doc. 12, ¶62. A reasonable inference arises from this extraordinary treatment: Defendants were not responding to safety concerns. They were responding to a Commissioner who repeatedly criticized them in public and challenged their relationship with NWE.

The retaliation here is not difficult to identify. Defendants punished Commissioner Molnar because he spoke publicly, criticized PSC leadership, challenged the legitimacy of the investigation, filed oversight complaints, answered reporters' questions, and accused fellow Commissioners of serving utility interests rather than the public. In other words, Defendants punished him for acting like an elected official. The third prong is satisfied.

27

II.  MOLNAR WILL SUFFER IRREPARABLE HARM IN THE ABSENCE
     OF INJUNCTIVE RELIEF

The irreparable harm here is self-evident and legally compelled. Every moment Commissioner Molnar is excluded from the PSC hearing room is an opportunity to speak — on behalf of 250,000 constituents — that he will never recover. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Warsoldier v. Woodford*, 418 F.3d 989, 1001 (9th Cir. 2005) (A "colorable First Amendment claim" is "irreparable injury sufficient to merit the grant of relief."). Commissioner Molnar's claim is far more than colorable.

Remote video participation does not cure the harm — it compounds it. As demonstrated above, a commissioner attending by video cannot consult with staff in real time, cannot observe witness demeanor and hallway dynamics, and cannot confer quietly with counsel at the table as testimony unfolds. Each day of a hearing that passes without Commissioner Molnar physically present is a day of irreversible constitutional deprivation.

"The manifest function of the First Amendment in a representative government requires that legislators be given the widest latitude to express their views on issues of policy." *Bond*, 385 U.S. at 135–36. Commissioner Molnar's denial of participation in the hearing clearly constitutes irreparable harm.

28

III.  THE BALANCE OF EQUITIES AND PUBLIC INTEREST TIPS
      SHARPLY IN MOLNAR'S FAVOR

Where government actors are defendants, the balance-of-equities and public-interest factors merge. *Garcia v. County of Alameda*, 150 F.4th 1224, 1234 (9th Cir. 2025). That a plaintiff has "ha[s] raised serious First Amendment questions compels a finding that ... the balance of hardships tips sharply in [his] favor." *Id.*

On one side sits Commissioner Molnar: an elected official, physically barred from the only building where he can fulfill his constitutional duties. On the other side sit Defendants, who seek to preserve the effect of a sanction built almost entirely on constitutionally protected speech.

The public interest is not abstract here. The 250,000 Montanans Commissioner Molnar represents — and the broader majority of Montanans whose energy costs are shaped by the outcome of PSC hearings — have a direct and immediate stake in whether their elected representative can participate in them. The public interest demands that the hearings be conducted with all five Commissioners present, particularly a Commissioner with Molnar's breadth of regulatory experience. What's at stake is not only Molnar's *presence* but the *integrity of the merger record*. The public has an interest in both. A PSC order approving or rejecting a $3.6 billion merger issued after one elected commissioner was physically barred from the proceedings is more legally vulnerable to challenge.

29

Defendants suffer no cognizable harm from a preliminary injunction and they retain every other remedy available to them under their internal processes. What they may not do is use those processes to silence an elected official's voice at a public proceeding — and then claim hardship when a court intervenes to stop them.

## CONCLUSION

For all of the foregoing reasons, Commissioner Molnar respectfully requests that this Court grant his motion for preliminary injunction.

DATED: May 28, 2026

Respectfully submitted,
MONFORTON LAW OFFICES

/s/ Matthew G. Monforton
Matthew G. Monforton
Attorneys for Plaintiff

30

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document, excluding caption, tables and certificate of compliance, contains 6218 words, as determined by the word processing software used to prepare this document, specifically Microsoft Word 2007.

DATED: May 28, 2026

Respectfully submitted,
MONFORTON LAW OFFICES

/s/ Matthew G. Monforton
Matthew G. Monforton
Attorneys for Plaintiff

31