# CONFIDENTIAL INFORMATION WARNING

The following document contains protected information about Department personnel and/or third parties.

The references herein to complainants and witnesses in the Response Team investigatory process is protected by the Montana Constitution Article II, Section 10 (Right of Individual Privacy). Disclosure of this information is unlawful and would violate the individuals' reasonable expectations of privacy that are not clearly outweighed by the public's right to know.

The confidential information contained herein may not be shared with anyone beyond the intended recipients. All persons with access to the confidential information must take reasonable precautions to keep it secure.



Est. 1998

# CMS

Communication
and Management
Services, LLC

CONFIDENTIAL

# INVESTIGATION REPORT

## Workplace Complaint

August 2025
Submitted to Montana Public Service Commission

Greg Ross and Jim Kerins
gross@cmsmontana.com, jkerins@cmsmontana.com


CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.

Montana Public Service Commission
Complaint Fact-Finding Report
Table of Contents

I.   Introduction ............................................................................................................ 1

II.  Methodology and List of Participants ................................................................... 1

III. Background & Relevant Policies/Laws ................................................................. 2

   A.  Background ......................................................................................................... 2

   B.  Issues Presented ................................................................................................ 3

IV.  Summary of Issues and Findings .......................................................................... 4

   A.  Complainant Position Statements, including Complainant Witness Statements ......... 4

   B.  Witness Statements: .......................................................................................... 8

   C.  Respondent's Statement: ................................................................................. 14

   D.  Documents ....................................................................................................... 14

   E.  Relevant Policies and Laws............................................................................. 19

   F.  Omissions ......................................................................................................... 20

   G.  Analysis ............................................................................................................ 20

      1.  Issue 1, Derisive Behavior ........................................................................ 21

      2.  Issue 2, Staff Time .................................................................................... 22

      3.  Issue 3, Discriminatory Comments ........................................................... 23

      4.  Issue 4, Misrepresentation ....................................................................... 28

      5.  Issue 5, Unprofessional Communication .................................................. 30

      6.  Issue 6, Retaliation.................................................................................... 32

      7.  Issue 7, Conduct ....................................................................................... 39

V.   Recommendations ............................................................................................... 40

VI.  Summary............................................................................................................... 40

VII. Submitted: ............................................................................................................ 41

VIII. Attachments......................................................................................................... ii

   A.  Complaint 1........................................................................................................ ii

   B.  Complaint 2...................................................................................................... vii

   C.  Complaint 3...................................................................................................... xvi

   D.  Notice of Investigation to President Molnar.................................................... xix

   E.  Organizational Chart and Chain of Command ................................................. xx


CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

## I.    Introduction

This report summarizes a workplace investigation into complaints filed against Montana Public Service Commission ("PSC") President Brad Molnar. Personnel 1 ███████ complained in writing to Personnel 2 ███ on May 11, 2025, and submitted a *Complaint Resolution Form on June 25, 2025.* Personnel 2 ███████ complained in writing to Personnel 2 and Personnel 4 ███ on May 20, 2025, with a *Complaint Resolution Form* completed on May 24, 2025. Personnel 5 ███████ complained to Personnel 2 ███ on July 2, 2025, and submitted a *Discrimination Complaint Resolution Form that same day.*

Personnel 6 ████████████████████, appointed Communication and Management Services, LLC (CMS) on Friday, June 6, 2025, to review the concerns beginning on June 23, 2025, a mutually agreed-upon date. CMS assigned Greg Ross and Jim Kerins, HR Consultants, to conduct the review. The purpose of the review is to gather information, determine whether substantiated findings violate agency policy or law, and to provide this report to the PSC Response Team for their consideration in determining the appropriate response.

## II.    Methodology and List of Participants

The fact-finding process involved interviews with complainants and witnesses, and evaluation of substantiated findings in relation to PSC policies and procedures and relevant employment law. The investigation is based on a preponderance of evidence standard. This means that the evidence must show that the fact to be proven is more probable than not.

CMS, LLC conducted the following interviews in July and August 2025:

| Interview Date & Time | Interviewee | Title | Role |
|---|---|---|---|
| 7/15/25; 3:45pm | Personnel 1 | ███████ | Complainant |
| 7/10/25; 12:30pm | Personnel 3 | ███████ | Complainant |
| 7/11/25; 2:00pm | Personnel 2 | ███████ | Witness |
| 7/10/25; 1:45pm | Personnel 8 | ███████ | Witness |
| 7/22/25, 3:30pm | Personnel 7 | ███████ | Witness |
| 7/10/25, 3:30pm | Personnel 5 | ███████ | Complainant |
| 7/22/25, 8:30am | Personnel 4 | ███████ | Witness |
| Declined interview | Brad Molnar | PSC President | Subject |
| 8/5/25 follow-up call | Personnel 1 | ███████ | Complainant |
| 8/5/25 follow-up call | Personnel 2 | ███████ | Witness |
| 8/5/25 follow-up call | Personnel 4 | ███████ | Witness |

CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

## III.    Background & Relevant Policies/Laws

### A.    Background

Following are the key facts related to the background of the investigation.

Brad Molnar began his term as Commission President of the PSC in January 2025. Informal complaints, including requests to address President Molnar's conduct, began as early as February 2025.

Personnel 2 began employment with the Montana PSC on ███████ 2025. The day after she began employment, she was informed about a remark made by President Molnar to Personnel 4 ███████ including the Personnel 4 ███████ at which point the Personnel 2 began taking steps to document and address the alleged behavior.

On February 21, 2025 Personnel 7 ███████ met with President Molnar for a "polite conversation" to address inappropriate comments of a sexual nature which he made during selection committee proceedings, to bring the unwelcome conduct to his attention. On April 9, 2025, Personnel 7 and Personnel 6 ███████ again met with President Molnar to discuss his behavior and provide him with information and resources which explain Montana and Federal Equal Employment Opportunity (EEOC) guidelines regarding workplace harassment and discrimination.

In May 2025 Personnel 1 ███████ and Personnel 3 ███████ filed formal complaints regarding separate instances of alleged inappropriate conduct. The PSC Response team, comprised of the Personnel 7 ███████ the President who was excluded, per policy), Personnel 2 Personnel 6 ███████ and Personnel 8 ███████ met to discuss how to move forward, ultimately concluding that an external investigation was required to look into the allegations due to conflict of interest concerns and the seniority of the person involved.

Personnel 2 ███████ contacted State of Montana Human Resources Division (SHRD) for assistance. SHRD indicated they were unable to provide investigative assistance at the time. Personnel 6 ███████ called Communication and Management Services, LLC (CMS) on Friday, May 23, 2025, regarding a "relatively small scope of investigative work" because most of the allegedly offending conduct could be found in public records. Due to scheduling conflicts on the part of both agencies, including a rate case hearing between the PSC and NorthWestern Energy which Personnel 6 ███████ believed would make most complaints, witnesses, and the respondent unavailable, CMS and PSC agreed to move forward beginning the week of June 23, 2025.

While gathering documentary evidence, Personnel 6 ███████ and Personnel 2 ███████ had encounters with President Molnar impacting the scope of the investigation. Personnel 2 experience included, in part, statements directed at her by President Molnar, in which "he stated that he would use his personal resources and attorneys to silence people who bring forward 'stupid' complaints." (quoting Personnel 2) Personnel 6 ███████ interaction included President Molnar indicating to ███████ Personnel 6 ███████ that President Molnar intended to discuss potential legal action against the agency, PSC, regarding the investigation and stating he would "make sure this doesn't happen to anyone ever again."

PSC retained Amy Christensen of Christensen & Prezeau, PLLP, as external counsel to serve as CMS' liaison according to Mont. Admin. R. 2.21.4020(4)(b) when it became clear Personnel 6 ███████ was in a position to provide information relevant to the investigation.

 CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com



*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

On July 2, 2025, **Personnel 5** submitted a Discrimination Complaint Resolution form with allegations of inappropriate behavior on the part of President Molnar, which was added to the investigation scope.

CMS and Christensen received additional allegations of retaliation from the PSC during the investigation, which, under the guidance of counsel Christensen, CMS added to the investigation scope.

CMS conducted interviews in July and August 2025.

### B.    Issues Presented

The following section outlines the specific issues identified for investigation. These guiding questions define the scope of the inquiry, ensuring a focused and consistent approach to fact-finding.

1.  Did PSC President Brad Molnar engage in "dismissive, derisive, and otherwise abusive behavior" toward **Personnel 1** in violation of PSC Personnel Policy, Code of Conduct Policy 2.2.6 and 2.2.3; and PSC Personnel Policy, Communications Policy 2.4 during the April 30, 2025, business meeting?

2.  Did PSC President Brad Molnar misuse staff time in violation of Administration Policy 2.10.3.2 or 2.13.1.6.3 on April 30, 2025, when he asked staff to draft a letter to the Governor requesting a veto of HB 490?

3.  Did PSC President Brad Molnar make discriminatory comments to **Personnel 7** and **Personnel 1** on March 4, 2025; discriminatory comments to **Personnel 1** on March 3, 2025; discriminatory comments to **Personnel 4** on March 24, 2025; discriminatory comments to **Personnel 2** on April 7, 2025; and inappropriate comments to a federal official during the June rate case based on sex in violation of PSC Code of Conduct Policy 2.12 Equal Employment Opportunity, Non-discrimination, and Harassment Prevention?

4.  Did PSC President Brad Molnar publicly misrepresent **Personnel 1** during the April 30 business meeting and March 11, 2025, scheduling meeting, and **Personnel 7** during the July 22, 2025, business meeting in violation of PSC Personnel Policy, 2.2 General Standards of Conduct and Performance section 2.2.6?

5.  Did PSC President Brad Molnar engage in unprofessional, hostile, and bullying communication in violation of PSC Personnel Policy, 2.2 General Standards of Conduct and Performance section 2.2.6 through his email exchanges with **Personnel 3** and **Personnel 7** on May 16, 2025.

6.  Did PSC President Brad Molnar engage in retaliation in violation of PSC Personnel Policy 2.13 (Retaliation) and/or PSC Personnel Policy 2.2 (General Standards of Conduct and Performance, section 2.2.6) on June 24, July 29 and 30, and August 1, 2025, by engaging in conduct and making statements intended to discourage or deter complaints related to workplace behavior? Specifically, by:

3



*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

- Telling **Personnel 2** on June 24, 2025, that he was "livid" about the independent review and stating he had hired an attorney and a private investigator to "take out" whoever had brought the complaints, and that he would "use his personal resources and attorneys to silence individuals making "stupid" complaints, and that the Response Team's decision hire an external party was "horseshit," asking her why she was not doing her job, and in response to her telling him that it was a response team decision saying, that was a "lame ass excuse?;"
- Telling **Personnel 6** in reference to the investigation, that he "would make sure this doesn't happen to anyone ever again;"
- Conducting a press conference and making statements to the Daily Montanan published on asserting that he could not be subject to a workplace investigation, describing the investigation as unlawful, stating that the investigation related to issues other than his workplace behavior (Press Conference, July 29, 2025), and describing **Personnel 2** as someone who "darn near breaks into tears" when he asks questions about NorthWestern — a claim she flatly denied — and indicating **Personnel 1** and the **Personnel 6** are in the same boat (Daily Montanan, July 30, 2025); and
- Responding to **Personnel 7** August 1, 2025, letter advising him that retaliation is prohibited by internal policy and state and federal law and cautioning him that his recent statements appear retaliatory (particularly comments mentioning staff and individual commissioners by name) by stating, "If I were to be of similar mind I would have filed 'conduct unbecoming' charges on you several times (I could even have had you recused to win my motion, I did not because I am not that kind of person.) **Personnel 2** many times on very serious issues, and **Personnel 1** every week."
- Emailing **Personnel 2** on August 10, 2025, (Document #37 in Section D of this report) copying multiple colleagues, and accusing **Personnel 2** of interfering in his financial decision-making disparaging her experience, and stating: "So, a word of advice, please stop trying to back door me and back stab me for whatever it is you think it gains you."

7. Did PSC President Brad Molnar violate PSC Policy in his interaction with **Personnel 5** on July 2, 2025, at 3:00 p.m. at the front desk of the PSC?

## IV.    Summary of Issues and Findings

Below is a summary of the issues and findings. Details regarding each allegation are found in the following report and complaints are found in Attachment A, Attachment B, and Attachment C. Each of the following issues illustrates the complainant(s) statement or allegation, subject(s) response, relevant evidence, and findings.

   A.    Complainant Position Statements, including Complainant Witness Statements

**Personnel 1**

**Personnel 1** the Public Service Commission in

She filed a complaint against PSC President Molnar on May 11, 2025, alleging "significant violations of [PSC] Code of Conduct 2.26" as well as statements of a discriminatory nature that "are gender-related and


CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

are all leveled at women...in [her] opinion they involve an exploitive objectification of women that is sexual in nature." Personnel 1 provided documentary evidence as well as statements during a complainant interview.

Personnel 1 alleges that on the date of Personnel 2 interview for the Position, President Molnar made a comment in front of Personnel 7 and Personnel 1 referring to the Commission having themed days, including "topless Tuesdays." She also alleges that the previous day he relayed a story to her about how, as a teenager, President Molnar and his friends would watch girls in their bikinis at the pool. She relayed in another instance "at the NorthWestern hearing there was this nice gentleman who had been representing the federal agencies and they [President Molnar and the gentleman] were talking about travel and then President Molnar starts talking about how there's this certain area in China where 'they have the most beautiful women and the reason they're so beautiful is that it rains all the time, there's no sun, so they don't get old and wrinkly.' And here's an aging woman Personnel 1 referring to herself] two seats down, and it was really insensitive."

Personnel 1 also alleges that President Molnar repeatedly misrepresents her, citing two instances on March 11, 2025, during a Scheduling Meeting in which she says he twists her statement about two of five commissioners not being in office when NorthWestern Energy delivered a presentation, which he brought forth as her having said that not every commissioner saw the presentation, which he contested and listed out the times when he did hear the presentation, through other committees on which he served. She also states that President Molnar misrepresented that she and he had met and discussed a NorthWestern Energy work session item, including that she had supported his position in this matter, which she contests having occurred, or agreeing with his position. During the April 30, 2025, meeting, while discussing[1] House Bill (HB) 490, Personnel 1 offered that President Molnar's concerns about HB 490 had an avenue for being heard  President Molnar responded about providing concerns verbally during a committee, and then when she claimed that he was misrepresenting her and re-directs him back to the original question about his opportunity to write something to legislators and the governor, he then responded with a series of questions which Personnel 1 described as "irrelevant."

During this same April 30, 2025, meeting, Personnel 1 also describes President Molnar's behavior toward her as "dismissive, derisive and otherwise abusive." After Personnel 1 raises a concern in the meeting about the PSC bringing a veto request before the governor against a bill which passed with bipartisan votes from 139 of 150 legislators, President Molnar tells her that "Frankly, your knowledge on the subject is not to the degree ...to have the debate.  The things you said are absolutely...immaterial."[2]  President Molnar's response included a review of previous vetos which the Governor had signed in opposition of strong legislative support, and during this Personnel 1 told CMS investigators, "I was trying to be polite. I gave him a little piece of paper that he misrepresented my view." She described his tone as condescending, and attributes his misrepresentations as one reason why she will no longer meet with him one-on-one, out of concern that what she has said to him will be misconstrued in the future.

We asked Personnel 1 why she thought he was dismissive of her.  She stated, "I can't say for sure that this thing has to do with me being a female...because he doesn't seem to regard other people's

---

[1] Document #18 in Section D of this report, timestamp 24:40 – 26:04
[2] Document #18 in Section D of this report ,timestamp 19:28

CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

opinions very highly." She later adds "And I just don't think he would be singling me out other for any, any reason other than I disagree with him on certain things. Because I've known him for 10 years, I voted for him, I spoke up for him on the day that we voted for him... [but] I suspect he doesn't do well with people standing up to him... suggesting he might be mistaken, countering something he does. So, I thought anybody that has stood up to him has probably felt his wrath and degradation." She also referred to "his past history of violence," relaying a story President Molnar had shared with her about how "he had beat up somebody really, really badly on his front porch."

Personnel 1 alleges that, in advance of the April 30, 2025, meeting, President Molnar misused PSC staff's time by asking them to draft a letter to the Governor requesting a veto of HB 490 before the commission has voted to pursue that course of action.

