# CONFIDENTIAL INFORMATION WARNING

The following document contains protected information about Department personnel and/or third parties.

The references herein to complainants and witnesses in the Response Team investigatory process is protected by the Montana Constitution Article II, Section 10 (Right of Individual Privacy). Disclosure of this information is unlawful and would violate the individuals' reasonable expectations of privacy that are not clearly outweighed by the public's right to know.

The confidential information contained herein may not be shared with anyone beyond the intended recipients. All persons with access to the confidential information must take reasonable precautions to keep it secure.

Est. 1998

# CMS

Communication
and Management
Services, LLC

# RETALIATION

# INVESTIGATION REPORT

## Workplace Complaint

Conducted in October - November 2025
Submitted to Montana Department of Public Service Regulation

Greg Ross
gross@cmsmontana.com



Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

**Montana Department of Public Service Regulation**
**Retaliation Complaint Fact-Finding Report**
**Table of Contents**

I.     Introduction ........................................................................................................................... 1

II.    Methodology and List of Participants ................................................................................... 1

III.   Background & Relevant Policies/Laws .................................................................................. 2

    A.    Background ....................................................................................................................... 2

    B.    Issues Presented .............................................................................................................. 3

IV.   Summary of Issues and Findings .......................................................................................... 3

    A.    Complainant Position Statements, including Complainant Interview Statements .......... 3

    B.    Witness Statements: ........................................................................................................ 9

    C.    Respondent's Statement: ............................................................................................... 13

    D.    Documents ..................................................................................................................... 15

    E.    Relevant Policies and Laws ............................................................................................ 18

    F.    Omissions ...................................................................................................................... 21

    G.    Analysis .......................................................................................................................... 21

       Timeline ......................................................................................................................... 22

       1.    Issue 1: Retaliation .................................................................................................. 24

       2.    Issue 2: Retaliation and Hostile Work Environment ................................................ 29

V.    Recommendations .............................................................................................................. 38

VI.   Summary ............................................................................................................................. 39

VII.   Submitted: .......................................................................................................................... 40

VIII.   Attachments ....................................................................................................................... ii

    A.    Report 1 ........................................................................................................................... ii

    B.    Complaint 1 ..................................................................................................................... iii

    C.    Complaint 2 ...................................................................................................................... v

    D.    Organizational Chart and Chain of Command ................................................................. vi


CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

CONFIDENTIAL: *This report may be read only by authorized individuals with a need to know.*

## I.  Introduction

This report summarizes a workplace investigation into complaints filed against Montana's Department of Public Service Regulation (DPSR) Commission President Brad Molnar. ▮ Personnel 1 ▮ submitted a written complaint on September 4, 2025, about President Molnar's "insensitive" and "insulting" behavior. Personnel 2 ▮ ▮, made a report concerning President Molnar's behavior which made her uncomfortable to Personnel 3 ▮ on September 4, 2025. Personnel 4 ▮ filed a written complaint on September 30, 2025, alleging retaliation and a hostile work environment.

Personnel 5 ▮

contacted Communication and Management Services, LLC (CMS), on Wednesday, October 1, 2025, to review the concerns and assign CMS to investigate the complaints. CMS assigned Greg Ross, Human Resource Consultant, to conduct the review. The purpose of the review is to gather information, determine whether substantiated findings violate agency policy or law, and to provide this report to the DPSR Response Team for their consideration in determining the appropriate response.

## II.  Methodology and List of Participants

The fact-finding process involved interviews with complainants and witnesses, and evaluation of substantiated findings in relation to DPSR policies and procedures and relevant employment law. CMS offered the Respondent the opportunity to respond to the allegations and he declined through his legal counsel. The investigation is based on a preponderance of evidence standard. This means that the evidence must show that the fact to be proven is more probable than not.

CMS, LLC conducted the following interviews in November 2025:

| Interview Date & Time | Interviewee | Title | Role |
|---|---|---|---|
| 11/3/25, 3:00pm | Personnel 4 | ▮ | Complainant |
| 11/4/25, 11:00am | Personnel 1 | ▮ | Complainant |
| 11/5/25, 1:00pm | Personnel 2 | ▮ | Witness |
| 11/17/25; 2:25pm | Personnel 6 | ▮ | Witness |
| 11/20/2025, 1:30pm | Personnel 3 | ▮ | Witness |
| 11/14/25, 10:25am | 3rd Party 1 | ▮ | Witness |
| 11/13/25, 2:30 | Personnel 7 | ▮ | Witness |
| Declined to Participate | Brad Molnar | PSC President | Respondent |

 CMS    Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

## III.    Background & Relevant Policies/Laws

### A.    Background

Following are the key facts related to the background of the investigation.

Brad Molnar began his term as Commission President of the PSC in January 2025. Informal complaints, including requests to address President Molnar's conduct, began as early as February 2025. CMS investigated the complaints regarding President Molnar's conduct beginning at the end of June 2025, with a report delivered to DPSR's external legal counsel, who was then assisting the Response Team, on August 14, 2025.

Personnel 4 began employment as the ███████████████████ on March 24, 2025. The day after she began employment, she says she was informed about a remark made by President Molnar to Commission **Personnel 1**, including the **Personnel 1** reaction, at which point the **Personnel 4** began taking steps to document and address the alleged behavior.

While participating in the first phase of the investigation into Brad Molnar's conduct, including allegations of discriminatory behavior and retaliation **Personnel 6** and **Personnel 1** had encounters with President Molnar impacting the scope of the investigation **Personnel 1** experience included, in part, statements directed at her by President Molnar, in which "he stated that he would use his personal resources and attorneys to silence people who bring forward 'stupid' complaints." (quoting Personnel 4 **Personnel 6** interaction included President Molnar indicating to █████ **Personnel 5** that President Molnar intended to discuss potential legal action against the agency, DPSR, regarding the investigation and stating he would "make sure this doesn't happen to anyone ever again." CMS investigated these reports of retaliation during the first phase investigation.

This investigation is focused on reports, issues or complaints that arose between the completion of the first phase of the investigation, on or around August 10, and October 10, 2025. However, in allegations of a hostile work environment, a complainant must demonstrate, in part, that the conduct was sufficiently severe or pervasive enough to alter the conditions of their employment and create an abusive or hostile work environment. To determine pervasiveness, I may consider relevant conduct occurring before or after the stated timeframe if it establishes a pattern or continuity of behavior. Earlier incidents, even if not independently actionable, may provide necessary context for assessing whether the reported conduct collectively meets the threshold of a hostile work environment or establishes a pattern of behaviors that constitute retaliation.

On October 21, 2025, the PSC voted to remove Commissioner Brad Molnar from the position of Commission President. Although the agency voted to remove Commissioner Molnar from this role, the allegations concern his actions while holding that title. For that reason, and to maintain consistency in describing the positional authority and influence that defined the respondent's relationship to others, this report continues to reference Commissioner Molnar as "President."

CMS conducted interviews in October and November 2025.

 CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

B.    Issues Presented

The following section outlines the specific issues identified for investigation, issues occurring between August 10, 2025, and October 10, 2025. This timeline and these guiding questions define the scope of the inquiry, ensuring a focused and consistent approach to fact-finding.

1. Did PSC President Brad Molnar engage in retaliation in violation of DPSR Personnel Policy 2.13 (Retaliation) and/or DPSR Personnel Policy 2.2 (General Standards of Conduct and Performance, section 2.2.6) by engaging in conduct and making statements intended to discourage or deter complaints related to workplace behavior? Specifically, by:
   a) Celebrating the securing of a restraining order in front of **Personnel 1** on September 4, 2025;
   b) Placing a phone call to **Personnel 2** on September 3, 2025, and making threatening comments; and
   c) Disparaging **Personnel 6**

2. Did PSC President Brad Molnar engage in conduct toward **Personnel 4** that created a hostile work environment or constituted retaliation in violation of DPSR Personnel Policy 2.13 (Retaliation) and/or DPSR Personnel Policy 2.2 (General Standards of Conduct and Performance, section 2.2.6)?

## IV.    Summary of Issues and Findings

Below is a summary of the issues and findings. Details regarding each allegation are found in the following report and in <u>Attachment A</u>, <u>Attachment B</u>, and <u>Attachment C.</u> Each of the following issues illustrates the complainant(s) statement or allegation, subject(s) response, relevant evidence, and findings.

A.    Complainant Position Statements, including Complainant Interview Statements

**Personnel 4**

**Personnel 4** served as **Personnel 4** of the Department of Public Service Regulation since March 24, 2025. She participated in a protected activity (a workplace investigation) by notifying President Molnar of the investigation into his conduct, including the appointment of an external investigator and providing documentary evidence for the previous investigation in the form of detailed notes and emails regarding instances of President Molnar's behavior or actions which were reported to her or which she directly observed and/or experienced. She also provided statements during a witness interview.

In her September 30, 2025, complaint *Timeline,* **Personnel 4** opens:

> For months, I have attempted to have faith in the established process for handling complaints against President Molnar. Out of respect for the Commission and the agency, I withheld additional formal complaints, knowing that each new report could bring further negative attention to the organization...I also recognized that convening the Response Team would not mitigate President Molnar's retaliation. In fact, I feared it might escalate the situation further, and I remain convinced this may still be the case.



Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

In the same document, she also reported that during the previous investigation she "recommended that President Molnar be placed on administrative leave to prevent retaliation, as his prior comments made clear that retaliation was likely...However, because President Molnar is an elected official, action could only be taken by the Commission or through intervention from the Governor's office..." She claims that "Despite my recommendations with members of the Response Team and outside legal counsel to bring this before the Commission to consider, my recommendation was not supported or acted upon."

She also reported that she "was advised that [her] reports of retaliation could be viewed as posturing and was cautioned to avoid appearing adverse to the agency." She declined to name the person who provided this advice but noted that the individual seemed well-intentioned. She noted that "comments made by President Molnar regarding my character have been downplayed and dismissed as trivial..." by the same individual and "I worry that other staff members are experiencing the same dismissive attitude in response to any concerns brought forward."

She reflects that "Despite repeated warnings, documentation of retaliation, and requests for intervention, the retaliation has been allowed to continue and even escalate over the course of months. The retaliation is now spreading to other staff members and I feel powerless to act."

She, in her complaint, emphasizes "that reporting these issues carries personal risk to my reputation, career and future employment."

She provided instances she believes to be retaliatory, and which contribute to a hostile work environment. In an August 10, 2025, email from President Molnar Subject: "RE: NARUC Renewal Membership,"[1] to **Personnel 4** and **Personnel 5** with cc'd recipients redacted, **Personnel 4** lleges that 'he also made a point to publicly admonish me through agency emails.; This email on the 10th, has content which includes, in part: "YOU may have just messed up a really big deal. Yes, really big. When I need your assistance in a financial decision or in negotiating, I will ask you directly. Don't wait by the phone...Everyone on this list has more experience than you. So a word of advice, please stop trying to back door me and back stab me for whatever it is you think it gains you." While this instance was cited in the previous investigation report, the email chain continued into August 11th and 12th **Personnel 4** offers clarification on her intent and her role when communicating with NARUC, and President Molnar responds that "Negotiating a lower rate was successfully done in my first time on the Commission. I was considering it until **Personnel 4** jumped in."

**Personnel 4** relayed that while she was in **[redacted]** leave, on August 11, 2025, President Molnar moved into the office next to hers "from across the building." She relayed that President Molnar would walk past her office and glare into her office as he passed, "It felt like a harassing presence, he was glaring." She likened it to a look similarly described by **Personnel 5** **Personnel 4** described it as an "I want to kill you type of look." (While using this description of his menacing look, she did not indicate that she believed he was actually planning to kill her.)

In her *Timeline* document **Personnel 4** describes that:

> President Molnar also began to go to staff behind my back to undermine my role and deny my expense requests in a way that felt particularly retaliatory. [See Exhibit 10, email from August 27] He lied about conversations he had with me regarding relinquishing

 CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

*regulatory duties, attempted to make personnel moves while intentionally circumventing me, and withdrew some of my responsibilities regarding media engagement despite my care in handling all requests in a fair manner.*

On 29 August 2025, President Molnar appeared on Voices of Montana, and [Personnel 4] alleges that "he attacked me personally and inferred I was disrupting due process by not allowing him to see the complaints." She also denied that she had been saving up complaints, nor that she told him that she'd been saving up the complaints.

On September 3, 2025, immediately following the out of cycle work session to attempt to rescind the letter to Governor Gianforte, [Personnel 4] alleges that she overheard President Molnar asking the person on the other end, whom [Personnel 4] was unable to identify, if he could hold PSC management individually financially liable for the contracts made with CMS and Amy Christensen.

On September 4 [Personnel 4] alleges that President Molnar "drove up to the Montana Family Foundation, and asked staff to assist him in looking at and navigating the 'Follow the Money' website. When asked why he needed assistance, President Molnar stated he was there to retaliate against members of the Commission. President Molnar was subsequently asked to leave." She did not disclose who provided her with this information but stated she heard it from a reliable source. She provided [3rd Party 1] as someone who could confirm her account.

She described that she reported to Capitol Police, Montana Highway Patrol, some of President Molnar's behavior—including, in part, his alleged history of violence, harassing behaviors, threats, outbursts, and recent escalation[2]—and sought their advice. She conveyed that through the information shared with them, verbally and written, which she noted was enough for them to show up to a few meetings. She was deliberate in noting that she did not request their presence.

