Natasha Prinzing Jones
Thomas J. Leonard
BOONE KARLBERG P.C.
P.O. Box 9199
Missoula, MT 59807-9199
Telephone:  (406) 543-6646
npjones@boonekarlberg.com
tleonard@boonekarlberg.com
*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT
DISTRICT OF MONTANA
HELENA DIVISION**

| | |
|---|---|
| BRAD MOLNAR,<br><br>    Plaintiff,<br><br> vs.<br><br>JEFF WELBORN, in his official capacity as a member of the Montana Public Service Commission; JENNIFER FIELDER; in her official capacity as a member of the Montana Public Service Commission; ANNIE BUKACEK, in her official capacity as a member of the Montana Public Service Commission;<br><br>    Defendants. | Cause No. CV-26-41-H-DWM<br><br>**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

**Table of Contents**

INTRODUCTION ………………………………………………………… 1

BACKGROUND ………………………………………………………. 1

LEGAL STAND ...……………………………………………………… 12

ANALYSIS …………………………………………………………... 13

    I.     MOLNAR IS UNABLE TO DEMOSTRATE HE IS LIKELY
           TO SUCCEED ON THE MERITS ………………………………… 13

        A.    Protected Activity …………………………………………….... 13

        B.    Materially Adverse Action……………………………………… 16

        C.    Substantial Motivating Factor ………………………………….. 24

    II.    MOLNAR IS UNABLE TO DEMOSTRATE A LIKELIHOOD OF
          IRREPARABLE INJURY ABSENT PRELIMINARY RELIEF …….. 25

    III.    MOLNAR IS UNABLE TO DEMONSTRATE THE BALANCE
          OF EQUITIES TIPS IN HIS FAVOR OR THAT A PRELIMINARY
          INJUNCTION WOULD BE IN THE PUBLIC INTEREST ………... 26

CONCLUSION ……………………………………………………… 29

## Table of Authorities

**Federal Cases**                                                                      **Page(s)**

*Blair v. Bethel Sch. Dist.*,
608 F.3d 540 (9th Cir. 2010) (upholding removal of elected-school board
member as vice president) ...................................................................... 17, 21

*Bond v. Floyd*,
385 U.S. 116 (1966) ...................................................................... 20, 21, 22

*Boquist v. Courtney*,
32 F.4th 764 (9th Cir. 2022) ........................... 14, 16, 17, 19, 20, 21, 22, 23, 24

*Coszalter v. City of Salem*,
320 F.3d 968 (9th Cir. 2003) ...................................................................... 14

*Dex Media West, Inc. v. City of Seattle*,
790 F. Supp. 2d 1276 (W.D. Wash. 2011) ...................................................... 25, 27

*Env't. Council of Sacramento v. Slater*,
184 F. Supp. 2d 1016 (E.D. Cal. 2000) ........................................................ 13

*Hous. Cmty. Coll. Sys. v. Wilson*,
595 U.S. 468 (2022) ............................................... 1, 13, 17, 18,19 20, 21, 22

*Hubbard v. City of San Diego*,
139 F.4th 843 (9th Cir. 2025) .................................................................. 26

*Hustler Magazine, Inc. v. Falwell*,
485 U.S. 46 (1988) .............................................................................. 15

*Jeffrey Katz Chiropractic Inc. v. iBeat, Inc.*,
2020 U.S. Dist. LEXIS 140329 (N.D. Cal. May 26, 2020) ............................... 14

*Joiner v. Callaghan*,
2025 U.S. Dist. LEXIS 121180 (C.D. Cal. 2025) ........................................... 14

*Linthicum v. Wagner*,
94 F.4th 887 (9th Cir. 2024) .................................................................. 13, 15

*Lopez v. Brewer*,
680 F.3d 1068 (9th Cir. 2012) ................................................................ 12

*Marquez v. City of Cypress*,
2025 U.S. Dist. LEXIS 34971 ................................................................ 15

*Meinecke v. City of Seattle*,
99 F.4th 514 (9th Cir. 2024) .................................................................. 25

*Shell Offshore, Inc. v. Greenpeace, Inc.*,
709 F.3d 1281 (9th Cir. 2013) ................................................................ 12-13

*Skillicorn v. Dickey*,
2024 U.S. Dist. LEXIS 155307 (D. Ariz. 2024) ........................................... 20, 22

*Swenson v. Potter*,
  271 F.3d 1184 (9th Cir. 2001) ................................................................. 2

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................................................ 12

**Federal Statutes**

42 U.S.C. § 2000e-2(a)(1) ......................................................................... 2

**State Statutes**

Mont. Code Ann. 69-2-201, et seq. ........................................................... 26

Mont. Code Ann. § 2-3-202 ...................................................................... 22

Mont. Code Ann. § 49-2-303(1)(a) ............................................................. 2

Mont. Code Ann. § 69-1-101, et seq. ......................................................... 26

Mont. Code Ann. § 69-1-110 .................................................................... 23

§ 1983 ................................................................................................. 1


**Rules**

Rule 12(b)(6) ........................................................................................ 19

Admin. R. Mont. 2.21.4001, *et. seq*………………………………………… 4, 23

Admin. R. Mont. 38.2.3901…………………………………………………… 23

Admin. R. Mont. 38.2.601…………………………………………………….. 26

Mont. Const., art. XIII, § 2 ....................................................................... 26

