Natasha Prinzing Jones
Thomas J. Leonard
BOONE KARLBERG P.C.
P.O. Box 9199
Missoula, MT 59807-9199
Telephone:  (406) 543-6646
npjones@boonekarlberg.com
tleonard@boonekarlberg.com
*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MONTANA**
**HELENA DIVISION**

| | |
|---|---|
| BRAD MOLNAR,<br><br>  Plaintiff,<br><br>  vs.<br><br>JEFF WELBORN, in his official capacity as a member of the Montana Public Service Commission; JENNIFER FIELDER; in her official capacity as a member of the Montana Public Service Commission; ANNIE BUKACEK, in her official capacity as a member of the Montana Public Service Commission;<br><br>  Defendants. | Cause No. CV-26-41-H-DWM<br><br>**FIRST DECLARATION OF**<br>**ALANA LAKE** |

ALANA LAKE hereby declares, pursuant to 28 U.S.C. § 1746:

1. I have personal knowledge of the matters addressed herein and am competent to testify regarding the same.

2. I served as Executive Director and Chief of Staff of the Montana Department of Public Service Regulation beginning on March 24, 2025.

1

3.    In that role, I was responsible for overseeing agency operations, supervising staff, advising the Commission, supporting the work of Commissioners, and ensuring compliance with applicable laws, policies, procedures, and workplace standards.

4.    Prior to serving as Executive Director, I spent more than a decade in law enforcement, investigations, and leadership roles.  My professional background includes training and experience in workplace misconduct investigations, retaliation prevention, behavioral threat assessment, targeted violence prevention, and the responsibility of leaders to protect employees who report misconduct.

5.    I was credentialed as an 1811 Criminal Investigator in 2015.  The 1811 series is the federal job classification for Criminal Investigators, commonly known as Special Agents.

6.    Since becoming an 1811, I have completed approximately 35 weeks of core criminal investigator training, as well as approximately 35 additional weeks of advanced investigative training.

7.    Over the course of my 11 years as a federal criminal investigator, I have served as either the lead agent or a supporting agent on hundreds of criminal and counterintelligence investigations.  These cases have involved serious and complex matters, including sexual assault, aggravated assault, homicide, crimes against children, terrorism, espionage, fraud, and other felony-level offenses.

2

Docusign Envelope ID: 33711C04-8926-80D8-80B7-DCF6E9A8D1D9

8.      I continue to hold my 1811 credentials as a reservist with the Air Force and routinely conduct criminal and counterintelligence investigations in that capacity.

9.      I did not seek conflict with President Brad Molnar.  To the contrary, I respected his experience, his knowledge of utility regulation, and the perspective he brought to the Commission.  I also recognized that he was elected by the people of Montana and had an important public role to perform.

10.      At the same time, I believed then, and continue to believe now, that elected officials are not exempt from workplace standards, anti-retaliation policies, or basic expectations of professional conduct.  No title or elected position should place a person above accountability when their conduct affects employees, agency operations, or the integrity of public service.

11.      As Executive Director, I had a legal, ethical, and professional obligation to address reports of discrimination, harassment, retaliation, and violations of the Commission's Code of Conduct. I also had a responsibility to safeguard the process by which complaints were handled so that employees could raise concerns without fear of intimidation, reprisal, public humiliation, or damage to their professional reputations.

12.      I began employment with the agency on March 24, 2025.  On March 25, 2025, my second day of employment, concerns regarding President Molnar's workplace conduct were brought to my attention by agency personnel.

Docusign Envelope ID: 33711C04-8926-80D8-80B7-DCF6E9A8D1D9

13.  Those initial concerns involved unprofessional and inappropriate remarks made by President Molnar to staff.  Although the employee involved did not initially choose to file a formal complaint, the information caused me to begin documenting concerns and alert Human Resources and our legal team regarding the conduct.

14.  Between March and June 2025, I received additional information from multiple agency personnel regarding other incidents involving President Molnar's conduct, including sexually inappropriate remarks, unprofessional behavior, and alleged violations of agency policy and the Code of Conduct.

