Matthew G. Monforton, Montana Bar # 5245
Monforton Law Offices, PLLC
32 Kelly Court
Bozeman, Montana 59718
Telephone: (406) 570-2949
Email: matthewmonforton@yahoo.com

Attorney for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA
## HELENA DIVISION

| | |
|---|---|
| BRAD MOLNAR,<br><br>Plaintiff,<br><br>vs.<br><br>JEFF WELBORN, in his official capacity as a member of the Montana Public Service Commission; JENNIFER FIELDER; in her official capacity as a member of the Montana Public Service Commission; ANNIE BUKACEK, in her official capacity as a member of the Montana Public Service Commission;<br><br>Defendants. | Case No. CV 26-41-H-DWM<br><br>**REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

## INTRODUCTION

This case began simply. On May 6, 2026, three Montana Public Service Commissioners voted to physically bar a fourth — a duly elected colleague with more than two decades of utility regulatory experience — from the only building where he can do his job. This Court issued a Temporary Restraining Order the

same day it was asked. The legal basis was straightforward: an elected official had been expelled from his workplace in retaliation for protected speech.

Nothing in Defendants' response brief changes that analysis. What it does instead is bury the Court in a misconduct narrative — sexual harassment allegations, workplace safety concerns, an employee exodus — while avoiding any engagement with the protected speech that the Response Team Report (Doc. 12-22) itself identifies as the basis for the sanctions. Defendants cannot have it both ways. The Response Team Report they voted to adopt, and on which they rely to justify expulsion, is a catalog of speech offenses: press conferences, press statements, oversight complaints, and public disclosures of government documents. The Ninth Circuit protects every one of them.

Defendants also cannot explain the six months that preceded May 6, 2026. After Commissioner Molnar was removed from the PSC presidency in October 2025, no new employee misconduct complaint was filed against him. The Governor refused to suspend him. For six months, Commissioner Molnar attended hearings, participated in agency business, and worked in the PSC building without incident. That was the status quo — one that prevailed without disruption until Defendants voted to expel Commissioner Molnar on the eve of the largest utility merger hearing in Montana history.

2

Commissioner Molnar does not ask this Court to immunize misconduct. He asks it to restore the arrangement that existed from November 2025 through May 5, 2026: an elected commissioner, present in his agency's building, doing the job his constituents elected him to do. Defendants have never explained why that arrangement was suddenly intolerable on May 6. The First Amendment does not permit the answer they are obviously unwilling to give.

## ARGUMENT

I.     DEFENDANTS' BRIEF EXPOSES ADDITIONAL FIRST AMENDMENT VIOLATIONS

Rather than rebutting Commissioner Molnar's showing that his speech was constitutionally protected, Defendants' brief inadvertently confesses additional First Amendment violations. Consider their compelled speech argument. Defendants complain that Commissioner Molnar refused to sign the PSC's Code of Conduct, "refused to even acknowledge" it, "insist[ed] he was not bound by the policies," and threatened to place the matter on the Commission agenda and "blow things up in a grand fashion." Doc. 34 at 6. They offer this as evidence of misconduct. It is, instead, evidence of protected resistance to an unconstitutional demand.

The First Amendment's prohibition on compelled speech is foundational. *AID v. Alliance for Open Society Int'l*, 570 U.S. 205, 213 (2013). The Montana

3

Constitution reinforces that principle: the only oath required of a public official is a pledge to support the state and federal constitutions and faithfully discharge the duties of office. Mont. Const. art. III, § 3. That provision then forecloses precisely what Defendants attempted here: "No other oath, declaration, or test shall be required as a qualification for any office or public trust." *Id.*

Commissioner Molnar is an elected constitutional officer. Defendants had no authority to compel him to sign a loyalty pledge to their internal policy manual, and the First Amendment does not permit them to punish him for refusing. That Defendants cite this as evidence of wrongdoing tells the Court everything it needs to know about the constitutional foundations of their sanctions.

Defendants also cite Commissioner Molnar's email to PSC technology staff. Doc. 34 at 7, citing Doc. 18-1 at 51. In that email, Molnar expressed frustration with the reliability of the state's Microsoft Outlook system and asked if an employee could work with "IT and/or the governors office to find a workable solution instead of limp excuses" *Id.*

This is not a close call. *Boquist* held that an elected official's speech is protected even when it is "vituperative, abusive, and inexact," and that the first prong of a retaliation claim is "readily met when elected officials express their views and opinions." 32 F.4th at 775, 780–81. The statement at issue in *Boquist* — "send bachelors and come heavily armed" directed at law enforcement — was far

4

more threatening in tone than a frustrated bureaucratic email about whether state IT can fix a recurring technology problem. If that statement is protected, this email plainly is as well.

