IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| BRAD MOLNAR,<br><br>Plaintiff,<br><br>vs.<br><br>JEFF WELBORN, in his official capacity as a member of the Montana Public Service Commission; JENNIFER FIELDER, in her official capacity as a member of the Montana Public Service Commission; and ANNIE BUKACEK, in her official capacity as a member of the Montana Public Service Commission,<br><br>Defendants. | CV 26–41–H–DWM<br><br><br>OPINION<br>and ORDER |

On May 6, 2026, Montana Public Service Commissioners Jeff Welborn, Jennifer Fielder, and Annie Bukacek (collectively, "Defendants") voted to physically bar Commissioner Brad Molnar from the Public Service Commission building (the "Building") despite his status as a duly elected public official. (Doc. 1 at ¶ 2.) On May 11, 2026, Molnar filed suit, claiming the exclusion was First Amendment violation and was in retaliation for his free speech exercise. (*See generally id.*) That same day, Molnar filed a motion for a temporary restraining order, asking that Defendants be enjoined from keeping him from participating in a

1

May 12, 2026 hearing on the proposed $3.6 billion merger between NorthWestern Energy and Black Hills Energy (the "NorthWestern Energy merger hearing"). (*Id.* ¶ 1; Docs. 3, 4.) That motion was granted, (Doc. 9), and Molnar attended the Commission merger hearing. Because of the transitory nature of a temporary restraining order, Molnar now requests a preliminary injunction restoring his full physical access to the Building and hearing room for the duration of this litigation. (Doc. 11.) To bolster his case, Molnar wants expedited discovery—disclosure of an email and leave to take a deposition. (Doc. 17.) Defendants oppose both motions. (Docs. 33, 34.) A preliminary injunction hearing took place on June 18, 2026. Based on the current record in the case, both Molnar's request for a preliminary injunction and his motion for expedited discovery are denied.

## BACKGROUND[1]

When deciding a motion for preliminary injunction, a district court is authorized to consider the parties' pleadings, declarations, affidavits, and exhibits submitted in support of and in opposition to the application, including hearsay statements. *See, e.g., Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988). The relevant filings here include Molnar's Verified Complaint and its attachments, (Docs. 1, 1-1 through 1-10); one declaration submitted by Molnar with 29 exhibits, (Docs. 12, 12-1 through 12-27, 18-1, 18-2); and four declarations

---

[1] A timeline has been attached as Appendix A.

with five exhibits submitted by Defendants, (Docs. 34-1 through 34-9).  Molnar also filed three sealed exhibits.  (Docs. 40-1, 40-2, and 40-3.)  Neither party presented any witness testimony at the June 18 hearing.

## I.      The Public Service Commission

The Public Service Commission (the "Commission") is the agency head of the Montana Department of Public Service Regulation (the "Department").  (Doc. 34-1 at ¶ 5.)  In 2021, the Commission launched an "intensive strategic plan" to "improve operations, performance, culture, and public reputation."  (Doc. 12-22 at 8.)  It adopted that Plan in 2022, (*id.*), and in 2024, the Commission promulgated an Internal Policy Manual that includes both a Communications Policy and a Code of Conduct, (Doc. 12-8 at 1, 4–16; Doc. 12-1, Doc. 12-22 at 9).  The Communications Policy requires, *inter alia*, that "[a]ll public communications . . . align with the lawful acts, policies, plans, and objectives of the Commission," (Doc. 12-at at 1, § 2.2), "Commissioners should coordinate with the President and External Affairs Coordinator before engaging in media interaction regarding official business of the [D]epartment," (*id.* at 2 § 2.5.2), and "[n]o commissioner . . . may communicate or disseminate, either directly or indirectly, confidential information to any unauthorized person," (*id.* at 5, § 2.14.5).  The Code of Conduct is explicitly replete with standards of conduct and performance for all Commission and Department personnel, including that they are "expected to maintain a

professional, courteous, productive, and respectful working relationship with co-workers, peers, supervisor, and the general public. Threatening, abusive, obscene, or derisive behavior or communications are strictly prohibited." (Doc. 12-8 at 6, § 2.2.6.) Additionally, the Code prohibits harassment and discrimination, (*see id.* at 11 § 2.12), and states that "[t]he [D]epartment does not tolerate retaliation against individuals who report violations" of the Code, or those "who exercise their rights to a workplace free from harassment and discrimination," (*id.* § 2.13.1).

Molnar was first elected to the Commission in 2007, re-elected in 2008, and after a statutory hiatus, again elected in 2024. (Doc. 1 at ¶¶ 14, 17.) In November 2024, Molnar received orientation and training on the Internal Policy Manual, including the Code of Conduct. (Doc. 12-22 at 9–10.) In January 2025, he was chosen by his colleagues to serve as the Commission's president. (*Id.* ¶ 18; *see* Doc. 34-1 at ¶ 7.) The Commission is comprised of the following Commissioners: Molnar, Randy Pinocci, and Defendants Fielder, Bukacek, and Welborn.

## II.    The Investigation

### A.    Early Reports of Misconduct

Starting in February 2025, Fielder received informal complaints from Department personnel about Molnar's unprofessional conduct and inappropriate comments. (Doc. 34-1 at ¶ 8.) Fielder met with Molnar to address these issues on February 21, 2025, she also discussed the matter with Executive Director Alana

4

Lake on March 25, 2025, and ultimately, she provided a brief written summary to agency chief legal counsel on March 27, 2025. (*Id.* ¶¶ 9–11; Doc. 34-2 at ¶ 12.)

On April 9, 2025, Fielder and agency chief legal counsel met with Molnar "to discuss several instances of unwelcome sex-based comments Molnar had made to various persons in the workplace and to provide him with information and resources on Equal Employment Opportunity (EEOC) guidelines." (Doc. 34-1 at ¶ 12.) Molnar refused to take a copy of the guidelines and he refused to sign an acknowledgement that he had received the Internal Policy Manual. That Policy includes the Code of Conduct. (*Id.* ¶¶ 14–15.) Molnar further insisted that the Manual did not apply to him. (*Id.* ¶ 16.) According to Executive Director Lake, "management did not immediately initiate an outside investigation" into Molnar's alleged workplace misconduct; rather, "[m]ultiple efforts were made to address concerns through ordinary workplace channels before an outside investigator was retained. Those efforts included formal intervention, policy discussions, training, peer-to-peer feedback, attempts to address the conduct at the lowest appropriate level, documentation, and written warnings." (Doc. 34-2 at ¶ 15.)