We spoke with Personnel 1 in the days following President Molnar's July 29, 2025, press conference. On August 5, 2025, Personnel 1 confirmed her written allegation that President Molnar's public comments during and after his July 29, 2025, press conference have a chilling effect on the ongoing workplace investigation. She recounted conversations with reporters 3rd Party 1 and 3rd Party 2 shortly before the articles were published, 3rd Party 1 said 3rd Party 2 told her Molnar mentioned her as part of the cause of his "woes" in the investigation. While she did not recall exact wording, she described Molnar's comments to the media as implying she was among those responsible. Commissioner Bukacek said President Molnar's remarks in the *Daily Montanan* grouped her with Personnel 2 and Personnel 6 rd Party 1 reportedly told her Molnar said Personnel 1 broke into "crocodile tears." She stated that neither she, Personnel 2 nor Personnel 6 had ever cried in such circumstances. She described Personnel 6 as consistently professional and composed, and Personnel 2 as "very intelligent and very clear minded and an extremely strong person." Personnel 1 said President Molnar's repeated framing of the investigation as related to his stance on NorthWestern Energy rather than concerns about his conduct is a deliberate misrepresentation intended to appeal to public sentiment and deflect from allegations about his behavior toward staff and commissioners Personnel 1 described PSC staff as generally professional and non-complaining and said Molnar's public naming and disparagement of her Personnel 2 and Personnel 6 "put everyone on notice" that speaking out could result in public targeting. She emphasized that others are likely to be deterred from participating in protected activity as a result of President Molnar's behavior.

## Personnel 3



Personnel 3 as served with the PSC as a Personnel 3 ince August 2023. He reports to Personnel 4 His role includes He filed a complaint against PSC President Molnar on May 20, 2025, alleging unprofessional, hostile, and bullying communication via email. He provided documentary evidence as well as statements during a complainant interview.

Personnel 3 expressed concerns about emails directed to his department on May 16, 2025, noting that the comments felt threatening, disparaging, and "fell short of professional and respectful communication" standards. (Screenshots of emails are found alongside his complaint)

He specifically points out that President Molnar refers to their attempts to help as "limp excuses" and that he claims that the "State IT Team needs to be pruned and people with competence installed."



Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

Both his supervisor **Personnel 4** and Personnel 2 approached him after the incident to check in on him. His recollection is that they let him know they supported him if he felt intimidated and needed to take action such as file a grievance.

Personnel 3 acknowledged that had it been this single email chain, he may have brushed it off, but there were previous instances of similar intimidating behavior from President Molnar, and this instance was one that had risen to his supervisor's attention, as well as to the attention of the Personnel 7 and Personnel 2 The previous incident was on President Molnar's first day, in which President Molnar came across as threatening stating, "The Montana Supreme Court has ruled that you have to help me with all my personal devices. Anything I do my job with [referring to his personal laptop], you have to help me with." Personnel 3 remembers being completely flushed, feeling scared. In another instance, Personnel 3 stated that during President Molnar's onboarding, he was supposed to take the security training in order to access a system. He alleges that President Molnar was getting ready to sue "State IT" because the course was a violation of President Molnar's rights Personnel 3 claims it was very intimidating.

Personnel 3 when asked how it has affected his job, admitted a fear of retaliation for filing a complaint. He also noted that it has led to many sleepless nights, as well, due to anxiety over his work situation.

## Personnel 5



Personnel 5 has served as                      since           2025. She serves as the ▮▮▮ and provides           services to Commissioners and to legal staff. She filed a complaint on July 2, 2025, alleging actions, such as derogatory comments about staff and Commissioners, which contribute to a stressful work environment.

**Personnel 4** had asked Personnel 5 to look up flight plans for President Molnar. When, on July 2, President Molnar passed Personnel 5 desk, she asked if he'd had a chance to look at the flight plans which she had sent to him. He informed her that she could stop making travel arrangements, that he wasn't going to attend the training, and then she alleges that he began making derogatory comments about staff and commissioners. The only thing she could recall, specifically, was that he said "Some of the staff doesn't agree with my vision and my thoughts." When asked if she recalled him saying anything about specific individuals, she said he hadn't, his comments were more in general about staff.

She recounted that she told him "I need you to stop" but that he kept talking over her. She added that "He's like that in most of my encounters, he doesn't stop to listen, he tends to talk over you." She claims that it wasn't until the third time of her asking him to stop before he stopped. "I'd raised my voice in that third one, I was trying to get someone else's attention in the office...it was a 'help;' moment. I wanted someone to come step in."

She says that President Molnar's behaviors stress her out, and that she has to be on eggshells when the commissioners are in the office [specifically during interactions between Personnel 7 and President Molnar].."You can feel there's tension in the air... There's disagreements going on, I'm not in the business management meetings, but you can tell there's disagreement going on amongst the commissioners."

While Personnel 5 could not recall the exact language used by President Molnar, she did recall that It bothered her, and that she didn't like being put in that position where he was putting these negative comments

 CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

about coworkers into her head. She felt "violated" and "helpless." However, she did note that she did not specifically feel targeted by President Molnar.

**Personnel 7** during his interview, recounted to CMS an instance where ▓Personnel 5▓ had a phone interaction with President Molnar that they believed resulted in ▓Personnel 5▓ choosing to leave for the remainder of the day. When asked about this, she did not recall the specifics of the event but again recounted "he just doesn't listen to the conversation."

B.  Witness Statements:

## Personnel 7

**Personnel 7** has served with the PSC as a ▓▓▓▓▓▓▓ for almost ten years. He works closely with **Personnel 3** and reports to **Personnel 4** The email comments from May 12-16 from President Molnar which are the subject of **Personnel 3** complaint were in email responses to ▓Personnel 7▓ who claims that "Of my department, I have the easiest time with him."

▓Personnel 7▓ acknowledges that "it's not easy to work with," and that "if it was just me, it wouldn't be as bad, but I see how it affects my co-workers and that makes it worse...seeing it affect people I care about is really off putting."

▓Personnel 7▓ recalls that, "during this same period [as the email incident], he called the front desk and ▓Personnel 5▓ was gone for the rest of the day. She had to take the day off." He doesn't know what President Molnar said to her, but he said, "it was enough that she had to take the rest of the day to cool off," telling ▓Personnel 7▓ the next day "'After dealing with him, I just had to go.'"

▓Personnel 7▓ acknowledged that he has an easier time than others with President Molnar, he also noted that President Molnar frequently raises his voice, yells, threatens legal action, and threatens replacement [of staff].

## Personnel 2

**Personnel 2** has served with the PSC as ▓▓▓▓▓▓▓▓ since ▓▓▓▓ 2025. She provided documentary evidence in the form of detailed notes and emails regarding instances of President Molnar's behavior or actions which were reported to her or which she directly observed and/or experienced; she also provided statements during a witness interview.

▓Personnel 2▓ recounted how, on March 27, 2025, she received an informal complaint from ▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓ regarding comments that President Molnar made to ▓▓▓▓ about her thoughts regarding **Personnel 9** in which ▓Personnel 4▓ reported the comments as having sexual undertones. (Details provided in ▓Personnel 4▓ Witness Statement.) Even though ▓Personnel 4▓ did not choose at that time to make a formal complaint, ▓Personnel 2▓ recalls that ▓Personnel 4▓ mentioned that President Molnar had made inappropriate comments previously, which caused ▓Personnel 2▓ to request that both **Personnel 4** and **Personnel 10** document these types of behaviors, keep a record.

 CMS   Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

[Personnel 2] also recounted that she also received an email from [Personnel 7] on March 27 (Subject: "Misconduct – IPM 2.11") which included other documented incidents, including, but not limited to:

- Comments made to the Selection Panel for the [Personnel 2] position ("Topless Tuesdays"),
- Documentation of [Personnel 1] request of [Personnel 7] to address President Molnar's conduct,
- Documentation that [Personnel 7] advised President Molnar, in accordance with IPM 2.11.1, that his comments were inappropriate, and
- [Personnel 7] recollection of her direct observance of President Molnar's statements to [Personnel 4] egarding [Personnel 9]

[Personnel 2] alleged that on April 7, 2025, President Molnar commented to her that his retirement dream included "to sit and be served drinks by ladies dressed only in hula skirts." She asked him to stop, waving her hands, and he stopped. She did not believe this comment to be directed specifically at her but acknowledged that she was more attuned to these types of comments based on the previous complaints she had received regarding him making sexually-based comments.

[Personnel 2] offered supporting examples to [Personnel 1] complaint of being dismissed, claiming that President Molnar has made comments to her like "your opinion doesn't matter" or "you don't have the experience." She was unsure if the comments which she's personally received were due to her newness to the position, or based on gender, specifically, but she does believe that those "he targets the most are [herself], [Personnel 7] and [Personnel 1] I don't see him targeting males like that."

[Personnel 2] does share some of [Personnel 1] concerns about President Molnar's treatment toward female staff—"I do because of the sexual comments he made [to [Personnel 4] and how he's treated a few of [the females]."

We asked [Personnel 2] about her recollection of [Personnel 5] reactions to interactions with President Molnar, and [Personnel 2] recalled the instance where President Molnar had been angry while on the phone with [Personnel 5] and that [Personnel 5] "doesn't do well with conflict...I think it affected her really deeply, more so than maybe a typical person." She says that on May 16, she observed [Personnel 5] "really, really upset," that [Personnel 4] was there, and she spoke with [  ] [Personnel 5] asking what President Molnar had said to her. "She was so upset that she couldn't really remember...it had to do with the IT staff...putting down the IT team...who she works very closely with." [Personnel 2] recalls that "It was really upsetting to her that he was being so demeaning towards them." Then on July 2, when a second incident occurred between [Personnel 5] and President Molnar, [Personnel 2] recalls that [Personnel 5] requested to speak with [Personnel 2] and she was "really, really frustrated," and was ready to file a complaint after this instance.

[Personnel 2] recalled coming across the two IT staff as they were conversing in the doorway to one of their offices. She noted that [Personnel 8] seemed upset, which was not like him, which caused her to inquire about why. She says that they informed her about the emails which President Molnar had sent in the previous week which they believed to be very disrespectful. She recalls asking them "What would you like to do?" explaining that the agency has a grievance policy, and reviewing the IPM with them. Her recollection is that [Personnel 3] said, "I'd be happy to file a complaint."

CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.

Personnel 6 and Personnel 2 notified President Molnar of the complaint via email on June 19, 2025, subject: "Notice of Code of Conduct Complaint and Independent Review," with the purpose of providing President Molnar "notice that an independent review is being conducted related to concerns that your conduct has violated the Commission's Code of Conduct." The email notified President Molar he could contact Personnel 6 or Personnel 2 with any questions and that "Individuals who make a complaint or participate the process are protected from retaliation," and it cites PSC Policy and the Administrative Rules of Montana, as well as describing what can constitute retaliation.

Personnel 2 conveyed to us that on June 24 she went into President Molnar's office to have him sign some paperwork. After he changed the subject to describe how he had hired an attorney and private investigator to 'take out' whoever had brought the complaints, he then told her that her decision to hire an external party was 'horseshit.' After she provided her response, which included that the decision was that of the Response Team, he told her "that was a 'lame ass excuse' and the result would be media coverage that would reflect poorly on him and affect his marriage and public image."

We asked her about his demeanor when using this language, which she described as angry and she also mentioned that she hadn't felt comfortable sitting, although he was. We asked why she didn't feel comfortable sitting, and she responded that "he's told me at length his past history of physical violence, how he beat a guy to a bloody pulp not even a year ago in the Walmart parking lot. I do have ██████████████████████ so I'm very aware of myself and safety issues, so I just don't put myself in those situations." We asked if she had felt in danger of a physical confrontation occurring. She responded that, based on her background, "there is evidence that he's had a history of it, so we know that patterns mean something. So, yes, I feel like he could. The likelihood is fairly low."

Personnel 2 described, from her perspective, the inefficiencies and "poor business practice" of having certain requests made of staff, regardless of whether or not they are in violation of policies, such as the alleged waste of staff time when having staff draft a letter requesting a veto to the Governor. "The way the chain of command is supposed to work is unless it's a ticketed, docketed issue, everything that has to do with staff work is supposed to come through me. But he doesn't do that." She noted that Personnel 7 gave [a training] on IPM...and then Personnel 6 did a number of others regarding expert pay and the Commission Head and the chain of command and things like that...we've tried all the steps, we've done trainings, we've done education, we've tried to do peer to peer feedback, and then it's just escalated to this point where we've tried to tick all the boxes of doing the right things and addressing things, and it's just getting worse."

We spoke to Personnel 2 in the days following President Molnar's press conference on July 29, 2025. On August 5, Personnel 2 affirmed her allegation that President Molnar's public comments during and after his July 29, 2025, press conference constituted "continued retaliation," were "completely false" and represent personal attacks targeting her character and credibility. She described Molnar's statement in the *Daily Montanan* that she "darn near breaks into tears" when questioned about NorthWestern Energy as entirely untrue, a slight to her professionalism, and an attempt to portray her as unstable and biased toward utilities. Personnel 2 said that after she notified Molnar of the investigation he ceased normal communication with her, speaking only to yell, swear, or make undermining remarks. She observed a clear change in his behavior toward her, which she interpreted him assuming she was a party to the investigation. She also recalled Molnar publicly undermining her in multiple PSC meetings, both before and after the press

CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

conference [Personnel 2] said Molnar's claim that the investigation relates to his position on NorthWestern Energy is a deliberate attempt to drum up public support and deflect from his personal conduct. She characterized it as political grandstanding aimed at appealing to ratepayers and portraying himself as a victim of political persecution. She noted that the complaints solely relate to his workplace behavior [Personnel 2] reported that Molnar's claims that he cannot be investigated, that the investigation is illegal, and that the allegations are baseless will make employees less likely to bring up concerns regarding workplace behavior and that they damaged morale. She cited the loss of a critical staff member and said she is personally considering leaving the PSC due to Molnar's continued public disparagement, and the harm to her professional reputation. She has already experienced career impacts since Molnar's disparagement began and believes the reputational damage will be lasting. She stated that Molnar's public and private conduct will deter others from coming forward, making the PSC a workplace where employees will not feel safe reporting misconduct. She also expressed diminished confidence in the PSC's ability to manage misconduct by an elected official, noting that she had warned from the outset about the likelihood of the need to take action during the investigation to prevent further harm.

## Personnel 7

Personnel 7    has served with the PSC since 2020, [redacted] since January 2023. Personnel 7 provided documentary evidence in the form of emails and provided statements during a witness interview.

Personnel 7 was not present during the April 30th meeting, and had not watched it at the time of our interview. She did say that she had spoken with President Molnar about the interaction between himself and Personnel 1    and that he had told Personnel 7 that he had gotten heated, been terse, and probably shouldn't have. She suggested that he apologize on the record if he had gotten out of line on the record. To her knowledge she doesn't believe he followed this recommendation.

We asked Personnel 7 what she feels the basis is for his interaction with Personnel 1    and she responded that he doesn't like to be challenged. She noted a common thread of trying to teach him, to help him, being a potential trigger for him. "It got to the point by April that I felt like almost every conversation, I was kind of harping on him, because there was always something that he was doing that was just needed correction. And so, he did get upset with me a couple of times when I corrected him in front of somebody, and he asked me not to do that in front of anybody. And I said, 'it will depend on what the situation is.' I basically told him, 'if you're going to say something on the record that needs to be corrected, I'm going to correct it.'"

Personnel 7 claims that she was present "at a public meeting when the Commission President proclaimed that this agency was the second office of NorthWestern [Energy]... and I called him out on that, I talked to him privately about it, and I said, basically, what you just said on the record is that our staff is corrupt, and that this agency is corrupt, and that we're colluding with NorthWestern Energy or other regulated entities in an improper way. And there's just no basis for that."

At a quarterly Administrative Meeting, Personnel 7 recalls asking: "'Mr. President, do you really need a vote at a work session to know what the commission wants you to do on our behalf?' And he glared at me like he wanted, I mean, he glared at me in a way that only one other person's ever done in my life, and it was very intimidating and very threatening, and it was just a stare."

 CMS
Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

**Personnel 7** explained that she did believe President Molnar's direction to have staff draft a letter to Governor Gianforte regarding HB 490 to be a prohibited action based on agency IPM, explaining: "So if you're a commission officer..., like the a chair of a committee, you may work directly with Department personnel as necessary to fill their assigned duties. So having staff write the letter to the governor was not his assigned duty at that point. Once the commission voted they wanted to do that, it was. I don't think it's that big of a deal, really, but we're just trying to train commissioners and staff to not allow any particular commissioner to eat up a bunch of their time unless it's something the Commission said, 'This is what we want our staff to spend time on.'"