She conducted an exit interview[3] with [Personnel 6] whose last date of employment with the agency was September 5, 2025. She notes that part of the reason he departed had to do with feeling disrespected [Personnel 4] also, later, conducted an exit interview with [Personnel 8] who she says chose to leave after seeing the way [Personnel 4] at she believed the Commission disrespected [Personnel 4] by not taking his advice, although what specific advice was not discussed.

On September 5, in an email[4] from President Molnar, he directed media requests and legal requests be sent to [Personnel 9] rather than [Personnel 4] and [Personnel 8]. [Personnel 4] described this as "part of a pattern of him targeting people who he thinks are inexperienced, are new, or may not know what he knows." She also notes that he told [Personnel 9] "I don't trus [Personnel 4] I want you to handle anything to do with the removal attempt."

She explained that she had requested that President Molnar speak with her about any concerns he may have regarding her performance, but that he is intentionally not communicating with her, including, she believes, screening her calls and not taking them. President Molnar, according to [Personnel 4] attempted to

---

[2] Document #12 in Section D of this report; Exhibit 12, "Safety Documentation"
[3] Document #7 in Section D of this report
[4] Document #6 in Section D of this report


CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

have the new staff attorney █Personnel 10█ who was in his first week, assume media responsibilities, which were held at the time by █Personnel 4█

President Molnar, again via email, on October 10, 2025, sent direction that media requests be sent t █████ █Personnel 7█ removing █Personnel 9█ and █Personnel 4█. She referenced a question that she had answered to the media about an IPM amendment that █Personnel 5█ ad made, "President Molnar stated my comments to the media regarding a proposed IPM change violated his order that I not be allowed to speak to them about the 'suspension attempt'. This was a completely separate issue as discussed and agreed upon with our █Personnel 9█ Despite their recommendations and his accusations, he never came and spoke to me about his concerns which seemed to be another example of his attempts to degrade my reputation and role in the agency." She alleges that after she provided clarifying context to a media outlet, President Molnar called her behavior 'grossly insubordinate.' This October 10th email also included two paragraphs explaining how President Molnar had previously assigned a "security concern to a staffe █Personnel 4█ that took point and invited [Montana Highway Patrol] to provide a physical presence...I never meant for the authority/extra work to remain with the staffer but failed to officially notify them. My mistake...Please note that in an emergency anyone can call any emergency responders. But, other than that I will handle this decision or delegate law enforcement presence for a specific event. █Personnel 4█ perceived this as removing her security responsibilities.

# Personnel 2

█Personnel 2█ served with the Department of Public Service Regulation from 2005 until 2013 and worked with Commissioner Brad Molnar for seven years during that time. She recently ██████ the state and returned to the DPSR in April 2025 as ████████████ She reports to █Personnel 3█ and as the █████████████████ handles accounting, payroll, and budgeting responsibilities; she is in the office ███████████ She described her relationship with President Molnar as a good working relationship, both in the past and currently.

She stated that on September 2, 2025, she provided President Molnar with a group of bills which needed to receive his signature for payments to be issued. One of those bills was from CMS, the HR consulting firm which had investigated alleged misconduct on President Molnar's part. President Molnar, instead of approving the payment, wrote "Denied" across the bill. She states that it is not normal for the President to not sign off on a payment request.[5] She then sought direction from her supervisor █Personnel 3█, who directed her to provide the bill to the █Personnel 5█

█Personnel 2█ alleges that on September 3 at or around 10:35am she received a call from President Molnar on her personal phone. After explaining how he received her number from █Personnel 1█ █████, █Personnel 2█ lleges that Molnar told her "Now that I know your number, I can find out where you live and show up at 3:30 in the morning and knock on your door." She also said that he told her he would get pictures of her kids sleeping in their beds. While she acknowledged that this part of the conversation was said in a joking manner, with both parties chuckling, she clarified that it also made her feel "weird, yucky." After she had gotten off the phone, she recalls that it made her feel

---

[5] This is corroborated in the September 3, 2025, Out of Cycle Work Session held by the PSC; VP Fielder references it around the 1hour and 5 minute mark. https://www.youtube.com/watch?v=3owa76HuwDM&t=10932s


Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

"really uncomfortable," and upon reflection, later that evening, she wondered if he had been trying to intimidate her. With this possible perspective, she became angry and found it to be "really inappropriate." She clarified that she felt intimidated but not threatened.

Following this "uncomfortable" exchange about her home and family, she states that he "asked about the payment document that I'd asked him to sign...and wanted to look at it again." At that point she no longer had the document and said that he was not happy that she had removed it from under his purview. She said his voice was slightly raised and didn't sound happy anymore, as it had when he was making the unusual comments. His tone had changed in response to her telling him that she had given the paperwork to Personnel 5 He told her that she shouldn't have done it, that it was his responsibility to do it.

After the call, she immediately called her supervisor, Personnel 3 to inform her of the conversation, but only about the aspects that may be relevant to the invoice—"it was to give her a heads up in case he went into the office, so that she was prepared that he might say something...and to let her know that I hadn't put her name out there."

Personnel 2 acknowledged that "sometimes things take a little time to sink in with me to where it just starts to weigh on me...I did have trouble sleeping that night. I put that in the Teams message to Personnel 3 that I was very uncomfortable with this, and that I wasn't planning on writing this as a formal documentation to her when I got off the phone with him, it was after I sat there and thought about it. Personnel 2 said she chose not to make her report a formal complaint out of fear for her job because she is in a new, part time position and has not yet completed her probationary period and therefore considered herself unprotected in that aspect from retaliatory termination, but knew she needed to document the incident and, after sleeping on it, she decided to submit her report on the morning of September 4[6].

Personnel 2 stated that "It made me angry because it did make me uncomfortable. I wouldn't have gotten angry, otherwise...It was just so bizarre. I just can't consider any context with it, it's so out of the norm of something you would say to someone, especially a work colleague or a work subordinate." She is unaware of any similar calls or conversations of a similar nature to other colleagues, but volunteered that she doesn't know who else might be complaining except perhaps for Personnel 11 "because of what Molnar said in the news, which was a totally inappropriate comment to make publicly as well...he said he did not sexually harass her because his wife is a hottie."

Personnel 1
Personnel 1 served with the Department of Public Service Regulation since May of 2021 as the Personnel 1 She manages a team of                          IT/Systems support, and one Assistant

On September 3, 2025, the Commission held an Out of Cycle Work Session to discuss whether to rescind a letter whic Personnel 5 sent to Montana Governor Greg Gianforte, requesting that he temporarily suspend PSC President Molnar from his position during the pending investigation. Personnel 1 provided public comment during this session because she "wasn't

---

[6] Document #4 in Section D of this report.


CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

sleeping at night." She was "worried and thinking and trying to find if there was any kind of resolution" and wondered how she could contribute. She says it dawned on her, "Why can't I make public comment? I'm not just an employee. I'm a citizen. I'm a rate payer, and some of the complainants [from the first phase of this investigation], are directly under me." █Personnel 1█ voiced her concerns regarding Molnar's workplace conduct, specifically, his refusal to participate in the investigation.

CMS received a copy of her one-page public comment, which she read to the Commission, including directing a portion of her comment directly to President Molnar. "I purposely paused and looked right at him, so he knew I was speaking to him." She said to him, taken from her notes: "**Your refusal to participate in the investigation is causing damage to you, those around you, and this agency. As President, you have an obligation to this agency, to take full responsibility for your actions and the perception of your actions. I ask you, please, take ownership of your actions by participating in the investigation**" [bold in original].

While President Molnar made no reaction in the moments she was specifically addressing him, she relayed a story to CMS that earlier in the day on September 3, as she was debating internally whether or not she was going to put herself out there and make public comment, he had said something to her along the lines of "you look really tired." She claims she responded "Yeah, I'm not sleeping very well," and then he walked away. After the Work Session, where the commission voted not to rescind the letter, she claims he came up to her and said "Now I know why you didn't sleep well last night," to which she says she responded by saying "I haven't been sleeping well for months." President Molnar's alleged response to this statement, alluding to her public comment, was "Well, that took a lot of courage. You must really disrespect me." She says she countered this interpretation, "I never said I disrespected you," then President Molnar said "Well, maybe you just don't like me," and walked away.

Her comments to the commission included stating that "I believe recalling this letter to the Governor would have long-lasting negative consequences for the Commission. I believe the investigation for allegations of misconduct in the workplace must be allowed to go forward with full cooperation from President Molnar."

On March 4, 2025, Judge Menahan for the 1st Judicial District Court in Montana "granted a temporary restraining order blocking Governor Greg Gianforte from taking any action to suspend Montana Public Service Commission President Brad Molnar.[7]" That day, she writes in her complaint, President Molnar came to her at the █████ and "did a 'happy dance' while he announced that a judge ruled to grant a temporary restraining order against █Personnel 5█ and the Governor." She demonstrated this by raising her arms, hands in fists, alternating one arm up and the other down.[8] █Personnel 1█ reflected on whether President Molnar specifically sought her out, or simply wanted to share this information with someone, and noted that she thinks he "needed someone to know. So, in that respect, I don't believe that it's retaliation. But given my words, it felt like retaliation. So, I don't know his intent, but I know what I said, and he did not take it to heart."

█Personnel 1█ ultimately decided to make her complaint because she believes "an unwilling participant is making this a much larger issue than it needs to be..." and she thinks "there

---

[7] https://www.ktvh.com/news/montana-news/district-court-judge-intervenes-in-psc-dispute
[8] This is the same motion described and demonstrated by █Personnel 4█



Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

CMS

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

just needs to be some record of accuracy here, instead of one person saying all these things that I don't believe are true, some of them I know are not true.  Because he's willing to hold news conferences, that's what the public is hearing, and that's very discouraging." She also wondered why he would choose to do such a thing with the ongoing investigation into his behavior.

To address the timing, 11 days between the event and her complaint, she stated "I didn't really want to be a complainant...But it took me that long to say, 'Yeah, I better do it. I should do it. It's the right thing to do if it can protect others. [Protect] myself and others.'"

##### B.    Witness Statements:

**Personnel 7**

**Personnel 7** has worked for the DPSR for 35 years, the most recent ten in the role as **Personnel 7** I interviewed **Personnel 7** to learn more information regarding **Personnel 4** allegations of Molnar removing responsibilities from her, as well as to ask about a statement **Personnel 4** understood Commissioner Molnar to have made to **Personnel 7** following Molnar's removal from the role as PSC President.

He recalls being asked by **Personnel 10** and PSC President Molnar, in October 2025, to take on media responsibilities, and taking those on, but emphasized that he tried to point out to both of them, individually, that he was willing to take on the position "if the Commission needs me to do this." He did this in recognition that these changes are things which would typically be a Commission decision, if not in actual violation of IPM, which he could not confirm. He also recalled emphasizing "the need to pu **Personnel 4** in the loop...I didn't wan **Personnel 4** to think I was undermining her."  He noted that it was quickly after a phone call from President Molnar to himself that the email announcing the decision came out from President Molnar, indicating to **Personnel 7** that the decision had not gone through the processes he expected it should have, so he confirmed calling and apologizing to **Personnel 4** after the media responsibilities were taken from her via email and given to him. During his call with President Molnar, he recalls that part of the reason for the change in role was President Molnar's "dissatisfaction wit **Personnel 4** nd his [Molnar's] communications with her."

He also recalled the letter referenced by **Personnel 4** a letter which needed to be sent to DEQ in response to a request made of the DPSR by DEQ, a letter whose contents didn't merit, in his estimation, the need to have full Commission involvement or action, but which could simply have been delivered with **Personnel 4** name as the signatory. He stated that he sent the letter to the Commission for their information, and that he received an email from President Molnar stating that he wanted the letter to go out with his signature, instead **Personnel 7** did not recall there being any more context or implication in this instance, nothing to indicate that all future letters which might have come from th **Personnel 4** would now come from the Commission or the President, it was more specifically directed at this one instance.

**Personnel 7** oted that when Commissioner Molnar's title of President had been removed, he remembered Commissioner Molnar saying "something to the effect of 'this isn't going to keep [me] from pursuing [my] regulatory interest with vigor. They haven't quieted me down, I'm still going to be as active as ever, even though I'm not President.'"

**Personnel 3**

**Personnel 3** has been with the DPSR since August of 2021. Although she initially applied n, she was informed during her interview that the role had been changed to a

CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

**Personnel 3** position, for which she proceeded to interview and was subsequently hired. She noted the multiple roles[9] her position fills but described the primary function of her position as "keeping the agency together," including everything from ██████████████. "It's all encompassing." Being in an ████████ position, she described that she reports to the ██████████████ She supervises ██ employees, an ████████████ Technician and ██████████ one of the complainants.

Based on her role on the response team, she described the initial three email complaints from the first phase of the investigation, and how her role as **Personnel 3** ████████ would have typically worked with an individual employee and/or supervisor upon receipt of a complaint, ██████████ ████████████ who would be the one doing the corrective action, performance improvement, etc. However, because of the continued pattern of complaint after complaint coming in, the matter rose to a level where "it became a Response Team matter." For individual complaints, she noted that she would typically have worked in coordination with internal legal counsel, as needed.

Because I was unable to ask President Molnar about the allegation he made during his Voices of Montana conversation about Personnel 4 saving up complaints, I asked **Personnel 3** ████, as a member of the Response Team, if there might be any truth to President Molnar's allegation. She stated that she was not aware of any attempt of Personnel 4 to recommend or otherwise influence the 'saving up' of any of the initial complaints that came through, and would not agree with President Molnar's statement that Personnel 4 ████ had been saving them up.