Part I.A., supra ..................................................................................... 24

## INTRODUCTION

Plaintiff Brad Molnar ("Molnar") attempts to play the victim to deflect from his own documented, pervasive, and grave misconduct.  This case is not about silencing Molnar because he "acted like a regulator." (Doc. 13 at 4.)  This case asks whether a public official can be held accountable for misconduct that severely disrupts agency operations and creates a hostile work environment, leading to an exodus of valuable employees.  Contrary to Molnar's argument, winning an election does not confer authority to engage in sexual harassment, threats, or flout a government body's duly enacted code of conduct.  The Montana Public Service Commission ("PSC") imposed a limited remote work sanction for Molnar's misconduct that does not infringe upon his First Amendment rights in any respect, and which, as a matter of law, does not constitute "materially adverse action" for purposes of a § 1983 retaliation claim.  *See Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477-479 (2022).  Molnar's Motion for Preliminary Injunction should be denied.

## BACKGROUND

Molnar took office as a commissioner in January 2025.  (Declaration of Jennifer Fielder, **Exhibit A**, ¶ 7.)  Soon thereafter—as early as February 2025—the PSC began receiving informal complaints about Molnar's unprofessional conduct, including comments of a sexual and harassing nature.  (Ex. A, ¶ 8.)  *As required by*

*law*, the PSC took action to address the behavior.  *See* Mont. Code Ann. § 49-2-303(1)(a); 42 U.S.C. § 2000e-2(a)(1) *Swenson v. Potter*, 271 F.3d 1184, 1191 (9th Cir. 2001) ("By tolerating sexual harassment against its employees, the employer is deemed to have adversely changed the terms of their employment in violation of Title VII.")

Before a formal investigation was considered, multiple efforts were made to address Molnar's behavior through ordinary workplace channels, including informal intervention, policy discussions, training, peer-to-peer feedback, attempts to address the conduct at the lowest appropriate level, documentation, and written warnings.  (Declaration of Alana Lake, **Exhibit B**, ¶ 15; Ex. A, ¶¶ 9-17.)  These efforts were unsuccessful.  (*See id*.)

Indeed, Molnar refused to even acknowledge that the PSC's Code of Conduct applied to him.  (Ex. A, ¶ 16.)  He refused to sign the routine acknowledgment that he received the PSC's Internal Policy Manual ("IPM"), provided to all new Commissioners during their orientation, insisting he was not bound by the policies.  (*Id*., ¶ 15.)  When asked again to sign, he threatened to put the matter on the next Commission agenda and "blow things up in a grand fashion."  (*Id*., ¶ 17)

In May 2025, two formal complaints were submitted against Molnar.  The first came from PSC Commissioner Annie Bukacek ("Bukacek").  (Declaration of

2

Annie Bukacek, **Exhibit C**, ¶ 6; Doc. 16, Ex. 1.)  She reported, among other things, that Molnar had suggested the PSC have "topless Tuesdays."  (Ex. C, ¶ 8.)  She also relayed how Molnar had commented there were certain areas in China where "they have the most beautiful women" because it "rains all the time, so there's no sun, so they don't get old and wrinkly."  (*Id.*, ¶ 9.)  In a private conversation with Bukacek one night in her office, Molnar made unwelcome comments about watching girls in bikinis as a teenager, demeaningly mocked his own wife, and bragged about beating a man within an inch of his life.  (*Id.*, ¶ 10.)[1]  Molnar also maliciously misrepresented Bukacek, and engaged in behavior that was "dismissive, derisive and otherwise abusive."  (*Id.*, ¶ 14.)

The second complainant similarly complained about Molnar's unprofessional, hostile, and bullying conduct.  (Ex. A, ¶ 20.)  Molnar referred to the employee's attempts to help him with technology issues as "limp excuses" and said the "State IT Team needs to be pruned."  (*Id.*, ¶ 21.)  This and previous instances of intimidating behavior left the employee feeling demeaned and scared, leading to many sleepless nights and anxiety.  (*Id.*, ¶ 22.)

---

[1] Molnar similarly boasted to others about past violent physical altercations with individuals he believed had wronged him.  (Ex. B, ¶ 29.)  He told then PSC Executive Director Amanda Lake ("Lake") about beating a man to death, assaulting a man in a Wal Mart parking lot which resulted in his chipped teeth, and his background as a mixed martial artist.  (*Id.*)

Montana law *requires* complaints alleging harassment in the workplace be investigated, and sets procedures for handling complaints.  *See* Admin. R. Mont. 2.21.4001, *et. seq*.  Pursuant to those procedures  and internal policy, the Response Team determined an external investigation was necessary, as Molnar was PSC President and a supervisor of some members, thus creating an actual or perceived conflict.  (*Id*., ¶ 24; Ex. B, ¶¶ 16-17.)  Communication and Management Services, LLC ("CMS") was retained to perform the investigation, and external counsel was retained as to serve as CMS's liaison.  (Ex. A, ¶ 24.)  Importantly, this process commenced *months* before the NorthWestern Energy Group and Black Hills Corporation merger was announced on August 19, 2025.  (*Id*., ¶ 26; Ex. B, ¶ 19.)