15.  Contrary to public statements and implications later made by President Molnar, management did not immediately initiate an outside investigation.  Multiple efforts were made to address concerns through ordinary workplace channels before an outside investigator was retained.  Those efforts included informal intervention, policy discussions, training, peer-to-peer feedback, attempts to address the conduct at the lowest appropriate level, documentation, and written warnings.

16.  Despite those efforts, concerns continued to arise.  Because the allegations involved the President of the Commission, who was also my direct supervisor and a member of the agency's Response Team, I consulted with the remaining members of the Response Team and determined that an internal

4

Docusign Envelope ID: 33711C04-8926-80D8-80B7-DCF6E9A8D1D9

investigation would create an actual or perceived conflict. For that reason, an outside investigator was retained pursuant to agency policy.

17. The decision to retain an outside investigator was not my decision alone. It was a Response Team decision made because of the nature of the allegations, President Molnar's position within the agency, and the need to ensure fairness, independence, and credibility in the process.

18. I contacted the State of Montana Human Resources Division seeking assistance. I was informed that investigative assistance was not available at that time. The agency then hired an independent outside firm and outside legal counsel to assist with the investigation.

19. It is important to emphasize that the concerns that led to the investigation arose almost immediately after I began employment and months before the later public disputes involving NorthWestern Energy, House Bill 490, wildfire mitigation planning, or other regulatory matters. The investigation had nothing to do with NorthWestern Energy, utility regulation, data centers, mergers, rate cases, or President Molnar's policy positions. It concerned workplace conduct.

20. On June 19, 2025, President Molnar was formally notified that an independent review was being conducted regarding concerns that his conduct had violated the Commission's Code of Conduct. He was also informed that

individuals who made complaints or participated in the process were protected from retaliation.

21.    After President Molnar was notified of the investigation, I observed an immediate and significant change in his behavior toward staff involved in the process.

22.    On June 24, 2025, I entered President Molnar's office to obtain signatures on routine agency documents. During that interaction, he changed the subject to the independent review and told me he was "livid" about it. President Molnar stated that he had hired an attorney and private investigator to "take out" whoever had brought the complaints. I asked him who the complainant was. He stated that he did not know but would find out.

23.    I asked President Molnar to clarify what he meant by "take out." He stated he would not elaborate but would ensure this would never happen to anyone again. I asked him to clarify that he did not mean physically "take out." He stated that he would use his personal resources and attorneys to silence people who brought forward "stupid" complaints.

24.    During that same conversation, President Molnar told me that the decision to hire an external investigator was "horseshit" and asked why I was not doing my job. I explained that the decision was made by the Response Team and was not solely my decision, although I supported the decision because it was necessary to promote transparency and avoid the perception of bias.

6

25. President Molnar responded that this was a "lame ass excuse." He further stated that the result would be media coverage that would damage his public image, affect his marriage, and portray him negatively. President Molnar raised his voice during this interaction and repeatedly suggested that I should have handled the matter internally. I asked who he believed could have internally reviewed the matter without a conflict of interest. He stated that he did not care, but that it should have been handled internally.

26. I then explained that management had, in fact, attempted to address the concerns internally before retaining an outside investigator. I described the prior efforts that had been made, including informal conversations, documentation, policy review, and attempts to resolve the conduct at the lowest appropriate level. I also told him that I was disappointed the issues had not been resolved internally, but that the continued concerns and the conflict created by his position left management with no reasonable alternative but to seek an independent review.

27. I remained calm and professional during the interaction, but I found the conversation concerning and markedly different from our prior professional interactions. His raised voice, profanity, focus on identifying the complainants, and statements about using personal resources to silence those involved caused me great concern.

28.    I understood from that conversation that President Molnar appeared to hold me personally responsible for the independent investigation, despite my explanation that it was a Response Team decision made pursuant to policy.

29.    My concern during that interaction was heightened by prior conversations in which President Molnar had described what he characterized as past violent physical altercations involving individuals he believed had wronged him. He described beating a man to death, assaulting a man in a WalMart parking lot which resulted in his chipped teeth, and his background as a mixed martial artist. Whether those accounts were entirely accurate or not, they remained in my mind during the June 24 conversation.