More fundamentally, the email at issue is Commissioner Molnar, acting as PSC President, pushing staff to solve an operational problem affecting his ability to do his job. Directing staff to find solutions rather than offer excuses is, if anything, the paradigmatic exercise of supervisory authority that comes with elected office. That Defendants have packaged this email as evidence of actionable misconduct illustrates precisely why this Court should look skeptically at the entire misconduct narrative: it is built, at least in part, on the proposition that an elected official can be sanctioned for complaining, in colorful terms, that his computer doesn't work.

II.     DEFENDANTS FAIL TO REBUT – OR EVEN ADDRESS – THE
        PROTECTED SPEECH THAT ACTUALLY DROVE THE
        SANCTIONS AGAINST COMMISSIONER MOLNAR

Defendants' response brief is notable as much for what it omits as for what it argues. Commissioner Molnar's opening brief identified, with specificity, the protected speech and petitioning activity that Defendants formally adopted as the basis for expelling him from the PSC building. Doc. 13 at 19–28. Defendants do not meaningfully engage with any of it. That silence is telling — and it is fatal to their opposition.

Because Commissioner Molnar has made a prima facie showing that his protected speech played a part in the adverse action, "the burden shifts to [Defendants] to demonstrate that even without the impetus to retaliate [they] would have taken the action complained of." *Boquist*, 32 F.4th at 778. Defendants' brief makes no attempt to carry that burden with respect to the protected speech that actually appears in the Response Team Report. The Court should treat that failure as a concession that they cannot.

The Response Team Report that Defendants adopted on May 6, 2026 — the document that served as the direct predicate for Commissioner Molnar's physical expulsion — is, at bottom, a catalog of speech offenses. It condemns him for:

- making "disparaging and defamatory public and private remarks" about complainants and PSC personnel;
- engaging in "improper or unauthorized external communications" with the press;
- "misrepresenting colleagues and facts";
- disseminating "misleading and false information to the public";
- criticizing the investigation itself in public statements;
- filing oversight complaints with other state agencies; and
- publicly disclosing allegedly "confidential" information — specifically, Defendant Fielder's letter to the Governor demanding Molnar's immediate suspension.

Doc. 12-22 at 11, 13, 15–16, 18–21. Each of these is protected activity. Defendants response brief does not explain why any of them is not.

III.    DEFENDANTS FAIL TO REBUT MOLNAR'S SHOWING OF SERIOUS QUESTIONS GOING TO THE MERIT

A. **Protected Activity**

Defendants argue that harassment is unprotected without explaining which of Commissioner Molnar's actually constituted "harassment." Doc. 34 at 17-18. The record shows that much of what Defendants and the CMS investigators label as "harassment" by Molnar, however, consisted of protected statements made by him to the press. *See, e.g.*, Doc. 18-2 at 40-41. Additional problems with Defendants' harassment arguments are analyzed in Section I of the Sealed Brief, filed contemporaneously with this Brief.

What remains are statements Commissioner Molnar made *over a year ago* about converting "Taco Tuesdays" to "Topless Tuesdays," being served drinks by girls in hula skirts after he retires, and noting in one conversation that, while in high school, he watched girls in bikinis. Doc. 18-1 at 8, 28. These remarks were inept, Commissioner Molnar regrets saying them, and he hasn't made any similar remarks in the workplace in the past year. These remarks are not grounds for expelling an elected utility regulator from his office and from his agency's hearing room a year later.

Defendants also argue that they cannot be liable for First Amendment retaliation because Commissioner Molnar himself engaged in "retaliation." Doc. 34 at 18. But Defendants' conclusion does not follow from their premise. The threshold question is not whether unlawful retaliation is protected speech. It is

7

whether the conduct Defendants label as retaliation actually constitutes unlawful retaliation. It does not.

Much of the "retaliation" at issue consists of Commissioner Molnar criticizing PSC personnel and fellow commissioners, speaking to the press about matters of public concern, disclosing Defendant Fielder's August 2025 suspension request to the Governor, and filing complaints with other governmental agencies. These are not acts of unlawful retaliation. They are paradigmatic exercises of the freedoms of speech and petition that the First Amendment protects and that *Boquist*, *Wood*, and *Tschida* recognize in particularly robust form when exercised by elected officials.

Defendants simply assumed the conclusion they seek to prove. They repeatedly characterize Commissioner Molnar's speech as "retaliation" and then argue that retaliation is unprotected. But labeling speech as retaliatory does not strip it of constitutional protection. If it did, public officials could evade the First Amendment merely by characterizing criticism, complaints, or unfavorable publicity as retaliatory and then punishing the speaker for engaging in them.

Additional analysis concerning Commissioner Molnar's "retaliation" is found in Section II of the Sealed Brief.

As Defendants correctly argue, true threats are not protected speech. Doc. 34 at 18. They then argue that "Molnar's threats to 'take out' those who dared speak

out against him, while boasting of beating others who had crossed him within an inch of their lives, satisfies this standard." Doc. 34 at 19.