## B.    The August 2025 Investigation Report

In May 2025, two formal complaints regarding Molnar's workplace conduct were submitted to the Department, the first by Bukacek and the second by a staff member. (Doc. 34-1 at ¶¶ 18–20 ; Doc. 34-3 at ¶ 6.) Those allegations contended

5

Molnar, *inter alia*, was derisive to another Commissioner during formal proceedings, misused staff time, made discriminatory comments such as suggesting the adoption of "topless Tuesdays," misrepresented communications with colleagues, engaged in "unprofessional, hostile, and bullying communication" with staff, made derogatory comments to/about Commission personnel, and publicly and privately retaliated against his coworkers for pursuing these complaints. (*See* Docs. 1-1, 18-1.)

Following the Internal Policy Manual, the agency chief legal counsel convened a "Response Team" to investigate the allegations. (Doc. 12-8 at 12, § 2.15; Doc. 34-1 at ¶ 23; Doc. 1 at ¶ 22.) On June 6, 2025, the Response Team retained an outside investigative firm, Communications and Management Services ("CMS") and outside legal counsel, Amy Christensen. (Doc. 34-1 at ¶¶ 24–25; Doc. 18-1 at 4; Doc. 12-22 at 11.) On June 19, 2025, Molnar was formally notified that an independent review was being conducted regarding his conduct. (Doc. 34-2 at ¶ 20.) After that notification occurred, Director Lake "observed an immediate and significant change in his behavior toward staff involved in the process," including comments by Molnar that he was "livid" about the investigation and that he had "hired an attorney and private investigator to 'take out' whoever had brought the complaints." (*Id.* ¶¶ 21–22.) According to Fielder and Director Lake, during the course of the investigation, Molnar "lashed out at [D]epartment

6

personnel, openly declaring he would use his personal resources and attorneys 'to silence people who bring forward "stupid" complaints.'" (Doc. 34-1 at ¶ 31; Doc. 34-2 at ¶ 23.) Molnar also told Director Lake that she should have handled the matter internally and gave her the impression that he held her personally responsible for the independent investigation. (Doc. 34-2 at ¶¶ 25, 28.) He made no effort to address the concerns underlying the complaints about him, but instead "expressed distrust toward staff involved in the Response Team process" and insisted that hiring of independent investigators and counsel fell outside the Response Team's authority. (*Id.* ¶¶ 31–34.) On July 2, 2025, a third complaint was filed against Molnar, alleging that he made derogatory comments about staff and Commissioners, contributing to a stressful working environment. (Doc. 34-1 at ¶ 28; Doc. 18-1 at 16–17.)

The Response Team scheduled an investigative interview of Molnar for July 29, 2025. (Doc. 1 at ¶ 23.) Molnar requested that he be permitted to have an attorney present and that he be informed of the identity of the complainants or witnesses prior to that interview. (*Id.* ¶ 24.) The Response Team responded that it would allow an attorney to be present, but only as a passive observer, and denied Molnar's identification request. (*Id.* ¶ 25.) Molnar declined to be interviewed and instead held a press conference on the steps of the Commission Building in Helena. (*Id.* ¶ 26.) At that conference, he publicly denounced the investigation and the

7

Commission personnel he believed were behind it. (*Id.* ¶ 27.) He also explained that he was being targeted by Commissions "who favored large utilities and sought to undermine the [Commission]'s commitment to transparency." (*Id.*; *see also* Doc. 12-5 (*Daily Montanan* article).) During this time, Molnar also made disparaging remarks about complainants and participants in the investigation, attempted to withhold payment from the investigator and legal counsel, tried to block management staff from advising the Commission on the matter, and pressed staff for confidential information. (Doc. 34-1 at ¶ 33.)

On August 1, 2025, Fielder sent Molnar a letter reminding him that "retaliation is prohibited by the [D]epartment's internal policy, as well as state and federal law." (Doc. 12-6.) In that letter, she further stated: "Some of your press activities over the last few days relating to the investigation appear to be retaliatory in nature, and therefore create the risk of liability for the . . . Commission. I am especially concerned about your comments regarding staff, who you mentioned by name, and individual commissioners." (*Id.*)

In August 2025, CMS prepared a report summarizing their workplace investigation into the complaints filed against Molnar between May and July 2025. (*See* Doc. 18-1.) This report was based on review of documentary evidence and witness interviews, including attempts to interview Molnar. (*Id.*) Molnar declined to participate. (*Id.*) At the time, in August 2025, only an executive summary of

the report was released to either Molnar or the public. (*See* Doc. 1-1.) According to that summary, CMS's investigation substantiated violations of the Commission's internal policies, including that he made "repeated unwelcome sex-based comments," he engaged in "retaliation," and that he "misrepresented colleagues and facts on several occasions." (*Id.*) Although the summary stated that CMS "did not find evidence the misrepresentations were malicious, they adversely affected courteous, productive, and respectful working relationships." (*Id.* (internal quotation marks omitted).) Finally, the summary indicated that the evidence did not substantiate one of the allegations of inappropriate conduct. (*Id.*) The Commission posted a redacted version of that summary on its website, which was the first time Molnar saw it. (Doc. 1 at ¶ 29.)

Only recently, after filing suit, was the underlying Investigative Report provided to Molnar. That report was redacted, and has since been filed in the public docket. (*See* Doc. 18-1.) Defendants were also ordered to provide Molnar with an unredacted version of the report, which he is not permitted to disseminate. (Doc. 38; *see* Doc. 40-1 (sealed).) That report is consistent with the summary.

### C.    The August 2025 Complaint to the Governor

On August 15, 2025, the Response Team decided, based on the Investigation Report, to ask Governor Greg Gianforte to temporarily suspend Molnar "to curb further retaliation against [D]epartment personnel and reduce ongoing interference

as the Response Team attempted to prepare its report and recommendations."
(Doc. 34-1 at ¶ 41.)  It began preparing a formal complaint.  (*Id.*)

On August 19, 2025, NorthWestern Energy announced a proposed $3.6 billion merger with Black Hills Energy, a multi-state utility conglomerate headquartered in South Dakota.  (Doc. 1 at ¶ 39.)  The transaction requires the Commission's approval.  (*Id.*)  According to Fielder, "[n]o [D]epartment personnel could have known about the proposed merger prior to the utility's release of the public announcement, as strict federal antitrust laws apply to such matters."  (Doc. 34-1 at ¶ 27.)  Several elected officials immediately announced their support for the merger, including Governor Gianforte.  (Doc. 1 at ¶ 40.)  Molnar has consistently voiced his concern regarding and opposition to NorthWestern Energy's influence on the Commission.  (*Id.* ¶¶ 19–20.)  This included his prior opposition to a rule, passed over his opposition, that allowed Commission staff to meet secretly with utility representatives.  (*Id.* ¶ 20; *see* Doc. 12-5 at 4.)  It also included his negative public response in May 2025 to an announcement that NorthWestern Energy was unilaterally raising Montana's electricity rates.  (*See* Docs. 12-2, 12-3, 12-4.)