**Personnel 7** recalled witnessing President Molnar's statements of a sexual nature to **Personnel 4** on March 24. "President Molnar and I were advising **Personnel 4** of the need to make a correction to the minutes to include a motion **Personnel 9** had made. On a side note, I commented to President Molnar along the lines that **Personnel 4** is a conscientious employee who even works on PSC business in the middle of the night sometimes. President Molnar jested to **Personnel 4** 'Oh, do you think about **Personnel 9** in the middle of the night?' **Personnel 7** claims that **Personnel 4** "kind of wrinkled like 'that's gross'". She claims that **Personnel 4** firmly responded, 'No. I think about WORK.'"

We asked **Personnel 7** if she's heard other comments of a sexual nature which she might consider inappropriate, she responded: "He's given out too many details a few times. It made me say 'stop, please don't, please don't.' One was when he was telling us about his dating history with a CIA agent or something that he brought up...I was like, 'we really don't need to hear about your dating history.' So I talked to him about that, too. When I talked to him about the other inappropriate remarks made at the [hiring] panel, I brought that up, too. I said, 'Nobody wants to hear about your dating history.'"

She also mentioned that "it's kind of frequent...he said something about 'We've all got to put on our big boy pants and earn our big boy wage.' And you know, that leaves the females in the room kind of feeling like, 'Really, only big boys get to do this? What do you mean by put on our big boy pants? What do you mean by earn a big boy wage? Does that mean the rest of us, you know, don't qualify?' I mean, it's just, it's really demeaning, and that's just the way President Molnar is. I don't think he actually means to demean us, but I think it's just the way he is."

**Personnel 7** described how the date of our interview with her, July 22, she was misrepresented by President Molnar when he stated that the Commission voted 5-0 to veto the bill, which she states was a 3-2 vote. She also described how President Molnar has a "propensity to hear what he wants to hear, and then to use that part...and not hear the other part." She provided this situation as an example. "I said 'Sure, go ahead and point your concerns to the governor, but I'm not ok with requesting a veto.' And I think he just heard 'Write a letter to the governor' and then felt like he had free reign to do whatever he wanted." "And so I've learned not to really take him at face value when he says so and so said this or so and so said that, because he's done it to me a few times where that's not actually what I said."

**Personnel 7** described two times when she had to speak with President Molnar regarding his behavior and comments of a sexual nature. One, was a one-on-on conversation shortly after the interview panel and she claims that said to him "you know, you really can't talk like this in the workplace," but that it still continued. "It continued enough to where I and **Personnel 6** agreed that we should probably...have a formal conversation with him. These were not formal complaints, and I wanted to keep it that way"

 CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

This second meeting occurred on April 9, and she was joined by **Personnel 6** She recalls Personnel 6 ran the meeting basically, and just told him, you know, making remarks like that doesn't play well. Doesn't always land well, you know, we need to refrain from that. I think Personnel 6 explained the law to him and some things like that. And President Molnar talked about a lot of things. And then he brought up some fight that he had been in. He said he referred to his broken tooth that he had been in a fight, and because someone said something derogatory about his wife, and so he jumped, jumped the guy on the street... I don't remember if Personnel 6 had written up or distributed the discrimination policy to him or not... I think he may have, because we have a poster in the front office that says even jokes [of a sexual nature] are not permissive under the state discrimination policy. And I said, I think it would be good to bring a copy of that in. So, I think he did bring a PDF, you know, printable version of that in and distribute it at that meeting." She also relayed that "I've given him a lot of polite advice, and sometimes it's been well taken and sometimes it's been ignored, and I've given him more firm advice, and sometimes it's well taken and sometimes it's ignored."

**Personnel 7** provided insight into how President Molnar's request of staff to prepare a letter to the governor has potential to violate PSC policies. She directed us to Administration policy 2.13.1 and explained that the exceptions should be considered. She explained that her understanding of the policies is that "if you're a Commission Officer, an ad hoc appointee, like a chair of a committee, you may work directly with Department personnel as necessary to fill their assigned duties. So, having staff write the letter to the governor was not his assigned duty at that point. Once the commission voted they wanted to do that, it was. I don't think it's that big of a deal, really, but we're just trying to train commissioners and staff to not allow any particular commissioner to eat up a bunch of their time unless it's something the Commission said, 'This is what we want our staff to spend time on.' However, we clarified with **Personnel 7** that the President is considered an Officer, but she also pointed out that "it says: 'as necessary to fulfill their assigned duties,' and he had not been assigned by the Commission to write a veto [request] on behalf of the Commission at that point. So I think **Personnel 1** point on that is probably a proper point."

# Personnel 4

**Personnel 4** has served with the PSC since May of 2021 as the ⬛⬛ She ⬛⬛ ⬛⬛ individuals, two who provide ⬛⬛ support, and one who works ⬛⬛

**Personnel 4** believes she was out of the office at the time of the email exchange between her IT staff and President Molnar, but does recall checking in with them about it afterwards. She recalled another instance, sometime between January and May, when President Molnar "was disrespectful to Personnel 3 ⬛⬛ and anything IT [related]" which caused **Personnel 3** to express concern...he was visibly upset."

**Personnel 4** was in her office at the time of President Molnar's interaction with **Personnel 5** ⬛⬛ on July 2, and recalls that "I heard him the least. Personnel 5 definitely raised her voice. I didn't realize at the time she was trying to get my attention, so I didn't hear much of what he said...I think based on the look on her face, she looked upset. So I just went out to check on her." **Personnel 4** also acknowledged "[President Molnar's] tone didn't seem loud or aggressive that I recall. He sounded like he was just explaining something."

 CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

**Personnel 4** was the target of behavior by President Molnar on March 24, (described by **Personnel 7** in the previous section) in which President Molnar made a comment about her dreaming about **Personnel 8**. She didn't recall her exact response, "but I'm pretty sure I rolled my eyes or something. It didn't really impact me, didn't bother me." After being asked about it by **Personnel 2** and **Personnel 7** when **Personnel 4** was asked if she believed the comment to be inappropriate, she agreed that it is inappropriate, but not to the level where she felt compelled to file a complaint.

When asked if she could think of any other types of comments from President Molnar of this nature, she couldn't think of any, but also responded that "with some of his comments he kind of uses violent messaging."

### C.    Respondent's Statement:

*President Molnar*

Brad Molnar has served with the PSC as President of the Commission since January 2025. He was previously elected to Montana PSC in 2004, serving until 2012, as Commissioner from District 2 and elected as Vice Chair twice.

CMS attempted to provide President Molnar with the opportunity to respond to every allegation under consideration. Through communication from President Molnar's legal counsel, Matthew Monforton, President Molnar chose not to participate in the investigation.[3] PSC's retained legal counsel, Amy Christensen, informed President Molnar, through an email to his attorney on July 29, 2025, that if President Molnar has declined the opportunity to participate, "the investigation will proceed to its completion without the benefit of his participation or responses to questions." On July 30, 2025, she again states that ""I would appreciate it if you could let me know by close of business on Friday, August 1, whether Commissioner Molnar is declining to participate in an interview. If I do not hear back from you by that date, I will conclude that he does not intend to participate, and the investigation will proceed to its conclusion without his input." On August 1, 2025, Monforton sent an email to Christiansen stating, in part, "Commissioner Molnar will not participate in this investigation."

### D.    Documents

The following documents were reviewed and are included as attachments.

1.  Email from **Personnel 7** to **Personnel 6** on March 27, 2025, 8:00 PM. Subject: "Misconduct – IPM 2.11" which includes **Personnel 7** documentation of instances of potentially harassing behaviors.
2.  Email chain beginning with Email from **Personnel 2** to **Personnel 4** on March 28, 9:09AM. Subject: "Sexual Harassment". Response from **Personnel 4** on March 31, 9:03AM. Response from **Personnel 2** at 9:09AM, and final response from **Personnel 4** at 10:06AM. Emails Forwarded to **Personnel 6** and **Personnel 7** on April 1, 11:48AM from **Personnel 2** Reply from **Personnel 2** to **Personnel 6** and **Personnel 7** on April 7, 3:27PM (Just a reminder to ensure to have these meetings this week.). Forward to **Personnel 10** on April 8, 1:23PM. Response from **Personnel 10** on April 8 1:47PM and response from **Personnel 2** on April 8, 1:50PM.
3.  Email from **Personnel 6** to **Personnel 2** (cc **Personnel 10** on April 9, 2025, 3:33PM. Subject "Update re: Meeting with Pres. Molnar about

---

[3] Document #39 in Section D of this report.

CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.



Inappropriate Jokes" in which he recaps his and █Personnel 7█ meeting with President Molnar.

4. Email from █Personnel 1█ to █Personnel 2█ on May 11, 11:24PM. Subject: "formal complaint... Please let me know if there are forms I need to fill out for this purpose..." which contains █Personnel 1█ initial complaint.

5. Two email chains, beginning with President Molnar to █Personnel 3█ and █Personnel 8█ on May 13, 2025, 4:34AM Subject: "Help". Both Chains eventually include a cc to PSC Support, and one chain includes cc and eventual response by, █Personnel 7█ Comments in question from President Molnar include: "Can she work with your team to work it IT and/or the governors office to find a workable solution instead of limp excuses?" and ". Governor Gianforte needs to be informed that his burgeoning in size while decreasing in capacity State IT Team needs to be pruned and people with competence installed."

6. Email from █Personnel 3█ to █Personnel 4█ and █Personnel 2█ cc █Personnel 10█ on May 20, 2025, subject: "Email incident – President Molnar." Email body contains, in part, "The content and tone of this email were, in my view, unprofessional and hostile, and I felt bullied by his communication." And "This incident has left me feeling disrespected and hesitant to communicate openly."

7. Email from █Personnel 1█ to █Personnel 2█ and █Personnel 6█ on May 13, 3:56AM. Subject: "Re_ additional documented episode of misrepresentation." Includes within the body two emails:

   a. One from █Personnel 1█ on March 11, 12:25PM to President Molnar, █Personnel 7█ █Personnel 6█ █Personnel 12█ Subject: re: docket 2024.09.090 and misrepresentations at this morning's scheduling meeting.

   b. The other from █Personnel 1█ on March 11, 9:14AM to President Molnar █Personnel 7█ █Personnel 11█ █Personnel 9█ █Personnel 12█ and █Personnel 6█ Subject: for your consideration: cancel today's work session re: docket 2024.09.090

8. Email from █Personnel 6█ to █Personnel 2█ and █Personnel 10█ on June 19, 10:48AM. Subject: "Call from Comm'r Bukacek re: Pres. Molnar's Conduct" which includes additions to █Personnel 1█ complaint:  an example of President Molnar describing a particular region of China and the women who come from there.

9. Discrimination Complaint Resolution Form █Personnel 3█ signed and dated June 24, 2025. Basis of complaint checkbox not checked. Complaint included two email chains beginning with President Molnar to █Personnel 3█ and █Personnel 8█ on May 13, 2025, 4:34AM Subject: "Help". Both email chains eventually include a cc to "PSC Support," and one chain includes cc and eventual response by █Personnel 7█

10. Email from █Personnel 6█ to █Personnel 2█ and █Personnel 10█ on June 24, 2025, 10:50AM. Subject: Additional Discussion w/ Molnar re Independent Review. Includes response by █Personnel 2█ to █Personnel 6█ and █ █Personnel 10█ Email describes interaction between █Personnel 2█ and President Molnar in which he chastises her for the decision to conduct an external investigation.

11. Discrimination Complaint Resolution Form █Personnel 1█ signed and dated June 25, 2025. Basis of complaint includes Age, Sex, Sexual Harassment and "Other."  Attachment 1 includes inappropriate, gender related comments leveled at women; being publicly denounced as lacking knowledge related to job; entitlement to degrade individuals and entities.

15

CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

12. Discrimination Complaint Resolution Form **Personnel 5** signed and dated July 2, 2025. Basis of complaint includes "Other." **Personnel 5** Statement on the form includes, in part, "He began making additional derogatory comments about staff and Commissioners and I asked him to stop. He kept speaking over me and would not let me finish making it very difficult for me to voice my opinion...I asked him to stop his comments a total of three times. He finally stopped. His actions are contributing to a very stressful work environment and disrupting my work."

13. Email from **Personnel 1** to **Personnel 6** and **Personnel 2** on July 9, 1:45PM. Subject: "two more items". Email includes, in part: "Toward the end of the afternoon meeting, President Molnar made a reference to what **Personnel 2** had said. President Molnar said it wasn't true. I intended to ask him if he was saying **Personnel 2** was lying, but I was waiting for the proper time to bring it up, and the proper time did not present itself because there was official business to attend to even past 5 pm. Accusing **Personnel 2** of lying is highly disparaging." And "I do not feel safe in the unmonitored parking lot if President Molnar is present. When my Tuesday workday is done, and it's time to exit the building, I am having to monitor his comings and goings in order to not be in that parking lot with him. I have no way of knowing if he would exhibit violent behavior against me, but I know he has misrepresented and mischaracterized me many times. For that reason, I will not have conversations with him without a witness... including in the parking lot. And if he did get violent with me, I would not put it past him if he said I started it."

14. Email from **Personnel 1** on July 15, 2025, 9:42PM, Subject: "RE: Meeting Request". **Personnel 1** recommends CMS to speak with **Personnel 7 Personnel 7** expressed to me how severely he lacked insight and was resistant to change. Getting a sense of that from **Personnel 6** and **Personnel 7** could give you an idea of how likely formal sensitivity training is to work for him." **Personnel 1** also writes: **Personnel 7** told me of an incident where after hours she got a weird vibe from him... more the way he said it that exactly what he said... something about working out at the gym. I don't remember the details. **Personnel 7** also said that some of the types of comments he makes about women can be used as a grooming technique, and/or used to size up a woman's interest in him or tolerance of inappropriate comments. I don't know if she was speaking in generalities or specific to something she knows about him."

15. Email from **Personnel 1** on July 16, 8:17AM. Subject: "this might be my final thoughts on this." Email includes, in part: "In Brad's case, his entitlement attitude toward women seems part of a more generalized sense of entitlement and superiority over everyone, males and females," and **Personnel 7** also told me **Personnel 3** **Personnel 12** and **Personnel 6** have considered leaving the PSC at least in part because of P. Molnar's verbal abuse. I have no direct knowledge of that."

16. Sections from .pdf document "President Molnar Documentation" from **Personnel 2** in which she documents personal observations, informal and formal complaints and concerns reported to her, and her/agency responses to behaviors on the part of President Molnar.

17. March 11th, 2025, MT PSC Business Meeting.[4]

18. April 30, 2025, MT PSC Legislative Update[5]

---

[4] "March 11th, 2025 MT PSC Business Meeting." *YouTube*, uploaded by Montana Public Service Commission, 11 Mar. 2025, www.youtube.com/watch?v=gMlPE0YWmuQ.

[5] "April 30th MT PSC Legislative Update." *YouTube*, uploaded by Montana Public Service Commission, 30 Apr. 2025, www.youtube.com/watch?v=h3oRQFfHbso.



Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

19. July 22, 2025, MT PSC Business Meeting[6].
20. Email from Personnel 1 / Personnel 12 on August 1, 2025, to President Molnar Personnel 6 Personnel 2 Subject: "another misuse/abuse of staff time—for which we will all pay"
21. Email chain between President Molnar and Personnel 7 from August 4-6, 2025, subject: "RE: Workplace Courtesy" in which President Molnar and Personnel 7 which discusses Personnel 1 courtesy towards others and her use of email carbon copies, and Personnel 9 request that Personnel 7 peak with Personnel 1 about the behaviors, which she confirms that she did.
22. Email from Personnel 1 on July 23, 2025, to the rest of the Commissioners and Personnel 2 Personnel 12 and Personnel 6 subject: "stealing people's time is a form of abuse" in which she alleges that President Molnar "absorbs PSC staff and commissioner time that could otherwise be spent on productive work" when he brings items forward that do not have staff or commissioner support.
23. July 24, 2025, email from Personnel 2 subject: "RE: Sexual Harassment Documentation" to CMS investigators which describe Personnel 2 concerns about President Molnar's publicly targeting staff.
24. July 30-August 11, 2025, email chain between multiple PSC staff and Commissioners, subject: "NARUC Renewal Membership" in which President Molnar respond to Personnel 2 in part: "YOU contacted NARUC Senior Director to discuss my financial decision? To give me guidance? YOU may have just messed up a really big deal. Yes, really big. When I need your assistance in a financial decision or in negotiating, I will ask you directly. Don't wait by the phone."
25. Emails between legal counsel Amy Christensen and Matthew Monforton, subject "Commissioner Brad Molnar" between July 24, 2025 and August 1, 2025, which describe attempts to schedule a time to meet with President Molnar to gather his input into the investigation.