When I asked **Personnel 3** ████████ about President Molnar's office move to the vacant office next to Personnel 4 she described the reasonable accommodations offered to President Molnar without disclosing the specific medical condition, but described the accommodation as improved lighting for his office. She worked with him to offer different types of lighting, to change his [computer] screen's settings. She acknowledged that both times his stated reasons for moving offices were medical, and although she did not receive, nor ask for, medical documentation, that she had no reason to question the sincerity of his requests, "it's pretty evident why he needed it."

She described her conversation with **Personnel 2** on September 3 where **Personnel 2** relayed to her the information about President Molnar's phone call to her personal number. She noted that she did not receive the full details from her direct report during the original call, but that after processing it "she Personnel 2 wanted to share more details." As the **Personnel 3** offered to speak to President Molnar about the interaction, which Personnel 2 greed to, and then a day or so later, "she asked me not to.. Personnel 2 said 'not to bring it up.'" She noted that in her experience it was abnormal for a President to write "denied" across the invoice itself, but that it was not uncommon for someone to delay payment until they fully understood the purpose of the payment they were authorizing.

**Personnel 3** ████████

████████

Personnel 5

Personnel 4

Personnel 1

████████

 CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

being something "you would expect a child to do." Using similar language as Personnel 1 she questioned the wisdom of his behavior with 'all that is going on' within the agency.

Personnel 3 confirmed that President Molnar told her at some point that he was aware she was the one who signed the agreement with CMS for the investigation. She relayed that "he said something like 'I Personnel 3 am the hubba bubba of it all since I signed the contract.' She noted that this was said in a joking manner, and that she wasn't sure why he brought it up, but that she did not feel intimidated by it. She confirmed what he said during his press conference with Personnel 12 and 3rd Party 2 that he had asked her if "people are really scared of me [Molnar]?" She pointed out that he was very surprised, adding "he's not very intimidating." When asked to explain this, she described that "he winces in pain when he gets out of the chair, so I don't see him as intimidating or threatening." She acknowledged that she'd been told he yells, but that she's "never heard him yell," despite her office being "four or five doors down" from his. She said she'd heard him raise his voice, and the one time she confronted him about a complaint of him yelling, he stated that he was speaking with someone for IT support who was having difficulty understanding President Molnar, so he was raising his voice to facilitate what she interpreted as a language barrier.

Personnel 3 near the end of her fact-finding interview, asked me why, at some point in the investigation, I had used the word "threatening" to inquire about her perception of President Molnar's behaviors. I explained that I had heard from numerous witnesses during the investigation about alleged stories told by President Molnar himself where he had become violent or physical. In response, she hypothesized that some of peoples' responses are based on not knowing what to anticipate from him. She was aware, however, of Personnel 11 hiring of private security, and she had received an email from Personnel 11 explaining "she feared for her safety, that's why she's changed her work schedule." Yet, she also noted that when she viewed their interactions in the camera, "they don't look afraid," and that she "doesn't sense fear there, at all." She denies hearing first-hand any comments from President Molnar about taking action against people who participated in the investigation, but she is aware of allegations of those comments based on her role on the response team. Regarding her assessment of the credibility of those comments or concerns of retaliation, she said she "doesn't know what his motive would be, doesn't know why he'd do it," but that because she didn't hear them directly, she doesn't know if it's credible. "It's he-said, she-said."

Regarding the departure of, and specifically the exit interviews of Personnel 6 and Personnel 8 while Personnel 3 wouldn't call their departures indicative of a trend, she agreed that the exit interview notes for Personnel 8 did not include anything specifically naming President Molnar, but that two staff leaving due to a single individual is unprecedented in her time, although there is frequent turnover in the ▮▮▮ roles, "they get much higher offers in the private sector, we can't compete with ▮▮▮ per hour." She described President Molnar's inquiry into ▮▮▮ Personnel 8 accrued leave balances—compensatory time, sick leave, vacation—as a question about how his payouts would be affected if the Commission were to choose to allow him to leave earlier than the date on his notice. She did not hear this inquiry as an attempt to prevent payout, but rather as an attempt to allow Personnel 8 to depart more quickly if it were his desire; "he was fine wit Personnel 8 being paid out and leaving earlier than the notice Personnel 8 provided."

CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

previous report or any of the complaints. Regarding whether there were any discussions about potential impact to the agency's reputation or the reputation of leadership, she noted the effect everything has had on morale. "It embarrasses people when things are said about the agency, when the work we do is so tough...they're not easy jobs...it hurts the agency, hurts morale, hurts recruitment." When this investigator asked if those considerations affected her judgment or actions, she noted that she hasn't observed any attempts to sweep things under the rug, and that from her point of view, she's "trying to keep costs in line," which is why she initially asked CMS at the onset of the initial investigation whether or not the investigation could be conducted using only the video recording of Commission sessions, she viewed it as a way to avoid stirring things up and a way to save costs by speeding things along. "It's less expensive if we can do it faster," and there would be less tension, she also noted. In addition to her comments represented in <u>Section V. Recommendations</u> **Personnel 3** considers the ideal outcome of this fact finding process to be that "we have a resolution, and that we stop paying the attorney fees" and spending the "taxpayer money" going to all of this.

She described President Molnar's September assessment of <sup>Personnel 4</sup> comments to the media as "insubordination," noting that he had said to **Personnel 3** "All I asked her to do was say 'no comment'". **Personnel 3** noted that a supervisor   could ask someone not to respond to media requests, that this would be within their purview, but that he, as President, wouldn't have full authority to change the full responsibilities, that would be a "commission level" decision in this instance. She also noted the dynamic created by the temporary filling of those responsibilities b <sup>Personnel 4</sup> the           position is vacant, so the formality of the whole situation is in question. Because she wasn't privy to the conversation between <sup>Personnel 4</sup> and President Molnar, she was unwilling to speak to the accuracy of the accusation of <sup>Personnel 4</sup> behaviors being insubordinate.

**Personnel 3** has noticed that things have improved since the role of President has been removed from Commissioner Molnar's responsibilities.

## Personnel 7

CMS spoke with **Personnel 7** who answered some questions and declined to answer others citing concerns about disclosing information that may be protected under attorney/client privilege. He notified President Molnar and **Personnel 4** on June 23, 2025, that he was seeking employment elsewhere, pursuant to MCA 2-2-121(2)(f)[11].

His last date of employment was           2025, and his exit interview was conducted by <sup>Personnel 4</sup> He clarified to me that what is recorded in her notes as "personal accusations" as one of the things he liked least about working at the agency, he explained that this was in reference to the Daily Montanan article[12] which describes a press conference held by President Molnar, during which he is quoted "Molnar said his

---

[10] According to DPSR Internal Policy Manual (IPM) Administration Policy 2.9.3.4.3. "The President directly supervises the Executive Director"

[11] Rules of conduct for public officers and public employees.  A public officer or a public employee may not: ... solicit or accept employment, or engage in negotiations or meetings to consider employment, with a person whom the officer or employee regulates in the course of official duties without first giving written notification to the officer's or employee's supervisor and department director.



Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

interest is in accountability, but **Personnel 4** darn near breaks into tears" when he asks questions about NorthWestern—a claim she flatly ▮▮▮—and **Personnel 11** and the **Personnel 6** re in the same boat." This quote, in the July 30th article, came over a month aft **Personnel 6** the agency that he was seeking employment elsewhere.

**Personnel 6** responded that he did not believe his decision to leave was entirely voluntary, meaning there were certain conditions which influenced his decision to leave, but he chose not to file a complaint. He also acknowledged, referencing himself, that having "the messenger get shot is a really tough spot."

## 3rd Party 1

**Personnel 4** tated in her timeline document that President Molnar "drove up to the Montana Family ▮▮▮ n, and asked staff to assist him in looking at and navigating the 'Follow the Money' website. When asked why he needed assistance, President Molnar stated he was there to retaliate against members of the Commission. President Molnar was subsequently asked to leave. **Personnel 4** chose not to provide the name of the source who relayed this information to her, but did provide **3rd Party 1** name as someone who could confirm this instance.

**3rd Party 1** did not recall President Molnar coming to the MFF offices in Laurel in September, nor did he remember a conversation with President Molnar via phone or otherwise about any PSC-related activities. He did acknowledge knowing Brad Molnar through living in the same town, Laurel, and attending church, but jokingly noted that he tried to avoid PSC-related activities.

### C.   Respondent's Statement:

*President Molnar*

Brad Molnar has served with the PSC as President of the Commission since January 2025. He was previously elected to Montana PSC in 2004, serving until 2012, as Commissioner from District 2 and elected as Vice Chair twice.

CMS attempted to provide President Molnar with the opportunity to respond to every allegation under consideration. Through communication from President Molnar's legal counsel, Matthew Monforton, President Molnar chose not to participate in the investigation. DPSR's retained legal counsel, Amy Christensen, informed President Molnar, through an email to his attorney on October 23, 2025, that an investigation was being conducted. On November 5, 2025, she informed President Molnar through an email to Mr. Monforton, of the request for CMS to would like "to meet with Commissioner Molnar so that he can hear about and respond to the complaints currently being investigated." On November 10, 2025, Monforton sent an email to Christensen stating, in part, "Commissioner Molnar respectfully declines to participate in an interview under the current process." [13]

However, I may draw upon some of President Molnar's own statements in other forums.

During a Voices of Montana interview on August 29, 2025, President Molnar tells the host:

---

[13] Document #16 in Section D of this report.



Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

> *I don't even know what [the allegation] is. I don't even know who made it. I don't know who the witnesses are. I did get a letter from a reporter about* **Personnel 4**
>
> > *[He asked her]*
>
> *"You claim there's three complaints?*
>
> *"Yes."*
>
> *"How are there three? Have you gone to Molnar and said, there's three complaints?"*
>
> *"She said, 'No, we're saving them up.'"*
>
> *I have to assume saving them up for this purpose.*

Regarding **Personnel 4** accusation of Molnar removing her responsibilities, during his October 17, 2025, interview with **3rd Party 2** when **3rd Party 2** sked President Molnar "why did you take away **Personnel 4** security clearance...?" President Molnar responded "I didn't take her security clearance away. I redefined some positions. Her position is subservient to mine...I don't think I walked on anybody's toes reassigning that. I'm fully qualified and by our own personnel manual, I can assign as I see fit, because, after all, I'm the President."

During the same October 17 interview President Molnar addresses retaliation, acknowledging that intimidation was something which has been brought to his attention. "They said that people are afraid to come to work because they're afraid I'm, according to **Personnel 5** gonna knock out 26 of them at one time...I checked with HR, I said 'are people afraid to come to work because when I walk in they're filled with terror? She said 'No.'" He went on to describe the inflammation in one of his knees, arthritis in his feet, and a disability permit he holds for his shoulder, asking "why would anybody fear a 75 year-old semi-animated wreck?" In an email exchange with **Personnel 9** subject: "Re: Status", on September 25, 2025, President Molnar is advised by **Personnel 9**

> *...retaliation against anyone who you believe may have filed a complaint or participated in the Code of Conduct proceeding is prohibited by agency policy and state law. Retaliation includes actions that would dissuade a reasonable person from engaging in protected activity, which includes any participation in the Code of Conduct process. Retaliation can include overt actions like demotion.*

President Molnar responds in line, in bold:

> **"So if I give her press duties to someone else due to attempting to mislead the press and insubordination you will expand your investigation and use that as proof she should be able to continue on and I should be vanquished? Plainly having her face a small consequence for her repeated violations should not be precluded by the investigation. Protection of wrongdoers is not the intent of what you are quoting.**

**Personnel 9** *original email content continues:*

CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

President Molnar's in-line response:

*Is this your way of warning me to not hold* ██████ *responsible for the gross insubordination mentioned above by suspension for a week with pay but she can still do her work remotely? Because I believe that my patience with her is obvious and certainly, I have had multiple opportunities to take retaliation against her over the last several months. Just as clearly, I have not taken retribution against her or anyone else..."* [bold in original]

**Personnel 9** responded the next day:

*Also, at the meeting on Wednesday, you indicated you did not want to make a formal complaint or follow the Response Team process for resolving the insubordination matter. If a similar media inquiry comes in again, both* ██████ *and I need to understand your direction. When the media inquiry came in last Thursday, I thought the questions regarding the VP's IPM Amendment and a possible, future complaint to the governor reasonably fell outside your delegation regarding the August suspension attempt. Now that I understand you intended a broader delegation, I will do my best to ensure that is followed. I recommend we work on clearer language to define the boundaries of that delegation.*

### D.    Documents

The following documents were reviewed and are included as attachments.

1.  August 25, 2025, letter from Matthew Monforton to Governor Gianforte in response to ██ **Personnel 5** complaint to Governor Gianforte about President Molnar.
2.  Audio Recording, *Voices of Montana* radio show and podcast, titled "PSC President Brad Molnar Responds to Complaints" recorded on August 29, 2025.
3.  Video Recording "Out of Cycle Work Session[14]" on September 3, 2025, in which the Commission considered rescinding the letter sent to Montana Governor Gianforte which requested the removal of President Molnar.
    o   Montana Free Press article[15] about September 3 PSC meeting.
    o   **Personnel 1** pre-written speech for use during public comment
4.  Email sent on September 4, 2025, Subject: "Phone Call Documentation 9-3-25," from ██████ **Personnel 2** to **Personnel 3**. Includes, in part, description of an alleged phone call from President Molnar to **Personnel 2** where she alleges "He said now that he has my phone number, he also can find my address and said that he might knock on my door at 3:30 in the morning, and also said something about having pictures of my kids sleeping in their beds." The email also describes a protected activity which **Personnel 2** had taken.
    o   Subsequent email chain also included:

---

[14] "Out of Cycle Work Session." *YouTube*, uploaded by Montana Public Service Commission, 3 Sept. 2025, www.youtube.com/watch?v=3owa76HuwDM.