On July 2, 2025, another employee—the third—submitted a discrimination complaint against Molnar.  (*Id*., ¶ 28.)  That employee recounted alleged derogatory comments about staff and commissioners that left her feeling "violated" and "helpless."  (*Id*., ¶ 29.)  On at least one occasion, the stress of her interactions with Molnar caused her to cut her workday short and leave the office.  (*Id*., ¶ 30.)

After Molnar was notified of the investigation, his behavior significantly worsened.  (Ex. B, ¶ 21) Conceding he was "livid" about the investigation, he lashed out at PSC personnel, promising to use his personal resources and attorneys "to silence people who bring forward 'stupid' complaints."  (Ex. A, ¶ 31; Ex. B, ¶¶ 22-23.)  He vowed to "take out" or "take down" whomever made accusations

against him.  (*Id.*)  He repeatedly disparaged complainants and participants in the investigation, threatened to withhold payment from the investigator and legal counsel, tried to block staff from advising the PSC, and pressed staff for confidential information.  (*Id.*, ¶ 33.)

PSC's Executive Director at the time viewed Molnar's behavior as an alarming workplace safety issue.  (Ex. B, ¶ 71.)  Her extensive experience in law enforcement, investigations and leadership made her attentive to escalating conflict and pathway-to-violence indicators.  (*Id.*, ¶¶ 5-7, 69, 72.)  Molnar exhibited increasing grievance fixation, perceived victimization, externalization of blame, escalating hostility toward perceived adversaries, threats of retaliation, distrust of colleagues, efforts to identify and punish those involved in protected activity, public campaigns against perceived opponents, refusal to accept responsibility for the conduct being reviewed, and conduct that caused fear, concern, and disruption within the workplace.  (*Id.*, ¶¶ 69-70, 73.)

During the course of its investigation, CMS interviewed the complainants and a host of other witnesses, and conducted an exhaustive review of the documentary evidence and relevant policies, administrative rules, and statutes. (Ex. A, ¶ 34; Doc. 16, Ex. 1.)  In addition, numerous attempts were made to secure Molnar's participation, but his attorney ultimately closed the door on these

attempts, stating "Commissioner Molnar will not participate in this investigation." (*Id.*, ¶ 36; 8/1/25 Email, **Exhibit D**.)

While too numerous to list here, many of Molnar's misdeeds were compiled and detailed in the CMS investigative materials, filed with the Court under seal. (Ex. A, ¶ 37; Doc. 16, Exs. 1-2.)  Additional facts are recounted in the declarations attached to this response.  Defendants urge the Court to review these materials to gain a fuller understanding of the egregious behavior that led to the sanctions at issue in this case, which is impossible to recount here within the Court's word limitations.

In August 2025, CMS issued its Investigation Report.  (*Id.*)  It found Molnar had violated PSC Policy 2.12 (EEO, Non-discrimination, and Harassment Prevention Policy), 2.2.6 (threatening, abusive, obscene, or derisive behavior), 2.2.3 (commissioner professional standards), 2.4 (impropriety and the appearance of impropriety), and 2.13 (retaliation against individuals who report policy violations).  (*Id.*)

After reviewing the CMS report, the Response Team decided to ask Governor Gianforte to temporarily suspend Molnar while the investigation continued.  (Ex. A, ¶ 41.)  A formal request was submitted on August 20, 2025. (*Id.*, ¶ 42; 8/20/25 Letter, **Exhibit E**.)  Notably, the decision to request Molnar's

6

suspension was made several days before the proposed NorthWestern Energy merger was announced.  (*Id.*, ¶ 43.)

Unfortunately, Molnar's bullying only intensified.  In August through October, 2025, PSC managers received more reports of troubling behavior and workplace safety concerns.  (*Id.*, ¶ 44.)  Four more formal complaints against Molnar were submitted, bringing the total to six.  (*Id.*, ¶ 45.)   Staff changed schedules and work locations to avoid Molnar, on site security was increased, and the CMS was asked to review the additional reports.  (*Id.*, ¶ 46; Ex. B, ¶ 71.)

On September 4, 2025, Molnar filed a lawsuit in Montana state district court against Fielder and the Governor to stop consideration of his suspension.  (Ex. A, ¶ 47.)  The court denied Molnar's motion for a preliminary injunction, finding Molnar's claims about a connection to PSC regulatory matters were "purely speculative."  (*Id.*, ¶ 49; 10/10/25 Order, **Exhibit F**.)

The PSC voted to remove Molnar as president on October 21, 2025.  (Ex. A, ¶ 50.)  On October 28, 2025, Commissioner Jeff Welborn was elected as his replacement.  (*Id.*)

The very next day, Molnar filed an ethics complaint against Bukacek with the Commission on Political Practices ("COPP"), falsely claiming she was copying patient files on government equipment.  (*Id.*, ¶ 52.)  A related complaint against Bukacek was filed with the Montana Board of Medical Examiners.  (*Id.*, ¶ 53.)

Both unfounded complaints were ultimately dismissed. (*Id.*, ¶ 54.) As the COPP determined, Molnar's claims were speculative and unsupported by evidence. (*Id.*, ¶ 55.)

On October 30, 2025, the Response Team received a *seventh* formal complaint against Molnar—this one from then PSC Executive Director Lake—alleging Molnar retaliated against Commissioner Bukacek for participating in the investigation and voting to remove Molnar as President. (*Id.*, ¶ 56.)