30.    My concern was not based solely on that single interaction. By that point, I had observed a broader pattern of conduct that included intense anger toward perceived adversaries, fixation on identifying complainants, threats of retaliation, increasing distrust of colleagues and staff, outbursts of anger, public attacks on the integrity and motives of others, and an unwillingness to accept responsibility for the conduct being investigated.

31.    Following notification of the investigation, I did not observe President Molnar make any meaningful effort to address the underlying workplace concerns, evaluate the substance of the complaints, or support a fair process. Instead, his conduct focused on identifying who he believed was responsible for the

complaints, discrediting those individuals, and retaliating against employees he perceived as participating in or supporting the investigation

32. On June 26, 2025, I spoke with President Molnar regarding time-sensitive agency approvals that he had failed to act upon. During that conversation, he stated that he had intentionally stayed off email for several days and expressed distrust toward staff involved in the Response Team process. President Molnar stated that he had no reason to trust certain agency personnel and would not speak with them. When I asked him to elaborate, he indicated that anyone who made their own rules should not be trusted and asserted that the Response Team had no authority to hire an outside agency to review an internal issue.

33. I explained that agency policy expressly allowed the Response Team to request assistance from an outside source when an internal investigation would not be appropriate because of a potential conflict. President Molnar raised his voice, argued the point, demanded that I send him the policy language immediately, told me the conversation was over, and hung up.

34. I then provided President Molnar with the relevant Internal Policy Manual language authorizing the Response Team to seek assistance from the State Human Resources Division or another outside source when an internal investigation would not be appropriate due to a potential conflict.

9

35.     In the weeks that followed, President Molnar increasingly portrayed the workplace investigation as unlawful, politically motivated, and related to utility regulation.  These claims were false.

36.     The investigation related to workplace conduct, not regulatory policy. Nevertheless, President Molnar repeatedly suggested publicly that agency staff, including me, were aligned with utility interests or were attempting to interfere with his work as a Commissioner.

37.     In my view, this narrative was intended to undermine the credibility of the investigation, discredit those involved, and shift public attention away from the underlying workplace conduct.

38.     On July 29, 2025, President Molnar held a press conference challenging the legitimacy of the investigation and portraying himself as the victim of unlawful actions.  In subsequent media coverage, President Molnar made statements that were personally and professionally damaging to me and the agency.

39.     Among other things, he suggested that I "darn near" broke into tears when he asked questions about NorthWestern Energy.  That statement was false.  I viewed that statement as an attempt to portray me as emotional, unstable, biased, or unable to perform my duties objectively.  It was damaging to my professionalism and credibility.

10

Docusign Envelope ID: 33711C04-8926-80D8-80B7-DCF6E9A8D1D9

40. President Molnar's public statements also suggested that the investigation was connected to his positions on NorthWestern Energy and related regulatory issues. Again, that was false.

41. By tying the investigation to public controversy over utility regulation, President Molnar created a misleading narrative that made it appear as though staff were retaliating against him for his policy positions. In reality, employees had raised concerns regarding his workplace conduct long before those regulatory disputes became central public issues.

42. In late August 2025, President Molnar appeared on Voices of Montana and again discussed the investigation publicly. During that interview, he attacked me personally and suggested that I was interfering with due process by preventing him from seeing complaints. I deny that characterization. I did not "save up" complaints or withhold information. I acted in accordance with the process established by agency policy, legal guidance, and the need to protect complainants and witnesses from retaliation.

43. On July 24, 2025, I documented concerns that President Molnar was continuing to retaliate and was using public meetings and work sessions to undermine my position in the agency and undermine staff. I believed he was framing unrelated operational matters as evidence that staff were untrustworthy or aligned with utility interests.

11

44.    One example involved House Bill 490 and wildfire mitigation planning. After the bill became law, staff and I began attempting to coordinate with utilities due to the short statutory timeline for implementation.

45.    President Molnar resisted these efforts, canceled or prevented multiple meetings we set with utilities, and later publicly suggested the agency had not made sufficient progress, despite our best efforts to make headway. This was part of a broader pattern in which President Molnar used regulatory issues to cast doubt on my motives, undermine my role, and support his public narrative that staff were acting improperly.