This is a gross mischaracterization of the record. What Molnar is accused of saying is that he "had hired an attorney and a private investigator to 'take out' whoever had brought the complaints, and that he would use his personal resources and attorneys to silence individuals making 'stupid' complaints…" Doc. 18-1 at 7. This is not a "true threat" involving "a serious expression of intent to harm or assault." *Boquist*, 32 F.4th at 781. Rather, it is a description of litigation strategy. Retaining counsel, engaging investigators, and pursuing lawful remedies against those who file complaints are constitutionally protected activities. *See Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 741 (1983).

The second category of statements — Commissioner Molnar's alleged accounts of past violent altercations — fails the true threat standard for an even more fundamental reason. A true threat requires a forward-looking expression of intent to harm. *See Virginia v. Black*, 538 U.S. 343, 359 (2003) (true threats are statements "where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals"). Past-tense anecdotes about prior altercations, however colorful or distasteful, communicate nothing about future intent toward any identifiable person. They are, as Defendants' own brief inadvertently concedes by using the

word "boasted," (Doc. 34 at 3), braggadocio. Braggadocio is not a true threat. It is not even close.

Additional problems with Defendants' arguments concerning Commissioner Molnar's "threats" can be found in Section III of the Sealed Brief.

Defendants also contend that Commissioner Molnar made a "malicious" false statement to the press about Executive Director Lake "almost crying" when he asked questions about NorthWestern Energy. Doc. 34 at 19. This argument fails at every level. Even assuming the statement was inaccurate, Defendants offer no evidence that Commissioner Molnar made it knowing it was false or with reckless disregard for the truth. Defendants' bare assertion of malice, supported by nothing more than Lake's own self-serving declaration, falls well short of that standard — and a disputed factual question about the accuracy of a colorful description cannot be resolved against Commissioner Molnar on a motion for preliminary injunction.

The statement is most naturally read as a colloquial description of Ms. Lake's visible discomfort when pressed about the PSC's relationship with NorthWestern Energy — a characterization for which there is ample support in the record. *See, e.g.,* Doc. 12-11. And as a constitutional matter, the Ninth Circuit protects elected officials' speech even when it is "inexact." *Boquist* 32 F.4th at 780–81. A description of a public official's demeanor during a meeting about a matter of major public concern — offered to a reporter in the course of discussing

10

that public concern — is precisely the kind of speech that protection is designed to cover. That Defendants have elevated this remark into a centerpiece of their misconduct case against Commissioner Molnar speaks volumes about the weakness of their position.

Finally, Defendants argue that certain actions Commissioner Molnar took while serving as PSC President — threatening to withhold payment from the investigator, attempting to block staff from advising the Commission, and canceling meetings with utilities — constitute unprotected exercises of official power rather than protected speech. Doc. 34 at 19-20. Commissioner Molnar was speaking — to staff, to colleagues, and in his capacity as an elected official resisting what he believed to be an unconstitutional investigation into his protected speech. *Boquist* makes clear that such internal criticism by an elected official, however pointed, is protected. 32 F.4th at 780–81.

As a factual matter, Commissioner Molnar has not held the PSC presidency for nearly a year — he was removed in October 2025. And critically, Defendants' own submission to the Governor confirms that no new employee misconduct complaints were identified after his removal from the presidency. Doc. 12-17 at 2. The Governor recognized as much when he declined Defendants' first suspension request in December 2025, concluding that removal from the presidency was a sufficient response to whatever concerns existed at that time. Doc. 12-18 at 2-3.

11

Additional evidence concerning this issue is analyzed in Section IV of the Sealed Brief.

From October 2025 through May 6, 2026 — a period of more than six months — Commissioner Molnar attended PSC proceedings, participated in agency business, and worked in the PSC building without incident.[1] He is not seeking to restore the status quo that existed before the misconduct investigation. He is seeking to restore the status quo that existed after his removal from the presidency — the arrangement that the Governor himself found adequate, that produced no new complaints, and that prevailed without disruption long before Defendants voted to expel him on the eve of the largest utility merger hearing in Montana history. Defendants offer no explanation for why that seven-month status quo suddenly became inadequate on May 6, 2026.

**B. Materially Adverse Action**

Defendants' central argument — that remote work is a "de minimis" inconvenience that does not materially impede Commissioner Molnar's ability to do his job — collapses under scrutiny of both the law and the facts specific to PSC proceedings. As this Court recognized when granting temporary relief, physical presence matters in PSC proceedings because commissioners must observe witness

---

[1] Commissioner Molnar has, however, continued to use the press to vigorously challenge Defendants' policies, Doc. 13 at 12-14, which clearly contributed to the decision by Defendants to expel him from the PSC building.

demeanor, confer in real time, and participate in the hearing process as it unfolds. Doc. 9 at 3, 5.