On August 20, 2025, the day after the merger was announced, Fielder, acting on behalf of the Response Team, sent a complaint to Governor Gianforte *demanding* Molnar's "immediate" suspension under Montana Code Annotated

10

§ 69–1–113 because Molnar, as the Commission President, was abusing his "high-level authority" to "thwart" the Response Team's investigation (the "August 2025 Complaint"). (Doc. 1 at ¶¶ 41, 43; Doc. 12-8 at 1.) Pursuant to that statute, the governor may, "[u]pon complaint made and good cause shown, . . . suspend any commissioner." Mont. Code Ann. § 69–1–113.

The August 2025 Complaint catalogued numerous allegations of workplace misconduct, asserting that Molnar had "engage[d] in a hostile pattern of activity designed to derail the investigation," including that he had:

1) Threatened retaliation against anyone involved;

2) Claimed he is not subject to the policies adopted by the [Commission] to regulate appropriate workplace conduct by commissioners;

3) Declined to participate in the fact-finding phase of the investigation, in part because he was not allowed to confront and cross-examine "his accusers";

4) Held a press conference to blow up publicity on an otherwise confidential [human resources] matter;

5) Made public comments that were dismissive, untruthful, and retaliatory in nature;

6) Demanded (through counsel) that the investigation be immediately terminated;

7) Stated (again through counsel) that as President, he will not approve any expenses [the Commission] incurs related to the investigation; [and]

8) Filed an official work session request to have the Commission negate

11

the investigative contracts, and to disallow the Commission's Chief Legal Counsel, Human Resources Officer, Executive Director and their staffs from advising the Commission on this topic.

(Doc. 1 at ¶ 44.)  The Complaint specifically stated that the recommendation was "[i]n no way . . . based on Commissioner Molnar's regulatory decisions, nor does it come in direct response to allegations [the Commission] is currently assessing regarding workplace misconduct."  (Doc. 12-8 at 1.)

On August 25, 2025, Molnar responded to the Governor, explaining that his actions were constitutionally protected speech and that the timing of the August 2025 Complaint was not "coincidental" but rather "calculated."  (Doc. 1 at ¶ 45; Doc. 12-9 at 1.)  Believing that the August 2025 Complaint should have been publicly disclosed, (*see* Doc. 12-9 at 3–4), Molnar distributed both it and his response to the press and posted it online.  (Doc. 12 at ¶ 33.)  Defendants disagreed with the dissemination of what they believed to be "confidential" information and denounced Molnar's actions.  (*Id.* at ¶ 34; *see, e.g.,* Doc. 12-10.)

On August 29, 2025, Molnar appeared on a state-wide radio talk show and accused Director Lake of "saving up" complaints against him.  (Doc. 12 at ¶ 36; Doc. 34-2 at ¶ 42.)  Then, in September 2025, Molnar provided the press with further information about alleged meetings between Northwestern Energy personnel and Director Lake.  (Doc. 12 at ¶ 37; *see* Doc. 12-11 at 4–5.) Subsequently, Director Lake sent Molnar an email disagreeing with his

12

interpretation of events and characterizing his statements as "an example of the retaliation [she] ha[d] asked to be stopped." (Doc. 12 at ¶ 38; Doc. 12-11 at 2.) According to Director Lake, Molnar's intimidation tactics escalated from July to September 2025, including his moving into an office closer to hers, restricting her role, and refusing to communicate directly with her. (Doc. 34-2 at ¶¶ 51–65, 77.) She had serious workplace safety concerns, (*id.* ¶¶ 68–75), which were shared by Bukacek, (Doc. 34-3 at ¶ 12). Director Lake ultimately resigned as a result of Molnar's misconduct. (Doc. 34-2 at ¶ 81.) During this same time, multiple management personnel left the Department and other staff members voiced a concern that they were "less confident that misconduct could be reported safely, less willing to participate openly in the accountability processes, and less certain that agency leadership could protect them from retaliation." (*Id.* ¶ 84.)

In September 2025, Molnar convened a public work session where he unsuccessfully sought to rescind the August 2025 Complaint. (Doc. 12-22 at 13.) Subsequently, Molnar unsuccessfully sought legal relief in Montana state court. (*Id.* at 13–14.) The state court denied Molnar's request for a preliminary injunction and found that the Commission had authority to establish internal policies and that Molnar's claims about a connection to the NorthWestern Energy merger were "entirely speculative." (Doc. 34-1 at ¶ 49; Doc. 34-6 at 10.)

13

On October 21, 2025, Defendants voted to remove Molnar as Commission President, and Welborn assumed the presidency on October 28, 2025. (Doc. 1 at ¶ 47; Doc. 12 at ¶ 39; Doc. 34-1 at ¶ 51.) Molnar immediately notified the Governor, taking the position that "removal from the presidency mooted the only stated basis for his immediate suspension," which Fielder had described as the "insurmountable challenges" Molnar's presidential powers posed to the investigation. (Doc. 1 at ¶ 49; Doc. 1-4.) In doing so, Molnar maintained that the August 2025 Complaint was a "targeted political maneuver," not a "good-faith workplace complaint." (Doc. 1 at ¶¶ 50–51.)

December 3, 2025, the Governor requested an update on the Response Team investigation from Fielder. (*Id.* ¶ 59; Doc. 12-16.) Fielder responded on December 9, 2025, indicating that she anticipated they would complete their work "as early as January 2026." (Doc. 1 at ¶ 60; Doc. 12-17.) On December 26, 2025, the Governor rejected the August 2025 Complaint, stating that "since Molnar's removal as president, the [Response] Team has been able to move forward with the investigation and expects to receive a report" soon. (Doc. 1 at ¶ 65; Doc. 12-18.)

**D.    The October 2025 Complaint against Commissioner Bukacek**

Sometime around October 30, 2025, Molnar filed a complaint against Bukacek with the Montana Commissioner of Political Practices (the "October 2025 Complaint"). (Doc. 1 at ¶¶ 52–55; Doc. 12-12.) According to Molnar, he had, on

14

multiple occasions, discovered confidential patient records, service solicitations, and cover sheets for medical documents originating from Bukacek's medical facility in the Commission copy room. (*Id.*) Molnar had concluded that Bukacek, a licensed physician, was copying documents late at night using Commission equipment. (*Id.*) That complaint also noted that Bukacek's time in the Commission office was limited to one or two hours per week outside of the legislative session. (*Id.*) He had notified Fielder of this information prior to filing the complaint. (*Id.*) On October 31, 2025, Molnar gave multiple statements to the press about the October 2025 Complaint. (Doc. 12 at ¶ 43; Doc. 12-13.)