Documents 26 -38 relate to media coverage of President Molnar's press conference on July 29, 2025.

26. July 31, 2025, email from Personnel 2 subject: "RE: Re: Continued Retaliation," to investigators, and PSC's retained legal counsel for the investigation, Christensen, which includes links to news articles about President Molnar's press conference and Personnel 2 concerns of his continued retaliation and attacks on her character.
27. July 30, 2025, Daily Montanan article, "PSC President Brad Molnar says workplace investigation waste of taxpayer resources"[7]
28. July 30, 2025, Missoula Current. Article "Montana PSC President Molnar Under Investigation"[8]

---

[6] "July 22nd, 2025 MT PSC Business Meeting." *YouTube*, uploaded by Montana Public Service Commission, 22 Jul. 2025, www.youtube.com/watch?v=QXJxCcyOq9E.

[7] "PSC President Brad Molnar Says Workplace Investigation Waste of Taxpayer Resources." *Daily Montanan*, 30 Jul. 2025. https://dailymontanan.com/2025/07/30/psc-president-brad-molnar-says-workplace-investigation-waste-of-taxpayer-resources/

[8] "Montana PSC President Molnar Under Investigation." *Missoula Current.*, 30 Jul. 2025. https://missoulacurrent.com/psc-president-investigation/

17

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

29. July 29, 2025, KPAX article "PSC president Molnar under investigation, claims he's being unfairly targeted"[9]

30. July 29, 2025, KTVH article "PSC president Molnar under investigation, claims he's being unfairly targeted"[10]

31. July 29, 2025, Missoulian article "Montana PSC President's conduct under investigation; Molnar alleges inquiry is 'illegal'"[11]

32. July 29, 2025, Helena Independent Record article "Video: Montana PSC President addresses internal investigation against him"[12]

33. July 30, 2025, WVNews article "PSC President Brad Molnar says workplace investigation waste of taxpayer resources"[13]

34. August 2, 2025, email from President Molnar, subject: "RE: Retaliation Advice" to ▮▮▮ Personnel 7 Personnel 10 ▮▮▮ and President Molnar's legal counsel, Matthew Monforton. In this email President Molnar acknowledges that his statements to the press may have caused discomfort.

35. August 3, 2025, email from Personnel 1 to Personnel 10 subject: "Brad Molnar retaliating" which describes Personnel 1 concern about her name being mentioned, among others, and describes the calls she received from reporters as part of the investigation, having been named by President Molnar "as part of the causes of his woes in this investigation." Describes chilling effect his activity will have.

36. August 4, 2025, email from Personnel 7 to Personnel 10 CMS investigators and PSC retained legal counsel Christensen, subject "RE: Brad Molnar retaliating" which includes screenshots of a request for comment to Personnel 7 from a member of the press.

37. August 1, 2025, letter from Personnel 7 on PSC letterhead addressed to President Molnar which addresses the active investigation and reminding him of the prohibition on retaliation.

38. July 25, 2025 email from Personnel 2 to CMS Investigators and PSC retained counsel Christensen, subject: "FW _EXTERNAL_ Re_ Always relying on staff is stealing from rate payers" in which Personnel 2 states that "his allegations that I publicly attacked him are baseless...I had Personnel 6 review my comments ahead of time to be sure they were accurate and fact-based."

[9] "PSC President Molnar under Investigation, Claims He's Being Unfairly Targeted." *Www.Kpax.Com*, 29 Jul. 2025, www.kpax.com/news/montana-politics/psc-president-molnar-under-investigation-claims-hes-being-unfairly-targeted. Accessed 31 Jul. 2025.

[10] "PSC President Molnar under Investigation, Claims He's Being Unfairly Targeted." *Www.Ktvh.Com*, 29 Jul. 2025, www.ktvh.com/news/montana-politics/psc-president-molnar-under-investigation-claims-hes-being-unfairly-targeted. Accessed 31 Jul. 2025.

[11] "Montana PSC President's Conduct under Investigation; Molnar Alleges Inquiry Is "Illegal"." *Missoulian*, 29 Jul. 2025. https://missoulian.com/news/state-regional/government-politics/article_7f48b6bc-b2fd-5c6a-8f0c-6ad4a40b7b43.html

[12] "Video: Montana PSC President Addresses Internal Investigation against Him." *Helena Independent Record*, 29 Jul. 2025. https://helenair.com/video_53bf4918-3038-5f7d-9ee3-f02dd3a0287a.html

[13] "PSC President Brad Molnar Says Workplace Investigation Waste of Taxpayer Resources." *West Virginia News (WVNews)*, 30 Jul. 2025. https://www.wvnews.com/news/around_the_web/states/brad-molnar-president-of-the-montana-public-service-commission/image_694fa846-11ce-5eea-981d-117d849868ef.html


CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

### E.    Relevant Policies and Laws

The following policies and statutes listed below are applicable to the review:

*Administration Policy, effective 07/09/2024*

2.10.3.2. IT & Administrative Support: This unit is responsible for the department's administrative support, technology systems, reception services, inventory, and upkeep of office equipment, supplies, and common areas. It provides mail processing, purchasing, and travel arrangement services; facilitates online and in-person department meetings; ensures timely compilation, assembly, and distribution of commission agendas, minutes, and work session materials; manages the department's record-keeping and retention requirements; and provides up to one hour per week of individualized secretarial and technology support to each commissioner and member of ACT. The group coordinates with the External Affairs unit to manage public access to commission meetings, cross-train unit staff, and enlist additional coverage of reception, technology, and administrative support when needed.

2.13.1.2. Individual commissioners go through the President to request commission meetings, work sessions, schedule changes, agenda items, or actions of the Commission.

2.13.1.3. Individual commissioners go through the ED to work with staff within the Centralized Services Division.

2.13.1.4. Individual commissioners go through the Chief Regulator to work with staff within the Regulatory Division.

2.13.1.5. Individual commissioners go through the Chief Legal Counsel to work with staff within the Legal Division.

2.13.1.6.1. Commission officers and ad hoc appointees may work directly with department personnel, as necessary to fulfill their assigned duties.

2.13.1.6.2. Individual commissioners may confer with staff, regarding dockets or other commission business to which the staff member is assigned. In order to manage time-sensitive workload balances within the department, such interactions should be brief, unless an appointment or staff assignment has been approved through the chain of command.

2.13.1.6.3. Individual commissioners may utilize up to one hour per week of administrative support staff time for secretarial, clerical, and technology services to support the commissioner's official duties. Such utilization is subject to staff availability and prioritization as determined by an appropriate supervisor or the President.

*Code of Conduct Policy, effective 8/13/2024*

2.2.3. Commissioners are expected to perform their essential job functions and produce work that consistently meets or exceeds professional standards for individuals in the same or similar positions.

2.2.6 Department personnel are expected to maintain a professional, courteous, productive, and respectful working relationship with co-workers, peers, supervisors, and the general public. Threatening, abusive, obscene, or derisive behavior or communications are strictly prohibited.

 CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

2.7. Commissioners' Impartial and Diligent Performance of Duties

2.7.1. The official duties of a commissioner take precedence over all other activities. A commissioner's duties include all the duties of office prescribed by law, administrative rule, and set forth in the DPSR Internal Policy Manual. In the performance of these duties, the following standards apply:

...

2.7.1.5. A commissioner should maintain order and decorum in all proceedings, and abide by applicable rules of order.

2.7.1.6. A commissioner should be patient, dignified, and courteous to litigants, lawyers, witnesses, fellow commissioners, staff, and others with whom the Commission deals in an official capacity, and should expect and strive to secure similar conduct of the same.

2.12. Equal Employment Opportunity, Non-discrimination, and Harassment Prevention

...

2.12.2. The department will not tolerate any behavior that negatively focuses on a protected class. Although a behavior or pattern of behavior might not constitute illegal discrimination, it might still violate this policy.

*Communications Policy, effective 12/05/23*
2.4.

Individual commissioners, staff, and contractors must be deliberative and judicious with their speech in public settings, written communications subject to public disclosure, and when interacting with the media. When acting in an official capacity, they must only speak in turn and should always communicate in a courteous, professional, and respectful manner.

F.    Omissions

**Personnel 10**    and **Personnel 6**    were not interviewed as witnesses in this investigation, nor were other PSC Commissioners who were not direct complainants or referred to us by complainants.

G.    Analysis

This section contains each itemized Issue which was investigated, including the allegation, Evidence Considered, and our Findings. We would normally also include Respondent statements here, but through communication from President Molnar's legal counsel Matthew Monforton, President Molnar chose not to participate in the investigation.[14]

---

[14] "In response to your request for confirmation by close of business on August 1, 2025: Commissioner Molnar will not participate in this investigation." Email from Matthew Monforton to Amy Christensen on August 1, 2025, Subject: "Re: Commissioner Brad Molnar"

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com


CMS

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

1. Issue 1, Derisive Behavior

Did PSC President Brad Molnar engage in "dismissive, derisive, and otherwise abusive behavior" toward PSC Commissioner Bukacek in violation of PSC Personnel Policy 2.2.6 Code of Conduct Policy; and 2.2.3 of the Code of Conduct Policy; and 2.4 of the Communication Policy during the April 30, 2025, business meeting.

a) Allegation

In her email to █Personnel 2█ Commissioner Bukacek states:

> *President Molnar's dismissive, derisive and otherwise abusive behavior toward me was demonstrated multiple times during the 4/30/25 business meeting linked to here https://www.youtube.com/watch?v=h3oRQFfHbso*
>
> *Numerous people called me after experiencing President Molnar's belittling tenor, manner and words in this video... including but not limited to... Publicly telling me my knowledge of the topic is inadequate and my words immaterial (time stamp 19:28 though I was clearly well-versed), repeatedly asking me an irrelevant (time stamp 25:16; I had voted to monitor, not oppose or support the bill, so my testifying would have been inappropriate) question in a strange, mocking tone, misrepresented my position at least twice... At the end, after the microphones were off, he told me I should talk to the governor myself. When I told him that would be silly, he said, "it wouldn't be the first time."*

b) Evidence (Witness Statement and Documents)

█Personnel 2█ **Personnel 5** █████████████ and █Personnel 7█ all provided examples of similar statements being said directly toward or around to them.

CMS also viewed the Business Meeting linked by Commissioner Bukacek. From timestamp 19:24 forward in the April 30th MT PSC Legislative Update, President Molnar, in addressing Commissioner Bukacek's concern about requesting a veto from the Governor on a bill that passed with significant support, says to Commissioner Bukacek: "I'm not going to debate with you. Frankly, your knowledge on this subject is not to the degree that it would have to be to debate...what you said was immaterial." At timestamp 24:40, Commissioner Bukacek asks President Molnar if he expressed his concerns during the session in writing. He responds with a recap of his previous statement that demonstrated how little time he would have had to present his ideas in front of committee (timestamp 25:00). She corrects him, "I said written. You misrepresented what I said earlier, you're misrepresenting me now." He responded:

"Everybody in the state of Montana has that opportunity. Did you write one?"

Bukacek: "I'm not the one asking for a veto."

Molnar: "Did you write a memorandum of understanding or concern to the legislature?"

Bukacek: "Relevance, sir?"

Molnar: "Did you?"

Bukacek: "Relevance?"

Molnar: "The relevance is that you seem to believe I was going to do that? You're a commissioner, I'm a commissioner. Did you do that?"

Bukacek: "Irrelevant"

...

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com



CMS

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

> Bukacek: "I didn't vote to oppose it...I was one of the two that voted to monitor and not oppose. Just a little chronological dispute there."
> Molnar: "Interesting beyond belief."

We observed in recorded, but primarily in written, exchanges that Commissioner Bukacek also sent emails to Commissioners and staff using language that could be considered inappropriate.

c)  Findings

Based on a preponderance of the evidence, when President Molnar responds to Commissioner Bukacek's question with a question using a mocking tone rather than address the original inquiry, his response can be perceived as "dismissive, derisive, and otherwise abusive behavior" toward Commissioner Bukacek. This behavior, which disregards Commissioner Bukacek's request for information, conveys superiority or disdain through his tone, and has the possibility of humiliating or belittling the questioner, in violation of PSC Code of Conduct policies 2.2.6 and 2.2.3, specifically that his behavior did not meet or exceed professional standards, and that he did not maintain a professional, courteous or respectful working relationship with his co-worker; "derisive behavior or communications are strictly prohibited."

This behavior, which Commissioner Bukacek described as "dismissive, derisive and otherwise abusive," also violates 2.4 of the Communication policy, which states that "...When acting in an official capacity, they [Individual Commissioners] must only speak in turn and should always communicate in a courteous, professional, and respectful manner." This review recognizes that both Commissioners engaged in conduct that falls short of the policy expectation.

## 2.  Issue 2, Staff Time

Did PSC President Brad Molnar misuse staff time in violation of Administration Policy 2.10.3.2 or 2.13.1.6.3 on April 30, 2025, when he asked staff to draft a letter to the Governor requesting a veto of HB 490?

a)  Allegation

**Personnel 1** in her email to **Personnel 2** and **Personnel 6** subject: "RE: formal complaint... Please let me know if there are forms I need to fill out for this purpose..." states:

> At time stamp 18:51 he publicly states the staff are almost done with his letter to the governor asking him to veto HB 490... in other words, before the commissioners had voted whether or not we wanted the letter sent to Governor Gianforte, President Molnar had already pushed staff to write the letter. This is one example of what I consider misuse of staff's time. Given what I see as self-absorption in his own areas of focus, I am certain there are many more examples of abuse of our fine staff.

b)  Evidence (Witness Statement and Documents)

**Personnel 7** and **Personnel 2** described the IPM and the chain of command in their witness statements. While neither believed this specific instance to be of particular gravity, they described the process, the expectations, and their attempts to ensure President Molnar was aware of the proper steps. CMS reviewed the PSC's Administrative policies relevant to the Chain of Command and other policies about commissioner utilization of staff time (2.13.1.2-5 and 2.13.2.6.1-3).



CMS    Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

**Personnel 1** provided us with an email that she sent on July 23, 2025, to the rest of the Commissioners and Personnel 2 **Personnel 12** and **Personnel 6** subject: "stealing people's time is a form of abuse" which contains, in part:

*When Commissioner Molnar brings forth emails and public meetings for topics that do not have staff and commissioner support and /or are otherwise baseless--- it absorbs PSC staff and commissioner time that could otherwise be spent on productive work. It takes utility staff time. Utility staff spent several hours yesterday, plus travel time, which took away time from practical/productive work they could have been doing on their fire mitigation plans. All unnecessary or inefficient use of utility staff time costs ratepayers. Commissioner Molnar already caused delays in the fire mitigation plan process by his mandates in letters to Mr. Jacobson and Merkel...He ignored the will of the majority of commissioners expressed in the last administrative meeting. He knew he didn't have the support, yet pushed it forth...*

c) Findings

We did not identify how much staff time was spent preparing the letter to the Governor, but have the reference to "several hours" in **Personnel 1** email on July 23. When reviewing the PSC's Chain of Command policies, and while acknowledging that the President is an Officer, it does appear that his request of staff to draft a letter to the Governor requesting a veto was not yet something the Commission had agreed to. Based on the evidence, and in the absence of any rebuttal or alternative explanation from President Molnar due to his refusal to participate, it appears President Molnar's request did not align with Administration Policy . However, there is insufficient information to substantiate that it constitutes a policy violation.

3. Issue 3, Discriminatory Comments

Did PSC President Brad Molnar make discriminatory comments to **Personnel 7** and **Personnel 1** on March 4, 2025; discriminatory comments to **Personnel 1** on March 3, 2025; discriminatory comments to **Personnel 4** on March 24, 2025; discriminatory comments to **Personnel 2** on April 7, 2025; inappropriate comments to a federal official during the June rate case; and disparaging comments regarding Personnel 2 based on sex in violation of PSC Code of Conduct Policy 2.12 Equal Employment Opportunity, Non-discrimination, and Harassment Prevention?

a) Allegation

In her email to Personnel 2 on May 11, 2025, subject: "RE: formal complaint... Please let me know if there are forms I need to fill out for this purpose..."**Personnel 1** wrote:

*The day of your interview, I believe it was March 4th2025, President Molnar made an inappropriate comment in front of me and Personnel 7 about the PSC considering having "topless Tuesdays". The night before, when he and I were both working late, President Molnar made a comment to me about him as a teenager, along with his friends, watching girls in their bikinis. The same evening, in my office, while his wife was talking to him on the phone, he put her on speaker phone without asking her permission and made mocking gestures like rolling his eyes in response to what she was saying. If*

23

 

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.