[15] Eggert, Amanda. "The Vice President of Montana's Utility Regulator Wants Its President Gone." *Montana Free Press*, 5 Sept. 2025. https://montanafreepress.org/2025/09/05/the-vice-president-of-montanas-utility-regulator-wants-its-president-gone/



Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.

- Confirmation of Receipt from **Personnel 3** on September 4
- Forward from **Personnel 3** to **Personnel 5** on September 4
- **Personnel 5** forward of email chain to **Personnel 9** and Amy Christensen, cc'ing **Personnel 3** with an atte President Fielder shared the email with **Personnel 4** who "is head of security." Email clarifies that "The document in question is the July 14 Claim Log which includes the $1500 invoice from CMS."
- Response from **Personnel 3** to **Personnel 5** **Personnel 9** and Christensen in which **Personnel 3** affirms that she was able to speak with **Personnel 2** at "she believes he maybe was being funny because he has known her for a long time…is she afraid he will knock on her door in the middle of the night, or do the things he mentioned, and she said no…She also said they were both "chuckling" but that the conversation made her uncomfortable enough to document it."

5. Email correspondence between **Personnel 1** and **Personnel 3**, with **Personnel 5** **Personnel 4** **Personnel 9** "09/04/2025 – Unprofessional Conduct' w ar's behavior toward **Personnel 1** following Judge Menahan's order blocking any action on the nt Molnar.

6. Email on September 5, 2025, Subject: "RE: INFO Meeting Today: Wildfire Presentation," from Brad Molnar t **Personnel 11** **Personnel 4** and <PSC_Comm'nrs@mt.gov>, in which President Molnar re-directs media requests and legal requests from **Personnel 4** and **Personnel 8** to **Personnel 9**

7. Exit interview notes fo **Personnel 6** (last date of employment ___ )

8. Email sent on September 15, 2025, Subject: "09/04/2025 – Unprofessional Conduct," from **Personnel 1** to **Personnel 5** **Personnel 4** **Personnel 9** and **Personnel 3** form eport of "what I feel is retaliatory behavior on the part of Brad Molnar." It outlines the protected activity taken by **Personnel 1** and a description of the alleged retaliatory behavior.
    o Confirmation of receipt email sent in reply (to all) by **Personnel 3** on the same day.
        - Thanks for confirmation sent from **Personnel 1** in reply to all.

9. Email sent on September 22, 2025, Subject: "Status," in which President Molnar requests the status of the investigation.
    o September 25, 2025, 1:36 PM email response, Subject "RE: Status," from **Personnel 9** to Brad Molnar, in which **Personnel 9** provides President Molnar with an update pu ining that the complaint to the Governor and District Court proceeding have impacted the timing. She also includes an advisement that retaliation is prohibited, and describes retaliatory behaviors: "Retaliation includes actions that would dissuade a reasonable person from engaging in protected activity, which includes any participation in the Code of Conduct process. Retaliation can include overt actions like demotion or denial of benefits, as well as subtler behaviors like increased scrutiny or making a person's work more difficult."

**Personnel 9**


Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.

"My question was if the investigation is complete and only the write up was pending. That is a yes or no question. Please respond...Do you stand four square against not only due process but also equal protection under the law? Inquiring minds want to know." [bold in original]

- September 26, 2025, response from Personnel 9

10. Email sent on September 29, 2025, Subject: "suspension," from Brad Molnar to Governor Greg Gianforte, Personnel 9 Personnel 4 Personnel 12 in which President Molnar offers polygraph test.

11. Email sent on September 30, 2025, Subject: "Formal Complaint Personnel 4 from Personnel 4 o Personnel 9 in which Personnel 4 states that she "would like to file a formal complaint of retaliation and a hostile work environment," and she includes two attachments as files: "Exhibits" and "Timeline." Documents outline, in part: Personnel 4 reasoning for filing a complaint, her hesitation for doing so, and her concerns about retaliation. Her documentation recognizes the limitations of state government's "statutes and procedures governing the conduct and accountability of elected officials." She documents that "Despite repeated warnings, documentation of retaliation, and requests for intervention, the retaliation has been allowed to continue and even escalate over the course of months. The retaliation is now spreading to other staff members and I feel powerless to act." She emphasizes the personal risks assumed by complaining, risks to "reputation, career and future employment," yet continues to provide "examples of events that [she has] experienced that feel retaliatory and contribute to a hostile work environment. Personnel 4 also provides examples of her engagement in protected activities under numerous statues and policies.

12. Email sent on October 10, 2025, Subject: "Minor changes," from Brad Molnar to PSC_PSC@mt.gov, in which he re-directs Personnel 7 as contact for media requests, removing Personnel 9 and Personnel 4 It also includes comments about Montana Highway P              ng up              , and President Molnar notes that in the future he will "delegate law enforcement presence for a specific event."

13. October 23, 2025, letter to President Molnar notifying him investigation of "complaints and reports, received between 8/12/25 and 10/10/25, alleging you have engaged in retaliation, in violation of DPSR policy."

14. Email dated October 30, 2025, subject: "Notice of Ethics complaint submitted to COPP-Molnar v. Bukacek," sent by Personnel 11 to legal counse Personnel 9 an Personnel 10 c'd Personnel 4 Personnel 12 Personnel 5

15. Exit interview notes for Personnel 8 (last date of employment 10/31/25)

16. Email sent on November 10, 2025, from Matthew Monforton on Commissioner Molnar's behalf to external legal counsel Amy Christensen, declining to participate in the interview. "Commissioner Molnar respectfully declines to participate in an interview under the current process."

17. July 30, 2025, Daily Montanan article, "PSC President Brad Molnar says workplace investigation waste of taxpayer resources"[16]

18. October 17, 2025, video recording of Press Conference with President Molnar, Commissioner Pinocci, and Helena Independent Record editor Thom Bridge. [17]

---

[16] "PSC President Brad Molnar Says Workplace Investigation Waste of Taxpayer Resources." *Daily Montanan*, 30 Jul. 2025. https://dailymontanan.com/2025/07/30/psc-president-brad-molnar-says-workplace-investigation-waste-of-taxpayer-resources/

 CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

19. September 3, 2025, Daily Montanan article, "Complaint to Gianforte about PSC President Molnar will proceed."[18]

20. August 10, 2025, email from Brad Molnar to ▉Personnel 4▉ and ▉Personnel 5▉ Subject: "RE: NARUC Renewal Membership", which includes, in part President Molnar's chastising ▉Personnel 4▉ for her contact with NARUC's Senior Director, "YOU may have just messed up a really big deal. Yes, really big;" and stating that "everyone on this list has more experience than you."

### E.    Relevant Policies and Laws

The following policies and statutes listed below are applicable to the review:

*Administration Policy, effective 07/09/2024*

2.9.3.4.3. "The President directly supervises the Executive Director"

2.9.4.5. Business Manager: The Business Manager manages the Internal Business unit within the Centralized Services Division and serves as the department's Human Resources Officer (HRO) and Agency Procurement Officer (APO).

*Code of Conduct Policy, effective 8/13/2024*

2.2.3. Commissioners are expected to perform their essential job functions and produce work that consistently meets or exceeds professional standards for individuals in the same or similar positions.

2.2.6 Department personnel are expected to maintain a professional, courteous, productive, and respectful working relationship with co-workers, peers, supervisors, and the general public. Threatening, abusive, obscene, or derisive behavior or communications are strictly prohibited.

2.7. Commissioners' Impartial and Diligent Performance of Duties

2.7.1. The official duties of a commissioner take precedence over all other activities. A commissioner's duties include all the duties of office prescribed by law, administrative rule, and set forth in the DPSR Internal Policy Manual. In the performance of these duties, the following standards apply:

...

2.7.1.5. A commissioner should maintain order and decorum in all proceedings, and abide by applicable rules of order.

2.7.1.6. A commissioner should be patient, dignified, and courteous to litigants, lawyers, witnesses, fellow commissioners, staff, and others with whom the Commission deals in an official capacity, and should expect and strive to secure similar conduct of the same.

2.12. Equal Employment Opportunity, Non-discrimination, and Harassment Prevention

2.12.1. The department follows the State of Montana's Equal Employment Opportunity, Non-discrimination, and Harassment Prevention Policy, found in Administrative Rules of Montana (ARM) Title 2, Chapter 21, Subchapter 40.

---



*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

2.12.2. The department will not tolerate any behavior that negatively focuses on a protected class. Although a behavior or pattern of behavior might not constitute illegal discrimination, it might still violate this policy.

2.12.3. Department personnel who believe they have been discriminated against are encouraged to contact their supervisor or one or more members of the Response Team.

2.12.4. Supervisors who observe behavior that could be viewed as discrimination or harassment shall stop the behavior and notify the Human Resources Officer (HRO) or another member of the Response Team as soon as possible.

2.13. Retaliation

2.13.1. The department does not tolerate retaliation against individuals who report violations of this policy, or who exercise their rights to a workplace free from harassment and discrimination. Department personnel who retaliate are subject to disciplinary action, up to and including termination of their employment.

2.13.2. Supervisors shall not retaliate or allow, condone, or encourage others to retaliate against any current or former employee or job applicant for opposing unlawful discriminatory practices, filing a discrimination complaint, or participating in a discrimination proceeding, including testifying in court.

2.13.3. Supervisors who perceive retaliatory behavior must notify the appropriate direct supervisor, Business Manager, Executive Director, Chief Legal Counsel, or President as soon as possible, but no later than one working day after the supervisor becomes aware of the retaliatory behavior.

2.14. Reporting

2.14.1. Department personnel may formally report violations of Sections 2.1 through 2.13 of this policy to a direct supervisor or a member of the Response Team.

2.14.1.1. A direct supervisor or a member of the Response Team who receives a report must notify the HRO within one working day, regardless of their perception of the validity of a report. The HRO shall notify the members of the Response Team within one working day of receiving a report.

2.14.2. Reporting harassment, discrimination, or retaliation to management is an essential step toward correcting the behavior. Department personnel should report any of these behaviors on the part of any department personnel to a direct supervisor or a member of the Response Team.

2.14.3. For violations of MCA Title 2, Chapter 2, Part 1, department personnel may also file a complaint with the Commissioner of Political Practices, as described in MCA 2-2-136.

2.14.4. Fraud, waste, or abuse of state resources may also be reported to the Montana State Legislature's Fraud Hotline.

2.18. Privacy and Confidentiality

2.18.1. Management shall make every attempt to reasonably protect the privacy of individuals making or named in a report; however, management cannot guarantee in-dividual privacy.



CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

2.18.2. Management may not prohibit department personnel from discussing a complaint or ongoing investigation with co-workers unless management conducts an individualized assessment and demonstrates that one of the following factors exists:

2.18.2.1. There are witnesses in need of protection.

2.18.2.2. Evidence is in danger of being destroyed.

2.18.2.3. Testimony is in danger of being fabricated.

2.18.2.4. There is a need to prevent a cover-up.

2.18.3. Management shall document the rationale for requiring department personnel to refrain from discussing a complaint or ongoing investigation.

2.18.4. Disciplinary action records resulting from an investigation are confidential personnel records. Other documented information related to an investigation, while not a part of a personnel record, will be treated as confidential to protect the privacy of the individuals involved. If a request for the information is made, the Response Team shall review the information and balance the merits of public disclosure against an individual's right to privacy to determine whether the information or portions of the information may be released.

2.18.5. The HRO shall maintain all investigative reports and supporting documents in a secure, confidential case file separate from the regular employee file.

*Montana Code Annotated*

MCA 49-2-301. **Retaliation Prohibited**. It is an unlawful discriminatory practice for a person, educational institution, financial institution, or governmental entity or agency to discharge, expel, blacklist, or otherwise discriminate against an individual because the individual has opposed any practices forbidden under this chapter or because the individual has filed a complaint, testified, assisted, or participated in any manner in an investigation or proceeding under this chapter. [bold in original]

*Equal Employment Opportunity Commission on Retaliation*[19]
*Participating in a complaint process is protected from retaliation under all circumstances. Other acts to oppose discrimination are protected as long as the employee was acting on a reasonable belief that something in the workplace may violate EEO laws, even if he or she did not use legal terminology to describe it.*

*Engaging in EEO activity, however, does not shield an employee from all discipline or discharge. Employers are free to discipline or terminate workers if motivated by non-retaliatory and non-discriminatory reasons that would otherwise result in such consequences. However, an employer is not allowed to do anything in response to EEO activity that would discourage someone from resisting or complaining about future discrimination.*

*For example, depending on the facts, it could be retaliation if an employer acts because of the employee's EEO activity to:*

- *reprimand the employee or give a performance evaluation that is lower than it should be;*

---

[19] "Retaliation." *U.S. Equal Employment Opportunity Commission*, www.eeoc.gov/retaliation. Accessed 3 Nov. 2025.


CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

- transfer the employee to a less desirable position;
- engage in verbal or physical abuse;
- threaten to make, or actually make reports to authorities (such as reporting immigration status or contacting the police);
- increase scrutiny;
- spread false rumors, treat a family member negatively (for example, cancel a contract with the person's spouse); or
- make the person's work more difficult (for example, punishing an employee for an EEO complaint by purposefully changing his work schedule to conflict with family responsibilities).

### F.    Omissions

The following individuals were named as individuals with whom CMS might want to speak regarding the investigation:

- Personnel 11
- Personnel 9
- Personnel 8

**Personnel 11**

Additionally, CMS received reports during the investigation from Personnel 11 alleging retaliatory behavior. CMS collected the relevant documentation but did not separately investigate the claim of retaliation based on the timing of the complaint/activities coming outside the scope of the investigation.

**Personnel 9**

Personnel 9 held the █████ title until her █████ leave on █████ 2025. As CMS' main contact with the agency during the lead up to the second phase of the investigation, and as a member of the response team, I chose not to question Personnel 9 about circumstances where she may have been a direct observer or recipient of statements or behaviors.

**Personnel 8**

Because she was no longer with the PSC, and because I was able to speak with former Personnel 6 I did not pursue conversation with former Personnel 8

### G.    Analysis

This section contains each itemized Issue which was investigated, including the allegation, Evidence Considered, and my Findings. We would normally also include Respondent statements here, but through communication from President Molnar's legal counsel Matthew Monforton, President Molnar chose not to participate in the investigation.[20]


CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

## Timeline

While incidents before August 10 and after October 10, 2025, fall outside the scope of this phase of the investigation, they are referenced and acknowledged as part of the effort to determine whether a broader pattern of behavior exists that may contribute to the alleged retaliation and hostile work environment.

- *~May 20, 2025, per* Personnel 4 *notes, President Molnar openly stated he might have intentionally intended to offend staff when I briefed him that a staff member was brought to tears from his aggressive and demeaning tone. He further threatened to move into the currently vacant External Affairs office during the night despite being explicitly told no from our* Personnel 3 *(Relevant to August 11 occurrence where Molnar does move in)*

- *June 19, 2025 –*
  - *President Molnar is notified via email, with* Personnel 4 *cc'd, of the investigation into his conduct.*

- *June 24, 2025—*
  - *President Molnar allegedly tell* Personnel 4 *hat "he was livid about the independent review [investigation] and said he had        n attorney and private investigator to 'take out' whoever had brought the complaints...he would use his personal resources and attorneys to silence people who would bring forward 'stupid complaints.'*

- *August 1, 2025—*
  - Personnel 5 *signs letter cautioning President Molnar that his "press activities over the last few days relating to the investigation appear to be retaliatory in nature..."*

- *August 10, 2025 –*
  - *President Molnar sends NARUC emails (Exhibit 11 in* Personnel 4 *"Exhibits" complaint document).*
  - *This is the latest-occurring event which is included in CMS' first report.*

- August 11, 2025 –
  - President Molnar moves into office next to Personnel 4

- August 14, 2025 –
  - CMS submitted investigation report of findings from investigation conducted in June/July.

- August 25, 2025—
  - President Molnar's legal counsel, Matthew Monforton, sends a letter to Montana's Governor, Greg Gianforte, responding to Personnel 5 complaint against President Molnar.

- August 27, 2025—
  - Personnel 4 emails President Molnar requesting more information about, in part, his possible intention to "take away [her] oversight on regulatory issues...take away [her] responsibilities in regard to media relations and external affairs..." and requesting more information for his denial of her expense request for a resiliency training for staff.

- August 29, 2025—
  - President Molnar speaks on *Voices of Montana*, alleging that he received a letter from a reporter telling him that there are three complaints, and that Personnel 4 told the reporter


CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

that President Molnar had not been informed of those yet, and that she's "saving them up."

- September 3, 2025 –
  - Out of Cycle Business Meeting during which **Personnel 1** gave public comment
  - **Personnel 4** alleges that "after stating multiple times in the Public Meeting that he would never retaliate, President Molnar got on the phone immediately after the meeting concluded and began talking loudly. He asked the person on the other end if he could hold PSC management individually financially liable for the contracts made with CMS and Amy Christensen, the investigation firm and attorney hired work his case."
  - **Personnel 2** alleges that President Molnar called her personal number and made comments during the conversation which "made her uncomfortable enough to document it."
- September 4, 2025—
  - **Personnel 1** submits complaint email and reports that "President Molnar did a 'happy dance' while he announced that a judge ruled to grant a temporary restraining order against **Personnel 5** and the Governor…My public comments meant so little (or so much) that he found it necessary to perform the happy dance to let me know he "won."'
  - **Personnel 2** submits email complaint to **Personnel 3** regarding phone call on September 3.
- September 5, 2025—
  - **Personnel 6** last day of employment with DPSR
  - Email from President Molnar, subject "RE: INFO Meeting Today: Wildfire Presentation," directing media requests and legal requests be sent to **Personnel 9** rather than **Personnel 4** and **Personnel 8**
- September 15, 2025 (week of)—
  - **Personnel 4** states that "President Molnar accused me of "gross insubordination" in a conversation with our **Personnel 9** and **Personnel 3** who recommended he address the issue with me…Despite their recommendations and his accusations, he never came and spoke to me about his concerns which seemed to be another example of his attempts to degrade my reputation and role in the agency."
  - **Personnel 1** submits complaint email
- September 29, 2025—
  - President Molnar sends email, subject "suspension," to Montana Governor Gianforte, **Personnel 9** **Personnel 4** **Personnel 12** and bcc'ing the rest of the PSC. Contents include, in part, notice that President Molnar will take a polygraph and that if others choose to take one as well, he will pay for the tests.


- September 30, 2025 –
  - **Personnel 4** ubmits complaint, including Timeline and Exhibits attachments.


CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

- o Email from President Molnar directing that media requests be sent to **Personnel 7** removing **Personnel 9** and **Personnel 4**
  - ▪ October 15 response from **Personnel 4** highlighting that the President does not have the ability to change the roles of management staff without an amendment to the IPM.
- October 21, 2025—
  - o *Commissioner Bukacek motions to vacate Brad Molnar from the office of the president. Commissioner Welborn seconds. Motion carries.*
- October 28, 2025—
  - o *Vice President Fielder makes a motion, and Commissioner Bukacek seconds, to nominate Commissioner Welborn as PSC President. Motion passes.*
- October 29, 2025—
  - o *Commissioner Molnar files ethics complaint against Commissioner Bukacek*
- October 31, 2025—
  - o **Personnel 8** *last day of employment with DPSR*

## 1. Issue 1: Retaliation

I first considered the question: did PSC President Brad Molnar engage in retaliation in violation of DPSR Personnel Policy 2.13 (Retaliation) and/or DPSR Personnel Policy 2.2 (General Standards of Conduct and Performance, section 2.2.6) on September 3rd and 4th by engaging in conduct and making statements intended to discourage or deter complaints related to workplace behavior?

To answer this, I looked at the complaints by **Personnel 2** and **Personnel 1** as the events surrounding their complaints are factors in **Personnel 4** complaint of retaliation and a hostile work environment, which we will analyze last.

### a) Allegation

**Personnel 2**

**Personnel 2** reported that President Molnar called her on September 3, 2025, while she was working at home, on her personal line and made comments which made her feel "weird, yucky" in the moment and that afterwards made her feel "really uncomfortable," which she relayed to her supervisor, **Personnel 3** During this call, President Molnar asked her about an invoice for CMS, the company hired to investigate his workplace conduct, which he received from her on September 2, but refused to sign, writing "declined" across the front of the document. When, during the phone call, she informed him that the invoice had been provided to **Personnel 5** to sign, facilitating the payment, his tone changed and his voice raised, and he told her that she should not have done this, as it was his responsibility to sign off and approve payments. She noted that she was unsure if he was trying to intimidate her or not with his comments which, while not threatening, did intimidate her.

**Personnel 1**
**Personnel 1**



Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

from taking any action on the request from **Personnel 5** "President Molnar did a 'happy dance' while he announced that a judge ruled to grant a temporary restraining order against **Personnel 5** and the Governor."

b)  Subject Response

The subject of the complaint, Montana Public Service Commission President Brad Molnar, refused to participate in the investigation. Therefore, the analysis relies on formal statements he made in the media or in email communication.

c)  Evidence

CMS reviewed the following documentary evidence and drew upon comments from the following witnesses:

- Email correspondence on September 4 documenting the phone call to **Personnel 2** emails with the subject "Phone Call Documentation 9-3-25" between **Personnel 2** and her supervisor, **Personnel 3** including messages forwarded from **Personnel 3** to **Personnel 5** which was then forwarded to **Personnel 9** and External Counsel Christensen.
- Email correspondence between **Personnel 1** and **Personnel 3** with **Personnel 5** **Personnel 4** **Personnel 9** cc'd, subject line "09/04/2025 – Unprofessional Conduct" which described President Molnar's behavior toward **Personnel 1** following Judge Menahan's order blocking any action on the Governor's part against President Molnar.
- Video Recording of September 3, 2025, PSC Out of Cycle Work Session, during which **Personnel 1** addresses the Commission including specifically addressing President Molnar, about the need for him to participate in the investigation.
- **Personnel 1** re-written speech for use during public comment at September 3, 2025, Out of Cycle Work Session.
- Exit Interview notes for **Personnel 6** (last date of employment 9/5/25) and **Personnel 8** (last date of employment 10/31/25).

**Personnel 3**

**Personnel 3** described her response to **Personnel 2** report and that she offered to speak with President Molnar about it, noting that although the offer was initially accepted, it was later rejected.

She also described a similar incident as reported by **Personnel 4** and **Personnel 1** where President Molnar came by on September 4 to let her know "that he had some good news" and shared with her that the judge had stopped any movement regarding **Personnel 5** request to Governor Gianforte about removing President Molnar from his role. While she noted that he did not do a dance, she did note that if he had done a dance, it would be "unprofessional," something "you would expect a child to do."

d)  Findings

Applying the standards of analysis for a complaint of retaliation, complainants must first establish a prima facie case of retaliation based on the following criteria:

1.  The complainant engaged in a protected activity;

 CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

2. President Molnar subjected them to a significant adverse act; and
3. There is a causal connection or nexus between the protected activity and the significant adverse act.

Personnel 2

Personnel 2 provided President Molnar with an invoice to sign for services rendered during the investigation into his conduct. He declined to sign, so she facilitated the payment by re-routing the paperwork to Personnel 4

MCA 49-2-301 includes, in part, that "It is an unlawful discriminatory practice for a person… or governmental entity or agency to discharge, expel, blacklist, or otherwise discriminate against an individual…because the individual has…assisted, <u>or participated in any manner in an investigation or proceeding under this chapter.</u>" [underline added]

Personnel 2 assisted or participated in the investigation by facilitating payment of the investigation. She engaged in a protected activity and made President Molnar aware of her efforts to facilitate payment of the investigation during their phone call on September 3, 2025.

We consider whether or not it was an adverse action when, during a phone call wit Personnel 2 President Molnar is alleged as having become unhappy, changing his tone to signify his displeasure with Personnel 2 or providing the invoice to Personnel 5 facilitating payment for the investigation into his conduct. Through review of email documentary evidence, specifically President Molnar's emails to Personnel 4 on August 10[21] "YOU have really messed this up" and his email to Personnel 9 on September 25[22] "**Do you stand four square against not only due process but also equal protection under the law? Inquiring minds want to know.**" [bold in original] President Molnar demonstrates a pattern of using language that can be interpreted as aggressive and passive aggressive in response to unwelcome news or behavior. Based on a preponderance of the evidence, it is more likely than not that President Molnar had a negative reaction to receiving the news fro Personnel 2 and responded as she described.

This changed tone alone may not be enough to be considered a significant adverse act, although the timing is worth noting. The purpose of the call was to inquire about the invoice for services rendered during an investigation into his own conduct, an investigation which he opposed and actively tried to hinder. The behaviors which Personnel 2 noted as most concerning and "uncomfortable" were made prior to President Molnar's knowledge that Personnel 2 had taken any action regarding the payment to CMS. Still, President Molnar's allusion to his coming to her home was introduced in the context of this phone call whose only purpose was a single inquiry about payment for the investigative services. Then, immediately upon learning of her protected activities, she described that his tone changed and his voice raised, and he told her that she should not have done this. A single instance of a negative tone alone may not meet the threshold for retaliation, but the entirety of this specific conversation must be considered The purpose of the call, the power dynamic between the two positions, the "weird, yucky" comments made to her, the noted shift in President Molnar's tone, and Personnel 2 description of the interaction's effect on her ("he did intimidate me a little, but not threatened.") are all relevant. I find that

---

[21] Document 20 in <u>section D</u> of this report.
[22] Document 9 in <u>section D</u> of this report.


Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

President Molnar's interaction with Personnel 2 on the phone, based on a preponderance of the evidence, was engaging in abusive verbal behavior that constitutes a materially adverse act.

The EEOC tells us that "For retaliation claims against private sector employers and state or local government employers, the Supreme Court has ruled that the causation standard requires that "but for" a retaliatory motive, the employer would not have taken the adverse action. "But for" causation means, even if there are multiple causes, the materially adverse action would not have occurred without retaliation.[23]" [underline in original] President Molnar would not have inquired about the invoice for the investigation into his behaviors, an investigation to which he would have had strong personal investment, and he likely would not have had the same negative reaction to the response she provided to him had it not been for the investigation and her participation in it.