In December 2025, CMS issued its second report, entitled "Retaliation Investigation Report," which addressed the fourth, fifth, and sixth complaints. (*Id.*, ¶ 57; Doc. 16, Ex. 2.) Once again, numerous policy violations were substantiated, including of IPM 2.13 (retaliation); 2.2.6 (threatening, abusive, obscene, or derisive behavior); and 2.7.1.6 (commissioners expected to be "patient, dignified, and courteous"). (*Id.*)

On December 26, 2025, Governor Gianforte declined the request to suspend Molnar, concluding Molnar's removal as president was enough to limit further interference while the investigation continued. (*Id.*, ¶ 59; 12/26/25 Letter, **Exhibit G**.) The Governor made clear his decision did not excuse Molnar's conduct, and the PSC could finish its investigation and make its own decision under its policy manual. (*Id.*)

8

The Response Team issued its report on May 1, 2026.  (Doc. 1-10.)  It found that although the CMS investigation did not include all of Molnar's misconduct, it did confirm multiple policy violations.  (Doc. 1-10.)  Additionally, because the seventh complaint against Molnar had been submitted after the contractual scope of CMS's investigation had closed, the Response Team devoted a portion of the report to independently addressing that complaint, finding the most recent allegations of retaliation were substantiated.  (*Doc. 1-10, pp. 18-21*)

The Response Team found that Molnar's misconduct had been pervasive since February 2025, and included unprofessional conduct toward staff, repeated unwelcome sex-based comments, retaliation against complainants and others involved in the investigation, and misrepresentations of coworkers and facts. (*Doc. 1-10, pp. 21-22*) The report further noted that Molnar "chose non-cooperation, escalation, obstruction, diversion, and retaliation," which turned "a relatively simple, confidential HR matter into a public controversy of substantial cost, complexity and severity."  (*Id*. at 16.)  The report confirmed the investigation bore no relation to any regulatory decision, pointing out the investigation's commencement, and the decision to seek Molnar's suspension, pre-dated the announcement of the NorthWestern Energy merger.  (*Id*. at 23.)

The Response Team recommended: (1) an immediate remote-work requirement for Molnar to mitigate the risk of further retaliation and code of

9

conduct violations, (2) consideration of a public censure, (3) a request that the governor suspend Molnar for good cause, and (4) probation/monitoring for the remainder of Molnar's term.  (*Id*. at 25-28.)

On May 6, 2026, the PSC adopted the Response Team Report.  (Ex. A, ¶ 61.)  The PSC adopted the remote work requirement, and later followed the recommendation to seek Molnar's suspension, presenting its request to the Governor on May 21, 2026.  (*Id*., ¶ 61; 5/21/26 Letter, **Exhibit H**.)

Over the course of these events, the PSC lost multiple employees who resigned to escape Molnar.  (Ex. A, ¶ 65; Ex. B, ¶¶ 84.)  The effect on morale and retention has been significant.  (Ex. B, ¶¶ 81-84.)  Multiple employees have expressed fear about what they might experience if Molnar learns they raised concerns about his behavior or participated in the investigative process. (*Id*.)

Molnar filed this action on May 11, 2026, seeking declaratory and injunctive relief to overturn the sanctions against him.  (Doc. 1.)  The same day, he filed an Emergency Motion for Temporary Restraining Order ("TRO").  (Doc. 4.)  The Court granted the TRO later that day, temporarily enjoining the PSC from imposing the remote work requirement "to the extent that [Molnar] must be permitted to enter the hearing room and participate as a Commissioner for the duration of the NorthWestern Energy/Black Hills merger proceedings."  (Doc. 9 at 7.)

10

Molnar was allowed to attend and participate in the merger proceedings. (Ex. A, ¶ 64.)  He now suggests Defendants did not comply with the TRO in good faith.  This is false.

Security personnel were present at the hearing, as per regular practice, but were not assigned to Molnar and did not "escort" him.  (Declaration of Jeff Welborn, **Exhibit I**, ¶ 13.)

Molnar was not "limited to a single designated restroom." (*Id.*, ¶ 14.)  The building has separate restrooms for the public and for commissioners during hearings, and Molnar was allowed to use either of the two commissioner bathrooms. (*Id.*, ¶ 14.)

Molnar was ultimately not restricted to a ten-minute pre-hearing entry window, a five-minute post-recess exit requirement, or a requirement to leave the building during recesses. (*Id.*, ¶ 15.)  Molnar was permitted to enter the building when he arrived each day and stay for the time he needed. (*Id.*, ¶ 16.)

Molnar was not restricted from accessing staff during the hearing. (*Id.*, ¶ 17.)  Staff are not available to commissioners in-person during hearings. (*Id.*, ¶ 18.)  Docket staff are busy and the staff attorney that sits next to the chair in the hearing room provides dedicated advice to the chair. (*Id.*, ¶ 18.)  Although staff do not have time to answer questions in person, commissioners can email questions to staff during a hearing. (*Id.*, ¶ 19.)

11

In sum, Molnar was provided every accommodation at the hearing that he requested, and to which every other commissioner is entitled.  (*Id*., ¶ 20.)

After the hearing concluded, Molnar filed his Motion for Preliminary Injunction, demanding immediate "full access" to the PSC office building.  (Doc. 13.)  As set forth more fully below, Molnar has failed to carry his burden to obtain preliminary relief.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (cleaned up). "A plaintiff seeking a preliminary injunction must establish that [1] he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  "But if a plaintiff can only show that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits— then a preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are satisfied."  *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (cleaned up).  Regardless of which standard applies, the movant "carries the burden of proof

12

on each element of either test." *Env't. Council of Sacramento v. Slater*, 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000). Molnar has not carried his burden here.