46.    Another example involved National Association of Regulatory Utility Commissioners ("NARUC") membership. On or about August 10, 2025, President Molnar sent an email to me and other agency personnel regarding NARUC membership in which he accused me of interfering with his financial decision-making.

47.    In that email, President Molnar stated, in part, that I "may have just messed up a really big deal," that everyone copied on the email had more experience than me, and advised me to stop trying to "back door" and "back stab" him.

48.    In reality, I had reached out in my role as Executive Director to inquire about membership dues based on previous inquiries he had made regarding pricing.

Docusign Envelope ID: 33711C04-8926-80D8-80B7-DCF6E9A8D1D9

49. I viewed that email as publicly disparaging, professionally humiliating, and retaliatory. It was sent to multiple colleagues and attacked my experience, motives, and integrity.

50. At a management meeting in July 2025, President Molnar became visibly enraged during a disagreement with a colleague. Without warning, he stood up, flung his chair back, threw his cup against the wall, stormed out, and slammed the door.

51. In August 2025, while I was away on military leave, President Molnar moved from his prior office across the building into the office immediately next to mine. President Molnar had been attempting to move into that office for months, despite being told that the move was not appropriate. He claimed that he needed more natural light, although he had been offered additional lighting options for his existing office and declined those alternatives.

52. I objected to the move because of the ongoing investigation, the June 24 interaction, President Molnar's public and private statements about those involved in the investigation, and his increasingly hostile conduct toward me. It is my understanding that, while I was away, staff ultimately allowed the move after continued pressure from President Molnar. Under the circumstances, I believed the timing and manner of the move were not coincidental and were intended to place him in closer proximity to me.

13

53.    After moving into the office next to mine, President Molnar frequently walked past my office, looked or glared into my office, and appeared to monitor my activities and meetings.  I found this conduct concerning and unsettling.  His stated reason for moving offices was that he needed more light; however, after moving, he routinely kept the blinds in his new office tightly closed.  That fact further caused me to question the stated purpose of the move and reinforced my concern that the move was intended to monitor or intimidate me rather than to address a legitimate workspace need.

54.    In December 2025, I was responsible for evacuating the Commissioner hallway during a fire drill and asked President Molnar to evacuate with the rest of the team.  He became visibly angry and asked how long the drill would take.  At the rally point, while I was assisting with accountability, President Molnar approached me, looked me up and down, brushed my shoulder, and grabbed my backpack.  I could find no explanation for why he did this and found it unsettling.  My discomfort was heightened by the months of prior conduct, including staring, glaring, monitoring, and other behavior I perceived as intended to intimidate or degrade me.  This physical contact appeared to be another escalation.

55.    I had also previously caught President Molnar exiting my office when I was not present. That fact, combined with his proximity to my office and his repeated staring or glaring, contributed to my discomfort in the workplace.

14

56.     Starting in March 2025, I also became aware of other employees expressing discomfort with his proximity, volume, and conduct in the hallway.  I received multiple requests from staff to move offices away from him.

57.     President Molnar also began bypassing me and communicating directly with staff in ways that undermined and diminished my role as Executive Director.  He directed media and legal requests away from me and toward other staff members who felt obligated to take those on, despite those responsibilities falling within my role and established agency practice.

58.     He also attempted to remove or limit my responsibilities related to media engagement, regulatory coordination, and security-related matters without addressing those changes with me directly or following the appropriate process for changing management duties.

59.     One example involved media relations.  After I had responded to media inquiries consistent with my role and in coordination with agency leadership, President Molnar later directed that media requests be routed to other staff instead of me.  He also criticized my media interactions, including characterizing my conduct as biased or "laughable," without first speaking to me about his concerns.

60.     My interactions with the media were always factual and professional. I viewed this as an attempt to publicly diminish my credibility and remove a core responsibility from my position.

Docusign Envelope ID: 33711C04-8926-80D8-80B7-DCF6E9A8D1D9

61. Another example involved regulatory coordination. President Molnar attempted to shift or restrict my involvement in matters involving utility communications and regulatory implementation. At one point, he went to a public meeting to try to change policy and restrict staff from having regular meetings with NorthWestern Energy, a key component of our duties. Rather than working through me as Executive Director, he contacted staff directly, issued direction that affected agency operations, and questioned my role in a manner that made it more difficult for me to manage staff and ensure consistent agency processes.