Defendants also argue that their expulsion of Commissioner Molnar from the PSC building "had no chilling effect on his First Amendment rights" and "[i]f anything, Molnar's speech *intensified* after the subject sanctions were imposed." Doc. 34 at 22 (emphasis in original). They cite no evidence for these assertions. Moreover, Defendants are wrong on the law. The test is not whether Commissioner Molnar himself is subjectively chilled, but rather "whether the government's challenged conduct would chill *a person of ordinary firmness* in the plaintiff's position from engaging in future First Amendment activity." Boquist, 32 F.4th at 775. Defendants' expulsion of Molnar has substantially diminished his ability to participate in hearings as well as perform his work. PSC proceedings are quasi-judicial evidentiary hearings involving live witnesses, documentary exhibits, and real-time examination of testimony — proceedings structurally identical to the trial-like proceedings that courts have uniformly recognized cannot be conducted adequately by remote attendance. Molnar's expulsion has also been clearly intended to stigmatize him, thereby further reducing his effectiveness. These difficulties would clearly chill a person of ordinary firmness.

Defendants also argue that PSC hearings are "relatively rare." Doc. 34 at 22. This argument backfires. The rarity of PSC hearings makes each one *more* consequential, not less. Exclusion from a rare hearing is thus a graver deprivation.

Defendants further contend that "approximately 33% of employed persons worked from home on an average day in 2024" to suggest remote work is categorically adequate. Doc. 34 at 23. The statistic is irrelevant. Remote work is adequate for tasks that can be performed without physical presence — reviewing documents, attending video conferences, processing routine filings. It is not adequate for quasi-judicial hearings requiring real-time witness examination, observation of demeanor, and contemporaneous consultation with counsel. Defendants cite no authority — because none exists — holding that an elected quasi-judicial officer's forced remote attendance at an evidentiary hearing is constitutionally indistinguishable from physical presence.

*Boquist's* analysis controls. It held that an adverse action "is material when it prevents the elected official from doing his job, deprives him of the authority he enjoyed by virtue of his popular election, or otherwise prevents him from enjoying the full range of rights and prerogatives that came with having been publicly elected." 32 F.4th at 777. Physical exclusion from the only building where Commissioner Molnar can examine witnesses, observe proceedings, and consult with counsel satisfies each of these criteria.

14

## C. Substantial Motivating Factor

Defendants argue that because the investigation predated the merger announcement, there can be no causal connection between the merger and the sanctions. That argument addresses a claim Commissioner Molnar has never made. His retaliation claim is not premised on the merger announcement as the triggering event. It is premised on the full chronology of protected speech — press conferences, press statements, oversight complaints, public disclosures — that Defendants formally adopted as the basis for expelling him.

The Report is not ambiguous on this point. It catalogues Commissioner Molnar's protected speech as misconduct, devotes four pages to his Political Practices complaint, and treats his disclosure of Defendant Fielder's "Confidential" suspension request as a sanctionable offense. Doc. 12-22 at 11, 13, 15–16, 18–21. That the investigation began before the merger was announced does not neutralize the protected speech that followed — or the retaliatory escalation that tracked it, step for step.

One of Commissioner Molnar's detractors complained to CMS investigators about him declaring during a public meeting that the PSC was the "second office of NorthWestern [Energy]." Doc. 18-1 at 14.[2] This vignette encapsulates the entire case. Defendants believe that Molnar's public accusations of regulatory capture of

---

[2] Section V of the Sealed Brief identifies this detractor.

the PSC are appropriate grounds for sanctions. The record is devoid of efforts by Defendants to, instead, challenge Molnar's accusations by presenting counter evidence and engaging him in public debate. They would rather sanction him and, ultimately, silence him.

## CONCLUSION

For all of the foregoing reasons, Commissioner Molnar respectfully requests that this Court grant his motion for a preliminary injunction restoring him to full physical participation in the proceedings of the agency to which the people of Montana elected him.

DATED: June 17, 2026

Respectfully submitted,
MONFORTON LAW OFFICES

/s/ Matthew G. Monforton
Matthew G. Monforton
Attorneys for Plaintiff

# <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this document, excluding caption, tables and certificate of compliance, contains 3223 words, as determined by the word processing software used to prepare this document, specifically Microsoft Word 2007.

DATED: June 17, 2026

Respectfully submitted,
MONFORTON LAW OFFICES

<u>/s/ Matthew G. Monforton</u>
Matthew G. Monforton
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY this 17th day of June, 2026, that a copy of the foregoing will be delivered this day via the Court's ECF system to Defendants.

DATED: June 17, 2026

Respectfully submitted,

MONFORTON LAW OFFICES, PLLC

/s/ Matthew G. Monforton
Matthew G. Monforton
Attorney for Plaintiff