Before Molnar's complaint, on October 24, 2025, an individual named Catherine Holley filed a complaint with the state Board of Medical Examiners alleging Commissioner Bukacek was bringing documents from her medical practice into the Commission Building. (Doc. 1 at ¶ 57; Doc. 34-3 at ¶ 18.) Although that complaint named Molnar as a potential witness, (*id.*), Molnar had never communicated with Holley or encouraged her to file a complaint, (Doc. 1 at ¶ 58). The Response Team received another formal complaint against Molnar on October 30, 2025, this one from Bukacek. (Doc. 34-1 at ¶ 56.)

November 7, 2025, Welborn, the new Commission President, issued a memo that included a section expressly prohibiting communication with the press by elected Commissioners: "Per the [Internal Policy Manual] Communications Policy,

15

Commissioners must coordinate with the Commission President and the External Affairs Coordinator/Executive Director before engaging in media interaction regarding [Commission] business." (Doc. 12 at ¶ 44; Doc. 12-14 at 2; *see also* Doc. 12-1 (Communications Policy).) Molnar reacted and responded with a press release denouncing Welborn's memo as a "transparent attempt to cover-up [Commission] corruption" and reiterating his concerns regarding both the Commission's relationship with NorthWestern Energy and Commissioner Bukacek's misuse of public resources. (Doc. 22 at ¶ 45; Doc. 12-15.)

The Commission on Political Practices rejected the October 2025 Complaint against Bukacek on December 3, 2025, describing the claims as "speculative and unsupported by evidence." (Doc. 12-22 at 14; Doc. 34-3 at ¶ 21.) Later, on March 20, 2026, the Screening Panel of the Board of Medical Examiners dismissed Holley's independent complaint against Dr. Bukacek. (Doc. 12-22 at 15.)

**E.    The November 2025 Retaliation Report**

In November 2025, CMS prepared a second report summarizing their workplace investigation into three additional complaints filed against Molnar between August and September 2025, which did not include Bukacek's October 30, 2025 complaint. (*See* Doc. 18-2.) The complaints alleged retaliation and hostile work environment. (*See id.*) At the time, only an executive summary of the report was released to either Molnar or to the public. (*See* Doc. 1-8 (dated

16

12/16/25).)  According to that summary, CMS's investigation substantiated violations of the Commission's internal policies, including incidents of retaliation. (*Id.*)  The summary indicated that the evidence did not substantiate every instance of retaliation, nor "a hostile work environment under the Equal Employment Opportunity Commission (EEOC) and based on an individual's protected status; however, it does substantiate violations of anti-retaliation standards set forth by the EEOC, including retaliatory harassment."  (*Id.*)  Only recently, after suit was filed in May 2026, was the complete Retaliation Report provided to Molnar.  That report was redacted, and has since been filed in the public docket.  (*See* Doc. 18-2.) Defendants were also ordered to provide Molnar with an unredacted version of the report, which he is not permitted to disseminate.  (Doc. 38; Doc. 40-2 (sealed).) That report is consistent with the summary.

## F.    Molnar's 2026 Press Contacts

On January 13, 2026, Molnar spoke with a reporter from the *Daily Montanan* about efforts Defendants made to record Commissioner Pinocci as having voted to support a NorthWestern Energy rate increase when, according to Molnar, Pinocci had not cast that vote.  (Doc. 12 at ¶ 49; Doc. 12-19.)  According to Molnar, that vote was also not taken in a public session, in violation of the Montana Constitution.  (*Id.*)  The following day—January 14, 2026—Commission Executive Director Jamey Peterson sent an email to all Commission personnel

instructing them to route all media inquiries through the External Communications Coordinator and specifically directing personnel to "not answers questions directly" and to tell press that "all inquiries must go through the Communications Office." (Doc. 12 at ¶ 50; Doc. 12-20.) Commissioner Bukacek responded to that email, thanking Petersen "for this reminder to all" and stating that "[t]he reckless irresponsibility of a few has not been for the good of the order." (Doc. 12 at ¶ 51; Doc. 12-21.)

On March 20, 2026 and April 13, 2026, Molnar appeared on Billings television station KTVQ to discuss his beliefs that Defendants refused to allow adequate time to review documents related to the proposed NorthWestern Energy merger and that data centers would be net bad for Montana residential rate payers. (Doc. 1 at ¶¶ 66–67.)

### G.    The Response Team Report

On May 6, 2026, Defendants voted to bar Molnar from physically entering the Commission Building and its hearing room effective immediately. (*Id.* ¶ 68; *see* Docs. 12-23, 12-24 (hearing transcripts)[2].) The basis for the vote was the

---

[2] There was also a closed session between the morning and afternoon sessions and there is no transcript of that session. (Doc. 12 at ¶ 55; *see* Doc. 12-23 at 2.) That session was closed so the Commission could "discuss the confidential investigatory reports," including "information that specifically identifie[d] [D]epartment personnel who made complaints as well as third parties [who] were witnesses in the investigation." (Doc. 12-23 at 19.)

18

Response Team Report dated May 1, 2026 (the "Report" or "Response Team Report"). (Doc. 1 at ¶¶ 68, 86; Doc. 12-22.) The Report addressed Molnar's "misconduct . . .from February 2025 through April 2026." (Doc. 12-22.) The background portions of that Report flagged certain actions by Molnar as problematic, such as his assertion that the Commission's Internal Policy Manual and Code of Conduct did not apply to elected Commissioners, (*id.* at 10, § 5.3); his "retaliatory statements" and actions, (*id.* at 11, § 5.7; *id.* at 12, § 5.9); and his "improper or unauthorized external communications," "unauthorized disclosure of confidential and attorney-client privileged information," "disregard for the established chain of command and administrative procedures," and "documented instances of conduct inconsistent with required ethical and professional standards," (*id.* at 15, § 5.14). The Report then made twelve findings, including that Molnar engaged in serious misconduct, including "[u]nprofessional conduct towards staff; [r]epeated unwelcome sex-based comments; [r]etaliation against complainants and other employees who were involved in the investigatory process; [m]isrepresenting colleagues and facts]; violation of [Mont. Code Ann.] § 49–2–301 – Retaliation Prohibited; and [v]iolation of anti-retaliation standards set forth by the [Equal Employment Opportunity Commission]." (*Id.* at 16, § 6.1.) It also criticized Molnar's nonparticipation in the investigation, stating that he escalated the situation by "denying, denouncing, or dismissing the validity of the allegations;

19

making disparaging and threatening statements to and about [D]epartment personnel; disseminating misleading and false information to the public (including the media, Governor, and Court) about the purpose of the investigation; and repeatedly attempting to obstruct the investigation and interfere in the Response Team process." (*Id.* § 6.2.)  The Report also confirmed that his filing of the October 2025 Complaint against Bukacek was retaliation, (*id.* at 18–19, § 6.5), a finding that relied in part on Molnar's press conferences and statements, (*id.* at 19–20, § 6.5.4).