*President Molnar would talk in such a manner around* Personnel 7 *and I, it is certain he will talk that way round others. My concern is not for my safety nor my feelings, but primarily for the rest of the staff who may not have the temperament to speak up, or may feel too intimidated to speak up. This type of language creates a toxic environment.*

In her email to Personnel 6 and Personnel 2 subject: "Misconduct – IPM 2.11," Personnel 7 notes that on March 24:

*I observed President Molnar make another inappropriate remark, this time to* Personnel 4 *while working at the reception desk. President Molnar and I were advising* Personnel 4 *of the need to make a correction to the minutes to include a motion* Personnel 9 *had made. On a side note, I commented to President Molnar along the lines that* Personnel 4 *is a conscientious employee who even works on PSC business in the middle of the night sometimes. President Molnar jested to* Personnel 4 *"Oh, do you think about* Personnel 9 *in the middle of the night?"* Personnel 4 *immediately and firmly responded, "No. I think about WORK."*

b) Subject Response

It is important to note that in the Daily Montanan[15,] President Molnar acknowledges the PSC had multiple conversations with him regarding his sexually-based remarks and contradicts himself by saying that the PSC should have taken the steps he just acknowledged them taking: "he believes the appropriate way to handle such concerns would be for a PSC staff member to approach him and request he be more sensitive — as a first step."

His statements demonstrate the PSC followed policy in their attempts to address his inappropriate behavior.

*However, Molnar said legal staff shared a couple of specific examples of problematic incidents with him, albeit ones he does not believe merit an investigation and public resources.*

*Molnar most recently took office with the PSC in January, but he said when he was first elected in 2004, the head of the commission was described as "chairman."*

*He currently holds the top post among the five elected commissioners, and he said the PSC's new term is "president," but he offers an embellished version some have found offensive.*

*"El presidente de la grande mucho macho man Molnar commander of all the forces of the five districts," he said.*

*Molnar said he received word he should be more sensitive to women, but he disagrees the title he uses in jest is a slight.*

---

[15] Document #25 in Section D of this report


CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.

"It's funny," Molnar said. "I'm not saying women can't be de la grande anything. I'm saying (the title) should be chairman."

He also said he was told something he said at a meeting could have been construed as having sexual innuendo, a conclusion he said would require multiple leaps.

"You can make something out of anything," he said.

Either way, Molnar said he believes the appropriate way to handle such concerns would be for a PSC staff member to approach him and request he be more sensitive — as a first step.

c)  Evidence (Witness Statement and Documents)
Four of the women who participated in the investigation as complainants or witnesses recalled instances of President Molnar making comments of a sexualized nature:
- Referencing "Topless Tuesdays";
- Describing how as a teenager he and his friends were "watching girls in their bikinis";
- Describing his retirement desire of being "served drinks by ladies dressed only in hula skirts;"
- Describing the women from a certain area in China to a federal official during the June rate case;
- References to a female staff member dreaming about a male Commissioner;
- Telling the Commission that they're going to be "putting on big boy pants" and earning "big boy" wages.

Personnel 7            and Personnel 6            took opportunity to follow PSC policies ("In instances where an offending individual may not be aware that they are violating this policy, the solution may be as simple as a polite conversation to bring it to their attention so they have an opportunity to understand the issue and make voluntary corrections." Code of Conduct Policy 2.11.1.) by meeting with President Molnar on multiple occasions in March and April to attempt to bring his behavior and its impact to his attention.  He acknowledges as much in his comments as recorded by the Daily Montanan[16].

Also recorded in the Daily Montanan, "Molnar said... Personnel 2 darn near breaks into tears' when he asks questions about NorthWestern—a claim she flatly denied—and Personnel 1 and Personnel 2 Personnel 6 are in the same boat." His statement appears to portray     s unstable and can be perceived as playing on gender stereotypes of women (although he lumps Personnel 6 a male, into the disparaging statement).

Personnel 6            documented the April 9 meeting in an email to Personnel 2 and Personnel 10 subject: "Update re: Meeting with Pres. Molnar about Inappropriate Jokes" in which he recounts the meeting.

Pres. Molnar, Personnel 7 and I met this afternoon to discuss his pattern of telling jokes that either are, or could be construed as, having sexual connotations. I gave him copies

---

[16] Document #25 in Section D of this report



Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.

of both the State of Montana and Federal EEOC posters that explain workplace harassment and discrimination. I highlighted the content of the Montana poster that discusses sexually oriented discussions, jokes, innuendoes, and comments as examples of a hostile work environment.

Initially, he said he did not remember the incident at the front desk, where he joked that **Personnel 9** was the reason **Personnel 4** was up late at night, thinking about work. Later, he said that the remark was not intended as sexual, and he would never make such a joke. I explained that what he intended is not what matters, and that we all need to be sensitive to how different people will hear and interpret the things we say. In response, he said he can't possibly know or predict how everyone will interpret and react to his jokes. I reiterated that that is why we need to be careful about the things we say and remember that we are in a professional environment.

He said he would do his best to be careful in the future, but that he couldn't guarantee he would be perfect.

We asked **Personnel 10** about any required training through the State of Montana which Commissioners and staff might have had to take regarding harassment and discrimination. In her email response to us on July 23, 2025, she replied: "Currently, I'm not seeing any of the commissioners have completed the training."

d) Findings

Complainants and witnesses recounted unwelcome comments of a sexual nature made by President Molnar. Complainants and witnesses provided documentation of attempts to make President Molnar aware of the impact and inappropriateness of his unwelcome sexual comments. President Molnar's public comments, as captured by the Daily Montanan, including potential gender stereotyping (**Personnel 4** darn near breaks into tears'").

The Equal Employment Opportunity Commission (EEOC) Guidance on analyzing harassment claims[17] states that "Title VII prohibits employment discrimination, including unlawful harassment based on sex... Harassing conduct based on sex includes conduct of a sexualized nature, such as unwanted conduct expressing sexual attraction or involving sexual activity (e.g., "sexual conduct")... Harassment based on sex under Title VII also includes non-sexual conduct based on sex, such as sex-based epithets; sexist comments (such as remarks that women do not belong in management or that men do not belong in the nursing profession); or facially sex-neutral offensive conduct motivated by sex (such as bullying directed toward employees of one sex)." [internal references removed]

The Equal Employment Opportunity Commission (EEOC) Guidance on analyzing harassment claims also advises that there is no 'magic number' of harassing incidents that establish a hostile work environment. But it is widely accepted that – a few stray remarks - do not satisfy the burden. It also states that "An employer is vicariously liable for a hostile work environment created by a supervisor." However, an employer may have an affirmative defense ("Faragher-Ellerth" defense)

---

[17] "Enforcement Guidance on Harassment in the Workplace." U.S. Equal Employment Opportunity Commission, 29 Apr. 2024, www.eeoc.gov/laws/guidance/enforcement-guidance-harassment-workplace. Accessed 5 Aug. 2025. No. 915.064



Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

by proving, in part, that "the employer acted reasonably to prevent and promptly correct harassment…If the employer fails to exercise reasonable care to correct the harassing behavior, it will be unable to satisfy prong one of the Faragher-Ellerth defense, regardless of any policy, complaint procedure, or training." The PSC's efforts to prevent and correct the harassing behavior are demonstrated by the meetings with President Molnar regarding his behavior, once with ▮▮ Personnel 7 and the second with Personnel 7 and **Personnel 6** ▮▮▮▮ However, the continuation of unwelcome comments or behaviors indicate the need for further intervention or corrective action.

The EEOC also provides a *Summary of Key Provisions*[18] regarding harassment in the workplace. Within this guidance, it offers questions to assist with providing general information. #11 of the guidance reads, in full:
**When determining whether conduct was objectively hostile, what evidence may be considered?**

*Whether conduct creates a hostile work environment depends on the totality of the circumstances. Some factors that may be considered include the frequency and severity of the harassing conduct; how physically threatening or humiliating it was; whether and if so, how much, it interfered with the employee's work performance; whether and if so, how much, psychological harm it caused; and any power disparity between the victim and the harasser.*

Based on the evidence, and in the absence of any rebuttal or alternative explanation from President Molnar due to his refusal to participate, it is more likely than not that President Molnar's behavior violates PSC Code of Conduct Policy 2.12 Equal Employment Opportunity, Non-discrimination, and Harassment Prevention. Policy 2.12.2 says, "the department will not tolerate *any* behavior that negatively focuses on a protected class." If the unwelcome comments or behaviors continue or escalate, they could rise to the level of an illegal hostile work environment under EEOC guidance. Specifically, President Molnar is in a position of power over Commissioners (as an Officer, Commission President[19]) and staff, President Molnar was counseled twice on the matters of his discriminatory comments of a sexual nature, this counseling is in alignment with PSC policy, and his behavior has continued despite those interventions (President Molnar's statement about "the most beautiful women in China" coming from a particular region were alleged to have been spoken during the NorthWestern Energy general rate case, which occurred between June 9-20, and his comments to the Daily Montanan were on July 29, both of these instances were after the second, and most recent, documented instance of President Molnar being counseled regarding his unwelcome sexual comments, which was on April 9, 2025).

---

[18] *"Summary of Key Provisions: EEOC Enforcement Guidance on Harassment in the Workplace." U.S. Equal Employment Opportunity Commission, www.eeoc.gov/summary-key-provisions-eeoc-enforcement-guidance-harassment-workplace. Accessed 5 Aug. 2025.*

[19] PSC Internal Policy Manual's Administration Policy states that "The President reports to the Commission…" (2.9.3.4.3) but also that "The President has authority…to act as the department head on behalf of the Commission in all administrative matters not otherwise delegated by law, administrative rule, policy, or an act of the Commission." (2.9.3.4.1) The President also "designates commissioners and staff for special assignments." (2.9.3.4.2) and individual commissioners must "go through the President to request commission meetings, work sessions, schedule changes, agenda items, or actions f the Commission." (2.13.1.2)



Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.

### 4. Issue 4, Misrepresentation

Did PSC President Brad Molnar publicly misrepresent Commissioner Bukacek during the April 30 business meeting and March 11, 2025, scheduling meeting, and **Personnel 7** during the July 22, 2025, business meeting in violation of PSC Personnel Policy, 2.2 General Standards of Conduct and Performance section 2.2.6?

a) Allegation

Commissioner Bukacek alleges that multiple times during the April 30th business meeting she is misrepresented by President Molnar, including alleging that he misrepresented her by saying that she and he had discussed a particular NorthWestern Energy work session item and that she had supported his motion or his position.

Commissioner Bukacek also alleges that on March 11, President Molnar misrepresented her statement that "Two of five Commissioners were not in office, were not PSC Commissioners, when on March 6th, 2024, NorthWestern Energy representatives gave us an hour and a half presentation in response to our letter to them dated January 30th, 2024, asking them to explain their response to the cold winter event that happened mid-January of last year."

**Personnel 6** described how earlier on the date of our interview with her, July 22, she was misrepresented by President Molnar when he stated that the Commission voted 5-0 to veto the bill, which she states was a 3-2 vote.

b) Subject Response[20]

President Molnar responded during the March 11th meeting: "True, only 3 commissioners currently seated were here at the time and therefore saw the presentation by NorthWestern Energy. However, I was a senator at the time and I saw the same presentation through the Montana Consumer Council because I was on the legislative oversight Committee."

c) Evidence (Witness Statement and Documents)

On April 30, during the Legislative Update meeting, Commissioner Bukacek alleges that President Molnar misrepresents her multiple times. One instance regarded his statements which insinuated to her that she didn't know the governor could veto a bill, and another instance where he responds to a question about having opportunity to put concerns about HB 490 in writing during the legislative session with a recap of his previous statement that demonstrated how little time he would have had to present his ideas in front of committee. The content of this exchange is provided in the Evidence section for the allegation regarding President Molnar's derisive behavior.

CMS reviewed video of the April 30th MT PSC Legislative Update meeting[21]. As she conveyed to CMS Investigators during her interview, Commissioner Bukacek can be seen sliding a note to President Molnar, which she says was "trying to be polite" while informing him that he was misrepresenting her.

We reviewed an email from Commissioner Bukacek from Tuesday, March 11, 2025, subject "re: docket 2024.09.090 and misrepresentations at this morning's scheduling meeting":

---

[20] Document #17 in Section D of this report; Timestamp 9:10

[21] Document #18 in Section D of this report; Timestamp 21:25



Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.

*I have a good memory and do not recall a discussion with you prior to today regarding your NWE agenda item. I do not believe the conversation happened, and that is a serious allegation from you that you and I had that conversation and I agreed with your motion.*

*If we had had that discussion, my opinion would have been the same as it was today if I had known your questions...*

We also viewed the July 22nd meeting referenced by Personnel 7 and during it, President Molnar says: "I do know we voted 5-0 for the governor to veto."[22] (Of note, Personnel 9 also mis-remembers the vote count: "My concern is this entire commission stood against House Bill 490.") Commissioner Bukacek asks to address his incorrect statement.

Personnel 7 mentioned during our interview that President Molnar has "a propensity to hear what he wants to hear, and then use that part of it...and not hear the other part." She reiterated it a different way, which is particularly relevant to this allegation, she said: "But he does frequently hear what he wants to hear, and then represents maybe... what he wants us to think people said."

In an email to us on July 23, 2025, subject: "significance of misquote," Commissioner Bukacek notes that:

*People can innocently misquote, I know that. I have seen and heard from Commissioner Molnar so many misrepresentations of what people said and did that I am confident many, if not most or all, of his misrepresentations are intentional.*

*In his misrepresentation of me at that meeting, the more significant portion is his saying he and I had a meeting about the topic and I agreed with him. I am 100% certain we did not have that meeting. I am equally certain I would not have been in agreement with him in this case.*

In an earlier email, on May 13, 2025, to Personnel 2 and Personnel 6 subject: "RE: additional documented episode of misrepresentation," she explains why she feels the misrepresentations to be a form of abuse:

*I don't have any way to know whether President Molnar's misrepresentations are intentional. It is possible he doesn't remember correctly. Either way, there is a toxic pattern that is abusive and appears to violate code of conduct 2.2.6. below.*

*Intentional misrepresentations, as you know, are a form of abusive manipulation. There is the one-on-one intentional misrepresentation called "gas-lighting," where an individual tries, by persuasive repetition, to convince someone of something that was or was not done or said by the victim or perpetrator.*

*Public display of misrepresentation can serve the purposes of gaslighting, and can also be used to further an agenda by discrediting with false information the opposing side.*

Commissioner Bukacek has ceased to meet with President Molnar one-on-one due to concerns about being misrepresented by him, as of March 11, 2025.

---

[22] Document #19 in Section D of this report; Timestamp 1:13:15

CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

**Personnel 2** referenced this dynamic between Commissioners Bukacek and Molnar during her interview, as well—"Commissioner Bukacek has had a policy in place...because she's felt that he's mischaracterized what she said so many times she wont' even allow him to come to her office without another person present, because she feels like she needs a witness there." She told us about her own dynamic with President Molnar, stating that "He'll go around my back, he'll talk poorly to me in front of staff, tell lies about me and staff that aren't even true."

**Personnel 2** sent an email on July 24, 2025, to CMS investigators, subject: "RE: Sexual Harassment Documentation," in which she describes a work session which President Molnar introduced regarding HB 490:

> *This issue had been discussed previously with the Commissioners, and a majority expressed their opposition to his proposition. Instead of complying, he ordered staff, under his Presidential authority, to cease and desist all communications with NWE unless they were recorded, in direct opposition to the will of the Commission, which is what the President is legally obligated to carry out. He then scheduled a public work session to force me to prepare public statements which he then accused of being untrue. He provided a wildly inaccurate and misleading perspective of his motion. My interpretation of his actions is that he is attempting to build public support to remove me from my position and undermine my role.*

d) Findings

President Molnar is documented as having made the alleged statements which are not factual. In one instance he notes the correction he received and explains his intent.

Based on the evidence, and in the absence of any rebuttal or alternative explanation from President Molnar due to his refusal to participate, President Molnar did misrepresent fellow Commissioners on the occasions referenced.

PSC's Code of Conduct Policy 2.2.6 reads: "Department personnel are expected to maintain a professional, courteous, productive, and respectful working relationship with co-workers, peers, supervisors, and the general public. Threatening, abusive, obscene, or derisive behavior or communications are strictly prohibited." We acknowledge that we cannot know President Molnar's intent, as he declined to participate in an interview. We can know the impact, as conveyed by Commissioners Bukacek and **Personnel 7** The impact of his behaviors indicate that the behaviors fall short of the policy's expectation of maintaining a "...courteous, productive, and respectful working relationship..." However, regarding the allegation of abusive communication, there is insufficient evidence to support a finding of a policy violation.