I consider this verbal behavior, which began as a call for the purposes of inquiring about an invoice for an investigation into his own behavior, and which resulted in a feeling of intimidation and Personnel 2 questioning of President Molnar's motives for the call to her, as significant enough to constitute retaliation because the call would not have occurred without this invoice.

President Molnar's comments must also be viewed in light of agency policy. While Personnel 2 did not feel threatened, she did reflect that "It made me angry because it did make me uncomfortable. I wouldn't have gotten angry, otherwise...It was just so bizarre. I just can't consider any context with it, it's so out of the norm of something you would say to someone, especially a work colleague or a work subordinate." Code of Conduct Policy 2.2.6 states that "Department personnel are expected to maintain a professional, courteous, productive, and respectful working relationship with co-workers, peers, supervisors, and the general public. Threatening, abusive, obscene, or derisive behavior or communications are strictly prohibited." President Molnar's comments about knowing wher Personnel 2 ives and that he could take photos of her sleeping children or dogs were neither professional or productive, nor were they respectful of her privacy.

Code of Conduct Policy 2.7 addresses Commissioners' Impartial and Diligent Performance of Duties, and outlines standards to be followed in the performance of these duties, which include: "2.7.1.6. A commissioner should be patient, dignified, and courteous to litigants, lawyers, witnesses, fellow commissioners, staff, and others with whom the Commission deals in an official capacity, and should expect and strive to secure similar conduct of the same." President Molnar's phone call to Personnel 2 lacked a seriousness of manner and language expected of a person in both a high-ranking elected position and higher within the chain of command, it lacked dignity[24]. Neither was it courteous to make statements about coming to an employee's house at 3:30 in the morning, which unsurprisingly caused her to "have trouble sleeping that night." The preponderance of evidence demonstrates that President Molnar's comments and behavior on the phone with Personnel 2 do not appear to align with internal policies or expectations of the agency.

Personnel 1

# Personnel 1

spoke during the Out of Cycle Work Session on September 3, 2025, during mission as a whole and specifically addressed President Molnar, imploring

---

[23]    https://www.eeoc.gov/laws/guidance/questions-and-answers-enforcement-guidance-retaliation-and-related-issues



Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

him to participate in the investigation into his conduct. Per MCA 49-2-301, she participated in an investigation and encouraged his participation. She engaged in a protected activity and President Molnar was aware of her protected activity.

I next considered items 2 and 3, regarding whether President Molnar subjected her to a significant adverse act, and, whether there is a causal connection or nexus between her protected activity and the significant adverse act.

The EEOC's webpage on retaliation states that "an employer is not allowed to do anything in response to EEO activity that would discourage someone from resisting or complaining about future discrimination."[25] The investigation into President Molnar's conduct began in June 2025 and he, through public comments to the media on his own part[26] and in PSC meetings[27], made it known that he was aware what he was being investigated for.  Having determined that President Molnar was aware, we consider President Molnar's alleged celebration in front of **Personnel 1** where he "did a 'happy dance' while he announced that a judge ruled to grant a temporary restraining order against **Personnel 5** and the Governor." In doing this, President Molnar, knowing that she had spoken to him directly about participating in the investigation barely 24 hours prior, engaged in seemingly gloating and/or taunting behaviors, both verbal and physical behaviors which could be reasonably likely to deter an employee from opposing discrimination or participating in a discrimination investigation or proceeding. She stated, "these comments were not only insensitive but insulting. My public comments meant so little (or so much) that he found it necessary to perform the happy dance to let me know he 'won.' He demonstrates no regard for me or the staff that support him." **Personnel 4** reported a similar dance, and **Personnel 3** described similar comments from President Molnar, though without any physical gestures.

Adverse acts do not have to be limited to terminations or demotions. An action that could dissuade a reasonable person from engaging in protected activity may qualify **Personnel 3** escribed his behavior as "unprofessional" and childish, but the behavior she observed was not to the same extent as that demonstrated toward the **Personnel 1** His behavior toward **Personnel 1** constitutes a significant adverse act in that it would deter a reasonable person from participating in an investigation or associated proceedings.

The timing of the judge's decision was outside the control of both the complainant and the respondent and is therefore not evidence of retaliation. However, because the decision occurred the day after the **Personnel 1** engaged in protected activity, President Molnar's subsequent reaction and behavior toward the complainant gain contextual significance. The proximity in timing, provides relevant context for evaluating whether President Molnar's dancing in front of **Personnel 1** was

---

[25] "Retaliation." *U.S. Equal Employment Opportunity Commission*, www.eeoc.gov/retaliation. Accessed 3 Nov. 2025.
[26] Document 17 in section D of this report: "He currently holds the top post among the five elected commissioners, and he said the PSC's new term is "president," but he offers an embellished version some have found offensive. "El presidente de la grande mucho macho man Molnar commander of all the forces of the five districts," he said.  Molnar said he received word he should be more sensitive to women, but he disagrees the title he uses in jest is a slight. "It's funny," Molnar said. "I'm not saying women can't be de la grande anything. I'm saying (the title) should be chairman." He also said he was told something he said at a meeting could have been construed as having sexual innuendo, a conclusion he said would require multiple leaps. "You can make something out of anything," he said.
[27] Document 19 in section D of this report: "At the meeting Wednesday, Fielder also said they include allegations of

CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.

influenced by knowledge of her protected activity the day before. The preponderance of the evidence indicates there is a causal connection between [Personnel 1] protected activity and Molnar's act, which would deter a reasonable person from participating in an investigation. I find that President Molnar engaged in retaliation against [Personnel 1]

Similarly, his behavior violated Code of Conduct policy 2.2.6[28], by demonstrating behavior that was described by [Personnel 1] as "Unprofessional Conduct" in the subject line of her email[29] about the event, which included statements in the body of the document, further describing the behavior: "These comments were not only insensitive but insulting...He demonstrates no regard for me or the staff that support him." The preponderance of the evidence demonstrates that in this interaction with [Personnel 1] Molnar failed to maintain a professional, courteous, productive, and respectful working relationship, and that he failed to act in a dignified and courteous manner with staff whom the Commission deals in an official capacity

## 2.  Issue 2: Retaliation and Hostile Work Environment

I next considered the question: did PSC President Brad Molnar create a hostile work environment or engage in retaliation in violation of DPSR Personnel Policy 2.13 (Retaliation) and/or DPSR Personnel Policy 2.2 (General Standards of Conduct and Performance, section 2.2.6) by engaging in behaviors creating a retaliatory hostile work environment[30] toward [Personnel 4]

### a)  Allegation

[Personnel 4]

[Personnel 4] filed a "formal complaint of retaliation and a hostile work environment" on the part of President Molnar, demonstrated through his increased scrutiny of her performance by moving into the office next to hers, by his removing responsibilities from her purview (e.g., media relations and her security clearance), and by his disparagement of her publicly, all based on her protected activity of participating in the investigation beginning in June 2025.

[Personnel 4] was informed via email from [Personnel 3] on August 11, 2025, that President Molnar would be moving into the office next to hers. She opposed the decision, citing reasons[31]. She notes, "In addition, he recently moved into the office next to mine and regularly surveys my work and occasionally shouts and glares at me."[32]

---

[28] Department personnel are expected to maintain a professional, courteous, productive, and respectful working relationship with co-workers, peers, supervisors, and the general public. Threatening, abusive, obscene, or derisive behavior or communications are strictly prohibited.

[29] Document #6 in Section D of this report

[30] A 'retaliatory hostile work environment" occurs when an employer, in retaliation for an employee's protected activity (like reporting harassment or participating in an investigation), creates a workplace that is so hostile it would deter a reasonable person from engaging in such activity.

[31] "...the office has been specifically organized in a logical fashion by team. The office President Molnar wishes to move into is designated for our External Affairs Coordinator who we are looking to hire this month. Our staff is here daily while Commissioners are only here a day or two per week. In addition, for safety and security reasons, this office is not ideal for Commissioners as it cannot be blocked off during public hearings...What are your thoughts on where our External Affairs Coordinator will sit now?"

[32] [Personnel 4] Timeline Exhibit 12: Safety Documentation


Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

CMS

CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.

President Molnar, according to ██Personnel 4██ attempted to have the new staff ████████Personnel 10██ who was ████████ assume media responsibilities, which were held at the time by ████Personnel 4██ With his newness, ██Personnel 10██ allegedly declined and recommended ██Personnel 7██ as a potential individual who could take on those responsibilities.

President Molnar spoke on Voices of Montana on August 29 and said a reporter informed him that ██ ██Personnel 4██ had been saving up complaints against President Molnar.

President Molnar described to ██3rd Party 3████████ in a September 19, 2025, email that "there are multiple NWE staff in ██Personnel 4██ office at one time"[33], which ██Personnel 4██ describes as "not an accurate representation of the facts." She describes in her September 13th email how "if you truly thought we were conducting these meetings inappropriately, why am I the sole individual you are targeting when others were also in the room?" Previously, on September 22, she recaps the connection to retaliation: "You expressly told me[34] you would take out anyone involved in this process of the external investigation and hired an attorney and investigator to come after me and others involved."

On September 29, 2025, ██Personnel 4██ and others were invited via email by President Molnar to take a polygraph. President Molnar wrote: "The purpose of this is to separate some facts and fiction that seem to be getting incorporated into the attempt to suspend me." President Molnar repeatedly referred to the investigation into his conduct as an attempt to suspend him.

Thursday, October 16, 2025, email from President Molnar to ██Personnel 4██ subject: "Minor changes", cc'ing PSC_ACT; PSC_Comm'nrs, which includes, in part, a response that ██Personnel 4██ "interactions with the press were A) very bias and B) laughable." [sic]

b) Subject Response

The subject of the complaint, Montana Public Service Commission President Brad Molnar, refused to participate in the investigation. Therefore, the analysis relies on formal statements he made in the media or in email communication.

c) Evidence (Witness Statement and Documents)

CMS reviewed the following documentary evidence and drew upon comments from the following witnesses:

- Email from ██Personnel 11██ to ██Personnel 5██ an ██Personnel 4██ on July 9, 1:45PM. Subject: "two more items". Email includes, in part: "Toward the end of the afternoon meeting, President Molnar made a reference to what ██Personnel 4██ had said. President Molnar said it wasn't true. I intended to ask him if he was saying ██Personnel 4██ was lying, but I was waiting for the proper time to bring it up, and the proper time did not present itself because there was official business to attend to even past 5 pm. Accusing ██Personnel 4██ of lying is highly disparaging."
- ██Personnel 4██ Timeline of comments and behaviors from President Molnar.
- ██Personnel 4██ Exhibits, which accompany her timeline.
- August 11, 2025 emails subject: "Office Move" between ██Personnel 4██, ██Personnel 3██ and ██Personnel 5██

---

[33] ██Staff 4██ Timeline Exhibit 14

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com


CMS

CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.

- o September 5 email response in the same email chain from **Personnel 4** t **Personnel 3** , expressing discomfort on her own part as well as on the parts of others in the hall.
- September 5 Email from President Molnar, subject "RE: INFO Meeting Today: Wildfire Presentation," directing media requests and legal requests be sent t **Personnel 9** rather than **Personnel 4** and **Personnel 8**
- President Molnar email on September 29, 2025, subject "suspension," to Montana Governor Gianforte, **Personnel 9** **Personnel 4** **Personnel 12** and bcc'ing the notice that President Molnar will take a polygraph and that if others choose to take one as well, he will pay for the tests.
- Email from President Molnar on October 10, 2025, directing that media requests be sent to **Personnel 6** removing **Personnel 9** and **Personnel 4**
- Email form President Molnar on October 16, 2025, explaining that his decision to remove media responsibilities was "because [her] last interactions with the press were A) very bias and B) laughable) I have rerouted the authority exactly as I have in the past when **Personnel 9** was given the duty."
- Daily Montanan articles by **3rd Party 4** on July 3, 2025, "PSC President Brad Molnar says workplace investigation waste of taxpayer resources," and on September 3, 2025, "Complaint to Gianforte about PSC President Molnar will proceed"
- Previous investigatory report into President Molnar's conduct

**Personnel 6**

**Personnel 6** clarified that one of the reasons contributing to his departure was the personal attack from President Molnar to the media. However, **Personnel 6** did not speak about whether or not he believed he had been treated differently following his participation in any of the protected acts—informing President Molnar of an investigation, or telling him that some might consider "El president de la grande mucho macho man Molnar" to be viewed as discriminating. "These questions get into the realm of needing to maintain confidentiality."

**Personnel 7**

**Personnel 7** confirmed that he had heard from President Molnar some negative things about **Personnel 4** and **Personnel 7** was aware of a dissatisfaction with **Personnel 4** and President Molnar's communications with considered these when he took on media responsibilities at President Molnar's request, but **Personnel 7** did not interpret the removal of regulatory responsibilities from the **Personnel 4** as broadly as **Personnel 4** When discussing the letter to DEQ, **Personnel 7** had no indication other than that this was a one-time thing, there was not removal of regulatory responsibilities from **Personnel 4** He did not, however, confirm that Commissioner Molnar sought to continue to retaliate upon having his presidential role removed, rather he explained that Commissioner Molnar reaffirmed his commitment to the role as an elected official who would pursue his regulatory role with continued vigor.