**ANALYSIS**

## I. MOLNAR IS UNABLE TO DEMONSTRATE HE IS LIKELY TO SUCCEED ON THE MERITS.

When an elected official brings an action for First Amendment retaliation, he bears the burden of proving (1) he engaged in constitutionally protected activity, (2) he was subjected to materially adverse action by the defendant, and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action. *Linthicum v. Wagner*, 94 F.4th 887, 892 (9th Cir. 2024); *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477-479 (2022). If the plaintiff official makes a prima facie showing, "the burden shifts to the defendant official to demonstrate that even without the impetus to retaliate he would have taken the action complained of." *Linthicum*, 94 F.4th at 892.

### A. Protected Activity

Molnar disregards or mischaracterizes the PSC's findings, attempting to cast his misconduct as constitutionally protected speech. A closer look reveals his transgressions are not entitled to protection.

First, there is no categorical harassment exception to the First Amendment, but certain unlawful harassment, including sexual harassment, constitutes an exception to the First Amendment's general prohibition against prior restraints and

13

content-based restrictions on speech.  *E.g., Joiner v. Callaghan,* 2025 U.S. Dist.

LEXIS 121180, *12-13 (C.D. Cal. 2025).  As one district court in this Circuit

explained:

> Courts have made a distinction between communication and
> harassment. The difference is one between free speech and conduct
> that may be proscribed. Although restrictions based upon conduct may
> incidentally restrict speech, the courts have found that such a
> restriction poses only a minimal burden on speech.

*Jeffrey Katz Chiropractic Inc. v. iBeat, Inc.*, 2020 U.S. Dist. LEXIS 140329, at *3

(N.D. Cal. May 26, 2020) (quoting *Test Masters Educ. Servs., Inc. v. Singh*, 428

F.3d 559, 580 (5th Cir. 2005)).

Second, unlawful retaliation is not protected; to the contrary, it is actionable

constitutional wrongdoing.  *See Coszalter v. City of Salem,* 320 F.3d 968, 975 (9th

Cir. 2003).  Molnar's case rests on that very premise.  Molnar cannot claim the

PSC's alleged retaliation is not protected First Amendment activity on the one

hand, while insisting his own unlawful retaliation is impervious to sanctions under

the First Amendment.

Third, true threats are not protected under the First Amendment.  *Boquist v.*

*Courtney*, 32 F.4th 764, 780-782 (9th Cir. 2022).  A true threat is made when "a

reasonable person would foresee that the statement would be interpreted by those

to whom the maker communicates the statement as a serious expression of intent to

harm or assault."  *Id*. (quoting *Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 746

14

(9th Cir. 2021).  Molnar's threats to "take out" those who dared speak out against him, while boasting of beating others who had crossed him within an inch of their lives, satisfies this standard.

Fourth, false statements made with malice are not protected speech.  *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988) ("False statements of fact are particularly valueless; they interfere with the truth-seeking function of the marketplace of ideas.").  For example, Molnar maliciously relayed false statements of fact to the press about Lake almost crying when he asked questions about NorthWestern Energy (Ex. B, ¶ 35). Malicious lies are not protected speech.

Fifth, actions taken in Molnar's official capacity as PSC commissioner—i.e., actions exercising his power as a commissioner—are not protected.  *Linthicum*, 94 F.4th at 894-895.  "Where an elected official uses her official powers that implicate governmental mechanics, the official has no right to use those powers for expressive purposes."  *Marquez v. City of Cypress*, 2025 U.S. Dist. LEXIS 34971, *13-17, 2025 LX 116742, 2025 WL 636676 (cleaned up) (quoting *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117 (2011)).  Certain of Molnar's misconduct, such as threatening to withhold payment from the investigator and legal counsel, trying to block staff from advising the Commission, denying payment for investigative services, speaking on behalf of the PSC, and cancelling or preventing

meetings with utilities, involved an exercise of his power as a commissioner and do not constitute protected speech.

In summary, the First Amendment does not grant Molnar immunity from the consequences of his unlawful harassment, retaliation, threats, malicious falsehoods, and improper use of official powers.

### B.      Materially Adverse Action

Even if Molnar's misconduct was protected speech, the remote work requirement does not prevent or materially hinder him from doing his job as a PSC commissioner.  Contrary to Molnar's argument, being restricted from the PSC office building is not akin to a senator being effectively expelled from the senate, as was the case in *Boquist*, 32 F.4th at 776.  Like the many millions of Americans who work remotely every day, a PSC commissioner can perform all tasks necessary to the job without being physically present in the PSC building.

"[I]t is more difficult for elected officials to establish that they were subjected to an adverse action that offends the First Amendment because more is fair in electoral politics than in other contexts, and the First Amendment therefore doesn't shield public figures from the give-and-take of the political process." *Boquist*, 32 F.4th at 776 (cleaned up).  Accordingly, deprivations of an elected official's benefits and privileges on account of speech do not give rise to a First Amendment claim when they do not materially interfere with an official's ability

16

to do his or her job.  *Id.*; *see also Blair v. Bethel Sch. Dist.,* 608 F.3d 540, 544 (9th Cir. 2010) (upholding removal of elected-school board member as vice president).