62. President Molnar also attempted to limit my role in security-related matters. At times when I had sought appropriate guidance regarding workplace safety concerns, he later suggested that decisions involving law enforcement presence or security coordination should be handled by him or delegated by him, rather than through my role as Executive Director responsible for agency operations and employee safety. Given the ongoing retaliation and safety concerns, I viewed this as another effort to remove authority from me in an area directly connected to employee welfare.

63. President Molnar's refusal to communicate directly with me worsened over time. He rarely answered my calls, declined or avoided meetings I scheduled, and instead raised concerns about me with other staff members and members of the public.

16

64.     On multiple occasions, I learned from others that he had accused me of misconduct, insubordination, bias, or improper motives, yet he did not bring those concerns to me directly or provide me a reasonable opportunity to address them. I found those claims to be baseless and unsupported by facts.

65.     This pattern made it increasingly difficult for me to perform my duties. As Executive Director, I was responsible for coordinating staff work, maintaining orderly agency operations, managing external communications, and ensuring that Commissioners received appropriate support. President Molnar's practice of bypassing me, removing responsibilities from my purview, criticizing me to others, and refusing to communicate with me directly undermined my authority and impaired my ability to lead the agency effectively.

66.     On September 3, 2025, immediately after a public meeting in which President Molnar made repeated statements that he had not and would not retaliate, I overheard him on a phone call asking whether PSC management could be held individually financially liable for contracts associated with the investigation firm and outside legal counsel.

67.     I found that statement concerning because it appeared to be another effort to pursue individuals involved in the investigation process personally and financially.

68.    At various points, I sought guidance from appropriate law enforcement and security-related resources, including Capitol Police and the Montana Highway Patrol, regarding workplace safety concerns.

69.    I did so because, based on my training and experience, I believed the pattern of conduct warranted responsible attention and precaution. My concern was that the totality of the circumstances reflected an escalating pattern that should not be ignored.

70.    Those concerns included President Molnar's statements about using personal resources, attorneys, and a private investigator to "take out" or silence complainants; his own descriptions of prior violent altercations involving individuals he believed had wronged him; his escalating hostility toward perceived adversaries; his fixation on identifying those involved in the investigation; his public and private attacks on staff; his increased physical proximity to my office; and concerns expressed by other employees and Commissioners regarding retaliation, intimidation, and safety.

71.    Other individuals within the agency also expressed concerns regarding the workplace environment. Some altered their work schedules, avoided the office, or expressed discomfort being present under the circumstances. These concerns reinforced my belief that the situation should be treated as a workplace safety issue.

72.    Because of my law enforcement, investigative, and leadership background, I am particularly attentive to behavioral indicators associated with escalating conflict and pathway-to-violence indicators.  I understand threat assessment to be a prevention-oriented process based on observable behavior, context, stressors, and patterns over time.  My concern was based on an accumulating pattern.

73.    That pattern included grievance fixation, perceived victimization, externalization of blame, escalating hostility toward perceived adversaries, threats of retaliation, distrust of colleagues, efforts to identify and punish those involved in protected activity, public campaigns against perceived opponents, refusal to accept responsibility for the conduct being reviewed, and conduct that caused fear, concern, and disruption within the workplace.

74.    I am not a mental health professional and do not offer any clinical diagnosis.  I also do not claim to predict future conduct.  However, based on my professional experience and training, I understood that workplace safety concerns often emerge through patterns of behavior, escalation, fixation, intimidation, and disruption.

75.    For that reason, I believed it was appropriate to document the conduct, seek guidance from appropriate resources, and consider reasonable protective measures for employees.

76.    My purpose was to ensure that the agency responded responsibly to a pattern of conduct that, in my judgment, created legitimate concerns for employee safety, morale, and the integrity of the workplace.