Based on the above findings, the Report recommended that Molnar apologize, undergo additional training and compliance monitoring, and be placed on a "remote-work requirement" "until the Response Team finds that the risk of further retaliation or misconduct has been adequately mitigated." (*Id.* at 27, § 7.2.1.)  The Report also recommended that the Commission publicly censure Molnar and confirmed the notion that good cause existed for the Governor to suspend him for up to one year.  (*Id.* at 27–28, §§ 7.2.2, 7.2.3.)

The Report was adopted at the May 6, 2026 Commission hearing.  (Doc. 1 at ¶ 86; Doc. 12-24 at 13–33; Doc. 34-9 at ¶ 4.)  The parties dispute whether Molnar was immediately escorted out of the Commission Building.  (*Compare* Doc. 1 at ¶ 87 *with* Doc. 34-9 at ¶¶ 5–12.)  According to Fielder, Molnar's misconduct has caused "the Commission and its staff [to be] . . . materially diverted from essential

duties," and "the Department has lost highly skilled, valued employees who resigned to escape [his] conduct." (Doc. 34-1 at ¶ 65.)

### III.    NorthWestern Energy Merger Hearings

On May 11, 2026, Molnar filed this lawsuit, asserting a First Amendment retaliation claim against Defendants. (Doc. 1.) He immediately sought temporary injunctive relief on the basis that he was barred from entering the Commission Building and would therefore be unable to physically attend the NorthWestern Energy merger hearing that was set to begin the next day, May 12. (Doc. 3.) His request was granted, and Defendants were "temporarily restrained and enjoined from excluding Molnar from the [Building] to the extent he must be permitted to enter the hearing room and participate as a Commissioner for the duration of the NorthWestern Energy/Black Hills merge proceedings." (Doc. 9.) The same day that Order was issued, Welborn emailed Molnar, informing him of the terms governing his attendance at the hearings. (Doc. 12 at ¶¶ 60–61; Doc. 12-25.) According to this email, Molnar was to be granted access to only the hearing room and a single designated restroom and given a ten-minute pre-hearing entry window and a five-minute post-hearing exit window. (*Id.*) He was not permitted to have any in-person contact with staff and all remarks to "staff, parties, or witnesses" had to be "directed through the Chair." (*Id.*) While Molnar maintains that his attendance at the hearings was consistent with these restrictions, (*id.*), Welborn

21

indicates that Molnar was "provided a lot of leeway" and the conditions were not strictly enforced, (Doc. 34-9 at ¶¶ 13–20).

Since the conclusion of the initial portion of the merger hearings on May 15, 2026, Molnar has been barred from physically entering the Commission Building. (Doc. 12 at ¶ 68.) Additional proceedings regarding the merger remain to be scheduled, including a final vote of the Commissioners. (*Id.* ¶ 69.) Molnar maintains that being physically present for Commission hearings is essential to fulfilling his role as an elected regulatory official. (*See id.* ¶¶ 63–67.)

On May 21, 2026, consistent with the May 1, 2026 Response Team Report, Defendants sent a second request to Governor Gianforte asking the Governor to suspend Molnar. (*Id.* ¶ 70; Doc. 12-26.) At the Governor's direction, Molnar was to respond by June 5, 2026, (Doc. 12-27), but counsel indicated Molnar was given an extension.

## ANALYSIS

This case asks whether adverse action can be taken against an elected official when he engages in both protected activity consistent with his elected position and the Constitution and in workplace misconduct and harassment. Although this analysis is complicated by the breadth of both categories of conduct in this particular case, the question was answered by the Supreme Court: "It may be dishonorable to act with an unconstitutional motive and perhaps in some

22

instances unlawful, but action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway." *Hartman v. Moore*, 547 U.S. 250, 260 (2006). Because that statement captures what the record shows at this stage, Molnar has failed to show preliminary injunctive relief is warranted. Nor has he shown that expedited discovery is appropriate. Accordingly, both of Molnar's motions are denied.

## I.    Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Accordingly, a preliminary injunction should only be entered "upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22. To succeed on his request, Molnar must show that: (1) he is "likely to succeed on the merits," (2) he is "likely to suffer irreparable harm in the absence of preliminary relief;" (3) "that the balance of equities tips in [his] favor," and (4) " that an injunction is in the public interest." *Id.* at 20. The Ninth Circuit has adopted an alternative sliding scale approach, in which the elements are balanced, "so that a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Specifically, "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of

the *Winter* test are also met." *Id.* at 1132 (internal quotation marks omitted). Because Molnar fails to meet his burden at the first step, his request for preliminary injunctive relief is denied.

To prevail on a motion for preliminary injunction, a plaintiff must show either a likelihood of eventual success on the merits or, under the Ninth Circuit's "sliding scale" test, serious questions going to the merits of their claims. *Winter*, 555 U.S. at 20; *Alliance for the Wild Rockies*, 632 F.3d at 1132. "As a general matter, the First Amendment prohibits government officials from subjecting individuals to retaliatory actions after the fact for having engaged in protected speech." *Boquist v. Courtney*, 32 F.4th 764, 774 (9th Cir. 2022) (quoting *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022)) (alteration omitted). "If an official takes adverse action against someone based on that forbidden motive, and non-retaliatory grounds are in fact insufficient to provoke the adverse consequences, the injured person may generally seek relief by bringing a First Amendment claim." *Id.* (quoting *Wilson*, 595 U.S. at 474). "An elected official may . . . raise a First Amendment retaliation claim." *Id.* In such an action, the elected official

> has the initial burden of pleading and proving (1) he engaged in constitutionally protected activity; (2) as a result he was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action.

24

*Id.* at 775 (internal quotation marks omitted).  Once such a showing has been made, "the burden shifts to the defendant official to demonstrate that even without the impetus to retaliate he would have taken the action complained of." *Id.* at 778 (quoting *Hartman*, 547 U.S. at 260).  "If there is a finding that retaliation was not the but-for cause of the adverse action, the claim fails for lack of causal connection between unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the official's mind." *Id.* (quoting *Hartman*, 547 U.S. at  260). On this record, Molnar's claim fails at this final step.  The actions regarding Molnar's speech claims are not the "but for" cause of the Commission's actions regarding his building and staff access.

## A.    Constitutionally Protected Activity

Molnar must first show that he was engaged in constitutionally protected activity.  *Boquist*, 32 F.4th at 775.  This prong "is readily met when elected officials express their views and opinions." *Id.*  Molnar has identified the following activities as protected: his statements to the press, his statements during Commission hearings, his October 2025 Complaint against Commissioner Bukacek, and his criticisms of Commissioners and Commission personnel. Defendants argue that Molnar was not engaged in protected activity because his statements are harassment, unlawful retaliation, true threats, or false statements made with malice.  Defendants further argue that "actions taken in Molnar's

25

official capacity as [a] commissioner—i.e., actions exercising his power as a commissioner—are not protected." (Doc. 34 at 19.)  Ultimately, and contrary to Defendants' characterization, at least some of Molnar's conduct is protected activity.  Thus, he has met his burden on this prong.