## 5. Issue 5, Unprofessional Communication

Did PSC President Brad Molnar engage in unprofessional, hostile, and bullying communication in violation of Personnel Policy 2.2.6 through his email exchanges with **Personnel 3**  and **Personnel 8** on May 16, 2025.

 CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

a) Allegation

In his email to his supervisor, **Personnel 4** **Personnel 2** and **Personnel 10** subject: "Email incident – President Molnar," **Personnel 3** states:

*I am writing to express serious concerns about emails directed to IT* **Personnel 8** and **Personnel 3** *on May 16th, 2025.*

*The content and tone of this email were, in my view, unprofessional and hostile, and I felt bullied by his communication.*

b) Evidence (Witness Statement and Documents)

In the email chain, from May 13 to May 16, President Molnar reached out to **Personnel 8** and **Personnel 3** respectively, for support. During this exchange, **Personnel 3** includes the @mt.gov email address, to include his supervisor, **Personnel 4** in the conversation ("I went to **Personnel 4** because I don't feel safe around him"). President Molnar adds **Personnel 7** into the email chain, as well.

On Thursday, May 15, 2025, President Molnar asks: "I do not have this problem with any other computer or email service. Why this one?" **Personnel 8** esponds seven minutes later: "I can answer this one!

Both the State of Montana and Microsoft strive for the highest levels of security in their enterprise email solutions. Unfortunately, this comes with concessions in usability; this results in in a product that is more secure, but less user friendly and reliable than many popular systems. In a nutshell, Outlook is locked down tight, but can't always find its keys."

The next morning, at 9:32am, President Molnar asks **Personnel 8** "So what good is it? Having a secure home with a warm fire is of little consequence while freezing to death in the back yard. Again, **Personnel 7** is our rep on this issue. Can she work with your team to work it IT and/or the governors office to find a workable solution instead of limp excuses?"

In a separate branch of the same email chain, when trying to "determine if the problem is with your account...or your local client," **Personnel 8** requests that President Molnar try a different login method. President Molnar responds at 11:50am, "Thank you for the "In the meantime solution." No, I won't. I will not spend days on end trying to make an inoperable by design system work. Governor Gianforte needs to be informed that his burgeoning in size while decreasing in capacity State IT Team needs to be pruned and people with competence installed."

c) Findings

To establish a prima facie case for a hostile work environment under 49-2-303, MCA, the complainant must demonstrate: 1) he is a member of a protected class; 2) he was subjected to unwelcome conduct based on that protected class and 3) the conduct was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive or hostile work environment.

President Molnar's communications do not appear to be based on either of the IT staff members'

31



CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

status in a protected class, therefore the threshold for a hostile work environment cannot be met.

However, the PSC's Code of Conduct Policy 2.2.6 prohibits "Threatening, abusive, obscene, or derisive behavior or communications." Likewise, the Communications Policy 2.4 states that "Individual commissioners, staff, and contractors must be deliberative and judicious with their speech in public settings, written communications subject to public disclosure, and when interacting with the media. When acting in an official capacity, they must only speak in turn and should always communicate in a courteous, professional, and respectful manner Personnel 3 indicated in his initial complaint that he felt bullied, and that he viewed the communication as unprofessional.

Based on the evidence, and in the absence of any rebuttal or alternative explanation from President Molnar due to his refusal to participate, it is more likely than not that President Molnar's behavior, perceived as unprofessional, bullying and hostile, constitute a violation of PSC Code of Conduct Policy 2.2.6 which prohibits "Threatening, abusive, obscene, or derisive behavior or communications." However, we do not find that President Molnar's behavior constitutes a hostile work environment under 49-2-303, MCA, as the complainant did not demonstrate either that he is a member of a protected class or that the behaviors directed at him were because of his status in a protected class.

## 6. Issue 6, Retaliation

Did PSC President Brad Molnar engage in retaliation in violation of PSC Personnel Policy 2.13 (Retaliation) and/or PSC Personnel Policy 2.2 (General Standards of Conduct and Performance, section 2.2.6) on June 24, July 29 and 30, and August 1, 2025, by engaging in conduct and making statements intended to discourage or deter complaints related to workplace behavior? Specifically, by:

- Telling Personnel 2 on June 24, 2025, that he was "livid" about the independent review and stating he had hired an attorney and a private investigator to "take out" whoever had brought the complaints, and that he would "use his personal resources and attorneys to silence individuals making "stupid" complaints;"
- Telling Personnel 6 in reference to the investigation, that he "would make sure this doesn't happen to anyone ever again;"
- Conducting a press conference asserting that he could not be subject to a workplace investigation, describing the investigation as unlawful, stating that the investigation related to issues other than his workplace behavior (Press Conference, July 29, 2025), and later describing Personnel 2 as someone who "darn near breaks into tears" when he asks questions about NorthWestern — a claim she flatly denied — and indicating Personnel 1 and the Personnel 6 are in the same boat (Daily Montanan, July 30, 2025); and
- Responding to Personnel 7 August 1, 2025, letter advising him that retaliation is prohibited by internal policy and state and federal law and cautioning him that his recent statements appear retaliatory (particularly comments mentioning staff and individual commissioners by name) by stating, "If I were to be of similar mind I would have filed 'conduct unbecoming' charges on you several times (I could even have had you recused to win my motion, I did not because I am not that kind of person.), Personnel 2 many times on very serious issues, and Personnel 1 every week."



Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

- Telling ▮Personnel 2▮

> "that my decision to hire an external party was "horseshit" and he asked me why I was not doing my job. I explained that the decision was a response team decision and not solely mine although I fully supported the decision which was meant to encourage transparency or the perception of bias. He told me that was a "lame ass excuse" and the result would be media coverage that would...affect his marriage and public image. He began to raise his voice and told me again I should have done my job. I asked who he would recommend that could have internally looked at the matter without a conflict of interest. He stated he did not care but it should have been handled internally.

a) Allegation

▮Personnel 1▮ and ▮Personnel 2▮ allege that PSC President Brad Molnar engaged in retaliation in violation of PSC Personnel Policy 2.13 (Retaliation). The allegation is based on public statements President Molnar made during and after his July 29, 2025, press conference, including comments identifying and criticizing individuals associated with the investigation into his conduct. These statements were subsequently quoted in multiple media articles. President Molnar made additional statements quoted in a *Daily Montanan* article on July 30, 2025. In an email dated July 31, 2025, ▮Personnel 2▮ stated that Molnar's public comments had "become personal," were "completely false," and amounted to "continued retaliation," particularly targeting her character and that of PSC staff. In a separate email dated August 3, 2025, ▮Personnel 1▮ wrote that President Molnar's press conference and related media coverage including his identification of "suspects" would "have a chilling effect on the investigation" and likely dissuade others from coming forward. In addition, other PSC staff said these public comments will deter investigation participation, cause increased fear of additional retaliation, and have a deleterious effect on morale, including diminished confidence that the PSC will take appropriate corrective action.

b) Subject Response

The subject of the complaint, Montana Public Service Commission President Brad Molnar, refused to participate in the investigation. Therefore, the analysis relies on formal statements he made in the media.

c) Evidence (Witness Statement and Documents)

The following documents and witness statements support the retaliation allegation under PSC Personnel Policy 2.13 and Policy 2.2.6:
- Email from ▮Personnel 2▮ July 31, 2025, and subsequent email thread "Re: Continued Retaliation"[23], ▮Personnel 2▮ described President Molnar's public comments as "completely false," "personal," and part of a pattern of "continued retaliation," particularly targeting her character and credibility. She stated that these actions were damaging to morale and confidence in the process.
- Email from ▮Personnel 1▮ August 3, 2025[24], ▮Personnel 1▮ stated that Molnar's press conference and his naming of "suspects" would likely have a chilling effect on the investigation and dissuade others from coming forward. She emphasized the importance of ensuring accountability without intimidation.

---

[23] Document #24 in Section D of this report
[24] Document #33 in Section D of this report

33

CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

- **Phone Interview with PSC Staff Member, August 4, 2025,** A senior PSC staff member (not named here to protect confidentiality) expressed that the press conference and media coverage had a disturbing impact on morale and caused concern about the ability to maintain a cohesive workplace. The individual expressed personal worry as well as concern for coworkers, noting the press conference left staff feeling threatened and unsupported. The witness specifically questioned Molnar's claim that he "can't be investigated" and noted his unwillingness to reflect on the effects of his actions.
- **July 29, 2025 Press Conference Transcript** During the press conference, President Molnar made multiple public statements denying the validity of the investigation, characterizing it as politically motivated, and questioning the legitimacy of those involved in initiating the complaints.
- **Media Articles**
  - *Daily Montanan, July 30, 2025*[25]
    Molnar is quoted stating that the investigation is a "waste of taxpayer resources" and claiming that the complaints against him are "petty." He also stated that he could not be subject to investigation and that the complaints relate to utility policy disputes, not workplace conduct. He asserted that █Personnel 2█ "darn near breaks into tears" when he asks questions about NorthWestern Energy and indicated that █Personnel 1█ and █Personnel 6█ were "in the same boat."
  - *KTVH[26] and WVNews[27] Reports, July 29–30, 2025*
    These reports echoed and amplified the press statements made by Molnar. He portrayed himself as unfairly targeted.
- **Email from** █Personnel 7█ **to Brad Molnar, August 1, 2025**[28], █Personnel 7█ formally advised Molnar that retaliation is prohibited by PSC policy and law. She expressed concern that his statements—particularly naming staff and commissioners—could constitute retaliation.
- **Email Response from President Molnar, August 1, 2025,**[29] Molnar responded dismissively to █Personnel 7█ concern, suggesting he could have filed charges of "conduct unbecoming" against her, █Personnel 2█ and █Personnel 1█ "many times," but chose not to because he is "not that kind of person."
- **Phone Call Summary: Investigator Kerins Call to President Molnar (July 23, 2025)** Molnar stated he had never received complaints prior to this and suggested █Personnel 2█ had "drummed up" the complaints by taking "an aggressive stance." He expressed distrust of independent investigators and described the process as "bizarre," asserting investigators are usually hired "for a reason." He denied being "a retaliation kind of guy."
- **Email from** █Personnel 2█ **to** █Personnel 6█ **and** █Personnel 10█ **on June 24, 2025, subject: "RE: Additional Discussion w/ Molnar re Independent Review"** within which President Molnar said, "YOU contacted NARUC Senior Director to discuss my financial decision? To give me guidance? YOU may have just messed up a really big deal. Yes, really big. When I need your assistance in a financial decision or in negotiating, I will ask you directly. Don't wait by the phone…" and "So, a word of advice, please stop trying to back door me and back stab me for whatever it is you think it gains you…"

---

[25] Document #25 in <u>Section D</u> of this report
[26] Document #28 in <u>Section D</u> of this report
[27] Document #31 in <u>Section D</u> of this report
[28] Document #35 in <u>Section D</u> of this report
[29] Document #32 in <u>Section D</u> of this report



Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

Personnel 2 informed us that President Molnar's "horseshit" comment was directed at her, personally, not toward the Response Team, believing that she steered the decision. Personnel 2 acknowledged she felt the review should be handled by an external party, but that it was a group decision.

During Personnel 2 interview with CMS, we asked her about his propensity to swear. Personnel 2 said that during the situation with Personnel 5        Personnel 5 told Personnel 2 that President Molnar had been close to swearing at her; he "had the tone or demeanor where she thought he was trying not to swear at her, but [was] very, very agitated. Personnel 2 said it was not common for him to swear, this instance of him swearing at her was "pretty abnormal, but he was really upset."

She informed us that she attempted to demonstrate to President Molnar that the Response Team decision was grounded in policy. She emailed him the IPM on June 24.

Personnel 2 described the June 24, 2025, meeting as a situation where she didn't feel comfortable sitting down in his office.

Of note is the fact that President Molnar is not the only Commissioner to engage in inappropriate comments. Personnel 1        also sent emails to Commissioners and staff that could be considered inappropriate. However, a clear and important distinction is that President Molnar's comments documented in this report are directly in relation to and in the context of a protected activity (formal workplace complaints), which distinguishes them from inappropriate comments and behaviors on the part of others. Molnar's actions and statements disparaging those he knew were involved in the complaint also impacted other employees that are involved in the complaint, including staff of whose involvement he may have been unaware.

Therefore, this review focuses on President Molnar's comments and actions that directly relate to the workplace complaint (e.g., that he will "use his personal resources and attorneys to silence individuals making 'stupid' complaints") and comments regarding the complainants and witnesses. This analysis focuses on these issues to ensure that other inappropriate comments do not deflect from the allegations of illegal retaliation on the part of President Molnar.

d)  Findings
PSC staff and Commissioners assert that President Molnar retaliated against them for engaging in a protected activity (participating in this investigation). Under Equal Employment Opportunity Commission (EEOC) guidelines, a retaliation claim is substantiated if the evidence demonstrates that:
1. The individual engaged in a statutorily protected activity (e.g., filing a discrimination or harassment complaint, participating in an investigation; or opposing unlawful discrimination).
2. The employer or an official with authority took a materially adverse action against the individual after the protected activity occurred. The Supreme Court in *Burlington Northern & Santa Fe Railway Co. v. White* (2006) defined a materially adverse action as one that might well dissuade a reasonable person from engaging in protected activity (e.g., termination, demotion, or suspension; public criticism or disparagement in a manner that harms credibility; threats, intimidation, or spreading false information; and punitive changes to work conditions or assignments). The action need not affect pay or status if it is significant enough to deter protected activity.

 CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

3. There is a causal connection between the protected activity and the materially adverse action. Evidence of causation can be direct, such as statements linking the adverse action to the protected activity, or circumstantial, such as close timing between the two events, a pattern of antagonism following the protected activity, inconsistent or shifting explanations for the adverse action, or comparisons showing that individuals who engaged in protected activity were treated differently from those who did not. The protected activity must be a motivating factor for the adverse action; it need not be the sole cause, but it must be one of the reasons.

Additionally, the Montana Public Service Commission's Code of Conduct Policy explicitly prohibits retaliation. PSC Policy 2.13.1 states that the department does not tolerate retaliation against individuals who report violations of its equal employment opportunity, non-discrimination, and harassment prevention policies, or who exercise their rights to a workplace free from harassment and discrimination. Under Policy 2.13.2, supervisors must not retaliate or allow, condone, or encourage others to retaliate against any current or former employee or job applicant for opposing unlawful discriminatory practices, filing a discrimination complaint, or participating in a discrimination proceeding, including testifying in court. EEOC guidance and PSC policy prohibit any action - whether an overt employment decision or a statement or behavior - that could reasonably dissuade someone from engaging in protected activity

The evidence establishes that Personnel 2                    Personnel 1    Personnel 6
                               and Personnel 7                each engaged in a protected activity
as defined by EEOC standards and PSC Policy 2.13.

- Personnel 2 protected activity included notifying President Molnar of the investigation and participating in the process, as well as providing statements and evidence to investigators.
- Personnel 6          protected activity included notifying President Molnar of the complaint, talking to President Molnar about previous inappropriate behaviors, and participating in the investigation process. While Personnel 6          did not formally file a complaint, his actions are protected because he participated in the discrimination/harassment investigation. On or around June 24, 2025, Personnel 6 told President Molnar, in part:

  *"Pres. Molnar, The purpose of this email is to provide you notice that an independent review is being conducted related to concerns that your conduct has violated the Commission's Code of Conduct. During this process, the Department makes every attempt to protect the privacy of individuals involved; however, individual privacy cannot be guaranteed. Individuals who make a complaint or participate the process are protected from retaliation. ARM 2.21.4014; PSC Code of Conduct § 2.13*

  *Retaliation occurs when an employer (through a manager, supervisor, administrator or directly) takes any type of adverse action against an employee for engaging in protected activity. An adverse action is an action which would dissuade a reasonable person from raising a concern about a possible violation or engaging in other related protected activity. Retaliation can have a negative impact on overall employee morale...."*

- Personnel 7 protected activity included participating in the investigation and formally warning President Molnar in writing on August 1, 2025, that retaliation is prohibited by PSC policy and applicable law.
- Personnel 1          protected activities include making prior complaints related to

CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

alleged inappropriate comments on the part of President Molnar and making a complaint in the present investigation.