**3rd Party 1** **Personnel 4**

 CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

**Personnel 9**

Due to being out for ▮▮▮▮▮ leave, investigators were unable to confirm with **Personnel 9** **Personnel 9** whether or not President Molnar directed ▮▮▮▮▮ to handle 'the removal attempt,' and that he didn't trus **Personnel 4**

**Personnel 3**

# Personnel 3 who is also the agency's Personnel 3 provided her perspective on a number of the instances described.

She portrayed President Molnar's office move as related to a reasonable accommodation under the Americans with Disabilities Act (ADA), which she facilitated as the ADA point of contact. Without offering opinion, she acknowledged that the second request to move offices came closely to President Molnar's email admonishment of **Personnel 4**

# Personnel 3 in her role as the **Personnel 3** received complaint documents directly and as a Response Team member discussed those complaints and how the agency would respond. She corroborated **Personnel 4** assertion that the complaints were not being saved up.

She confirmed that the ACT was the body who recommended the resiliency training, and that none objected, including President Molnar, but believed his objection was to the price, which he found excessive.

When **Personnel 3** described the removal o **Personnel 4** media responsibilities which occurred via email, and described President Molnar's description of **Personnel 4** comments to the media as "insubordination," she explained to me the complicated dynamics of this situation because the responsibilities being discussed were typically assigned to a vacant position which were temporarily assigned to **Personnel 4** during the vacancy. She also described Internal Policy Manual (IPM) processes for reassigning responsibilities, and acknowledged the supervisory relationship between President Molnar and **Personnel 4**

# Personnel 3 did not consider President Molnar intimidating, and questioned why ▮▮▮ en language use in the fact-finding interview, but acknowledged that **Personnel 11** had feared for her safety, eventually providing her own security. She denied any attempts to pressure the way she approached any part of complaints or the investigation.

# Personnel 3 acknowledged hearing about President Molnar's menacing look during response team meetings, but noted she had never seen it, had never been yelled at by President Molnar, although she'd heard that he's yelled at others. When asked if those reports were credible, she responded "that's a tough thing…" and did not provide a definitive answer. She did, however, affirm that each of the complaints had been taken seriously, and described bringing the reports or complaints forward to the response team, which did not includ **Personnel 4** who had "been recused" from participation in that team by her participation in the investigation as a witness/complainant.

    d)  Findings

        i.   *Findings - Retaliation*

Applying the standards of analysis for a complaint of retaliation, complainants must first establish a prima facie case of retaliation based on the following criteria:

CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

1.  The complainant engaged in a protected activity;
2.  President Molnar subjected them to a significant adverse act; and
3.  There is a causal connection or nexus between the protected activity and the significant adverse act.

§ 49-2-301, MCA states: "**Retaliation Prohibited.** It is an unlawful discriminatory practice for a person, educational institution, financial institution, or governmental entity or agency to discharge, expel, blacklist, or otherwise discriminate against an individual because the individual has opposed any practices forbidden under this chapter or because the individual has filed a complaint, testified, assisted, or participated in any manner in an investigation or proceeding under this chapter." [Bold in original]

As reported in the first report, **Personnel 4** was cc'd on the June 19, 2025, email informing President Molnar of the initial investigation, has responded to media inquiries regarding the investigation, and on June 24 President Molnar complained to her about the Response Team's decision to hire an external party ("horseshit") and asked her why she wasn't doing her job. In response to her telling him that it was a response team decision, he said that was a 'lame ass excuse.' President Molnar knew and had known tha Personnel 4 has been involved in the process through her participation on the response team. Personnel 4 herefore engaged in a protected activity for her assistance with and participation in the investigation into President Molnar's conduct and President Molnar was aware of her protected activity.

The alleged retaliatory behaviors, adverse acts, identified by Personnel 4 include:

*   Increased scrutiny of her performance by President Molnar moving into the office next to hers and glaring at her when passing her office;
*   President Molnar's removing responsibilities from her purview, and
*   His public disparagement of her

The EEOC notes that its "anti-retaliation provisions make it unlawful to take a materially adverse action against an individual because of protected activity." While "the most obvious types of materially adverse actions are denial of promotion, refusal to hire, denial of job benefits, demotions, suspension and discharge..." the EEOC also notes that "Other examples of materially adverse actions may include: disparaging the person to others or in the media; ...scrutinizing work or attendance more closely than that of other employees, without justification; ...abusive verbal or physical behavior that is reasonably likely to deter protected activity, even if it is not sufficiently "severe or pervasive" to create a hostile work environment...and any other action that might well deter reasonable individuals from engaging in protected activity."[35]

According to Personnel 4 President Molnar's office move, which he initially proposed in May, was allegedly at that time to do with his desire to monitor the comings and goings of utility personnel, including their meetings with Personnel 4 Then, whil Personnel 4 was out of state, following his public admonishment of her via email on August 10, he moved offices next to hers on August 11 **Personnel 3**, who, as Personnel 3 is also the point of contact for ADA requests, noted that each of President Molnar's requests to

---

[35] "Enforcement Guidance on Retaliation and Related Issues." *U.S. Equal Employment Opportunity Commission*, 25 Aug. 2016, www.eeoc.gov/laws/guidance/enforcement-guidance-hahttps://www.eeoc.gov/laws/guidance/enforcement-guidance-retaliation-and-related-issuesrassment-workplace#_Toc164808031. Accessed 3 Nov. 2025.


CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

move offices was for a medical reason, and that she was attempting to make an ADA reasonable accommodation for him. She states that they offered different kinds of lighting for his office and changes to his computer monitor, and although she did not receive medical documentation, she noted "it was pretty evident why he needed it," based on his vision, and added "he also noted that it was lonely [in his original office]." Because President Molnar had previously considered moving into the office next to ███ for a medical reason, or perhaps even if it was for regulatory reasons, and because neither of those reasons are discriminatory nor in response to her engagement in a protected activity, it is difficult to conclusively determine that the motive behind his office move was due to retaliatory reasons. However, the timing of when the move actually occurred and the perceived increased scrutiny is relevant. President Molnar moved into the office next to ███ immediately, one day, following his email rebuke of her; his move also occurred while she was out of the state. From his new office, President Molnar is alleged as "glaring" at ███ as he passes her office, giving a menacing look. Physical behavior such as this menacing look (also described by **Personnel 5** during the previous part of the investigation), "is reasonably likely to deter protected activity, even if it is not sufficiently 'severe or pervasive' to create a hostile work environment."[36] Scrutinizing work or attendance more closely than that of other employees, without justification;" and "engaging in abusive verbal or physical behavior that is reasonably likely to deter protected activity..." are both listed as examples of materially adverse actions by the EEOC[37].

During the first phase of the investigation the email to ███ on August 10, 2025, was determined to be a materially adverse action. I find that the office move on the day following that email to her is also a materially adverse action which would likely deter protected activity. Based on a preponderance of evidence, these actions of President Molnar towar ███ do appear to be materially adverse.

I again relied on the EEOC's causation standard. "'But for' causation means, even if there are multiple causes, the materially adverse action would not have occurred without retaliation."[38]

Even if there are multiple causes which could have contributed to President Molnar's office move, the actual move itself did not occur until after ███ engaged in a protected activity. In May, when the subject of his office move initially came up, she had not participated in the investigation. As documented in the first report into the investigation:

> The evidence shows multiple materially adverse actions as defined under Burlington Northern v. White. On June 24, 2025, President Molnar allegedly told ███ he was "livid" about the investigation, had hired an attorney and private investigator to "take out" whoever brought the complaints, and would "use his personal resources and attorneys to silence individuals making 'stupid' complaints." On the same day, he told **Personnel 6** he would make sure "this doesn't happen to anyone ever again."

---

[36] "Enforcement Guidance on Retaliation and Related Issues." *U.S. Equal Employment Opportunity Commission*, 25 Aug. 2016, www.eeoc.gov/laws/guidance/enforcement-guidance-hahttps://www.eeoc.gov/laws/guidance/enforcement-guidance-retaliation-and-related-issuesrassment-workplace#_Toc164808031. Accessed 3 Nov. 2025.

[37]    https://www.eeoc.gov/laws/guidance/questions-and-answers-enforcement-guidance-retaliation-and-related-issues

[38]    https://www.eeoc.gov/laws/guidance/questions-and-answers-enforcement-guidance-retaliation-and-related-issues (Item #15)



CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

It is noteworthy, with these alleged statements by President Molnar in mind, that after ▮Personnel 4▮ participated a protected act, President Molnar then decides to officially make the move to the office next to hers when she is not in the office. Using the causation standard and a preponderance of the evidence, it appears that this adverse action would not have occurred without retaliatory motive and therefore a causal nexus exists between ▮Personnel 4▮ protected activity of participating in the investigation and President Molnar's significant adverse acts of increasing scrutiny and engagement of physical behavior that is reasonably likely to deter protected activity.

President Molnar is also alleged as removing responsibilities from ▮Personnel 4▮ Documentary email evidence affirms that this is true in at least two instances. However, the extent of it, according to ▮Personnel 7▮ ▮Personnel 4▮ may not be as extensive as ▮Personnel 4▮ indicates. She recalled that President M attempt to have his own signature on the letter to DEQ was an indication that he was removing all of her regulatory responsibilities. ▮Personnel 7▮ recalls, instead, that this may have been a one-time, specific to the situation, instance, and did not recall President Molnar saying that she had relinquished any of her duties. Even if this example were to be removed from consideration, President Molnar did remove ▮Personnel 4▮ media responsibilities and disparaged her in a group email while explaining why—by describing her media responses *about the investigation* as 'laughable.' ▮Personnel 3▮ recalled President Molnar's description of ▮Personnel 4▮ behavior as 'insubordinate,' and explained that "he thought it was insubordination because he gave ▮Personnel 4▮ instruction not to speak to the press, he said it was insubordinate when she did." ▮Personnel 3▮ again noted President Molnar as ▮Personnel 4▮ supervisor, but was unwilling to go as far as to say that she agreed the behavior to be insubordinate, noting how convoluted the situation was because even though changes to job responsibilities would typically go through her, in the role of HR, per the IPM, the media responsibilities were not a specific role of the ▮Personnel 4▮ and that they were only being temporarily fulfilled by ▮Personnel 4▮ ▮Personnel 9▮ comments in her September 26 email to him also note her lac
President Molnar's intended prohibition on media responses. In the context that her media responsibilities caused ▮Personnel 4▮ o provide media responses to questions about the investigation, responses with President Molnar disagreed with, his reprimand in a group email and removal of media responsibilities both constitute materially adverse actions. However, I am unable to determine that an adverse act occurred with the removal of her signature from the letter to DEQ.

Based on a preponderance of the evidence, I find that there is a causal connection between ▮Personnel 4▮ protected activity of responding to media inquiries about the investigation and the adverse act by President Molnar of removing those responsibilities from her. In this instance, President Molnar's behaviors do meet the criteria for retaliation.

President Molnar's accusation on Voices of Montana about ▮Personnel 4▮ 'saving up' complaints against him were unable to be substantiated, based on a preponderance of the evidence. Her protected activity of receiving complaints against him, which he acknowledged within the broadcast, is necessarily part of the investigation into his behavior. His disparagement of her in the media is an adverse act. There is a clear causal connection between her protected activities and his adverse act, meeting the criteria for retaliation.

▮Personnel 4▮

▮Personnel 4▮

CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.

### ii.    Findings – Hostile Work Environment

Since [Personnel 4] claimed both retaliation and a hostile work environment in her complaint email, we investigated whether or not a hostile work environment exists. Claims of a hostile work environment are typically investigated based on an individual's status in a protected class, not based upon protected activity on the part of the individual. When determining a prima facie hostile work environment, an employe must show three things: that the employee was subjected to conduct based on a legally protected characteristic; that the conduct was either so severe or frequent that a reasonable person in the employee's position would conclude that the working conditions were abusive; and that the employee actually found the conduct to be hostile. [Personnel 4] has not alleged in this instance that she was treated differently based on her status in a protected class, so I have been unable to substantiate that she satisfies the first element of a hostile work environment claim. I am unable to conclude that a prima facie hostile work environment exists.

### iii.    Findings – Retaliatory Hostile Work Environment

While I am unable to determine that a prima facie hostile work environment exists, [Personnel 4] complaint documentation includes relevant information which I considered. Some of [Personnel 4] comments in her Timeline[39] document include that "Despite repeated warnings, documentation of retaliation, and requests for intervention, the retaliation has been allowed to continue and even escalate over the course of months." I considered this in light of EEO guidance in the context of retaliation, which states that:

> "Sometimes, retaliatory conduct is characterized as "retaliatory harassment." The threshold for establishing unlawful retaliatory harassment is different than that for a discriminatory hostile work environment. As the Supreme Court explained in Burlington Northern & Santa Fe Railway Co. v. White, the EEO laws' antiretaliation provisions complement their antidiscrimination provisions but protect against a broader range of behaviors—they forbid anything that might deter a reasonable person from engaging in protected activity.[64] Thus, retaliatory harassing conduct can be challenged under the Burlington Northern standard even if it is not sufficiently severe or pervasive to alter the terms and conditions of employment by creating a hostile work environment.[65]"

Footnote 65 from the above quote is included here, in part:

> See, e.g., Carr v. NYC Transit Auth., 76 F.4th 172, 181 (2d Cir. 2023) ("[W]hen analyzing a retaliation claim, the sole inquiry regarding the third element of the prima facie case is whether the allegedly retaliatory actions were materially adverse. **Even if a plaintiff labels her retaliation claim as a 'retaliatory hostile work environment' claim, courts should not consider whether the allegedly retaliatory actions meet the higher 'severe and [sic] pervasive' standard. All that is relevant is whether the actions, taken in the aggregate, are materially adverse and would dissuade a reasonable employee from making a complaint of discrimination.**"); Chambers v. Dist. of Columbia, 35 F.4th 870, 876 (D.C. Cir. 2022) (en banc) [bold added][40]

---

[39] Document #12 in Section D of this report

CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

I believe this retaliatory harassment is what ▮▮▮ **Personnel 4** is referring to when she described a hostile work environment. The previously described adverse actions, found within the investigation to have cumulatively satisfied the elements to establish retaliation, are now considered in light of the question: "Are the actions taken by President Molnar, taken in the aggregate, materially adverse and would they dissuade a reasonable employee from making a complaint of discrimination?"