The U.S. Supreme Court has addressed how to distinguish material from immaterial adverse actions.  *Wilson*, 595 U.S. at 477-479.  Any fair assessment of materiality must account for at least two things:  First, "when individuals consent to be a candidate for a public office conferred by the election of the people, they necessarily put their character in issue, so far as it may respect their fitness and qualifications for the office."  *Id.*  Second, the adverse action "is itself a form of speech" entitled to First Amendment protection.  *Id.*  As the First Amendment promises Molnar the right to speak freely on questions of government policy, "just as surely, *it cannot be used as a weapon to silence other representatives seeking to do the same.*"  *Id.* (cleaned up and emphasis added).  Indeed, "[t]he right to 'examin[e] public characters and measures' through 'free communication' may be no less than the 'guardian of every other right.'"  *Id.* (quoting Madison's Report on the Virginia Resolutions (Jan. 7, 1800)).

With these principles in mind, a sanction that permits an official to continue doing his or her job without material impediment does not offend the First Amendment.  In *Wilson*, for instance, the plaintiff was a publicly elected member of a community college's board of trustees.  *Id.* at 471.  He "[o]ften and strongly" disagreed with his fellow board members and even accused them "in various media

17

outlets with violating [the college's] bylaws and ethical rules." *Id.* at 471. The other board members voted to censure and impose certain penalties against him, including rendering him ineligible for certain board officer positions, declaring him ineligible for reimbursement for any college-related travel, and requiring him to complete additional training on governance and ethics. *Id.* at 472. All of these sanctions were ultimately upheld, including the censure:

> The censure at issue before us was a form of speech by elected representatives. It concerned the public conduct of another elected representative. Everyone involved was an equal member of the same deliberative body. As it comes to us, too, the censure did not prevent Mr. Wilson from doing his job, it did not deny him any privilege of office, and Mr. Wilson does not allege it was defamatory. At least in these circumstances, we do not see how the Board's censure could have materially deterred an elected official like Mr. Wilson from exercising his own right to speak.

*Id*.

Critically important to the court's analysis was a finding that there was no indication the censure would "chill a person of ordinary firmness from continuing to engage in the protected activity." *Id*. Rather than "cower[ing] silently," the censured member engaged in a full-throated public rebuttal, showing he was not "materially deterred him from speaking his mind." *Id*. The same is true here. If anything, Molnar's speech *intensified* after the subject sanctions were imposed. Defendants had no chilling effect on his First Amendment rights.

18

Also like *Wilson*, the sanctions do not materially interfere with the basic functions of Molnar's office.  It is true this case, unlike *Wilson*, involves a remote work requirement, but this does not change the conclusion.  Molnar contends the remote work requirement crossed the line, relying on *Boquist* to suggest *any* work restriction imposed against an elected official runs afoul of the First Amendment.  Molnar reads that case too broadly.

In *Boquist*, the Ninth Circuit considered a district court's Rule 12(b)(6) dismissal of a First Amendment retaliation claim brought by an Oregon state senator.  *Id.*, 32 F.4th at 772-73.  Majority party members allegedly retaliated against the minority party senator when they ordered him not to enter the state capitol without giving them 12 hours advance notice.  *Id.*  No provision was made alternative remote attendance or participation in senate business.  *Id.*  This meant that, in order to perform almost *any* of his official duties—most notably to vote—the senator had to provide 12 hours advance notice.  *Id.*  The Ninth Circuit likened the restriction to "the *expulsion* or *exclusion*" of an elected official due to his protected speech.  *Id.* at 783 (emphasis added).

The Ninth Circuit began its analysis with the premise that it is "more difficult" for an elected official to demonstrate materially adverse action, and that "de minimis deprivations of benefits and privileges on account of one's speech do not give rise to a First Amendment claim."  *Id.* at 776.  A sanction only

19

offends the First Amendment if it *materially* interferes with an official's ability to do his or her job. *Id*. (emphasis added). The court referenced the example of *Bond v. Floyd*, 385 U.S. 116, 136-37 (1966), where a state legislature blocked an elected representative from taking office due to his statements criticizing the government's policy in Vietnam. *Id*.

In *Boquist*, the Ninth Circuit found there were sufficient allegations in the complaint to raise a "*plausible inference*" (a much different standard than demonstrating a likelihood of success on the merits) that the 12-hour notice rule was a materially adverse action because "the prevailing view is that members of the legislature do not have the power to suspend members and therefore deprive them of the right to vote." *Id*. (emphasis added). The court found the rule effectively prevented the senator "from doing his job" because it eliminated his ability to vote and "immediately respond to and address a political issues arising on the floor of the Oregon state senate," thereby being tantamount to an "expulsion or exclusion." *Id*.