77.    When President Molnar found out that I was coordinating with law enforcement regarding workplace safety concerns, he became enraged and attempted to remove me from any continued role in security-related coordination. He later directed that, other than in an emergency, he would personally decide whether law enforcement should be involved or would delegate that responsibility himself.  Given that the security concerns related directly to his conduct, I viewed this as another effort to strip authority from me, undermine my role as Executive Director, and prevent appropriate safeguards from being considered for employees.

78.    The events described in this declaration had significant consequences for me personally and professionally and are not exhaustive. They represent only a portion of the turmoil, retaliation, and disruption that occurred during this period. Given the frequency, scope, and cumulative nature of these events, it would be impossible to capture every incident in this affidavit.

79.    President Molnar's conduct damaged my professional reputation, impaired my ability to perform my duties, caused substantial stress, contributed to declining morale within the agency, impacted recruiting and retention at the agency, and affected my confidence that I could continue leading effectively under the circumstances.  The public nature of his accusations also created harm beyond

20

Docusign Envelope ID: 33711C04-8926-80D8-80B7-DCF6E9A8D1D9

the agency. I experienced reputational damage that affected my career prospects and public standing.

80. During later employment processes, the turmoil at the Public Service Commission was raised publicly and used to portray me as responsible for agency conflict and dysfunction. Those allegations were inaccurate and unfair. The damage to my reputation was not speculative. It created tangible professional consequences, caused me to enter future opportunities under a cloud of controversy, and required me to defend my integrity in public settings because of matters outside my control.

81. Despite my efforts to remain focused on the mission of the Commission and the employees I served, the ongoing retaliation, public disparagement, and erosion of trust made it increasingly difficult to fulfill my responsibilities. Ultimately, I determined that President Molnar's continued conduct toward me was causing harm to both the organization and its employees. I therefore made the difficult decision to resign.

82. President Molnar's public and private conduct had a chilling effect on employees. I became increasingly concerned that employees would reasonably conclude that reporting misconduct was not worth the risk of retaliation, public exposure, reputational harm, or professional consequences.

83. My concerns about the chilling effect soon became a reality. Multiple employees approached me and expressed fear about what they might experience if

21

President Molnar learned they had raised concerns about his behavior or participated in the investigative process. Some employees were visibly anxious about being identified as complainants or witnesses. Others expressed frustration and discouragement that the public narrative surrounding the investigation had shifted attention away from the critical regulatory work our agency conducted and instead portrayed the PSC as an agency consumed by controversy.

84. The impact on morale and retention was significant. During this period, the agency lost three of five of their top management positions, and multiple others. In conversations with me, those employees indicated that President Molnar's conduct, the resulting workplace environment, and the ongoing controversy were substantial factors in their decisions to leave. Their departures were particularly damaging because they occurred at a time when the agency needed experienced leadership, stability, and institutional knowledge.

85. President Molnar's conduct affected the broader workplace by making employees less confident that misconduct could be reported safely, less willing to participate openly in accountability processes, and less certain that agency leadership could protect them from retaliation. This erosion of trust directly undermined morale, continuity, and the effective functioning of the agency.

86. I had the privilege of serving alongside some of the most dedicated public servants in Montana state government. The employees of the Public Service

22

Commission approached their responsibilities with integrity, professionalism, and a genuine commitment to serving the people of Montana.

87.     I submit this declaration because I believe no employee should be forced to choose between reporting misconduct and protecting their career, reputation, or personal well-being.  Employees must be able to raise legitimate concerns without fear of retaliation, intimidation, public humiliation, or professional harm.

88.     I also believe accountability is a cornerstone of public service.  The standards that govern workplace conduct apply to everyone, regardless of title or position.  Elected officials serve an important role in our democracy, but they are not exempt from accountability when their conduct affects the employees they lead or the institutions they are entrusted to serve.

89.     A workplace where employees fear retaliation for speaking the truth is a workplace where accountability cannot exist.  I believe the employees of the Commission, and the people of Montana, deserved better.

90.     This declaration is filed in connection with the Court's order for a motions hearing on June 18, 2026.  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correction.

DATED this 15th day of June, 2026.



Signed by:

_Alana Lake_
2ACEC652A1654E9...
ALANA LAKE