There is little question that Molnar's statements to the press are protected by the First Amendment.  In *Boquist*, for example, the plaintiff, Boquist, was one of several minority party members who walked out of the Oregon Senate chamber to prevent the Senate from having a quorum.  32 F.4th at 772.  During a later debate, he told the Senate President on the floor that "if you send the state police to get me, Hell's coming to visit you personally."  *Id.*  He then spoke to reporters, stating, "[s]end bachelors and come heavily armed.  I am not going to be a political prisoner in the state of Oregon.  It's just that simple."  *Id.*  The Ninth Circuit concluded that Boquist presented a plausible claim that he was engaged in protected speech as both the minority party senators' walkout and the majority party senators' efforts to compel their appearance was "a purely political controversy" of "high[]" public interest.  *Id.* at 780.  The court therefore held that Boquist's "rhetorical response to the majority's threat to sue state police to arrest the departing senators and return them to the Capitol therefore fits easily within the wide latitude given to elected officials 'to express their views,' *Bond*[ *v. Floyd*], 385 U.S. [116,] 136 [(1966)], even when such political expressions are

'vituperative, abusive, and inexact,' *Watts v. United States*, 394 U.S. 705, 708 (1969)." *Id.* at 780–81.  This analysis applies equally to Molnar's press commentary.

However, the other activities identified as protected by Molnar present a closer question.  "Speech that concerns issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government merits the highest degree of first amendment protection." *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003) (internal quotation marks and alteration omitted).  "On the other hand, speech that deals with individual personnel disputes and grievances and that would be of no relevance to the public's evaluation of the performance of governmental agencies is generally not of public concern." *Id.* (internal quotation marks omitted).  "The determination of whether an employee's speech deals with an issue of public concern is to be made with reference to the content, form, and context of the speech," *id.* at 973–74 (internal quotation marks omitted), "as revealed by the whole record," *Connick v. Myers*, 461 U.S. 138, 148 (1983).  While Molnar's October 2025 Complaint against Bukacek is of public concern because it regarded the alleged waste of public resources, (*see* Doc. 12-12), he has not met his burden of showing that his nonpublic communications with Department personnel fall under that same rubric.  Molnar appears to take the position that because he is an

elected official, all his speech is protected. (*See* Doc. 13 at 25 ("Because Molnar is an elected official . . . this speech is protected.").) But Molnar's private harassment of his coworkers is not speech intended to enhance "the public's evaluation of the performance of governmental agencies." *Coszalter*, 320 F.3d at 973. Thus, Molnar has failed to show that his nonpublic communication vis-a-vis staff members is protected activity.

Defendants further argue that any expression or conduct associated with Molnar's role as a Commissioner and Commission President is not protected. Although Defendants' narrow concept is correct, it describes only a small amount of the speech at issue here. When an elected official uses his "official powers" that implicate "governmental mechanics," the official "has no right to use [those] powers for expressive purposes." *Nevada Com'n on Ethics v. Carrigan*, 564 U.S. 117, 127 (2011). In *Carrigan*, for example, the Supreme Court upheld a recusal provision in Nevada's Ethics in Government Law, explaining that "[t]he legislative power . . . is not personal to the legislator but belongs to the people; the legislator has no personal right to it." *Id.* at 119, 126, 129. The Court therefore reaffirmed its rejection of "the notion that the First Amendment confers a right to use governmental mechanics to convey a message." *Id.* at 127. Consistently, in *Linthicum v. Wagner*, the Ninth Circuit held that "walkouts by legislators to deny a quorum to conduct business in the legislature are exercises of legislative power not

protected under the First Amendment." 94 F.4th 887, 895 (9th Cir. 2024). Here then, the analysis is quite similar: no First Amendment protections apply when Molnar was engaged in purely "government acts," such as his approval or disapproval of investigation funds in his role as Commission President. Nonetheless, courts have refused to expand the "governmental act" carveout to apply to speech attendant to such acts. For example, in *Boquist*, the court found that Boquist's statements were protected speech even if they were made on the Senate floor or to reporters about what occurred on the Senate floor. 32 F.4th at 771, 773. Most of the conduct at issue here regards what Molnar said about the Commission, the investigation, and NorthWestern Energy, not his official actions as a Commissioner or Commission President. Because such speech is more akin to *Boquist* than *Carrigan* or *Linthicum*, this argument does little to undermine Molnar's First Amendment claim.

Likewise, Defendants' arguments regarding false statements and true threats do not alter the calculus. Defendants argue that Commissioner "Molnar's threats to 'take out' those who dared speak out against him, while boasting of beating others who had crossed him within an inch of their life, satisfies th[e true threat] standard." (Doc. 34 at 19.) Not so. First, the "take out" statement made to Director Lake was specifically in reference to the fact that he had "hired an attorney and private investigator to 'take out' whoever had brought the

29

complaints." (Doc. 34-2 at 6.) Thus, the statement taken in context was not a physical threat. It is more like mano y mano braggadocio. Moreover, as made clear in *Boquist*, a true threat requires an objective determination of "a serious expression of intent to harm or assault." 32 F.4th at 781. Molnar's relaying of a past, discrete instance of physical violence falls far short of that threshold. Defendants further claim that Molnar maliciously relayed false statements to the press and that such speech is not protected. However, as recognized in the same United States Supreme Court case Defendants rely on to make their point, "[f]reedoms of expression require breathing space." *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 52 (1988) (internal quotation marks omitted). Thus, proving a false statement requires showing both falsity and "that the statement was made with the requisite level of culpability." *Id.* Merely asserting a statement was made with malice does not meet this standard.

Consistent with the above, Molnar has engaged in both protected and nonprotected activity, both of which underly the May 1, 2026 Response Report that precipitated that Commission's decision to bar him from the Building. (*See* Doc. 12-22.)

## B.    Adverse Action

Molnar must next show that the decision to bar him from the Building is an adverse action that "would chill a person of ordinary firmness from continuing to

engage in the protected activity" discussed above. *Boquist*, 32 F.4th at 775. To determine whether an adverse action meets this standard, i.e., is material or not, the Supreme Court has identified two relevant considerations. *Wilson*, 595 U.S. at 478. First, the Court determined that criticism from colleagues alone is unlikely to be material because, "[i]n this country, we expect elected representative to shoulder a degree of criticism about their public service from their constituents and their peers." *Id.* Second, "courts should consider whether the purported adverse action was 'itself a form of speech' aimed at 'the conduct of public office.'" *Boquist*, 32 F.4th at 776 (quoting *Wilson*, 595 U.S. at 478). The Ninth Circuit has consistently "emphasized that it is more difficult for elected officials to establish that they were subjected to an adverse action that offends the First Amendment because more is fair in electoral politics than in other contexts and the First Amendment therefore doesn't shield public figures from the give-and-take of the political process." *Id.* (internal quotation marks and citation omitted).