The record reflects President Molnar was clearly aware of the involvement of ███ Personnel 2 ███ Personnel 6 and Personnel 7 Personnel 2 directly notified President Molnar of the investigation. Following that notification, she reports President Molnar ceased ordinary communication with her except to make undermining remarks. In a July 23, 2025, phone request for an interview with President Molnar, he said, "I have never had a complaint and now there are three? Personnel 2 has taken an aggressive stance in the last few weeks, and if someone goes so far as to create a persona such as she has created, I am sure there is a lot of stuff she has drummed up...."

President Molnar knew of and responded to Personnel 6 notification of the complaint, and ███ Personnel 7 written warning advising that his statements appeared retaliatory and cautioning him against further conduct of that nature.

Personnel 1 inclusion in relevant emails, her role in related complaints, and President Molnar's public grouping of her with Personnel 2 and Personnel 6 in the Daily Montana article support, but do not necessarily confirm that he knew she was connected to the investigation.

The evidence shows multiple materially adverse actions as defined under Burlington Northern v. White. On June 24, 2025, President Molnar allegedly told Personnel 2 he was "livid" about the investigation, had hired an attorney and private investigator to "take out" whoever brought the complaints, and would "use his personal resources and attorneys to silence individuals making 'stupid' complaints." On the same day, he told Personnel 6 he would make sure "this doesn't happen to anyone ever again."

On July 29, 2025, President Molnar held a press conference and made public statements asserting that he could not be subject to a workplace investigation, describing the investigation as unlawful, and stating it related to his stance on NorthWestern Energy rather than his workplace conduct. In a July 30, 2025, article in the Daily Montana, he publicly characterized Personnel 2 as someone who "darn near breaks into tears" when asked questions—a claim she flatly denied—and grouped her with Personnel 1 and Personnel 6 Personnel 1 reports a journalist told her President Molnar also used the term "crocodile tears" in reference to her Personnel 2 said that these remarks were false and personal. Personnel 6 was also targeted by these public statements, despite not having filed a formal complaint (i.e., being depicted as in the "same boat" as Personnel 2 and Personnel 1 .

On August 1, 2025, after receiving Personnel 7 letter warning him that retaliation is prohibited by policy and law, President Molnar responded:

*If I were to be of similar mind I would have filed 'conduct unbecoming' charges on you several times (I could even have had you recused to win my motion, I did not because I am not that kind of person.), Personnel 2 many times on very serious issues, and Personnel 1 every week.*

This statement can reasonably be interpreted as a threat of retaliation against Personnel 7 Personnel 2 and Personnel 1 It directly references the possibility of filing formal charges against

 CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

them.

The timing between the protected activity and President Molnar's adverse statements is close, and the link between the two is supported by both direct and circumstantial evidence. Personnel 2 noted a marked change in President Molnar's treatment toward her immediately after she notified him of the investigation. Personnel 1 said she believes President Molnar's public statements served to "put me, Personnel 2 and Personnel 6 on notice" and "put everyone on notice" not to speak out or they too would be disparaged in the media.

The testimony of complainants and additional PSC staff indicates that President Molnar's statements have caused fear of retaliation, reduced morale, and diminished confidence in the PSC's ability to address misconduct by an elected official. One staff member said, "I was hopeful [this investigation] would make him aware of his behavior and how it is affected others. I thought he had a good heart and would be willing to change. However, I can't believe that after the press conference…"

Personnel 2 reported that the situation is contributing to staff turnover and is prompting her to consider leaving. Personnel 1 described the chilling effect on staff willingness to come forward Personnel 6 public identification in connection with the investigation further reinforces the deterrent effect. Personnel 7 experience demonstrates that even those in leadership positions who raise concerns about retaliation can themselves become targets of comments reasonably interpreted as retaliatory threats.

The record demonstrates that all three elements of retaliation under EEOC guidance are met:

1. Protected Activity: Personnel 2 Personnel 1 Personnel 6 and Personnel 7 each participated in protected activity by making complaints, notifying the subject of the investigation, warning against retaliation, and/or providing witness information.
2. Materially Adverse Action: President Molnar made threatening and disparaging statements, both privately and publicly, that a reasonable person would find likely to deter protected activity, including but not limited to:
   - Telling Personnel 2 and Personnel 6 he would hire an attorney "….to 'take out' whoever brought the complaints and would "use his personal resources and attorneys to silence individuals making 'stupid' complaints."
   - Holding a press conference asserting he cannot be investigated, dismissing the claims, and in later news article making disparaging statements about investigation participants.
   - Making statements to Personnel 7 in an August 1, 2025, email that can reasonably be interpreted as a threat of retaliation.
   - Emailing Personnel 2 on August 10, 2025, (Document #37 in Section D of this report) copying multiple colleagues, and accusing Personnel 2 of interfering in his financial decision-making disparaging her experience, and stating: "So, a word of advice, please stop trying to back door me and back stab me for whatever it is you think it gains you." This phrase and the disparagement in front of peers could reasonably be perceived as conduct that would dissuade a reasonable employee from making or supporting a workplace complaint.
3. Causal Connection: Statements and actions occurred immediately after or in close proximity to the protected activity, targeted those known to be involved, and were tied by the recipients of the retaliation to their participation in the investigation.

The conduct violates PSC Policy 2.13, which prohibits retaliation against individuals who report

 CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.

policy violations or participate in investigations, and PSC Policy 2.2.6, which requires commissioners to conduct themselves in a professional manner consistent with maintaining public trust.

Based on the evidence, and in the absence of any rebuttal or alternative explanation from Molnar due to his refusal to participate, it is more likely than not that President Molnar engaged in retaliation against [Personnel 2] **Personnel 1**     **Personnel 6**     and [Personnel 7] as well as against other PSC staff, in violation of PSC Personnel Policy 2.13, PSC Personnel Policy 2.2.6, and EEOC retaliation standards. His statements and conduct were reasonably likely to deter a person from engaging in protected activity, caused tangible harm to morale and professional reputations, and undermined the integrity of the ongoing investigation.

## 7.  Issue 7, Conduct

Did PSC President Brad Molnar violate PSC Policy in his interaction with **Personnel 5** on July 2, 2025, at 3:00 p.m. at the front desk of the PSC?

a)  Allegation

*On July 2, 2025, President Molnar came to the front desk to let me know he had changed his travel plans. I acknowledged his change and related I would stop making travel arrangements. He began making additional derogatory comments about staff and Commissioners and I asked him to stop. He kept speaking over me and would not let me finish making it very difficult for me to voice my opinion. President Molnar then launched into a discourse about why he had changed his plans insinuating that he did not trust staff or Commissioners to operate without him. I asked him to stop his comments a total of three times. He finally stopped. His actions are contributing to a very stressful work environment and disrupting my work.*[30]

b)  Evidence (Witness Statement and Documents)

**Personnel 5** was unable to recall the specifics of the comments directed to her on July 2 that made her uncomfortable. However, the effect of the comments was apparent based on the observations of [Personnel 2] ("she was really, really frustrated") and **Personnel 4** ("based on the look on her face, she looked upset").

Witnesses also reported that **Personnel 5** was upset by a phone call with President Molnar on May 16, 2025, and that she needed to leave for the day after the call. When we asked about the call, she recalled the event but was unable to offer specifics of the conversation.

c)  Findings

While Molnar's conduct clearly affected [Personnel 5] due to the  lack of specifics regarding what President Molnar said we are unable to substantiate whether a policy violation occurred. However, the event supports a pattern of President Molnar speaking over people, and/or not recognizing when they have discomfort with his workplace behavior.

---

[30] From *Discrimination Complaint Resolution Statement* submitted by **Personnel 5** on July 2, 2025. Attached as Complaint 3 in this report.

CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

## V. Recommendations

Complainants and witnesses were each asked how they would like to see the situation resolved, and what they would consider to be the ideal outcomes of the fact-finding process. We provide responses here.

- It comes down to adherence to personnel policy regarding the code of conduct.
- I would like to know that there is a procedure or a protocol in place when it is an elected official at a high level like that. That alone is a huge intimidation point for not coming forward. The only thing that comes out of it is retaliation unless you know there is a process in place, and what that process would be.
- We've tried so many different methods and approaches, and I think it's apparent to me that he's not going to change so, you know, and this is, I'd hate to do this, but I don't think he can continue to serve in this role. And I think even as a commissioner in general, it's going to be hugely problematic because of his history.
- An admittance of "Oh, ok, I've been too harsh, I need to lighten up," but more realistically this individual noted that if President Molnar were no longer the president but still a Commissioner, this would remove him from a position of power "to be such a terror" and that this would go a long way towards making everyone's lives better.
- He has to be taken out of leadership. He doesn't listen...If he had to leave the commission completely, I think we'd really have to watch the doors for him "going postal."
- I don't want to be retaliated against.
- I had hoped that the commission was going to at least remove him from the position temporarily while this was ongoing, because it seems like, with his knowledge of this, his behavior has just gotten worse.
- Ideally, the President would take this all seriously and just adjust his behavior to be more professional and more cognizant of the proper protocols and procedures and professional conduct that's required of any person working for our agency, but particularly the higher standard of President of the Commission.
- A vote of no confidence.
- Completely separate the staff and the Commission.
- If he learned to be aware of the impact he has on people based on his behavior and his language. If he can adjust and be more professional or more sensitive, or all those things. I don't think he's a bad person. I think he probably has a good heart. He just needs to learn. If he can, that'd be great. If not, maybe it's time to retire.

## VI. Summary

CMS, LLC recommends PSC management review this report and the substantiated findings to determine appropriate next steps.

PSC can consider recommendations offered by the investigation participants, which are summarized in the previous Section V. Recommendations. PSC should document its response to the substantiated complaints and any associated corrective action. PSC should take measures to ensure investigation participants are not subject to further retaliation.

 Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

## VII.    Submitted:

Greg Ross
Greg Ross (Aug 14, 2025 14:58:54 MDT)

Greg Ross (sign above)

08/14/25

Date



Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

## VIII.  Attachments

### A.   Complaint 1

*May 11, 2025, Complaint from Commissioner Bukacek*

RE: formal complaint... Please let me know if there are forms I need to fill out for this purpose...

**Personnel 1**
BA  To **Personnel 2**
    Cc **Personnel 6**

↩ Reply    ↩ Reply All    → Forward    •••

Mon 5/12/2025 9:16 AM

From: Personnel 1
Sent: Sunday, May 11, 2025 11:24 PM
To: Personnel 2
Cc: Personnel 6
Subject: formal complaint... Please let me know if there are forms I need to fill out for this purpose...

3.2.6.  Department personnel are expected to maintain a professional, courteous, productive, and respectful working relationship with co-workers, peers, supervisors, and the general public. Threatening, abusive, obscene, or derisive behavior or communications are strictly prohibited.

Good evening [Personnel 2]

I wish this to be filed as a formal complaint against PSC President Molnar, referencing what I consider significant violations of our Code of Conduct 2.25. above. There are also sections in the Blue Book policy manual where commissioners are not to misuse staff's time

President Molnar's dismissive, derisive and otherwise abusive behavior toward me was demonstrated multiple times during the 4/30/25 business meeting linked to here https://www.youtube.com/watch?v=h3oRQFfHbsq

Numerous people called me after experiencing President Molnar's belittling tenor, manner and words in this video... including but not limited to... Publicly telling me my knowledge of the topic is inadequate and my words immaterial (time stamp 19:28 though I was clearly well-versed), repeatedly asking me an irrelevant (time stamp 25:16; I had voted to monitor, not oppose or support the bill, so my testifying would have been inappropriate) question in a strange, mocking tone, misrepresented my position at least twice... At the end, after the microphones were off, he told me I should talk to the governor myself. When I told him that would be silly, he said, "it wouldn't be the first time."

I don't take such things personally, and I will continue to be polite to President Molnar in public and whenever/wherever else possible. My primary concern is the toxic environment this type of behavior creates. If he treats a colleague commissioner with this level of disrespect, I am certain he is disrespectful to staff as well.

At time stamp 18:51 he publicly states the staff are almost done with his letter to the governor asking him to veto HB 490... in other words, before the commissioners had voted whether or not we wanted the letter sent to Governor Gianforte, President Molnar had already pushed staff to write the letter. This is one example of what I consider misuse of staff's time. Given what I see as self-absorption in his own areas of focus, I am certain there are many more examples of abuse of our fine staff

The day of your interview, I believe it was March 4 2025, President Molnar made an inappropriate comment in front of me and [Personnel 7] about the PSC considering having "topless Tuesdays". The night before, when he and I were both working late, President Molnar made a comment to me about him as a teenager, along with his friends, watching girls in their bikinis. The same evening, in my office, while his wife was talking to him on the phone, he put her on speaker phone without asking her permission and made mocking gestures like rolling his eyes in response to what she was saying. If President Molnar would talk in such a manner around [Personnel 7] and I, it is certain he will talk that way round others. My concern is not for my safety nor my feelings, but primarily for the rest of the staff who may not have the temperament to speak up, or may feel too intimidated to speak up. This type of language creates a toxic environment.

President Molnar does not meet minimal professional standards. He poorly represents the PSC when he speaks publicly... arrogant, petulant, oppressive, disorganized in thought processes, and often unintelligible unless he sticks to staff's script.

2.2.3.  Commissioners are expected to perform their essential job functions and produce work that consistently meets or exceeds professional standards for individuals in the same or similar positions.

Thank you for this consideration

**Personnel 1**


Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.

Date Received by Human Resource Office: 6/25/25

## Discrimination Complaint Resolution Form

*Alternative accessible formats of this document are available on request.*

Employees, job applicants, and customers may use this form to file an internal complaint based on discrimination or harassment (including a hostile work environment) based on any of the protected classes identified in this form. Individuals should submit this form to the agency where the event is believed to have occurred.

**Complainant's Name:** Personnel 1

**Mailing Address:** ▮▮▮▮

**Phone:** ▮▮▮▮

**Complainant's Status:**

☑ Employee  ☐ Job Applicant  ☐ Department Customer

**Basis of Complaint:**

| | | | |
|---|---|---|---|
| ☐ Race | ☐ Color | ☐ Genetic Information | ☐ Retaliation |
| ☐ Creed | ☑ Age | ☐ National Origin | ☐ Political Beliefs |
| ☐ Religion | ☐ Physical/Mental Disability | ☐ Sexual Orientation | ☐ Marital Status |
| ☑ Sex | ☑ Sexual Harassment | ☐ Military Service | ☐ Veteran Status |
| ☐ Pregnancy, Child Birth, or a Medical Condition Related to Pregnancy or Childbirth | | ☐ Gender Identity or Gender Expression | ☐ Social Origin or Condition |
| ☐ Ancestry | | ☑ Other | |

Name of person you believe discriminated against you: Brad Molnar

Department or Address: MT PSC

Phone: 406-794-5982

Date, time, and place of the incident(s): Various, see email attachments

CMS — Communication and Management Services, LLC — (406) 442-4934 — www.cmsmontana.com

CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.

**Documentation:**

Please attach copies of any documents or material you believe are relevant.

**Witnesses:**

Did anyone witness the incident(s) of discrimination? If so, please list names and phone numbers of any witnesses to the incident(s). Use additional pages, if necessary.

Name: Staff 1                                 Phone: ▓▓▓▓▓▓
Name: Personnel 7                             Phone: ▓▓▓▓▓▓

Name:_____        Phone:_____

Name:_____        Phone:_____

**Statement:**

Please describe the incident(s) as clearly and concisely as possible. Provide as much detail as you can recall, including when and where the events occurred and who said what to whom. Explain why you believe the conduct or treatment was discriminatory. Use additional pages, if necessary.

See Attachment 1

**Action Sought:**

Please describe what you would like to see done to correct the situation.

I don't think he will be receptive to psychotherapy or cognitive behavior therapy...because he doesn't think he does anything wrong. At a minimum, he needs to be removed from any position of leadership. If he is taken out of leadership, from what I have observed of him, I believe he will be chronically looking for ways to get even. I have not observed any evidence that he has a bit of insight into any wrongdoing on his part. Considering himself a victim of others, he will retaliate against those he thinks are victimizing him.



Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.

## Complaint Authorization

I understand that complete confidentiality cannot be maintained in the process of handling informal and formal complaints. I agree that this statement of allegations may be used during the investigation of the case. I further consent that this statement and certain information in the complaint file may be disclosed to certain agency employees including the person I believe discriminated against me, in order to resolve my complaint, conduct fact finding, or implement remedial action. I also understand that information may also be disclosed if required by law, rule, regulation, or court order.

I affirm that this complaint statement is true, accurate, and complete to the best of my knowledge.