In **Personnel 4** ▮▮▮ *Timeline*[41] attachment to her complaint, she wrote:

> For months, I have attempted to have faith in the established process for handling complaints against President Molnar. Out of respect for the Commission and the agency, I withheld additional formal complaints, knowing that each new report could bring further negative attention to the organization...I also recognized that convening the Response Team would not mitigate President Molnar's retaliation. In fact, I feared it might escalate the situation further, and I remain convinced this may still be the case.

She experienced President Molnar's behaviors and activities which were directed more broadly within or about the agency, such as generally stating in the media that he's not able to be investigated or invitin ▮▮▮ **Personnel 4** ▮▮▮ and others to participate in a polygraph. She has also been the direct target of some of his behaviors, such as his menacing looks, being disparaged in the media, and having responsibilities removed.

In assessing this retaliatory harassment, it is also appropriate to look outside the scope of the timeline parameters if this phase of the investigation to view President Molnar's actions "in the aggregate." When doing this, the report from the previous part of the investigation indicated clear disparaging of **Personnel 4** ▮▮▮ in the media. During his press conference on July 1, 2025, President Molnar acknowledge that "he was being accused of 'unprofessional conduct'" and he also "said he believes the current conflict comes out of his firm stance the PSC remain independent of outside influence, NorthWestern Energy in particular."[42] The same Daily Montanan article quotes **Personnel 4** ▮▮▮ [who] said the investigation 'has nothing to do with transparency and/or NWE relations...the investigation pertains to Commissioner Molnar's interactions with others in the workplace.'"[43] The article notes that President Molnar then said **Personnel 4** ▮▮▮ darn near breaks into tears' when he asks questions about NorthWestern—a claim she flatly denied—and **Personnel 11** ▮▮▮ and the **Personnel 6** ▮▮▮ are in the same boat." There are two relevant contexts here—the context of a press conference about an investigation into President Molnar's behavior, which he knew all three of those individuals participated in, in some manner or another, and the context of the regulatory roles. His comment is specifically about the regulatory aspect of these individuals' roles; the press conference, however, would not have been held had it not been for complaints into his behavior. While President Molnar's stated concerns about **Personnel 4** ▮▮▮ relationships with utilities may have been pre-existing, he took those pre-existing concerns and aired them in the context of the investigation, in an apparent attempt to discredit her. This behavior is clearly considered disparaging.

As also noted in the previous investigatory report into President Molnar's conduct:

---

[41] Document #11 in Section D of this report


CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

On August 1, 2025, after receiving ███Personnel 5███ letter warning him that retaliation is prohibited by policy and law, President Molnar responded:

> *If I were to be of similar mind I would have filed 'conduct unbecoming' charges on you several times (I could even have had you recused to win my motion, I did not because I am not that kind of person.),* ██Personnel 4██ *many times on very serious issues, and* ██Personnel 11██ *every week.*

This statement can reasonably be interpreted as a threat of retaliation against ██Personnel 5██ ██Personnel 4██ and ██Personnel 11██ It directly references the possibility of filing formal charges against them.

President Molnar's public comments about ██Personnel 4██ and his internal communication regarding ██Personnel 4██ performance, are closely timed after her participation in the investigation, and these types of comments toward ██Personnel 4██ appear to be more prevalent following her participation in the investigation. Whether or not they were done to discredit her is not as relevant, the pattern of behavior exists regardless of intent.

The witness accounts of ██3rd Party 1████████████████ and ██Personnel 7██ do not support some of the allegations which would have been considered within this pattern; specifically the full removal of significant regulatory responsibilities from ██Personnel 4██, or of a meeting attended by President Molnar with a stated intent of retaliating, respectively.

While acknowledging these contrary accounts, based on a preponderance of the evidence where retaliation has been determined to have occurred, I find that President Molnar's actions toward ██Personnel 4██ taken in the aggregate, are materially adverse and would dissuade a reasonable employee from making a complaint of discrimination.

██Personnel 4██ wrote that she was advised that her "reports of retaliation could be viewed as posturing and was cautioned to avoid appearing adverse to the agency." She declined to provide me with the name of the individual who made these "extremely frustrating" comments to her. CMS, therefore, was unable to investigate this specific allegation, which is also considered be outside of the scope of the investigation.

Finally, in addition to contributing to a pattern of a retaliatory harassment, President Molnar's conduct is in violation of agency Code of Conduct Policy 2.2.6, 2.7.1.6, and 2.13 which state, respectively, that call for "professional, courteous, productive, and respectful working relationship[s] with co-workers," prohibit threatening behavior or derisive behavior; direct that a "commissioner should be patient, dignified, and courteous to litigants, lawyers, witnesses, fellow commissioners, staff, and others…" and which states, "The department does not tolerate retaliation against individuals who report violations of this policy, or who exercise their rights to a workplace free from harassment and discrimination."

## V.    Recommendations

Complainants and witnesses were each asked how they would like to see the situation resolved, and what they would consider to be the ideal outcomes of the fact-finding process. We provide responses here.

 CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

unacceptable."

Another said "I think his removal is needed. If he could be empathetic, could have the capacity for that, it could be ok."

Others offered:
- I'd hope the process instills some confidence in a general sense that the agency is capable of addressing these sorts of challenges.
- "[I] would like to see us return to a healthy work environment," noting, "if behavior changes and conduct improves, including adherence to policy, then this is possible."
- "As he refuses to take accountability, to change, to participate, I don't see a way that he can stay in place...I don't see another path forward... He puts the agency at extreme liability."
- Ideally we'd all be able to move forward in a professional manner...I'm hoping the agency will be able to focus again on our work in a professional manner where everyone feels safe and respected.

## VI.   Summary

CMS, LLC recommends DPSR management review this report and the substantiated findings to determine appropriate next steps.

DPSR can consider recommendations offered by the investigation participants, which are summarized in the previous Section V. Recommendations. DPSR should document its response to the substantiated complaints and any associated corrective action. DPSR should take measures to ensure investigation participants are not subject to further retaliation.


CMS
Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

## VII.   Submitted:

_____     _____

Greg Ross (sign above)                          Date


CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.

## VIII.    Attachments

Complaints and reports of misconduct are listed in chronological order.

### A.    Report 1

September 4, 2025, Report from **Personnel 2**

From: **Personnel 2**
Sent: Thursday, September 4, 2025 8:37 AM
To: **Personnel 3**
Subject: Phone Call Documentation 9-3-25

Good morning **Personnel 3**

Please see below.

Thank you.

President Molnar (PM) called me at about 10:35 on Wednesday, September 3rd. We spoke about 5 minutes. He said **Personnel 1** gave him my number and that she also suggested he call from his work phone since I don't answer calls from unknown numbers.

He said now that he has my phone number, he also can find my address and said that he might knock on my door at 3:30 in the morning, and also said something about having pictures of my kids sleeping in their beds. I said back to him that my kid is grown and gone but I do have two dogs and then said they are both small and not really scary. He then chuckled while saying he'd have pictures of my dogs sleeping in their beds. This part of the conversation was said in a joking manner.

s://outlook.office.com/mail/id/AAkALgAAAAAHYQDEapmEc2byACqAC%2FEWg0ABrMpi5iG%2FEu9tve6MGOGFQACAcZO9AAA?nativeVersio...

21/25, 3:59 PM                                                        Mail - **Personnel 7** Outlook

We then talked about business and he asked about a payment document that I had asked him to sign the previous day. He refused to sign it on 9/2/25 and wrote declined across the front of the document. He wanted to know if it was still on my desk because he wanted to see it again. I told him that I'd given it to **Personnel 5** to sign. I gave the document to at the request of **Personnel 3** but I did not mention that to PM. He was upset that I gave the document to and said that he is required to sign off on all payments and contracts. I reassured him that I was not trying to undermine his authority. He planned on looking for the document and I told him it might be in my inbox or in inbox. We then ended the call. I called **Personnel 3** irectly after to let her know that PM and I had spoken and that he was upset that I had given the document to

I documented this conversation and sending it formally because of the comments about showing up at my house and mentioning my family and pets.

**Personnel 2**

 CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.

wat

B.    Complaint 1

*September 15, 2025, Complaint from* Personnel 1

From: Personnel 1
Sent: Monday, September 15, 2025 2:57 PM
To: Personnel 5          Personnel 4          Personnel 9
Personnel 9       Personnel 3 Personnel 3

https://outlook.office.com/mail/id/AAkALgAAAAAAHYQDEapmEc2byACqAC%2FEWg0ABrMpi5IG%2FEu9tve6MGOGFQACCahqQwAA?nativeVersio...          1/2

10/21/25, 3:51 PM                              Mail Personnel 9 Outlook
Cc: Personnel 1
Subject: 09/04/2025 - Unprofessional Conduct

Hello,

To whom it may concern. I write this email to formerly report what I feel is retaliatory behavior on the part of Brad Molnar.

On Wednesday 9/03/2025 I gave public comment at the out of cycle business meeting. The matter to be discussed was the possibility of rescinding a letter written by Personnel 5 and the response team and sent to Governor Gianforte requesting President Molnar be placed on temporary administrative leave. I have attached my comments here.

The day following the business meeting President Molnar did a "happy dance" while he announced that a judge ruled to grant a temporary restraining order against Personnel 5 and the Governor. These comments were not only insensitive but insulting. My public comments meant so little (or so much) that he found it necessary to perform the happy dance to let me know he "won." He demonstrates no regard for me or the staff that support him.

Thank you,

Personnel 1

CMS                Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.

wat

*Commission Secretary Trooien Public Comment notes from September 3, 2025*
[bold in original]

**Public Comment at Out of Cycle Work Session on September 03, 2025**

Hello Chairman and Commissioners,

My name, for the record, is Patricia Trooien, T R O O I E N, I am Commission Secretary for the Department of Public Service Regulation.

For almost five years at the PSC, I have had the pleasure of working with some of the most talented, dedicated, and committed staff. And I care about the people with whom I work.

Today, I would like to comment on Commissioner Fielder's letter to the Governor dated August 20, 2025. I believe recalling this letter to the Governor would have long-lasting negative consequences for the Commission. I believe the investigation for allegations of misconduct in the workplace must be allowed to go forward with full cooperation from President Molnar.

I have seen a number of ups and downs during my tenure, as short as it is compared to others' tenure. Overall, the ups have gained momentum, creating a better workplace environment. Until recently, that is.

As Commissioner Fielder's letter to the governor states, the earliest formal complaint was filed in May 2025. There are staff among us that have voiced complaints regarding President Molnar's workplace conduct and these complainants not only need to be heard but also have a **right** to be heard while protecting personal confidentiality.

President Molnar, we have shared conversations about many topics, work, our parents, kids, grandkids, and travel. I have personally seen your good heart and I believe you have the capacity to be empathetic, compassionate, and fair. Your refusal to participate in the investigation is causing damage to you, those around you, and this agency. As President, you have an obligation to this agency, to take full responsibility for your actions and the perception of your actions. I ask you, **please**, take ownership of your actions by participating in the investigation.

Commissioners, I ask all of you to carefully consider your actions today and to consider the toll this situation has already taken on Commissioners and staff. Recalling Commissioner Fielder's letter would effectively send a message to staff, loud and clear – "You don't matter!"

Thank you



CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.
wat

C.    Complaint 2

September 30, 2025, Complaint from  Personnel 3            to Personnel 9

Outlook

Formal Complaint  Personnel 4

From Personnel 4

Date  Tue 9/30/2025 10:05 AM

To  Personnel 9

2 attachments (6 MB)
Timeline.docx; Exhibits.pdf;

H Personnel 9

I would like to file a formal complaint of retaliation and a hostile work environment.
I have attached the relevant files.

Please reach out with any questions.

Personnel 4

CMS    Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com

*CONFIDENTIAL: This report may be read only by authorized individuals with a need to know.*

wat

D.    Organizational Chart and Chain of Command



# DEPARTMENT OF PUBLIC SERVICE REGULATION

## ORGANIZATIONAL CHART 1
## BASIC ADMINISTRATIVE STRUCTURE

COMMISSION

COMMISSION OFFICERS

EXECUTIVE DIRECTOR

LEGAL DIVISION

CENTRALIZED SERVICES DIVISION

REGULATORY DIVISION

EXTERNAL AFFAIRS UNIT

IT & ADMIN SUPPORT UNIT

INTERNAL BUSINESS UNIT

Adopted 7-9-2024

CMS

Communication and Management Services, LLC
(406) 442-4934
www.cmsmontana.com