A district court judge more recently applied this authority in denying a preliminary injunction. *Skillicorn v. Dickey*, 2024 U.S. Dist. LEXIS 155307, *16-25 (D. Ariz. 2024). There, the plaintiff town council member's political opponents decreed, based on alleged ethical violations, that the plaintiff: (1) could not be elected vice mayor; (2) was not permitted to interact with staff members without

20

another person present; (3) was required to apologize; and (4) could not be reimbursed for certain official travel expenses. *Id*. Analyzing Ninth Circuit and Supreme Court authority, the court found the plaintiff was *not* likely to prevail on the merits in showing the sanctions constituted materially adverse action:

> In the Court's view, this case is much closer to *Wilson* and *Blair* than it is to *Bond* and *Boquist*. In *Wilson* (verbal censure) and *Blair* (removal from vice-president position), the selected sanction did not prevent the plaintiff from carrying out his job as a legislator or otherwise deprive the plaintiff of the authority he enjoyed by virtue of his popular election. Similarly, the four sanctions at issue here . . . are only "de minimis deprivations of benefits and privileges," *Blair*, 608 F.3d at 544, that do not preclude Plaintiff from continuing to attend Town Council meetings, engage in spontaneous speech, meet with constituents, and cast votes. In contrast, the selected sanctions in *Bond* (exclusion from the legislature) and *Boquist* (advance-notice requirement that functionally operated as temporary exclusion) both had the effect of preventing the plaintiff from performing the basic functions of his legislative position. . .
>
> . . . The bottom line is that Plaintiff is the party with the heavy burden of establishing an entitlement to the extraordinary remedy of a preliminary injunction. Because Plaintiff fails to cite any case upholding the imposition of § 1983 liability against a member of a municipal legislative body (or the municipality itself) under remotely similar circumstances, the two primary authorities on which Plaintiff relies (*Bond* and *Boquist*) are distinguishable, and the more factually comparable cases (*Wilson* and *Blair*) tend to undermine the validity of Plaintiff's claim, Plaintiff has not met that burden.

*Id.*, *16-25.

Here too, the sanctions are more similar to those in *Wilson*, *Blair*, and *Skillicorn* than *Bond* or *Boquist*. The sanctions do not prevent Molnar from performing the basic functions of his position. Unlike the senator in *Boquist*,

who was effectively *expelled* because he required physical access to the senate floor in order to do his job, Molnar requires no such physical access to the PSC office building.  Unlike senate proceedings, PSC proceedings are relatively rare, and all are noticed in well in advance.  Admin. R. Mont. 38.2.3901.  Also unlike the senator in *Boquist*, Molnar has been provided alternative means for full participation.  He need not provide 12-hour advance notice—or, indeed, *any* advance notice—to participate in any PSC proceeding.  *Compare id*.  To the contrary, Molnar is expressly allowed and expected to participate in all PSC proceedings.  Although he must do so remotely, nothing in *Boquist* or Montana law suggests remote attendance imposes a material adverse restriction on a PSC commissioner's ability to do his or her job.  Molnar cites no legal authority suggesting otherwise.

Molnar's mere preference for access to the PSC office building is hardly sufficient to demonstrate materiality.  Montana's public-meeting laws expressly contemplate governmental bodies meeting through electronic means.  Mont. Code Ann. § 2-3-202 defines a "meeting" as the convening of a quorum of a public agency "whether corporal or by means of electronic equipment" to hear, discuss, or act upon agency business.  Montana administrative regulations provide "[t]he department may hold meetings electronically or by other means of remote communication, so long as public participation is allowed as provided

under Montana laws."  Admin. R. Mont. 2.2.102(2).  Likewise, nothing in the statutes or rules covering PSC business specifically suggest remote participation is anything but full and complete participation.  *See* Mont. Code Ann. § 69-1-110; Admin. R. Mont. 38.2.3901, *et seq*.[2]

More generally, Molnar's argument about the PSC's "extreme" sanction is exceedingly tenuous in 2026.  Remote work is a commonplace feature of the American workplace.  The most recent government statistics state that approximately 33% of employed persons worked from home on an average day in 2024.  U.S. Bureau of Labor Statistics, 2024 American Time Use Survey, Table 6 (available at https://www.bls.gov/news.release/atus.t06.htm).  As this Court is aware, even in the context of court proceedings, where constitutional due process interests are regularly at stake, remote attendance is routine.

In sum, Molnar cites no authority suggesting remote attendance presents a material restriction on work in *any* context, much less on the specific duties of a Montana public service commissioner.  As such, his reliance on *Boquist* is misplaced.  Nor does Molnar provide any viable evidence that remote attendance is insufficient.  Because Molnar is still free and able to perform every aspect of the job he was elected to do, the remote attendance requirement is the kind of "de

---

[2] Even assuming Molnar was correct that his physical attendance should be permitted at PSC hearings (he is not), he offers no rationale, nor could he, to require access to PSC offices at all other times.

minimis deprivation" that does not offend the First Amendment and is appropriately part of the "the give-and-take of the political process." *See id*. Absent a materially adverse action, Molnar is not likely to succeed on the merits.

## C. Substantial Motivating Factor

To establish the third prong of a prima facie case for First Amendment retaliation, Molnar must show a causal relationship between his alleged protected conduct and the PSC's sanctions. To do this, he must demonstrate the "protected conduct played a part, substantial or otherwise," in the claimed wrongdoing. *Boquist*, 32 F.4th at 777. Even if this showing is made, "[i]f there is a finding that retaliation was not the but-for cause of the [adverse action], the claim fails for lack of causal connection between unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the official's mind." *Id*. at 778.