Here, two cases provide two useful guideposts in determining whether Defendants' decision to bar Molnar from the Commission Building is an adverse action: *Blair v. Bethel School District* and *Boquist v. Courtney*. In *Blair*, the Bethel School District School Board voted to remove Blair as vice president after he cast the sole vote against extending the superintendent's contract and made negative press statements about the superintendent. 608 F.3d 540, 542–43 (9th

31

Cir. 2010). The court noted that this type of adverse action was difficult to parse under a general understanding of adverse action in the retaliation context as "[t]he most familiar adverse actions are exercises of governmental power that are regulatory, proscriptive, or compulsory in nature and have the effect of punishing someone for his or her speech." *Id.* at 544 (cleaned up). In determining that Blair was not subjected to a materially adverse action, the court concluded that the decision to strip Blair of his titular role of vice president was part of the "regular functioning of the political process" and that Blair's "authority as a member of the Board was unaffected; despite his removal as Board vice president, he retained the full range of rights and prerogatives that came with having been publicly elected." *Id.* at 544–45.

On the other hand, in *Boquist*, the Oregon Senate required that Boquist give "at least twelve hours advance notice in writing to the Secretary of the Senate before he intended to visit the State Capitol ( . . . 'the 12-hour notice rule')." 32 F.4th at 773. The Ninth Circuit ultimately held, contrasting *Blair*, that this constituted a materially adverse action as "the 12-hour notice rule . . . was not a mere exchange in the give-and-take of the political process or a rather minor indignity," and the rule itself was not "a form of speech from Boquist's political opponents, or an expression of their political views." *Id.* at 783 (internal quotation marks and citation omitted). "To the contrary, the 12-hour notice rule is a form of

punishment which deprives Boquist of authority he enjoyed by virtue of his popular election, and prevents Boquist from doing his job." *Id.* (cleaned up). The court further explained that "[t]he advance notice requirement eliminates the possibility of spontaneous speech, including a senator's ability to immediately respond to and address [] political issues arising on the floor of the Oregon state senate." *Id.* (internal quotation marks omitted).

The situation here hews more closely to *Boquist* than *Blair*. Like Blair, Molnar was not stripped of his authority as a Commissioner and he retains the ability to vote. However, like Boquist, Molnar's ability to engage in a panoply of necessary activities associated with his role as an elected member of a regulatory commission has been stymied. Barring Molnar from the Commission Building "interferes with [his] ability to meet with constituents, elected officials, and others" and "prevents [him] from doing his job." *Boquist*, 32 F.4th at 784 (internal quotation marks and alteration omitted). While Defendants maintain that Molnar can attend Commission hearings remotely, that ignores the fact that attending such hearings is not the sum total of the activities Molnar engages in as an elected official. Accordingly, Molnar has shown a likelihood that barring him from the Commission Building is a materially adverse action.

### C.    Causal Relationship

33

The final hurdle to establishing a prima facie case means Molnar must show "there was a substantial causal relationship between the constitutionally protected activity and the adverse action." *Boquist*, 32 F.4th at 775. He must therefore "show that the 'protected conduct played a part, substantial or otherwise,' in the defendant's wrongdoing." *Id.* at 777 (quoting *Nieves*, 587 U.S. at 399). "In many cases, 'establishing the causal connection between a defendant's animus and a plaintiff's injury is straightforward,' and courts may take the evidence of the motive and the defendant's wrongdoing as sufficient for a circumstantial demonstration that the one cause the other.'" *Id.* (quoting *Nieves*, 587 U.S. at 399). "[C]ourts have also given weight to circumstantial evidence such as proximity in time between the protected speech and the adverse action, the defendant's expression of opposition to the protected speech, and evidence that the defendant proffered false or pretextual explanations for the adverse action." *Id.* Here, as made clear in the record, the Commission based its decision to bar Molnar from the Commission Building on the May 1, 2026 Response Team Report. (*See* Doc. 12-24 at 13–34; Doc. 34-1 at ¶ 61; Doc. 34-9 at ¶ 4.) While the Response Team Report covers both protected and not protected activities and speech as discussed above, some protected conduct undeniably forms the basis of the recommendations contained in the Report. (*See* Doc. 12-22.) Thus, "protected conduct played a part,

34

substantial or otherwise, in" Defendants' adverse action. *Boquist*, 32 F.4th at 777 (internal quotation marks omitted).

Defendants argue that the causation element is not met because the timing of the independent investigation, the 2025 August Complaint to Governor Gianforte, and the Response Team Report do not actually line up with the NorthWestern Energy merger dispute. Defendants are correct that the cause-and-effect timeline presented by Molnar in his Verified Complaint is not substantiated by the record. Rather, the record shows independent yet contemporaneous developments in both Molnar's workplace misconduct and the NorthWestern Energy merger. However, Molnar has made the narrower showing that the Response Team Report, which includes protected conduct, was the cause of the sanction. This is enough to meet his initial burden.

### D.    Alternative Basis

Because Molnar makes a prima facie showing of retaliation, "the burden shifts to [Defendants] to demonstrate that even without the impetus to retaliate [they] would have taken the action complained of." *Boquist*, 32 F.4th at 778 (quoting *Hartman*, 547 U.S. at 260). "If there is a finding that retaliation was not the but-for cause of the adverse action, the claim fails for lack of causal connection between unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the official's mind." *Id.* (quoting *Hartman*, 547 U.S. at 260)

35

(alteration omitted). The Supreme Court has defined "but for" causation as being "established whenever a particular outcome would not have happened 'but for' the purported cause." *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 656 (2020). "In other words, a but-for test directs [courts] to change one thing at a time and see if the outcome changes. If it does, [the court] ha[s] found a but-for cause." *Id.* "Under this test, if the outcome (the adverse action) would not have occurred without the government official's retaliatory animus, then that animus was a but-for cause of the adverse action." *Boquist*, 32 F.4th at 778. "Conversely, if the government officials would have taken the same adverse action even in the absence of their animus or retaliatory motive arising from the plaintiff's speech, then the officials' animus was not a but-for cause of the adverse action, and there was not violation of the plaintiff's constitutional rights." *Id.*