 

**Signature of Complainant**                                    Date

In addition to the internal complaint process, complaints may be filed with the following agencies:

(a) Montana Human Rights Bureau, 1625 11th Avenue 33 S. Last Chance Gulch, Suite 2, P.O. Box 1728, Helena, MT 59624-1728, (406) 444-2884 4356, (800) 542-0807, TTY (406) 444-0532 Montana Relay Service 711; or

(b) United States Equal Employment Opportunity Commission (EEOC) San Francisco District Office, 350 The Embarcadero, Suite 500, San Francisco, CA 94105-1260, Seattle Field Office, 909 First Avenue, Suite 400, Seattle, WA 98104-1061, (800) 669-4000, TTY (800) 669-6820, ASL Video (844) 234-5122, or

(c) in the case of a service member or veteran:

   1. the Employer Support of the Guard and Reserve at (800) 336-4590; or

   2. the Veterans' Employment and Training Service (VETS) at (866)-487-2365. Service members and veterans may submit a formal, online complaint with VETS at http://webapps.dol.gov/elaws/vets/userra/1010.asp.

Created on 24 June 2025

CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

CONFIDENTIAL: *This report may be read only by authorized individuals with a need to know.*

Attachment 1

Discrimination Complaint Resolution Form **Personnel 1**

1. Inappropriate comments and actions I have documented that are gender-related are all leveled at women... in my opinion, they involve an exploitive objectification of women that is sexual in nature.

2. I am the only commissioner he has publicly denounced as lacking knowledge related to our commissioner job. There is a male commissioner who repeatedly publicly shows ignorance of our commissioner job despite multiple warnings and teaching from legal staff. One of the incidents was such a flagrant breach of our code of conduct, leading a rally against one of our utilities during an open docket, that the president was asked to take action. President Molnar declined.

3. My age, female gender, and the fact that I have stood up to him on occasion—that makes me a target for him to marginalize and otherwise degrade me. I have observed his words and actions for almost six months. Based on the composite of this experience, it looks to me like he considers himself entitled to degrade individuals and entities (including publicly) without sensible reflection on the harm he causes to individuals and entities. These entities include the utilities we regulate and the work environment of the Public Service Commission. I am most concerned about the negative impact his degrading words and actions have on the staff here, especially the female staff.



Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

B.    Complaint 2

*May 20, 2025, Complaint from* ███ Personnel 3 ███    *Email Subject line: "Email incident –*
*President Molnar"*



    Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

*Following screenshots are from an attachment to the Complaint from* **Personnel 3**
*Email Subject line: "Email incident – President Molnar;" the attachment is an Outlook Item with Subject line "RE: Help"*



Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.





CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.

Following screenshots are from an attachment to the Complaint from **Personnel 3**
Email Subject line: "Email incident – President Molnar;" the attachment is an Outlook Item with Subject line
"RE: Help2.msg"



CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.



From: Molnar, Bradley <bmolnar@mt.gov>
Sent: Friday, May 16, 2025 11:50 AM
To: Personnel 6     Personnel 3
Cc: PSC Support <PSC_Support@mt.gov> Personnel 7
Subject: RE: Help

Thank you for the "In the meantime solution". No, I won't. I will not spend days on end trying to make an inoperable by design system work. Governor Gianforte needs to be informed that his burgeoning in size while decreasing in capacity State IT Team needs to be pruned and people with competence installed.
Brad

Brad Molnar
Commission President
Montana Public Service Commission
Main line 406.444.6199
brad.molnar@mt.gov  http://psc.mt.gov/

From: Personnel 8
Sent: Friday, May 16, 2025 9:27 AM
To: Molnar, Bradley <bmolnar@mt.gov> Personnel 3
Cc: PSC Support <PSC_Support@mt.gov> Personnel 7
Subject: RE: Help

Good morning, Mister President!

We agree that it is important that your email work. Everyone has an email get stuck from time to time, but the extent to which you're having issues is quite a bit outside the norm. We've submitted a ticket with the State about it, and are hoping to get it resolved quickly; we will keep you updated on its status.

In the meantime, could you try logging into https://www.office.com/login?es=UnauthClick&ru=%2f (if it doesn't log you in automatically, use your email address, then CWC144 and work password)? After logging in, select "Apps", then "Outlook", and try using this web client for a while. That will help us determine if the problem is with your account (if items get stuck in your outbox even in the web client) or your local client (if the web client works without a hitch).

Thank you, sir!

Thank you,



 CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*



From: Molnar, Bradley <bmolnar@mt.gov>
Sent: Friday, May 16, 2025 9:05 AM
To:  Personnel 3
Cc: PSC Support <PSC_Support@mt.gov> Personnel 7
Subject: RE: Help

I just checked. The 4 emails that were "stuck" in my "out" box for at least 4 hours (when my plane took off). They all sent but I know not when. Am I the only one this is happening to? If the timing of the message is critical then this is dangerous. Since I am kinda/sorta mandated to use this system these are not questions of idle curiosity.

Since Personnel 7 is on our state E team I have cc'd her.

Brad

Brad Molnar
*Commission President*
**Montana Public Service Commission**
Main line 406.444.6199
brad.molnar@mt.gov  http://psc.mt.gov/

From: Molnar, Bradley
Sent: Thursday, May 15, 2025 11:39 AM
 Personnel 3
Cc: PSC Support <PSC_Support@mt.gov>
Subject: RE: Help

I do not have this problem with any other computer or email service. Why this one?

Brad Molnar
*Commission President*
**Montana Public Service Commission**
Main line 406.444.6199
brad.molnar@mt.gov  http://psc.mt.gov/

xii

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com


CMS

CONFIDENTIAL: *This report may be read only by authorized individuals with a need to know.*

*June 24, 2025, Discrimination Complaint Resolution Form from* Personnel 8

| Date Received by Human Resource Office: |
| --- |
| 6/24/25 |

## Discrimination Complaint Resolution Form

*Alternative accessible formats of this document are available on request.*

Employees, job applicants, and customers may use this form to file an internal complaint based on discrimination or harassment (including a hostile work environment) based on any of the protected classes identified in this form. Individuals should submit this form to the agency where the event is believed to have occurred.

**Complainant's Name:** Personnel 3

**Mailing Address:** ▮▮▮▮▮▮▮▮▮▮▮▮

**Phone:** ▮▮▮▮▮▮

**Complainant's Status:**

☒ Employee        ☐ Job Applicant        ☐ Department Customer

**Basis of Complaint:**

☐ Race    ☐ Color              ☐ Genetic Information       ☐ Retaliation

☐ Creed   ☐ Age                ☐ National Origin           ☐ Political Beliefs

☐ Religion  ☐ Physical/Mental Disability  ☐ Sexual Orientation    ☐ Marital Status

☐ Sex     ☐ Sexual Harassment  ☐ Military Service          ☐ Veteran Status

☐ Pregnancy, Child Birth, or a Medical     ☐ Gender Identity or Gender   ☐ Social Origin or
   Condition Related to Pregnancy or Childbirth     Expression              Condition

☐ Ancestry

**Name of person you believe discriminated against you:** Brad Molnar

**Department or Address:** MT PSC

**Phone:** 406-794-5982

**Date, time, and place of the incident(s):** See email attachment

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

CMS

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

## Documentation:

*Please attach copies of any documents or material you believe are relevant.*

## Witnesses:

Did anyone witness the incident(s) of discrimination? If so, please list names and phone numbers of any witnesses to the incident(s). Use additional pages, if necessary.

Name: ██████████ **Personnel 2**      Phone: ██████████

Name:_____ Phone:_____

Name:_____ Phone:_____

Name:_____ Phone:_____

## Statement:

Please describe the incident(s) as clearly and concisely as possible. Provide as much detail as you can recall, including when and where the events occurred and who said what to whom. Explain why you believe the conduct or treatment was discriminatory. Use additional pages, if necessary.

See emails.

## Action Sought:

Please describe what you would like to see done to correct the situation.

Adherence to personal policy regarding code of conduct.

CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

CONFIDENTIAL: *This report may be read only by authorized individuals with a need to know.*

## Complaint Authorization

I understand that complete confidentiality cannot be maintained in the process of handling informal and formal complaints. I agree that this statement of allegations may be used during the investigation of the case. I further consent that this statement and certain information in the complaint file may be disclosed to certain agency employees including the person I believe discriminated against me, in order to resolve my complaint, conduct fact finding, or implement remedial action. I also understand that information may also be disclosed if required by law, rule, regulation, or court order.

I affirm that this complaint statement is true, accurate, and complete to the best of my knowledge.



6/24/2025
Date

**In addition to the internal complaint process, complaints may be filed with the following agencies:**

(a) Montana Human Rights Bureau, 1625 11th Avenue 33 S. Last Chance Gulch, Suite 2, P.O. Box 1728, Helena, MT 59624-1728, (406) 444-2884 4356, (800) 542-0807, TTY (406) 444-0532 Montana Relay Service 711; or

(b) United States Equal Employment Opportunity Commission (EEOC) San Francisco District Office, 350 The Embarcadero, Suite 500, San Francisco, CA 94105-1260, Seattle Field Office, 909 First Avenue, Suite 400, Seattle, WA 98104-1061, (800) 669-4000, TTY (800) 669-6820, ASL Video (844) 234-5122, or

(c) in the case of a service member or veteran:

   1. the Employer Support of the Guard and Reserve at (800) 336-4590; or

   2. the Veterans' Employment and Training Service (VETS) at (866)-487-2365. Service members and veterans may submit a formal, online complaint with VETS at http://webapps.dol.gov/elaws/vets/userra/1010.asp.

-end of form-

CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

C.      Complaint 3

*July 2, 2025, Complaint from* **Personnel 5**

Date Received by Human
Resource Office:
_____

## Discrimination Complaint Resolution Form

***Alternative accessible formats of this document are available on request.***

Employees, job applicants, and customers may use this form to file an internal complaint based on discrimination or harassment (including a hostile work environment) based on any of the protected classes identified in this form. Individuals should submit this form to the agency where the event is believed to have occurred.

**Complainant's Name:** Personnel 5

**Mailing Address:** ▮▮▮▮▮▮▮▮▮▮▮▮▮

**Phone:** ▮▮▮▮▮▮▮

**Complainant's Status:**

■ Employee      ☐ Job Applicant      ☐ Department Customer

**Basis of Complaint:**

| | | | |
|---|---|---|---|
| ☐ Race | ☐ Color | ☐ Genetic Information | ☐ Retaliation |
| ☐ Creed | ☐ Age | ☐ National Origin | ☐ Political Beliefs |
| ☐ Religion | ☐ Physical/Mental Disability | ☐ Sexual Orientation | ☐ Marital Status |
| ☐ Sex | ☐ Sexual Harassment | ☐ Military Service | ☐ Veteran Status |
| ☐ Pregnancy, Child Birth, or a Medical Condition Related to Pregnancy or Childbirth | | ☐ Gender Identity or Gender Expression | ☐ Social Origin or Condition |
| ☐ Ancestry | | ☑ Other | |

Name of person you believe discriminated against you: Brad Molnar

Department or Address: MT PSC

Phone: 406-794-5982

Date, time, and place of the incident(s): July 2, 2025, 3pm, front desk of PSC


CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

## Complaint Authorization

I understand that complete confidentiality cannot be maintained in the process of handling informal and formal complaints. I agree that this statement of allegations may be used during the investigation of the case. I further consent that this statement and certain information in the complaint file may be disclosed to certain agency employees including the person I believe discriminated against me, in order to resolve my complaint, conduct fact finding, or implement remedial action. I also understand that information may also be disclosed if required by law, rule, regulation, or court order.

I affirm that this complaint statement is true, accurate, and complete to the best of my knowledge.



_____                7/2/2025
                                        Date

In addition to the internal complaint process, complaints may be filed with the following agencies:

(a) Montana Human Rights Bureau, 1625 11th Avenue 33 S. Last Chance Gulch, Suite 2, P.O. Box 1728, Helena, MT 59624-1728, (406) 444-2884 4356, (800) 542-0807, TTY (406) 444-0532 Montana Relay Service 711; or

(b) United States Equal Employment Opportunity Commission (EEOC) San Francisco District Office, 350 The Embarcadero, Suite 500, San Francisco, CA 94105-1260, Seattle Field Office, 909 First Avenue, Suite 400, Seattle, WA 98104-1061, (800) 669-4000, TTY (800) 669-6820, ASL Video (844) 234-5122, or

(c) in the case of a service member or veteran:

   1. the Employer Support of the Guard and Reserve at (800) 336-4590; or

   2. the Veterans' Employment and Training Service (VETS) at (866)-487-2365. Service members and veterans may submit a formal, online complaint with VETS at http://webapps.dol.gov/elaws/vets/userra/1010.asp.


CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

*Discrimination Complaint Resolution Statement*

**Documentation:**
*Please attach copies of any documents or material you believe are relevant.*

**Witnesses:**
*Did anyone witness the incident(s) of discrimination? If so, please list names and phone numbers of any witnesses to the incident(s). Use additional pages, if necessary.*

Name: _____ Phone: _____

Name: _____ Phone: _____

Name: _____ Phone: _____

Name: _____ Phone: _____

**Statement:**
*Please describe the incident(s) as clearly and concisely as possible. Provide as much detail as you can recall, including when and where the events occurred and who said what to whom. Explain why you believe the conduct or treatment was discriminatory. Use additional pages, if necessary.*

On July 2, 2025, President Molnar came to the front desk to let me know he had changed his travel plans. I acknowledged his change and related I would stop making travel arrangements. He began making additional derogatory comments about staff and Commissioners and I asked him to stop. He kept speaking over me and would not let me finish making it very difficult for me to voice my opinion. President Molnar then launched into a discourse about why he had changed his plans insinuating that he did not trust staff or Commissioners to operate without him. I asked him to stop his comments a total of three times. He finally stopped. His actions are contributing to a very stressful work environment and disrupting my work.

**Action Sought:**
*Please describe what you would like to see done to correct the situation.*

This is a very difficult because due the nature of my job I have to work with President Molnar everyday.

xviii

CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

CONFIDENTIAL: *This report may be read only by authorized individuals with a need to know.*

D.     Notice of Investigation to President Molnar



Notice of Code of Conduct Complaint and Independent Review

**Personnel 6**

HL    To  ● Molnar Bradley
      Cc  Personnel 2

↩ Reply    ⤷ Reply All    → Forward    ⋯

Thu 6/19/2025 10:08 AM

Pres. Molnar,

The purpose of this email is to provide you notice that an independent review is being conducted related to concerns that your conduct has violated the Commission's Code of Conduct. During this process, the Department makes every attempt to protect the privacy of individuals involved; however, individual privacy cannot be guaranteed. Individuals who make a complaint or participate the process are protected from retaliation. ARM 2.21.4014; PSC Code of Conduct § 2.13.

Retaliation occurs when an employer (through a manager, supervisor, administrator or directly) takes any type of adverse action against an employee for engaging in protected activity. An adverse action is an action which would dissuade a reasonable person from raising a concern about a possible violation or engaging in other related protected activity. Retaliation can have a negative impact on overall employee morale.

Greg Ross of Communications and Management Services, LLC has been retained to conduct an independent review. He may contact you in the coming weeks to schedule a time for an interview.

If you have immediate questions, you may contact me or Personnel 2

Thanks,

**Personnel 6**

xix

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

CMS

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

E.     Organizational Chart and Chain of Command



**DEPARTMENT OF PUBLIC SERVICE REGULATION**

**ORGANIZATIONAL CHART 1**
**BASIC ADMINISTRATIVE STRUCTURE**

COMMISSION

COMMISSION OFFICERS

EXECUTIVE DIRECTOR

LEGAL DIVISION

CENTRALIZED SERVICES DIVISION

REGULATORY DIVISION

EXTERNAL AFFAIRS UNIT

IT & ADMIN SUPPORT UNIT

INTERNAL BUSINESS UNIT

Adopted 7-9-2024

xx



Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

2.13.1. All department personnel are expected to work through the chain of command as follows.

2.13.1.1. The Commission is the agency head and, when acting as a body, may render direction to any member of the Commission or management, not-withstanding the following standard chain of command:

2.13.1.1.1. The President reports to, and is directed by, the Commission.

2.13.1.1.2. The Vice President reports to, and is directed by, the Presi-dent.

2.13.1.1.3. The Executive Director reports to, and is supervised by, the President.

2.13.1.1.4. The members of ACT report to, and are supervised by, the Executive Director.

2.13.1.1.5. The Supervisors within a division report to, and are super-vised by, their Division Administrator.

2.13.1.1.6. The staff within a work unit are directed by, and report to, their work unit supervisor, or an alternative leader if one is designated by the Division Administrator.[31]

---

[31] Department of Public Service Regulation Internal Policy Manual, 1st Edition 2024

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

CMS