Molnar's causation theory fails, first, because the misconduct outlined in the investigation reports was not protected speech, as set forth in Part I.A., *supra*. Molnar's causation theory fails, second, because the chronology of events undermines his rank speculation about Defendants' motives. He argues "Defendants waited nearly *seven months*—until immediately before hearings on the largest utility merger in Montana history—to suddenly declare that Molnar was too dangerous and disruptive to be physically present in the PSC building." (Doc. 13 at 27 (emphasis original).) The facts tell a different story. As the above

24

Background section recounts, the Response Team was assembled and the investigation into Molnar's misconduct commenced *months* before the proposed merger was announced, and the decision to request his suspension as commission predated the announcement by several days.  There is nothing, apart from Molnar's conjecture, suggesting the two matters had anything to do with one another.

## II.   MOLNAR IS UNABLE TO DEMONSTARATE A LIKELIHOOD OF IRREPARABLE INJURY ABSENT PRELIMINARY RELIEF.

A loss of First Amendment freedoms constitutes irreparable injury. *Meinecke v. City of Seattle*, 99 F.4th 514, 526 (9th Cir. 2024).  Accordingly, in the First Amendment context, a plaintiff must demonstrate a likelihood of success on the merits in order to demonstrate a likelihood of irreparable injury.  *Id*.; *see also Dex Media West, Inc. v. City of Seattle,* 790 F. Supp. 2d 1276, 1289 (W.D. Wash. 2011).

As set forth above, Molnar is unlikely to succeed on the merits of his First Amendment claim.  His argument on irreparable injury only underscores the weakness of his position:  Molnar argues "[e]very moment [he] is excluded from the PSC hearing room is an opportunity to speak—on behalf of 250,000 constituents—that he will never recover."[3]  (Doc. 13 at 31.)  But he is not excluded

---

[3] Molnar repeatedly argues he "represents" 250,000 Montanans (Doc. 13 at 32), but the PSC is a quasi-judicial regulatory body created by the Legislature.  Mont. Code Ann. § 69-1-101, *et seq*.  Commissioners are elected by district, but once in office they are legally required to act as impartial decision-makers for the public

from participating in PSC hearings. The remote attendance requirement does nothing to prevent or impede Molnar's ability to speak. Even his complaints about access to staff do not hold up, as staff members are not available to answer questions in person during hearings. (Ex. I, ¶ 18.) Commissioners—even those present in the hearing room—must *email* their questions. (*Id*., ¶ 19.)

Moreover, even if Molnar was correct about the relatively rare hearings at the PSC, he makes no attempt to argue why his exclusion from PSC offices at other times could possibly qualify as irreparable injury. It does not.

### III. MOLNAR IS UNABLE TO DEMONSTRATE THE BALANCE OF EQUITIES TIPS IN HIS FAVOR OR THAT A PRELIMINARY INJUNCTION WOULD BE IN THE PUBLIC INTEREST.

"Where, as here, the party opposing injunctive relief is a government entity, the third and fourth factors—the balance of equities and the public interest— 'merge.'" *Hubbard v. City of San Diego*, 139 F.4th 843, 854 (9th Cir. 2025). A failure to demonstrate a likelihood of success on the merits "undermines any assertion of a First Amendment public interest." *Dex Media West*, 790 F. Supp. 2d at 1289-1290. Also, "the Ninth Circuit has recognized that in some cases the public interest in maintaining a free exchange of ideas can be overcome by a strong

---

interest as a whole, *not* as advocates for their districts. *See id*.; Admin. R. Mont. 38.2.601. By contrast, the Montana Consumer Counsel is explicitly and constitutionally created to represent the interests of utility customers in PSC proceedings. Mont. Const., art. XIII, § 2; Mont. Code Ann. 69-2-201, *et seq*.

showing of other competing public interests, especially where the First Amendment activities of the public are only limited, rather than entirely eliminated." *Id*. (cleaned up) (citing *Sammartano v. First Jud. Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002)).

Here, the PSC has strong interests in upholding its Code of Ethics, fulfilling its legal obligation to prevent harassment and intimidation of its employees, retaining its workforce, and fostering an environment of mutual respect and professionalism in the workplace. These interests are central to the PSC's ability to effectively carry out its mission. By contrast, any First Amendment impact on Molnar or the public, to the extent there is an impact at all, would be limited because, as set forth above, the sanctions do not prevent Molnar from performing all of his duties of a PSC commissioner.

Because Molnar has failed to demonstrate a likelihood of success on the merits on his First Amendment claim, because any First Amendment impact on Molnar or the public is limited, and because the PSC has competing public interests that are compelling and strong, Molnar has failed to demonstrate the balance of equities tips in his favor, "sharply" or otherwise, or that a preliminary injunction is in the public interest.

## CONCLUSION

27

For the reasons stated, Molnar's Motion for Preliminary Injunction should be denied.

DATED this 15ᵗʰ day of June, 2026.    BOONE KARLBERG P.C.

*/s/ Natasha P. Jones*
Natasha P. Jones
*Attorneys for Defendants*

28

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 7.1(d)(2)(E), Local Rules of the United States District Court, District of Montana, I hereby certify that the textual portion of the foregoing brief uses a proportionally spaced Times New Roman typeface of 14 points, is double-spaced, and contains approximately 6309 words, excluding the parts of the brief exempted by L.R.7.1(d)(2)(E).

DATED:  June 15, 2026          BOONE KARLBERG P.C.

 /s/ Natasha P. Jones
Natasha Prinzing Jones
*Attorneys for Defendants*

29