As outlined above, the Response Team Report found that Molnar committed multiple violations of Commission policy, including "[u]nprofessional conduct toward staff," "[r]epeated, unwelcome sex-based comments," and "[r]etaliation against complainants and other employees who were involved in the investigatory process." (Doc. 12-22 at 16.) This included, *inter alia*, references to adopting "topless Tuesdays," (Doc. 18-1 at 26), and to a female staff member dreaming about another male Commissioner, (*id.* at 28–29); his threats to personnel that he was going to personally pursue and "take out" individuals that had made

36

complaints against him, (*id.* at 35, 39–40); and an off-putting phone call he made to a staff member on her personal phone, (Doc. 18-2 at 9–10). Even if one excises the protected activity from the decision-making process, the record shows that Defendants would have taken the adverse action in light of Molnar's workplace misconduct and his harassment of staff. As stated in the Report,

> Over the last 11 months, the Response Team has received seven reports alleging a wide range of misconduct on the part of Molnar, including repeated and unwelcome sex-based remarks; demeaning, disparaging, or hostile language toward staff; untruthful or misleading statements about coworkers or events; and behavior perceived as retaliatory toward individuals who raised concerns or participated in the Response Team process.

> Beyond the allegations substantiated by the independent investigation, agency managers have observed many other improprieties and policy violations. Managers have attempted to address some of these issues directly through a variety of means including frank conversations, written reminders, training, and multiple formal memoranda.

> Collectively, the reports, investigation, and other observations reflect a sustained pattern of unprofessional, disruptive, policy-violating conduct -- not isolated or inadvertent behavior. Molnar has shown little interest in acknowledging or correcting his misbehavior.

(Doc. 12-22 at 21–22.) Accordingly, on this record, Molnar has neither shown he is likely to succeed nor raised serious questions regarding his First Amendment claim.

Because Molnar has not satisfied the first element of the *Winter* test, the Court need not address the remaining elements. *See* 555 U.S. at 23–24. However, as it relates to both the public interests and the equities, *Garcia v. Cnty. of*

*Alameda*, 150 F.4th 1224, 1234 (9th Cir. 2025), excluding Molnar from the Building has the direct effect of preventing him from harassing or intimidating staff. Defendants have persuasively shown that if he is permitted to return before he makes attempts to comply with the other remedial sanctions—such as training and agreeing to abide by the Code of Conduct—there would be a negative impact on both Commission personnel and Commission work. Notably, while Molnar's attorney was contrite regarding at least some of Molnar's undisputed misconduct—specifically his inappropriate workplace "jokes"—the record does not show similar efforts by Molnar himself. Managing not to be the subject of a formal workplace complaint for seven months is a minimum standard of conduct for an elected official, not an achievement.

Ultimately, both parties overstate their position. Contrary to Molnar's position, not everything he says or does is protected by the First Amendment. Equally contrary to Defendants' position, however, Molnar has a First Amendment right as an elected official to engage in speech on matters of "public concern."

## II. Motion for Expedited Discovery

Molnar has also requested that he be permitted expedited discovery, specially two specific categories:

- Production of an email dated March 20, 2026, sent by Defendant Jennifer Fielder to Defendant Jeff Welborn, in which she stated — in substance—that Molnar would be no more able to defend himself in the disciplinary hearing she knew was coming than a named

38

> [Commission] employee had been able to defend himself against allegations of alcoholism . . .
>
> - Deposition of Tina Limesand, the PSC's former Human Resources Director, who was terminated on or about May 4, 2026 after she refused to characterize the allegations against him as "sexual harassment."

(Doc. 17 at 2.) He argues that "[t]his evidence goes directly to whether Defendnats acted with the retaliatory and bad-faith intent that [his] preliminary injunction motion places at the center of the case." (*Id.*) In response, Defendants state that they produced an unredacted copy of the March 20, 2026 email, mooting that request. (Doc. 33 at 2, 5.) Defendants further argue that the second request is "irrelevant and unnecessary to any issue" presented in the motion for preliminary injunction. (*Id.*) Defendants correct.

Rule 12(d)(1) of the Federal Rules of Civil Procedure prohibits a party from seeking discovery prior to a Rule 12(f) conference except when authorized by rule, stipulation, or court order. An order granting expedited discovery is "appropriate in some cases, such as those involving requests for a preliminary injunction . . ." Fed. R. Civ. P. 26, advisory committee notes, 1993 amend. District courts have "broad discretion to manage discovery and to control the course of litigation." *Avila v. Willits Env't Remediation Tr.*, 633 F.3d 828, 833 (9th Cir. 2011). Courts have applied a "good cause" standard to requests for expedited discovery, which exists when the moving party shows that "the need for expedited discovery, in

consideration of the administration of justice, outweighs the prejudice to the responding party." *Rovio Ent. Ltd. v. Royal Plush Toys, Inc.*, 907 F. Supp. 2d 1086, 1099 (N.D. Cal. 2012). Courts generally consider the following factors:

> (1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made.

*American LegalNet, Inc. v. Davis*, 673 F. Supp. 2d 1063, 1067 (C.D. Cal. 2009) (internal quotation marks omitted). The party seeking discovery bears the burden of showing cause. *Id.* at 1066.

Here, three of the above factors support Molnar's request. A preliminary injunction is pending and he seeks only a single deposition. Moreover, permitting this deposition would place a minimal burden on Defendants. However, the primary dispute here is "the purpose" of the request, i.e., whether Limesand's deposition would advance the issues presently before the Court. According to Molnar, Limesand determined, in her capacity as the Commission's Human Resources Director, "that the allegations against Molnar did not constitute sexual harassment," which "goes directly to whether the charges against him rest on a fabricated foundation." (Doc. 17 at 9; *see* Doc. 16 at ¶ 11.) However, there is no indication from the record that Limesand was involved in the investigation into Molnar's workplace misconduct or privy to the CMS reports or other investigatory

40

material.  It is therefore unclear how Limesand's opinion would be determinative of the issues in the case.  Notably, even if Limesand can speak to a retaliatory motive, the Supreme Court has made clear that an "action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway." *Hartman*, 547 U.S. at 260.  The request for an expedited deposition is therefore denied.

### CONCLUSION

Based on the current record, IT IS ORDERED that Molnar's motion for preliminary injunction (Doc. 11) and motion for expedited discovery (Doc. 14) are DENIED.

IT IS FURTHER ORDERED that, given the procedural posture of the case, a preliminary pretrial conference will not be held.  Rather, on or before July 15, 2026, the parties must submit a joint discovery plan proposing deadlines for expert disclosure and discovery.  The parties must also address the scope of anticipated discovery and identify whether they have reached an agreement as to that scope and/or the timing of specific discovery actions, such as depositions.  Other dates, such as a motions deadline and a trial date, will be set by future order.

DATED this 25th day of June, 2026.

11:04 A.M.

Donald W. Molloy, District Judge
United States District Court

41